**OFFICE OF THE CITY ATTORNEY**
**City of Scottsdale**
3939 North Drinkwater Boulevard
Scottsdale, Arizona 85251
Telephone: (480) 312-2405
Facsimile: (480) 312-2548
Lori S. Davis (SBN: 027875)
legal@scottsdaleaz.gov
**Attorneys for Defendants City of Scottsdale and Lt. Ronald Bayne**

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF ARIZONA

| | |
|---|---|
| Warren Prostrollo, an individual, on behalf of himself and the statutory beneficiaries of Jason Prostrollo and as the personal representative of the Estate of Jason Prostrollo,<br><br>          Plaintiff,<br><br>vs.<br><br>City of Scottsdale, a municipality organized under the laws of the State of Arizona; Ronald Bayne, in his individual and official capacities as a lieutenant with the City of Scottsdale Police Department; JOHN DOES I-X; and BLACK ENTITIES I-V,<br><br>          Defendants. | Case No.:  CV 12-01815-PHX-SMM<br><br><br>**DEFENDANT RONALD BAYNE'S STATEMENT OF FACTS IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT ON COUNT II OF THE COMPLAINT** |

### WHAT LT. BAYNE KNOWS AT THE MOMENT HE FIRES

1.      At the moment Lieutenant Ron Bayne ("Lt. Bayne") fires his duty weapon, he possesses the following information and beliefs, against the background of his nearly 25 years of experience and training as a police officer:

(a)      the female 911 caller had been locked in a bedroom and then moved to the bathroom, where she frantically reported to 911 that her boyfriend was on the other side being

11255923v4

threatened by a guest (*Lt. Ronald Bayne IA Interview, COS-PROST-011198, attached hereto as Exhibit 1*);

(b)     the suspect was threatening the boyfriend with a knife and that this man was trying desperately to talk him out of releasing the weapon, "that alone [tells] me that this man had a heightened level of potential violence" (aggravated assault - felony) (*Ex. 1, Bayne IA Interview, COS-PROST-011239.*);

(c)     the boyfriend asks the female to help him, but she is too scared to open the door (*Ex. 1, Bayne IA Interview, COS-PROST-011198*);

(d)     the 911 caller, the boyfriend and the suspect had been drinking (*Bayne IA Interview, COS-PROST-011198; Radio Traffic Transcript House, COS-PROST-011381, attached hereto as Exhibit 2.*);

(e)     the suspect is possibly a marine veteran with combat training which heightens the threat of violence (*Ex. 1, Bayne IA Interview, COS-PROST-011240*);

(f)     the suspect's behavior was extremely irrational (*Ex. 1, Bayne IA Interview, COS-PROST-011239*);

(g)     the suspect had threatened to slit the throat of a taxi driver (aggravated assault – felony) (*Lt. Ronald Bayne deposition, 153:24-154:22, attached hereto as Exhibit 3; Ex. 1, Bayne IA Interview, COS-PROST-011201*);

(h)     the suspect had forced the taxi driver to drive around with a knife held to his throat (kidnapping - felony) (*Ex. 1, Bayne IA Interview, COS-PROST-011201*);

(i)     the suspect had attempted to rob the taxi driver by knifepoint (aggravated robbery – felony) (*Ex. 1, Bayne IA Interview, COS-PROST-011201*);

11255923v4

(j)     having personally observed the fear and anxiety of the taxi driver, and how he was traumatized by the same man, all of which was validated by the on scene sergeant via mobile phone, Lt. Bayne believes the victim to have been in fear for his life, a clear indication of the dedication and elevated violence potential of the suspect (*Ex. 1, Bayne IA Interview, COS-PROST-011239-11240*);

(k)     the two calls ("Subject with a Knife Call" and "Taxi Armed Robbery Call", infra) are likely related (*Ex. 1, Bayne IA Interview, COS-PROST-011201*);

(l)     the officers in front of the house do not have sufficient cover behind a mailbox structure to withstand an attack (*Ex. 1, Bayne IA Interview, COS-PROST-011209*);

(m)     the suspect emerges from the house unexpectedly with a determined and fixed stare, with body language and actions indicating that he is prepared to fight (*Ex. 1, Bayne IA Interview, COS-PROST-011240*);

(n)     the suspect is carrying and handling objects in his hands like a trained martial arts stick fighter (*Ex. 1, Bayne IA Interview, COS-PROST-011241*);

(o)     police training teaches that blunt objects like batons, bats, and martial arts nunchucks can be used as deadly weapons *(Ex. 1, Bayne IA Interview, COS-PROST-011230)*;

(p)     there is a potential that the suspect has – somewhere on his person - the knife which he used to threaten the taxi driver and the boyfriend (*Ex. 1, Bayne IA Interview, COS-PROST-011240*);

(q)     the suspect does not respond to loud repeated police commands to stop and drop the weapons (*Lt. Ronald Bayne Walk-Thru, COS-PROST-001275, attached hereto as Exhibit 4*);

(r)     the suspect does not stop his advance toward the officers behind the mailbox

11255923v4

3

structure (*Ex. 4, Bayne Walk-Thru, COS-PROST-001273*);

(s)　　the suspect is behaving in an aggressive and threatening manner as he approaches the officers (*Ex. 4, Bayne Walk-Thru, COS-PROST-001273; Ex. 1, Bayne IA Interview, COS-PROST-011224*);

(t)　　the suspect appears to be under the influence of mind altering substances (*Ex. 1, Bayne IA Interview, COS-PROST-011215*);

(u)　　the suspect is not deterred by the barking of a police dog or the shouted commands of several police officers armed with firearms (*See Ex. 1, Bayne IA Interview, COS-PROST-011220*);

(v)　　the suspect is quickly approaching the officers who are located behind the mailbox structure (*Ex. 4, Bayne Walk-Thru, COS-PROST-001273*);

(w)　　the suspect is too close to the officers, per his training with regard to the 21 foot principle and reactionary gap (*Ex. 1, Bayne IA Interview, COS-PROST-011225; 11230*);

(x)　　only perfect shot placement will potentially stop a motivated suspect's advance, particularly if the suspect is on mind altering drugs *(Ex. 1, Bayne IA Interview, COS-PROST-011230-11231)*;

(y)　　for whatever reason, the canine is not being sent *(Ex. 1, Bayne IA Interview, COS-PROST-COS-PROST-011224-11225)*;

(z)　　the canine officer is relying upon the other officers' actions to defend him from the suspect's use of deadly force (*Ex. 3, Bayne Deposition 57: 6-10, 58:12 – 59:1, 150:18-21, 151:14-153:7*);

(aa)　　if Lt. Bayne hesitates any longer, he will lose his shot as the suspect will be

11255923v4

obscured by the mailbox structure and the suspect will be too close to the other officers. (*Ex. 1, Bayne IA Interview, COS-PROST-011235; Ex. 4, Bayne Walk-Thru, COS-PROST-001276*); and

(bb)    if he does not fire, serious bodily injury or death to the officers behind the mailbox structure is imminent (*Ex. 1, Bayne IA Interview, COS-PROST-011231; Ex. 4, Bayne Walk-Thru, COS-PROST-001273; 1275*).

## **BACKGROUND**

2.    Daniel Hall ("Dan") and Rachel Rogers ("Rachel") lived together in Dan's house at 12074 North 135th Place, Scottsdale. (*911 Transcript-house, COS-PROST-011461 and 011474, attached hereto as Exhibit 5.*)

3.    At 9:05 p.m. on the evening of Friday, January 27, 2012, Dan texts Jason Prostrollo ("Jason") to say, "We are definty [sic] going to Ernie's tonight. I will buy you a cocktail! Be there about 10:30"; Jason texted back that he was already at Ernie's, to which Dan replied, "Make sure you got what you need if we end up doing an after hours party at the house", to which Jason replies, "Sounds good". (*Det. Keith Swanson Supplement, COS-PROST-001610, attached hereto as Exhibit 6.*)

## **AT ERNIE'S BAR**

4.    Dan and Rachel meet up with Jason and his brother Bryan at Ernie's Bar, and they play pool and drink alcohol (*Bryan Prostrollo Deposition, 154-156, attached hereto as Exhibit 7; see also Ex. 5, 911 Transcript – House, COS-PROST-011450, COS-PROST-011461.*)

5.    Jason is drinking Jack Daniels whiskey, straight. (*Ex. 7, Bryan Prostrollo Deposition, 148:16-149:25, 153: 3, 156:5 - 157:11.*)

6.    At around midnight, right after his brother Bryan leaves the bar, Jason leaves with

11255923v4

Dan and Rachel to go to their house. (*Dr. Mace Beckson Expert Report, COS-PROST-012967, attached hereto as Exhibit 8; see also Ex. 5, 911 Transcript – House, COS-PROST-011461 and 011476.*)

## JASON SMOKES CRACK COCAINE

7.  Jason smokes a relatively large amount of crack cocaine. (*Toxicology Report, COS-PROST-002415-2416, attached hereto as Exhibit 9; Ex. 8, Beckson Report, COS-PROST-012916.*)

8.  Jason was a young novice, who had never before smoked cocaine, and as such, was ignorant and unprepared for its effects upon him. (*Ex. 8, Beckson Report, COS-PROST-012916; Ex. 7, Bryan Prostrollo Deposition 88:17-25; Sarah Beattie Deposition 77:11-17, attached hereto as Exhibit 10; Warren Prostrollo Deposition 125:12 – 126:1, attached hereto as Exhibit 11.*)

9.  Jason consequently suffers from cocaine intoxication, which causes cognitive and behavioral pathology, and which later contributes to Jason's violent behavior. (*Ex. 8, Beckson Report, COS-PROST-012916, 012968.*)

10.  Dan calls a taxi cab for Jason. (*Travis Keehn Declaration at ¶¶ 2-5, attached hereto as Exhibit 12; Keehn Statement-McKinnon, COS-PROST-011336, attached hereto as Exhibit "A" to Keehn Declaration at Exhibit 12; Ex. 5, 911 Transcript – House, COS-PROST-011460.*)

## JASON THREATENS THE TAXI DRIVER AT KNIFEPOINT

11.  Travis Keehn ("Keehn") is driving the taxi cab that picks up Jason from Dan's house at 12074 North 135th Place, Scottsdale at approximately 4:00 a.m. (*Travis Keehn call to*

11255923v4

1  *police transcript – taxi, COS-PROST-011485, attached hereto as Exhibit 13; Keehn Transcript-*

2  *McKinnon, COS-PROST-011339, Ex. "A" to Keehn Declaration at Ex. 12.*)

3      12.    Jason "start[s] walking up to my cab and I roll[] down my window and [say] how

4  is it going.  I don't think he … respon[ds] or anything…And then he g[ets] in the car and I [am]

5  just like okay so where you heading to this morning and right then I hear[] this shwoo sound

6  like…he [is] open[ing] something" (*Keehn Statement-McKinnon, COS-PROST-011337, Ex. "A"*

7  *to Keehn Declaration at Ex. 12; Ex. 8, Beckson Report, COS-PROST-012918.*)

8      13.    It sounds like a folding knife opening.  (*Keehn Statement - McKinnon, COS-*

9  *PROST-011350, Ex. "A" to Keehn Declaration at Ex. 12*)

10      14.    Jason holds a knife up to Keehn's chin and forces him to drive around, telling him

11  to "just drive…just drive around."  (*Keehn Statement - McKinnon, COS-PROST-011338, Ex.*

12  *"A" to Keehn Declaration at Ex. 12;  Ex. 8, Beckson Report, COS-PROST-012918-012919.*)

13      15.    Keehn sees the knife in his rear-view mirror.  It is "a big knife…like 5, 6 inches."

14  (*Keehn Statement-McKinnon, COS-PROST-011349-011350, Ex. "A" to Keehn Declaration at*

15  *Ex. 12; Ex. 8, Beckson Report, COS-PROST-012919.*)

16      16.    Jason tells Keehn to drive, "[w]herever I tell you to go, you go," while rubbing the

17  tip of the knife against Keehn.  It is "hard to breathe."  (*Keehn Statement - McKinnon, COS-*

18  *PROST-011338, Ex. "A" to Keehn Declaration at Ex. 12; Ex. 8, Beckson Report, COS-PROST-*

19  *012918-012919.*)

20      17.    Jason's speech seems normal to Keehn, and Keehn doesn't smell any unusual

21  smells like alcohol.  (*Keehn Statement-McKinnon, COS-PROST-011354-011355, Ex. "A" to*

22  *Keehn Declaration at Ex. 12; Ex. 8, Beckson Report, COS-PROST-012919*)

11255923v4

18. Keehn does not think that Jason is drunk, but he does think Jason seems "odd." (*Keehn Statement-McKinnon, COS-PROST-011354-011355, Ex. "A" to Keehn Declaration at Ex. 12; Ex. 8, Beckson Report, COS-PROST-012919*)

19. After being forced to drive around the community for several minutes, Keehn exits the private gate to the community, and Jason tells him to "take a right, then do a U-turn…" (*Keehn Statement - McKinnon, COS-PROST-011338, Ex. "A" to Keehn Declaration at Ex. 12; Ex. 8, Beckson Report, COS-PROST-012918-012919*)

20. Jason "…push[es] the knife a little bit harder…" (*Keehn Statement - McKinnon, COS-PROST-011338, Ex. "A" to Keehn Declaration at Ex. 12; Ex. 8, Beckson Report, COS-PROST-012918-012919*)

21. Jason tells Keehn, "…if you don't do what I tell you to do I'm gonna put this right through your neck…" (*Keehn Statement - McKinnon, COS-PROST-011338, Ex. "A" to Keehn Declaration at Ex. 12; Ex. 8, Beckson Report, COS-PROST-012918-012919*)

22. Keehn makes the U-turn back to the private gate. (*Keehn Statement - McKinnon, COS-PROST-011338, Ex. "A" to Keehn Declaration at Ex. 12; Ex. 8, Beckson Report, COS-PROST-012918-012919*)

23. Jason tells Keehn "don't put any emergency codes in the computer or I'll do something…" (*Keehn Statement - McKinnon, COS-PROST-011338, Ex. "A" to Keehn Declaration at Ex. 12; Ex. 8, Beckson Report, COS-PROST-012918-012919*)

24. Keehn pulls up to the private gate, and enters the numbers for the gate code. (*Keehn Statement - McKinnon, COS-PROST-011338, Ex. "A" to Keehn Declaration at Ex. 12; Ex. 8, Beckson Report, COS-PROST-012918-012919*)

11255923v4

25. Jason tells Keehn, "that better be the right code or…something's gonna happen…" (*Keehn Statement - McKinnon, COS-PROST-011338, Ex. "A" to Keehn Declaration at Ex. 12; Ex. 8, Beckson Report, COS-PROST-012918-012919*)

26. Keehn drives the taxi back down the road, toward Dan's house, past Dan's house, and back again. (*Keehn Statement - McKinnon, COS-PROST-011338, Ex. "A" to Keehn Declaration at Ex. 12; Ex. 8, Beckson Report, COS-PROST-012918-012919*)

27. Keehn drives for approximately "ten to fifteen" minutes with Jason holding the knife against him. (*Ex. 13, Keehn Call to Police transcript - taxi, COS-PROST-011481; Keehn Statement-McKinnon, COS-PROST-011351, Ex. "A" to Keehn Declaration at Ex. 12.*)

28. Jason then tells Keehn, "okay stop here, turn off the lights…" (*Keehn Statement - McKinnon, COS-PROST-011338, Ex. "A" to Keehn Declaration at Ex. 12; Ex. 8, Beckson Report, COS-PROST-012918-012919*)

29. As the taxi pulls up to Dan's house, Jason tells Keehn to get out of the taxi. (*Keehn Statement - McKinnon, COS-PROST-011338, Ex. "A" to Keehn Declaration at Ex. 12; Ex. 8, Beckson Report, COS-PROST-012918-012919*)

30. Keehn gets out of the taxi, and Jason stands behind him. (*Keehn Statement - McKinnon, COS-PROST-011338, Ex. "A" to Keehn Declaration at Ex. 12; Ex. 8, Beckson Report, COS-PROST-012918-012919*)

31. As Jason is exiting the taxi, Keehn sees Jason pull a 3 ½ foot long black object from the back seat. (*Keehn Statement - McKinnon, COS-PROST-011347-011348, Ex. "A" to Keehn Declaration at Ex. 12*)

32. Keehn thinks that long black object might be a rifle or a sword. (*Keehn Statement -

*McKinnon, COS-PROST-011347-011348, Ex. "A" to Keehn Declaration at Ex. 12*)

33.     Keehn doesn't know where the knife is. (*Keehn Statement - McKinnon, COS-PROST-011338, Ex. "A" to Keehn Declaration at Ex. 12, Ex. 8, Beckson Report, COS-PROST-012918-012919*)

34.     Jason moves toward Keehn to try to take Keehn's wallet from Keehn's pockets, and Keehn resists him. (*Keehn Statement - McKinnon, COS-PROST-011338, Ex. "A" to Keehn Declaration at Ex. 12; Ex. 8, Beckson Report, COS-PROST-012918-012919*)

35.     Keehn looks back and sees Jason walking away. (*Keehn Statement - McKinnon, COS-PROST-011338, Ex. "A" to Keehn Declaration at Ex. 12; Ex. 8, Beckson Report, COS-PROST-012918-012919*)

36.     Keehn gets back in his taxi and drives away "real fast" because he's afraid that Jason might come back after him.  (*Keehn Statement - McKinnon, COS-PROST-011338, 011348-011349, Ex. "A" to Keehn Declaration at Ex. 12; Ex. 8, Beckson Report, COS-PROST-012918-012919; Ex. 13, Keehn call to police transcript – taxi, COS-PROST-011484*)

## **JASON IS BACK – A KNIFE DRAWN**

37.     Dan and Rachel hear the doorbell ringing over and over.  (*Ex. 5, 911 Transcript – house, COS-PROST-011461*)

38.     When Dan answers the door, Rachel hears Jason say, "I have a knife," and Dan say, "Just put the knife down." (*Ex. 5, 911 Transcript – house, COS-PROST-011460-11461; 11467*)

## **911 – "SUBJECT WITH A KNIFE CALL"**

39.     At approximately 4:19 a.m., Scottsdale Police Communications Division receives

a 911 call from Rachel ("Subject With a Knife Call"). (*CAD – house, COS-PROST-001153, attached hereto as Exhibit 14*.)

40.    Rachel's first words are, "I need somebody over here right now." (*911 AUDIO – house, COS-PROST-001777, attached hereto as Exhibit 15; Ex. 5, 911 Transcript – house, COS-PROST-011459*)

41.    Calling from her bedroom, Rachel tells the 911 Operator, "A guy's in my house and he's threatening my boyfriend with a knife right now." (*Ex. 15, 911 AUDIO – house, COS-PROST-001777; Ex. 5, 911 Transcript – house, COS-PROST-011459-11460*)

42.    Rachel hears Dan say, "put the knife down, put the knife down" and Jason replies, "No, I'm not going to." Rachel tells the 911 Operator, "He's trying to talk him out of – he's trying to talk him into putting the knife down right now and he won't do it." (*Ex. 15, 911 AUDIO– house, COS-PROST-001777; Ex. 5, 911 Transcript – house, COS-PROST-011460*)

43.    Scottsdale Police Dispatch ("Dispatch") notifies officers of an emergency call for service at 4:20 am for "Subject With a Knife." (*Ex. 2, Radio Traffic Transcript - House, COS-PROST-011381; Ex. 15, 911 AUDIO – house COS-PROST-001777; Ex. 3, Bayne Deposition, 86:3-4.*)

44.    This call has an elevated priority for officers. (*Ex. 2, Radio Traffic Transcript - House, COS-PROST-011381; Ex. 15, 911 AUDIO – house, COS-PROST-001777; Ex. 3, Bayne Deposition, 86:3-4*)

45.    Rachel tells the 911 Operator, "His name is Jason. We met him at the bar." She doesn't know Jason's last name. (*Ex. 15, 911 AUDIO – house, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-011461-011462*)

11255923v4

46. Rachel again tells the 911 Operator, "I can hear Dan and he's like, 'Put the knife down, man. Put the knife down.' He's like, 'No, it's not gonna happen.'" (*Ex. 15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – house, COS-PROST-011461*)

47. Rachel tells the 911 Operator, "…if you can get – send the police please…. I'm really scared….Take him out of here." (*Ex. 15, 911 AUDIO – house, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-011460; 011462*)

48. Rachel peeks out the bedroom door and sees Dan and Jason in the kitchen separated by a bar area. Dan asks Rachel something, and she loudly states to Dan and Jason, "Yeah, the cops are on their way." (*Ex. 15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-011463; 011465; Ex. 8, Beckson Report, COS-PROST-012920*)

49. Rachel sees the knife and tells the 911 Operator, "Yeah. …he's got a knife." (*Ex. 15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – house, COS-PROST-011464*)

50. The 911 Operator asks if Rachel can get her boyfriend Dan into the bedroom with her. (*Ex. 15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – house, COS-PROST-011464-11465*)

51. While on the line with the 911 Operator, Rachel says to Dan, "Hon, can you come in here?" (*Ex. 15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-011465*)

52. Rachel tells the 911 Operator, "I'm standing probably 15 feet away from him. He sees me and everything. And Dan is in the kitchen area." (*Ex. 15, 911 AUDIO – House, COS-*

PROST-001777; *Ex. 5, 911 Transcript – House, COS-PROST-011463; Ex. 8, Beckson Report, COS-PROST-012920*)

53.    The 911 Operator sternly says, "Rachel, do you understand what I'm asking you to do? Get your boyfriend in the bedroom with you and lock the door." (*Ex. 15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-011465*)

54.    "He told me he can't," says Rachel. (*Ex. 15, 911 AUDIO – house, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-011466*)

55.    The 911 Operator asks, "Why can't you?" (*Ex.15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-011466*)

56.    Rachel replies, "Because he – he's – Jason's holding him there with the gun – I mean, with – not with the gun. I'm sorry, with the knife. He … oh, my God." (*Ex.15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-011466*)

57.    The 911 Operator asks Rachel if she can lock herself in the bedroom or get out of the house. Rachel tells the 911 Operator that she is unable to lock the bedroom door. Rachel says, "Oh, God, I'm just shaking." (*Ex.15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-011467*)

58.    Rachel tells the dispatcher that they had been drinking, but denies any drug use. (*Ex.15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-011469*)

59.    The dispatcher asks her again if she can get out of the house. Rachel indicates that she cannot and then attempts to lock herself in the bathroom. (*Ex.15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-11469*)

11255923v4

60.     Rachel thinks Jason is on the other side of the door.  (*Ex.15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-11469*)

61.     Rachel tells the 911 Operator, "when I'm trying to shut the door, it's just like, it felt like somebody trying – trying to kick it open a little bit….I'm sorry.  I'm just gonna be quiet, 'cause I think he's like, on the other side."  (*Ex.15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-11470*)

62.     The 911 Operator hears Rachel say to Dan and Jason, "Yeah? Yeah? Yeah? Yes….What do you need….In the what? The cops are coming.  She said they're right down the street.  He said he's – Dan said that he's shoving him."  (*Ex.15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-11473*)

63.     Rachel confirms that Dan and Jason are now fighting.  (*Ex.15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-11473*)

64.     The 911 Operator again tells Rachel to get out of the house.  (*Ex.15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-11473*)

65.     Rachel gets out of the house saying, "Oh, God, please tell them to hurry….Oh, God, please tell them to hurry.  I don't want him – I don't want him to hurt Dan."  (*Ex.15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-11474*)

66.     Dan seems scared to Rachel.  "Dan's a pretty big guy.  You know, like, that's just – and he could probably take this guy with one hand, you know? And so like, that's really not right that he's calling for me right now, you know? . . . I'm really scared.  This guy is – he's whacked out."  (*Ex.15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-11474*)

67.     Rachel tells the 911 Operator, "God.  Why is this – it's got me in a panic.  I swear to God, you can't trust anybody.  Apparently had no idea that he was gonna just totally creep out like this, I mean, he was … getting in the cab." (*Ex.15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-11475*)

68.     The dispatcher asks Rachel if Jason has a weapon and specifically asks about guns.  Rachel indicates that she did not see him with any guns, and states, "No, he brought his pool stick." (*Ex.15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-011476*)

69.     When Rachel sees the police arrive, she disconnects from the dispatcher at approximately 4:35 a.m. (*Ex.15, 911 AUDIO – House, COS-PROST-001777; Ex. 5, 911 Transcript – House, COS-PROST-11479; Ex. 2, Radio Traffic Transcript - House COS-PROST-011390*)

## LT. BAYNE EN ROUTE

70.     Lt. Bayne is the Watch Commander on duty.  (*Ex. 1, Bayne IA Interview, COS-PROST-011197-11198; Ex. 3, Bayne Deposition, 82:2-3; Sgt. Kenneth Moore Deposition, 88:19-89:5, attached hereto as Exhibit 16.*)

71.     The Watch Commander is responsible for the entire City at that time of night, and Lt. Bayne is the highest ranking officer on duty at that time.  (*Ex. 1, Bayne IA Interview, COS-PROST-011197-11198; Ex. 3, Bayne Deposition, 82:2-3; Ex.16, Moore Deposition, 88:19-89:5*)

72.     The Watch Commander is needed at the scene for a SWAT callout, should one be necessary. (*Ex. 1, Bayne IA Interview, COS-PROST-011197-11198; Ex. 3, Bayne Deposition,*

11255923v4

*82:2-3; Ex.16, Moore Deposition, 88:19-89:5*)

73.     Police Department Radio ("PD Radio") is broadcast such that Scottsdale Police Officers tuned to the channel can hear the discussion. (*Ex. 3, Bayne Deposition, 82:24-83:23*)

74.     Once emergency "hot tones" are broadcast over the radio, PD Dispatch dedicates a channel to that emergency call for service.   (*Ex. 3, Bayne Deposition, 81:22-82:1; 83:3-15*)

75.     Lt. Bayne, as Watch Commander over the entire City at that time of night, scans all three active channels simultaneously.  (*Ex. 3, Bayne Deposition, 82:2-7; 84:21-85-16*)

76.     Listening to PD Radio, Lt. Bayne hears patrol supervisor Sergeant K.C. Moore ("Sgt. Moore") making good decisions to respond to the Subject With A Knife Call with his patrol officers, but the call is not resolving.  He decides he needs to go to scene.  (*Ex. 1, Bayne IA Interview, COS-PROST-011199; Ex. 3, Bayne Deposition, 80:12-20*)

77.     At approximately 4:25 a.m., Lt. Bayne announces on PD Radio that he is en route to the Subject With a Knife call.  (*Ex.14, CAD – House, COS-PROST-001155; Ex. 1, Bayne IA Interview, COS-PROST-011199*)

78.     En route to the Subject With a Knife Call, Lt. Bayne is thinking about less lethal options.  Lt. Bayne wants to speak to Sgt. Moore to ensure that less than lethal options are in place. (*Ex. 1, Bayne IA Interview, COS-PROST-011199*)

79.     When Lt. Bayne is unable to communicate directly with Sgt. Moore, he makes a call over the PD Radio requesting a canine unit.  (*Ex. 1, Bayne IA Interview, COS-PROST-011200; Bayne Declaration at ¶¶ 2-4, attached hereto as Exhibit 17; Ex. 4, Bayne Walk-Thru, COS-PROST-001268-001269; Ex. 2, Radio Traffic Transcript - House COS-PROST-011386.*)

80.     K9 Officer Anthony Sanborn ("Officer Sanborn", "King 28") advises Lt. Bayne

that he is en route to the call. (*Ex. 1, Bayne IA Interview, COS-PROST-011200; Ex. 4, Bayne Walk-Thru, COS-PROST-001268-001269; Ex. 2, Radio Traffic Transcript - House COS-PROST-011386.*)

81.     Lt. Bayne has been trained that use of police canine is an intermediate force option which falls below deadly force. (*Ex. 3, Bayne Deposition, 16:16-25; 19:21 - 20:5.*)

82.     The canine handler is responsible for the dog and its actions.  The handler is aware of the dog's abilities, training, and temperament, and ultimately decides whether to use the dog in a particular situation.  (*SPD Operation Orders, K9 6404, COS-PROST-000122-123, attached hereto as Exhibit 18.*)

83.     Only the Watch Commander can overrule the canine handler. (*Ex. 18, SPD Operation Orders, K9 6404, COS-PROST-000122-23.*)

## LT. BAYNE'S EXPERIENCE

84.     Experience and training allows officers or anyone to read or recognize and predict behavior better than someone without experience. *(William Lewinski Expert Report, COS-PROST-012675 at ¶ 3, attached hereto as Exhibit 19.*)

85.     Lt. Bayne is an experienced officer.   He has been a police officer for approximately 25 years, and has never felt compelled to use deadly force on a suspect.  (*Ex. 3, Bayne Deposition, 151:17-152:2.*)

86.     Lt. Bayne's experience and history shows a record of de-escalation in force in very high risk violent situations. (*Ex. 1, Bayne IA Interview, COS-PROST-011246-49; IA Summary, COS-PROST-011535-36, attached hereto as Exhibit 20; Bayne Awards & Commendations Summary, attached hereto as Exhibit 21) (originals are available if required, Fed.R.Evid.*

11255923v4

*1006).*)

87.     Lt. Bayne's Training Summary details his training file from 1987 through January 2012.  (*See Bayne Training Summary, attached hereto as Exhibit 22) (originals are available if required, Fed.R.Evid. 1006).*)

88.     Lt. Bayne's Awards and Commendations Summary details his awards and commendations.  (*See Ex. 21, Bayne Awards & Commendations Summary.*)

89.     In 1997, Lt. Bayne received the only two reprimands he has received in his entire career.  (*Ex. 3, Bayne Deposition, 131:5-13; see also Bayne Reprimand Summary, attached hereto as Exhibit 23) (originals are available if required, FRE 1006).*)

90.     Lt. Bayne's law enforcement career began when he entered the United States Army as a Military Policeman in 1987 at the age of 17.  (*See Ex. 22, Bayne Training Summary.*)

91.     After three enlistments, serving 5 ½ years as a soldier and Military Policeman achieving the rank of Sergeant, Lt. Bayne was Honorably Discharged and joined the Scottsdale Police Department in 1993. (*Ex. 3, Bayne Deposition 12:4-20; see also Ex. 22, Bayne Training Summary.*)

92.     At the Scottsdale Police Department, over a 20 year period, Lt. Bayne has worked a variety of assignments including Patrol, Patrol Sergeant, Special Assignments Unit/SWAT, SWAT Negotiator, SWAT Precision Rifle Operator, Property Crimes Detective, State Gang Task Force (GITEM) Detective, High Enforcement Arrest Team Sergeant, Internal Affairs Sergeant, and Patrol Lieutenant and Watch Commander (2 years as of incident date). (*See Ex. 22, Bayne Training Summary.*)

93.     In 2007, Lt. Bayne was selected as Police Supervisor of the Year. (*See Ex. 21,*

*Bayne Awards & Commendations Summary.*)

94.     Among many areas, Lt. Bayne has been trained in advanced hostage negotiations, officer survival, crisis negotiations, critical incident management, and field force command and planning. (*See Ex. 22, Bayne Training Summary.*)

95.     Lt. Bayne has been an AZ POST Certified General Instructor, Fitness Instructor, Firearm's Instructor, Spanish for Law Enforcement Instructor, and High Risk Vehicle Stop Instructor. (*Ex. 1, Bayne IA Interview, COS-PROST-011192.*)

## POLICE ARRIVE AT THE HOUSE

96.     The officers initially on scene include Sgt. Moore, Officer Cody Carlisle ("Officer Carlisle"), Officer Sanborn with his canine Raider, Officer Kevin Reynolds ("Officer Reynolds"), and Officer Adam Fernandez ("Officer Fernandez"). (*Ex. 14, CAD - House, COS-PROST-001156; Michael Kuzel Expert Report and photos ("Kuzel Report"), COS-PROST-012720, attached hereto as Exhibit 24.*)

97.     Sgt. Moore directs Officer Fernandez to cover the rear of the house. (*Moore Declaration at ¶¶ 2-4, attached hereto as Exhibit 25; Moore First Interview, COS-PROST-001288, attached hereto as Exhibit 26.*)

98.     Sgt. Moore and Officer Carlisle see the reporting party, Rachel, running towards them. (*Ex. 26, Moore First Interview, COS-PROST-001288.*)

99.     Officer Carlisle interviews Rachel. (*Ex. 26, Moore First Interview, COS-PROST-001288.*)

100.    Rachel tells Officer Carlisle that Jason had stuck a knife at Dan's throat, and that Jason had pointed the knife at Dan. (*Officer Cody Carlisle Declaration at ¶¶ 2-4, attached*

11255923v4

*hereto as Exhibit 27; Carlisle Interview, COS-PROST-011433-11434, attached hereto as Exhibit 28.*)

101. Officers begin to form a contact/crisis team. (*Ex. 26, Moore First Interview, COS-PROST-001288.*) The team is at the front of the house where the street/sidewalk meets the property line. (*Moore Walk-Thru, COS-PROST-001306-1307, attached hereto as Exhibit 29; Ex. 20, IA Summary, COS-PROST-011492-11493.*)

102. A "crisis team" is a group of officers whose mission is possibly to rescue a hostage. It is a higher threat level because the hostage is involved. A "contact team," on the other hand, does not involve a hostage. A contact team is a group of officers whose mission is to receive a subject coming out of a residence, giving them verbal commands, having those commands heeded by the subject, and then taking that person into custody. (*Ex.16, Moore Deposition, 14:6-17.*)

103. Sgt. Moore, K-9 Officer Sanborn with canine Raider, and Officer Reynolds are located behind and near a small structure containing a mailbox. (*Scene Photos at COS-PROST-002180, 002272, attached hereto as Exhibit 30; Scene Diagram and Measurments, COS-PROST-001623, attached hereto as Exhibit 31; Ex. 24, Kuzel Report at photos 07693PH_0011, COS-PROST-012739 and 07693PH_0021, COS-PROST-012744; Ex. 20, IA Summary, COS-PROST-011493.*)

104. The mailbox structure is approximately 5 feet by 2 feet by 2 feet in size, and is at the east end of the driveway. (*Ex. 24, Kuzel Report, COS-PROST-012720.*)

105. The mailbox structure is approximately 51 feet from the front door. (*Ex. 31, Scene Diagram and Measurements, COS-PROST-001623; Ex. 24, Kuzel Report, COS-PROST-*

11255923v4

*012720.*)

106.    A paved walkway leads from the front door to a circular drive in front of the mailbox structure.    (*Ex. 24, Kuzel Report at COS-PROST-012720-12721, and photos 07693PH_007 and 07693PH_0010 at COS-PROST-012737 – 12738; see also Kuzel scene video, attached hereto at Exhibit 82.*)

107.    Lights are on inside the residence and there is a light on at the porch.    (*Ex. 30, Scene Photos at COS-PROST-001987-1989.*)

108.    It is a windy night with gusts of up to 17.3 mph, which adversely affects communication especially via PD Radio.    (*Weather Underground Report, COS-PROST-011605, attached hereto as Exhibit 32; Ex. 20, IA Summary, COS-PROST-011576.*)

## TAXI DRIVER KEEHN CALLS POLICE – "TAXI ARMED ROBBERY CALL"

109.    At 4:28 a.m., from the Super Pumper Gas Station located at 8990 East Shea Boulevard, Taxi driver Keehn calls the police and reports that he had been held up at knifepoint 10 minutes prior. (*Radio Traffic Transcript-Taxi, COS-PROST-011410, attached hereto as Exhibit 33; Ex. 20, IA Summary, COS-PROST-011497.*)

110.    Keehn advises police that he arrived at a residence, a man got in his car, and he "held me up with – by knife point."    (*Ex. 13, Keehn call to police transcript, COS-PROST-011480; Ex. 1, Bayne IA Interview, COS-PROST-011201.*)

111.    At approximately 4:28:44 am, Scottsdale Police Dispatch broadcasts another emergency call for service notifying officers of a "211" (armed robbery) at knife point. (*Ex. 33, Radio Traffic Transcript – Taxi, COS-PROST-011410.*)

112.    Keehn reports that the suspect had him drive around "in circles" while the suspect

11255923v4

held a knife up to his chin.  (*Ex. 13, Keehn call to police transcript, COS-PROST-011481.*)

113.   Keehn states that he is frightened.  (*Ex. 13, Keehn call to police transcript, COS-PROST-011481.*)

114.   Keehn also tells the police call taker that the suspect had something else that was "pretty long" and he does not know if it was a "gun or a rifle or anything." He states that the object was covered by the suspect's jacket.  (*Ex. 13, Keehn call to police transcript, COS-PROST-011482.*)

115.   Keehn explains that the suspect had him drop him off at the same location where he picked him up, 12074 North 135th Place. (*Ex. 13, Keehn call to police transcript, COS-PROST-011482; 011485; Ex. 1, Bayne IA Interview, COS-PROST-011201.*)

116.   Keehn describes the suspect. (*Ex. 13, Keehn call to police transcript, COS-PROST-011482-85.*)

117.   PD Radio broadcasts Keehn's description of the man who held him up by knife point. (*Ex. 33, Radio Traffic Transcript – Taxi, COS-PROST-011411.*)

118.   In the subsequent investigation, Keehn positively identifies Jason Prostrollo as the person who threatened to slit his throat, kidnapped, and attempted to rob him. (*Photo lineup statement and photograph at COS-PROST-011366-11367, Ex. "B" to Keehn Declaration at Ex. 12; Photo line-up identifying names at COS-PROST-011368, attached hereto as Exhibit 34.*)

**LT. BAYNE SPEAKS TO TAXI DRIVER KEEHN**

119.   Lt. Bayne is on his way to the "Subject With a Knife Call", and happens to be approaching the Super Pumper at 8990 East Shea Boulevard, when the emergency "Taxi Armed Robbery Call" is broadcast over PD Radio.  (*Ex. 1, Bayne IA Interview, COS-PROST-011200.*)

11255923v4

120.    Lt. Bayne stops at the Super Pumper and speaks with Keehn at approximately 4:30 a.m. (*Ex. 33, Radio Traffic Transcript-Taxi, COS-PROST-011411; Ex. 20, IA Summary, COS-PROST-011498.*)

121.    Lt. Bayne, "I pull up and immediately I see this man very visibly … distraught … he starts to step outta the car, and he steps back in the car, and he steps back outta the car and he keeps going back and forth and he's just in complete mental overload . . . ." (*Ex. 1, Bayne IA Interview, COS-PROST-011201; Ex. 3, Bayne Deposition, 155:18-22.*)

122.    Lt. Bayne observes that Keehn is visibly trembling (*Ex. 1, Bayne IA Interview, COS-PROST-011201; Ex. 3, Bayne Deposition, 160:10-20.*)

123.    Lt. Bayne believes the victim is terrified and authentic (*Ex. 3, Bayne Deposition, 152:8-13; 154:18-22; 158:15-25; 160:10-20; Ex. 4, Bayne Walk-Thru, COS-PROST-001266; 001270; Ex. 1, Bayne IA Interview, COS-PROST-011201.*)

124.    Keehn is yelling when he tells Bayne "this crazy guy got into a cab, had a big knife and he gets behind me and he puts it up to my throat and he was gonna slit my throat and he forced me to driver [sic] around And I thought he was gonna kill me and – and slash my throat. And he demanded money from me." (*Ex. 1, Bayne IA Interview, COS-PROST-011201.*)

125.    Keehn demonstrates to Bayne with a motion of his hand held up to his throat simulating a knife being held there from the rear seat passenger.  Keehn describes it to Bayne as a military style knife.  (*Ex. 3, Bayne Deposition, 153:24-154:22.*)

126.    Keehn tells Bayne that the guy "made me drop him off at his house.  He forced me to drive back to the house where I picked him up.  And he's crazy.  And he jumped out of the car and took off running with the knife and I think he went back into the house with the knife."

(*Ex. 1, Bayne IA Interview, COS-PROST-011201.*)

127.    Keehn tells Lt. Bayne that this happened in a neighborhood just north of Shea on 136th Street. (*Ex. 1, Bayne IA Interview, COS-PROST-011201.*)

128.    After seeing and speaking with Keehn, Lt. Bayne believes the two calls are most likely related (*Ex. 1, Bayne IA Interview, COS-PROST-011201- 011202; Ex. 3, Bayne Deposition, 101:4-10.*)

129.    Seeing the responding patrol unit arriving on scene to interview Keehn, Lt. Bayne then proceeds on to the "Subject With a Knife Call." (*Ex. 1, Bayne IA Interview, COS-PROST-011202; Ex. 3, Bayne Deposition, 157:11-22.*)

130.    While responding to the Taxi Armed Robbery Call, Lt. Bayne is not able to hear some of the PD Radio traffic from the Subject With a Knife Call. (*Ex. 1, Bayne IA Interview, COS-PROST-011202; Ex. 3, Bayne Deposition, 59:20-23.*)

131.    At approximately 4:34 a.m., Lt. Bayne asks Sgt. Moore if he is able to talk over PD Radio. (*Ex. 2, Radio Traffic Transcript – House, COS-PROST-11389.*) However, Sgt. Moore indicates that he is just arriving at the call and asks Lt. Bayne to standby. (*Ex. 2, Radio Traffic Transcript – House, COS-PROST-11389.*)

132.    PD Radio broadcasts that "cab driver stated that the subject held a knife to the [reporting party's] throat, and also possibly had a rifle." (*Ex. 2, Radio Traffic Transcript - House, COS-PROST-011388.*)

**DAN EXITS UNEVENTFULLY, OBEYING POLICE COMMANDS**

133.    Sgt. Moore directs Rachel to use her cell phone to call Dan, and she does so. (*Ex. 26, Moore First Interview, COS-PROST-001288; Ex. 26, Moore Deposition, 25:23 – 26:3; Ex.*

11255923v4

*28, Carlisle Interview, COS-PROST-011435.*)

134. Officer Thomas Goodson ("Officer Goodson") arrives at the house just moments before Lt. Bayne, and takes a position behind the mailbox with the other officers. (*Goodson Declaration at ¶¶ 2-4, attached hereto as Exhibit 35; Goodson Interview, COS-PROST-001348, attached hereto as Exhibit 36.*)

135. At approximately 4:43:48, Officer Carlisle announces that Dan is exiting the residence with his hands up. (*Ex. 2, Radio Traffic Transcript – House, COS-PROST-011394.*)

136. Dan exits the house, obeys police commands, and is escorted away to be interviewed by officers. (*Ex.16, Moore Deposition, 95:9-16; Sanborn Declaration at ¶¶ 2-4, attached hereto as Exhibit 37; Sanborn Interview, COS-PROST-001316, attached hereto as Exhibit 38; Sanborn Deposition, 28:13-15, attached hereto as Exhibit 39.*)

137. At approximately 4:45:29 a.m. Sgt. Moore announces over the PD Radio that the "boyfriend" (Dan) is out of the residence and the suspect is still in the residence. (*Ex. 2, Radio Traffic Transcript – House, COS-PROST-011394.*)

138. Dan tells the officers interviewing him that the subject inside has some military background and potentially has some PTSD ("Post Traumatic Stress Disorder") and is "going a little bit crazy." (*Ex. 38, Sanborn Interview, COS-PROST-001316; Ex.16, Moore Deposition, 84:4-5.*)

139. Dan relates that Jason has been oversees in a military conflict and that he is "messed up." (*Ex. 39, Sanborn Deposition, 168:9-12; Ex. 26, Moore First Interview at COS-PROST-001290; Officer Kevin Reynolds IA Interview at COS-PROST-011305, attached hereto as Exhibit 40.*)

140.   Officer Carlisle broadcasts over PD Radio that the suspect is a "military vet with possible issues." (*Ex. 2, Radio Traffic Transcript – House, COS-PROST-011395.*)

141.   The information that Jason is a "military vet with issues" raises concerns that the suspect is a trained combat warrior.  There is concern that Jason will be irrational, the threat level against the officers will increase, and concerns that the subject "ha[s] been trained to be in combat, a trained soldier, that his capabilities, his threat level, [i]s higher." (*Moore IA Interview, COS-PROST-011177, attached hereto as Exhibit 41; Ex. 39, Sanborn Deposition, 168:13-21.*)

142.   There is an increased incidence of violence among combat veterans who suffer from PTSD, head injuries, and alcohol abuse.  Jason had all three conditions.  (*Ex. 8, Beckson Report, COS-PROST-012948 at ¶2b; Medical Records from Veterans Administration Hospital, COS-PROST-008971-008974, 009005-009007, 009024, 009079, 009124-009126, 009130-009136, 009140, attached hereto as Exhibit 42*).

143.   Sgt. Moore, Officer Sanborn, and Officer Reynolds attempt to obtain information from Dan, but Dan is evasive and very intoxicated.  (*Ex.16, Moore Deposition, 83:19-25; Ex. 40, Reynolds IA Interview, COS-PROST-011305-11306; Ex. 39, Sanborn Deposition, 53:9-11; Ex. 38, Sanborn Interview, COS-PROST-001316.*)

144.   Sgt. Moore realizes that Dan is providing very little information about what was happening inside the residence.  Dan tells Sgt. Moore that Jason is out of control, but Dan denies that Jason had a knife – in direct contradiction to the information gleaned from the reporting party, Rachel.  (*Ex. 26, Moore First Interview, COS-PROST-001289; 001291-001292; Ex.16, Moore Deposition, 83:18-25.*)

145.   Hall's evasive and false information would prompt a reasonable and well-trained

11255923v4

officer to not rely on his assertion that Jason did not have a knife or access to other weapons. (*Kenneth Wallentine Expert Report, COS-PROST-012833 at ¶ 11, attached hereto as Exhibit 43.*)

## **LT. BAYNE ARRIVES ON SCENE - "SUBJECT WITH A KNIFE CALL"**

146.    Lt Bayne arrives at the Subject with a Knife Call between approximately 4:44 a.m. and 4:45 a.m., parks his vehicle east of the house on Paradise Drive, and begins walking toward the house. (*Ex. 1, Bayne IA Interview, COS-PROST-011206; Ex.14, CAD - House, COS-PROST-001156-001157; Ex. 20, IA Summary, COS-PROST-011507-11508.*)

147.    While Lt. Bayne walks toward the house he passes Rachel and asks the officers standing with her who she is.  The officers identify her as the reporting party / girlfriend.  Lt. Bayne also walks past Dan and ascertains that Dan is the boyfriend.  (*Ex. 1, Bayne IA Interview, COS-PROST-011206; Ex. 3, Bayne Deposition 60:4-11, 91:11-15, 94:20 – 95:13, 97:9-14, 97:23 – 98:6, 120:4-9.*)

148.    Lt. Bayne also confirms with the officers that, as far as they know, there is only one subject with a knife still inside the house. (*Ex. 3, Bayne Deposition, 98:10-15.*)

149.    As Lt. Bayne continues toward the house, he sees Sgt. Moore and other officers, including a canine. (*Ex. 1, Bayne IA Interview, COS-PROST-011208-11209.*)

150.    One of Lt. Bayne's primary objectives coming to the scene is to relay the information to Sgt. Moore about the taxi driver being held hostage at knife point. (*Ex. 3, Bayne Deposition, 99:19-24.*)   Lt. Bayne also wants to confirm with Sgt. Moore that he has containment and a crisis / contact team in place. (*Ex. 3, Bayne Deposition, 120:10-22.*)

151.    Lt. Bayne walks toward a group of three or four officers making themselves as

11255923v4

small as possible, huddled behind the mailbox pillar for cover. He thinks to himself, "well, that's not very good cover, but there's a very good distance from the house." (*Ex. 1, Bayne IA Interview, COS-PROST-011208-011209; Ex. 3, Bayne Deposition, 114:5-13.*)

152. Lt. Bayne tells Sgt. Moore that this "Subject With a Knife Call" is likely related to the "Taxi Armed Robbery Call" where a knife was used on the taxi driver. (*Ex. 29, Moore Walk-Thru, COS-PROST-001305; Ex.16, Moore Deposition, 130:18-24.*)

153. Lt. Bayne says to Sgt. Moore, "here's what I want to do. I want to slow this whole thing down. Treat this as a barricade… make sure we got good containment on this place." (*Ex. 3, Bayne Deposition, 99:8-15, 120:18 – 121:13; Ex. 4, Bayne Walk-Thru, COS-PROST-001270.*)

154. With barricade procedures, the objective is if there is an armed individual threatening inside that structure, the police responsibility is to protect the rest of the public from that person and that simply means containment; there is no need to rush in. (*Ex. 1, Bayne IA Interview, COS-PROST-011242.*)

155. Lt. Bayne tells Sgt. Moore, "if you need any equipment – bull horn, um, uh, shields or anything like that, let me know….I'm gonna go back to my vehicle, set up a command post and we're gonna call SWAT. . . . This is gonna be the fourth time in my tenure as watch commander that I've called SWAT." (*Ex. 1, Bayne IA Interview, COS-PROST-011212; Ex. 3, Bayne Deposition, 121:2-13.*)

156. Based upon all of the reported threatened violence, Lt. Bayne is thinking that this suspect needs to be detained. "He ha[s] already threatened at least two people this evening with the knife…we [are] the last line of stopping this individual from getting to another person – the

11255923v4

third person. He need[s] to be stopped, he need[s] to be detained. So there [is] the threat that if we [don't] stop him, he [will] eventually get to somebody else and continue with the same threat and violence of potentially even heightened and he would actually carry out the threat and – and—and cause great physical harm to somebody." (*Ex. 1, Bayne IA Interview, COS-PROST-011243.*)

157. The facts known to Lt. Bayne would have identified Jason as having a high risk for violence at the time he exited the house and was confronted by police. (*Ex. 8, Beckson Report, COS-PROST-012952 ¶6.*)

158. Lt. Bayne tells Sgt. Moore, "As long as there's nobody else inside bein' threatened immediately, I'm gonna call Sgt. Cabrera, who is at the scene, and I'm gonna get direct communication with him about what we have over there to verify that it definitely is related to this." (*Ex. 4, Bayne Walk-thru, COS-PROST-001270.*)

159. At approximately 4:46 a.m., while standing next to Sgt. Moore, Lt. Bayne calls Sergeant Chuck Cabrera ("Sgt. Cabrera") who is the patrol supervisor on the scene of the Taxi Armed Robbery Call. (*Ex. 1, Bayne IA Interview, COS-PROST-011212-11213; Ex. 4, Bayne Walk-thru, COS-PROST-001270.*)

160. Lt. Bayne receives confirmation from Sgt. Cabrera that the two calls are related, that violent felonies have occurred, and that the victim of the armed robbery wants to press charges. (*Ex. 1, Bayne IA Interview, COS-PROST-011212-11213; Ex. 4, Bayne Walk-thru, COS-PROST-001270.*)

161. Sgt. Cabrera also relays to Lt. Bayne that taxi driver Keehn has marks on his throat from the knife. (*Ex. 1, Bayne IA Interview, COS-PROST-011213; Ex. 3, Bayne*

*Deposition, 156:24-157:2.*)

162.   Lt. Bayne intends to complete the phone call with Sgt. Cabrera, ask Sgt. Moore what he needs, and then to go back to his vehicle and let Sgt. Moore handle the call.  (*Ex. 1, Bayne IA Interview, COS-PROST-011236, 011245.*)

## JASON EMERGES UNEXPECTEDLY FROM THE HOUSE

163.   Officers Carlisle and Goodson observe the suspect walking back and forth inside the house at the open front door. (*Goodson Walk-Thru, COS-PROST-001363, attached hereto as Exhibit 44; Goodson Deposition, 77:1-10, attached hereto as Exhibit 45";Ex. 28, Carlisle Interview, COS-PROST-011438.*)

164.   Cocaine is a powerful central nervous system stimulant that causes release of adrenaline which puts the sympathetic nervous system in overdrive:  the sympathetic nervous system is responsible for the "fight or flight" response in humans. (*Ex. 8, Beckson Report, COS-PROST-012963.*)

165.   With his sympathetic nervous system in overdrive because of the cocaine intoxication, and large quantities of adrenaline flowing through his brain and body, Jason likely finds himself in a "fight or flight" mode.  (*Ex. 8, Beckson Report, COS-PROST-012968.*)

166.   Without warning or being asked to do so, Jason exits the house and begins to advance toward police officers. (*Sanborn Walk-Thru, COS-PROST-001333, attached hereto as Exhibit 46; Ex. 44, Goodson Walk-thru, COS-PROST-001363-1364.*)

167.   At 04:49:42, Officer Carlisle announces on PD Radio that the suspect is exiting the house. (*Ex. 2, Radio Traffic Transcript – House, COS-PROST-011395.*)

168.   Lt. Bayne hangs up from his telephone call with Sgt. Cabrera and draws his

11255923v4

primary duty weapon, a Glock 22. (*Ex. 1, Bayne IA Interview, COS-PROST-011213-011214; Ex. 4, Bayne Walk Thru, COS-PROST-001279.*)

169.    Lt. Bayne:  "As soon as I [see] Jason I instantly [see] that he [has] some kind of batons in his hand, some kind of fighting weapons."  (*Ex. 3, Bayne Deposition, 106:11-21.*)

170.    Lt. Bayne: "I [am] almost a hundred percent certain that the person who appear[s] in the doorway with those objects in his hands [is] the same person who we were being sent there for who was holding somebody at knife point, who was the same person who I had saw had been holding the cab driver at knife point.  I ha[ve] no reason to believe that this [is] a different individual." (*Ex. 3, Bayne Deposition, 108:22 – 109:3.*)

171.    Officer Sanborn, the canine officer, confirms to Lt. Bayne that Sanborn will be issuing verbal commands to the suspect, and immediately begins shouting commands to Jason. (*Ex. 1, Bayne IA Interview, COS-PROST-011220; Ex. 4, Bayne Walk-thru, COS-PROST-001272; see also , Goodson video clip-commands from Goodson Deposition at 102:11-103:10, attached hereto as Exhibit 47.*)

172.    Officer Sanborn repeatedly gives commands, "Scottsdale Police. . . put your hands up. Turn around," "Drop what's in your hands,"  "Police, stop" (*Ex. 38, Sanborn Interview, COS-PROST-001317; Ex. 46, Sanborn Walk-Thru, COS-PROST-001333; Sanborn IA Interview, COS-PROST-011280, attached hereto as Exhibit 48.*)

173.    As Jason continues to approach, Sanborn repeatedly gives full canine commands to Jason, "You need to stop now, there's a police dog. . . he will bite you if you don't stop" and "Stop now." (*Ex. 38, Sanborn Interview, COS-PROST-001317; Ex. 46,  Sanborn Walk-Thru, COS-PROST-001333; Ex. 48, Sanborn IA Interview, COS-PROST-011280; Ex. 39, Sanborn*

*Deposition, 117:17-118:5.*)

174. As a former Marine trained in firearms and who has a gun collection, Jason knows that police have the means to use deadly force against him. (*Ex. 8, Beckson Report, COS-PROST-012964.*)

## JASON'S WEAPONS

175. As Jason emerges from the house, officers can see that he has two objects, one in each hand. (*Ex. 1, Bayne IA Interview, COS-PROST-011219; Ex. 4, Bayne Walk-thru, COS-PROST-001272; Ex. 3, Bayne Deposition, 106:11-13; Ex. 38, Sanborn Interview, COS-PROST-001317; Ex. 39, Sanborn Deposition, 80-12-17; 81-25; Ex. 48, Sanborn IA Interview, COS-PROST-011280-011281; Ex.16, Moore Deposition, 118:11-22; Moore Second Interview, COS-PROST-001300, attached hereto as Exhibit 49; Ex. 41, Moore IA Interview, COS-PROST-011172; Ex. 45, Goodson Deposition, 73:12; 77:20-23; 96:20; Reynolds Declaration at ¶¶ 2-4, attached hereto as Exhibit 50; Reynolds Interview, COS-PROST-001380-1381, attached hereto as Exhibit 51; Ex. 40, Reynolds IA Interview, COS-PROST-011310.*)

176. Humans rely to a large extent on pattern recognition as a basis for their perception and to derive meaning about an event. (*Ex. 19, Lewinski Report, COS-PROST-012674 at ¶ 2.*)

177. Lt. Bayne believes the objects to be "martial arts type fighter sticks." (*Ex. 1, Bayne IA Interview, COS-PROST-011216; Ex. 3, Bayne Deposition, 106:11-21.*)

178. Although not known to Lt. Bayne at the time, the objects are two halves of a pool cue that had been unscrewed at the middle of the cue. (*Ex. 1, Bayne IA Interview, COS-PROST-011216; Ex. 3, Bayne Deposition, 106:18-21.*)

179. The officers describe their impressions of what it is that Jason is holding in his

11255923v4

hands as he advances upon them as being clubs, batons, sticks, or steel barrel rifle blanks. (*Ex. 1, Bayne IA Interview, COS-PROST-011219; Ex. 3, Bayne Deposition, 106:11-13; Ex. 4, Bayne Walk-thru, COS-PROST-001272; Ex.16, Moore Deposition, 118:11-22; Ex. 38, Sanborn Interview, COS-PROST-001317; Ex. 39, Sanborn Deposition, 80-12-17; 81-25; Ex. 40, Reynolds IA Interview, COS-PROST-011310; Ex. 41, Moore IA Interview, COS-PROST-011172; Ex. 45, Goodson Deposition, 73:12; 77:20-23; 96:20; Ex. 48, Sanborn IA Interview, COS-PROST-011280-011280; Ex. 49, Moore Second Interview, COS-PROST-001300; Ex. 51, Reynolds Interview, COS-PROST-001380-1381.*)

180. "[T]he one in his – in one of his hands actually look[s] like …a blank in a rifle. It look[s] like a silver blank in a rifle …." (*Ex. 26, Moore First Interview, COS-PROST-001289; Ex. 29, Moore Walk-Thru, COS-PROST-001308; Ex. 49, Moore Second Interview, COS-PROST-001300.*) "I didn't think it [i]s the barrel of a gun that [i]s functional, I just th[ink] it [i]s like a piece of metal or … a pipe…but my perception [i]s that if he g[ets] close enough he [can] use those to strike officers with them as – as a weapon." (*Ex. 41, Moore IA Interview, COS-PROST-0011172.*)

181. Officer Reynolds observes that "as he approach[es] it quite literally look[s] like a darkened barrel, and only barrel of a rifle uh, same-same length….It appear[s] to be a – a rifle barrel. No gun or firearm mechanism attached." (*Ex. 51, Reynolds Interview, COS-PROST-001380-1381.*)

182. Officer Reynolds perceives the "rifle barrel" object to be made of metal, and the object in his other hand to be made of wood. (*Ex. 40, Reynolds IA Interview, COS-PROST-011310-11311.*)

183.    Lt. Bayne does not know whether Jason is still armed with the knife he had used to threaten taxi driver Keehn and Dan, but he knows that Jason may still have the knife somewhere on his person. (*Ex. 1, Bayne IA Interview, COS-PROST-011243; Ex. 3, Bayne Deposition, 108:5-109:11; Ex. 4, Bayne Walk-Thru, COS-PROST-001277-011278; see also Ex. 39, Sanborn Deposition.*)

184.    It is also unknown whether Jason has access to any other weapons inside the house. (*Ex. 2, Radio Traffic Transcript – House, COS-PROST-011383; Ex. 39, Sanborn Deposition, 171:11-19.*)

185.    The descriptions of the manner in which Jason is holding the two weapons vary, and include descriptions of Jason swinging the weapons martial arts style, to holding the weapons over his head, to holding them in a striking position. (*Ex. 1, Bayne IA Interview, COS-PROST-011215-11219; Ex. 3, Bayne Deposition, 142:13-143:8; Ex. 4, Bayne Walk-Thru, COS-PROST-001272; 001278; Ex.16, Moore Deposition, 128:2-5; Ex. 39, Sanborn Deposition, 81:8-25; 140:12-16; Ex. 41, Moore IA Interview, COS-PROST-011171; Ex. 45, Goodson Deposition, 73:18-75:25; Ex. 49, Moore Second Interview, COS-PROST-001301; Bayne video clip-sticks from Bayne Deposition at 142:7-143:8, attached hereto as Exhibit 52; Moore video clip-sticks from Moore Deposition at 115:15-23, attached hereto as Exhibit 53; Goodson video clip-sticks from Goodson Deposition at 73:18-74:10, attached hereto as Exhibit 54; Sanborn video clip-sticks from Sanborn Deposition at 81:8-82:7, attached hereto as Exhibit 55; Ex. 38, Sanborn Interview, COS-PROST-001317; 001323; Goodson IA Interview, COS-PROST-011126-11127, attached hereto as Exhibit 56.*)

186.    Lt. Bayne, Sgt. Moore, K9 Officer Sanborn, and Officer Goodson each

demonstrate on video at their depositions what they saw Jason do with the weapons. (*Ex. 52, Bayne video clip-sticks; Ex. 53, Moore video clip-sticks; Ex. 54, Goodson video clip-sticks; Ex. 55, Sanborn video clip-sticks.*)

187.     According to his own report and the information he provides on the action of Jason, it appears that the officer whose attention is most focused on the movement of Jason during all of the incident and whose attention only minimally waivers is K-9 Officer Sanborn, given his specific role at the scene.  (*Ex. 19, Lewinski Report, COS-PROST-012679 at ¶ 5.*)

188.     Officer Sanborn observes Jason's actions with the objects as he exits:

(a)   "As he comes outside both items, which I had not identified as pool sticks at that point, up on his shoulder." (*Ex. 39, Sanborn Deposition, 81:8-10.*)

(b)   "And as he exits and begins walking at a brisk pace towards us, he then begins to cross the sticks as he steps, sometimes one at a time, sometimes both…" (*Ex. 39, Sanborn Deposition, 81:10-12.*)

(c)   "I remember both pool cues coming across very aggressively along with his footsteps." (*Ex. 39, Sanborn Deposition, 81:14-15.*)

(d)   "Appears almost as if he [i]s stepping into each swing as he [i]s walking and as he comes to the side he steps in and swings, at one point brings them both across and just double crosses them." (*Ex. 39, Sanborn Deposition, 81:16-19.*)

(e)   "Very aggressive posture, aggressive walk…" (*Ex. 39, Sanborn Deposition, 81:19-20.*)

(f)   "… wielding as a weapon…" (*Ex. 39, Sanborn Deposition, 81:23.*)

(g)   "… and it appears as though he is taking warm up swings, very fast, very

11255923v4

aggressive." (*Ex. 39, Sanborn Deposition, 81:23-25.*)

(h) "Now that he's up in that light is when I'm first able to identify what's in his hands. I can see now that he's holding a stick, basically. He's holding a - I couldn't say it was a pool cue at that point, it wasn't clear enough but uh, not a rifle - clearly some sort of long stick - two long sticks." (*Ex. 48, Sanborn IA Interview, COS-PROST-011282.*)

(i) "[A]s he's walking he's basically cocking them and - and swinging them back and forth. . . ." (*Ex. 48, Sanborn IA Interview, COS-PROST-011282.*)

(j) "Basically that threatening manner of, you know, I'm swinging them and, you know, I'm coming for a fight is - is the way I took it, is that's - that's a threat. He's coming at us and he's warming these things up and - and swing them around to show us that, you know, he's coming at us to hit us with some sticks." (*Ex. 48, Sanborn IA Interview, COS-PROST-011282.*)

189. Officer Sanborn reports that Jason is "starting to kind of wield 'em a little bit and swing 'em as he's coming towards us. And he's in a threatening manner". (*Ex. 38, Sanborn Interview, COS-PROST-001317.*)

190. In his deposition, Officer Sanborn demonstrates his observation of how Jason swings the sticks forward and down using his whole body, including rotating his shoulders and hips and using his weight to move the stick "through the target," which is similar to what is described in the manual of Marine Corps Martial Arts (MCRP 3-02B), U.S. Marine Corps (18 February 1999). (*MCMAP 1999, COS-PROST-012280-012283, attached hereto as Exhibit 57; Ex. 55, Sanborn video clip-sticks; Ex. 8, Beckson report, COS-PROST-012922.*)

191. Lt. Bayne also sees Jason hold the sticks up in a fighting position, and cross them

over his body in a martial arts type movement. (*Ex. 4, Bayne Walk-thru, COS-PROST-001276.*)

192.   Lt. Bayne recognizes the weapon manipulation as similar to movements in martial arts stick fighting training that Lt. Bayne has received.  "It immediately [strikes] me as a fighting position; hands are up, two batons in hand, coming out the door and then it crosse[s] his body like . . . from a nunchuck across the body type movement . . ." (*Ex. 1,  Bayne IA Interview, COS-PROST-011219.*)

193.   Lt. Bayne: "I have taken basic martial arts training in the military, … the instructor of the Shorin Ryu used to teach stick fighting, with one stick and with two sticks.  And [Jason's movement] [i]s the same type of movement.  I believe that [Jason] ha[s] training in stick fighting." (*Ex. 1, Bayne IA Interview, COS-PROST-01121.*)

194.   Lt. Bayne sees Jason ignore the police commands and continue to advance upon the officers at a fairly quick pace while moving the sticks across his body like he was "going into battle . . . somebody coming at you swinging nunchucks around without a chain …" (*Ex. 1, Bayne IA Interview, COS-PROST-011221-011222; Ex. 4, Bayne Walk-thru, COS-PROST-001272.*)

195.   Sgt. Moore also perceives Jason carrying two "batons" in his hands like a person trained in stick fighting would carry them. (*Ex. 49, Moore Second Interview, COS-PROST-001294 and 001301.*)

196.   Sgt. Moore sees Jason bring the sticks up and down like a "Mui Thai Fighter" in striking position.  (*Ex.16, Moore Deposition, 128:2-5; Ex. 41, Moore IA Interview, COS-PROST-011171.*)

197.   Officer Goodson sees that Jason has one stick in each hand resting up on his neck

11255923v4

as he continuously walks toward the officers. (*Ex. 36, Goodson Interview, COS-PROST-001352; Ex. 44, Goodson Walk-Thru, COS-PROST-001363 and 001368.*)

198. Officer Goodson describes Jason's grip on the weapons as if they are "like loaded, ready to swing." (*Ex. 45, Goodson Deposition, 73:24-25.*)

199. Officer Reynolds reports that Jason has these "items" in "his hands, raised near his head, and he [i]s making movements with his arms". (*Ex. 51, Reynolds Interview, COS-PROST-001380.*)

## THE OFFICERS' PERCEPTION OF THE THREAT

200. Contemporary training in law enforcement, as well as experience in handling firearms, generally provides officers with a considerable store of information to use for the purpose of detecting threatening movements and patterns of behavior. (*Ex. 19, Lewinski Report, COS-PROST-012674-75 at ¶ 2.*)

201. Officers are trained that a subject manipulating weapons in a way similar to Jason could be deadly for them. (*Ex. 43, Wallentine Report, COS-PROST-012828 ¶19; COS-PROST-012830 ¶6.*)

202. Someone knowledgeable about the use of impact weapons and in particular "fighting sticks" will be more likely to identify a particular action or pattern of movement as belonging to that or a similar martial art than someone who is not familiar with it. (*Ex. 19, Lewinski Report, COS-PROST-012675 at ¶ 4.*)

203. Even officers not specifically trained in martial arts stick fighting will recognize the aggressive manipulation as a dangerous and potentially deadly use of batons. (*Ex. 43, Wallentine Report, COS-PROST-012829 at ¶ 5.*)

11255923v4

204. When the threat is perceived as substantial and urgent, officers are likely to reflexively initiate a response that they have learned, through training and experience, to be an appropriate response to the threat. (*Ex. 19, Lewinski Report, COS-PROST-012675 at ¶ 2.*)

205. Lt. Bayne recognizes the speed and the nature of the swing of the perceived fighting sticks in Jason's hands and realizes the almost immediate threat that they present to himself and others, given his knowledge of this incident. (*Ex. 19, Lewinski Report, COS-PROST-012675 at ¶ 2.*)

206. In this case, Lt. Bayne's training leads him to recognize the level of threat they are facing and the need for an immediate response before Jason can get closer. (*Ex. 19, Lewinski Report, COS-PROST-012675 at ¶ 4.*)

207. Lt. Bayne recognizes this pattern as conduct preceding a deadly attack by Jason. (*Ex. 43, Wallentine Report, COS-PROST-012829 at ¶ 4.*)

208. Lt. Bayne knows, through his experience, the type of serious injury that can result from being struck by an impact weapon that is wielded by someone familiar with their use and he recognizes this as a deadly force incident. (*Ex. 19, Lewinski Report, COS-PROST-012675 at ¶ 5.*)

209. The pool cue swings observed by officers are approximately 50-100 mph. (*Geoffrey T. Desmoulin Expert Report, COS-PROST-012990, attached hereto as Exhibit 58; Ex. 52, Bayne video clip-sticks ; Ex. 53, Moore video clip-sticks; Ex. 55, Sanborn video clip-sticks from Sanborn Deposition at 81:8-82:7.*)

210. If the officers received a blow to the head, the pool cue halves that Jason is wielding could produce skull fractures 98 percent of the time. (*Ex. 58, Desmoulin Report, COS-*

*PROST-012996.*)

211.    Skull fracture itself is a risk factor of mortality as 64 percent of individuals presenting with skull fracture die of their injuries.   More specifically, when the mechanism of death is a blow to the head, as was the potential in this case, 77 percent of these fatalities presented with skull fracture.  (*Ex. 58, Desmoulin Report, COS-PROST-012996.*)

212.    Based upon Lt. Bayne's demonstration of Jason's swing of the batons, each phase of the swing, forward and then backward, takes approximately a tenth of a second.  (*Ex. 19, Lewinski Report, COS-PROST-012675 at ¶ 3; Ex. 52, Bayne video clip-sticks.*)

213.    The blink of an eye takes approximately one third of a second.  (*Ex. 19, Lewinski Report, COS-PROST-012675 at ¶ 3.*)

214.    Given the speed with which the swings occur, someone would have to be directly focused on Jason to detect the movement and speed of the movement.  (*Ex. 19, Lewinski Report, COS-PROST-012675 at ¶ 3; Ex. 52, Bayne video clip-sticks; Ex. 53, Moore video clip-sticks; Ex. 54, Goodson video clip-sticks; Ex. 55, Sanborn video clip-sticks.*)

215.    If someone were to start to blink at the beginning of the motion demonstrated by Lt. Bayne, the forward and backward motion of the swing would be completed before the person had completed their blink.  (*Ex. 19, Lewinski Report, COS-PROST-012675 at ¶ 3; Ex. 52, Bayne video clip-sticks.*)

216.    Depending upon each officer's attentional focus at the time that Jason is swinging the pool cues, each officer will have a different perception and recall about that activity.  (*Ex. 19, Lewinski Report, COS-PROST-012675 at ¶ 4.*)

217.    Even if the officers are looking in the direction of Jason, have a clear and

11255923v4

unimpaired view of him and are focused on him, if they blink or shift their focus they will miss part or all of the swings. (*Ex. 19, Lewinski Report, COS-PROST-012675 at ¶ 4.*)

218. The inability to see the swings will be further impaired if the officers are not intentionally and directly focused on Jason at the time when he is swinging the pool cues, but instead are attentionally focused on their response, an adjustment to reach cover, attempting to draw a weapon, or some other element of the incident. (*Ex. 19, Lewinski Report, COS-PROST-012675 at ¶ 4.*)

219. The conclusion from this is that given the attentional and visual focus of each of the officers, each will likely have a different perception and then memory of the action of Jason as he is approaching the officer. (*Ex. 19, Lewinski Report, COS-PROST-012675 at ¶ 4.*)

## <u>POOL STICKS = DEADLY WEAPONS</u>

220. The Plaintiff admits that pool sticks can be used as a dangerous instrument or deadly weapon. (*Plaintiff's Response to Request for Admission No. 18, attached hereto as Exhibit 59.*)

221. Police officers commonly respond to bar fights. It is not uncommon in such fights to find that someone has used a pool cue as a weapon. (*Ex. 43, Wallentine Report, COS-PROST-012830 at ¶ 6.*)

222. Pool sticks are often carried by motorcycle gang and street gang members who desire to be armed with a potentially lethal weapon without having the liability of carrying a knife or a firearm. (*Greenberg Report, COS-PROST-012800 ¶3, attached hereto as Exhibit 60.*)

223. Pool sticks are frequently used as offensive weapons that can kill or maim victims via stabling with the sharp point of the stick or employing blunt trauma via clubbing with the

thick end of the stick.  (*Ex. 60, Greenberg Report, COS-PROST-012800 ¶3.*)

224.   Serious pool stick injuries most often involve damage to the victim's eyes, skull, brain, and neck.  (*Ex. 60, Greenberg Report, COS-PROST-012800 ¶3.*)

225.   If struck in the head by a relatively long cylindrical object like a pool cue, death is at least possible if not probable beyond the premise of reasonable biomechanical engineering certainty.  (*Ex. 58, Desmoulin Report, COS-PROST-012995-012996.*)

226.   Pool cues are very much like a baton weapon.  When separated in half, the two halves of a pool cue are virtually identical to batons or impact weapons.  (*Ex. 43, Wallentine Report, COS-PROST-012830 at ¶ 6.*)

227.   Officers are trained in the use of collapsible batons (often colloquially referred to as "ASP" batons).  They are taught that striking overhead blows to the head and neck are reasonably likely to cause death or serious bodily injury.  (*Ex. 43, Wallentine Report, COS-PROST-012829-30 at ¶ 5.*)

228.   Police officers are trained that blunt objects such as sticks, bats, and batons can be used as a deadly weapon.  (Ex. 39, *Sanborn Deposition, 168:22-170:2; Ex. 43, Wallentine Report, COS-PROST-012828 ¶4; Arizona Law Enforcement Academy training video, COS-PROST-012974, attached hereto as Exhibit 61; 2009 SIMS/FATS shooting decisions training video COS-PROST-011002, attached hereto as Exhibit 62; SPD FLD 1215, Baton Use Policy, COS-PROST-000021, attached hereto as Exhibit 63; Lt. Bayne 2009 shooting decision record for 2009 shooting decision video (first scenario), COS-PROST-010983, attached hereto as Exhibit 64.*)

229.   The Scottsdale Police Department Field Order 1215 (baton use policy) provides

11255923v4

that officers must "Avoid intentionally striking suspects on the head, neck, sternum, spine, lower abdomen, groin, or kidneys *due to the possibility of causing severe injury or death*, unless deadly force is justified." (*Ex. 63, SPD FLD 1215 (emphasis added), Baton Use Policy, COS-PROST-000021.*)

230.  Officers are aware that even single closed fist blows to the head can result in death. (*Ex. 43, Wallentine Report, COS-PROST-012830 at ¶ 5.*)

## JASON – MARINE TRAINED COMBAT MARTIAL ARTS WARRIOR

231.  While serving in the U.S. Marine Corps, Jason achieved a Marine martial arts tan belt, gray belt, and green belt 4/26/2006, 10/29/2007, and 8/22/2008, respectively. (*MCTFS Basic Training Record, COS-PROST-010819, attached hereto as Exhibit 65.*)

232.  In the Marine Corps Martial Arts Program ("MCMAP"), Marines are taught techniques using improvised weapons or weapons of opportunity. (*Ex. 57, MCMAP 1999, COS-PROST-012280-012283; Caldwell Deposition, 22:22-24:11, attached hereto as Exhibit 66; Close Combat (MCRP 3-02B), U.S. Marine Corps (12 February 1999) ("Close Combat 1999"), USMC Training Log, COS-PROST-012202-012219, Tan Belt Lesson Designators, COS-PROST-012210, Gray Belt Lesson Designators, COS-PROST-012213, and Green Belt Lesson Designators, COS-PROST-012219, attached hereto as Exhibit 67.*)

233.  "Weapons of opportunity" or "improvised weapons" are objects typically used for ordinary tasks but if wielded as a weapon could become just as lethal as objects designed for those purposes such as bowie knives or handguns. (*Ex. 58, Desmoulin Report, COS-PROST-012991.*)

234.  The Plaintiff admits a pool stick can be an improvised weapon / weapon of

11255923v4

opportunity.  (*Ex. 11, Warren Prostrollo Deposition, 201:21 – 206:4.*)

235.    Marines are taught that "weapons of opportunity" can be used to inflict deadly force.  (*Ex. 66, Caldwell Deposition at 25:2-8; 26:25-27:20; Ex. 67, Close Combat 1999, COS-PROST-012132.*)

236.    The Plaintiff admits that the bottom half of the pool stick can be used as a deadly weapon. (*Ex. 11, Warren Prostrollo Deposition, 201:21 – 206:4.*)

237.    Marines are taught that objects including half a pool cue stick could be used to inflict deadly force.  (*Ex. 66, Caldwell Deposition at 25:2-8; 26:25-27:20; see also Ex. 57, MCMAP 1999, COS-PROST-012280-12283.*)

238.    Marines are taught how to swing and strike with improvised weapons.  (*Ex. 57, MCMAP 1999, COS-PROST-012280-12283; Ex. 66, Caldwell Deposition, 25:2-25:22; Caldwell video clip from Caldwell deposition at 23:25-25:23, attached hereto as Exhibit 68.*)

239.    Marines are taught that a strike to the head, neck, or chest with an improvised weapon can cause death. (*Ex. 66, Caldwell Deposition, 23:21-24; see also Ex. 57, MCMAP 1999, COS-PROST-012248-012249.*)

240.    MCMAP Manuals that were in effect during Jason's training state that the head and neck are "targets" and that damage to either the head or neck can lead to death.  (*Ex. 57, MCMAP 1999, COS-PROST-012249.*)

241.    Individuals who are trained in hand to hand combat are often versed in utilizing strong sticks to both stab and club others. (*Ex. 60, Greenberg Report, COS-PROST-012800 ¶3.*)

242.    Jason knew or should have known that overhead strikes to the head and neck area are likely to cause death or serious bodily injury; that was part of the training he received as a

Marine. (*Ex. 43, Wallentine Report, COS-PROST-012830 at ¶ 5.*)

## JASON'S CONTINUOUS ADVANCE

243. All officers report that Jason continuously walks toward the officers, not stopping. (Ex. 1, Bayne IA Interview, COS-PROST-011222; Ex. 3, Bayne Deposition, 139:15-18; 151:17-152:2; Ex. 4, Bayne Walk-Thru, COS-PROST-001275; Ex. 26, Moore First Interview, COS-PROST-001289; 001292, 001295-1296; Ex. 28, Carlisle Interview, COS-PROST- 011442-11443; Ex. 29, Moore Walk-Thru, COS-PROST-001308; Ex. 36, Goodson Interview, COS-PROST-001352-54; Ex. 38, Sanborn Interview, COS-PROST-001317-1318; Ex. 40, Reynolds IA Interview, COS-PROST-011313-14; Ex. 41, Moore IA Interview, COS-PROST-011170; Ex. 44, Goodson Walk-Thru, COS-PROST-001364-65 and 1369-70; Ex. 46, Sanborn Walk-Thru, COS-PROST-001333; Ex. 48, Sanborn IA Interview, COS-PROST-011280-11281; Ex. 51, Reynolds Interview, COS-PROST-001381; Ex. 56, Goodson IA Interview, COS-PROST-011127.)

244. Jason's walking pace is described in the various witness reports, with a range of speeds, which include the following descriptors: a methodical slow pace, a regular pace, and a brisk pace. (*Ex. 24, Kuzel Report, COS-PROST-012722.*)

245. Officer Sanborn sees Jason's walk as steady (*Ex. 39, Sanborn Deposition, 82:20-12*) and at a brisk pace (*Ex. 39, Sanborn Deposition, 81:8-25*).

246. Sanborn: "I was – I think – more caught off guard on how fast he approached us." (*Ex. 48, Sanborn IA Interview, COS-PROST-011292.*)

247. Sanborn sees Jason "wielding the…cylinders and then as he gets closer again, never slowing down. Continue[s] on a bee line right for us" .(*Ex. 38, Sanborn Interview, COS-*

*PROST-001317.*)

2      248.   Lt Bayne sees "a very methodical slow paced walk, like he kn[ows] what he [i]s

3   doing coming at us, and he [i]s gonna take us on" (*Ex. 4, Bayne Walk-Thru, COS-PROST-*

4   *001275*).   "He [is] very methodical and he [is] very deliberate . . . it [i]sn't a run, it [i]sn't a

5   crawl, and it [i]sn't a stagger." (*Ex. 3, Bayne Deposition, 137:24 – 138:1.*)

6      249.   Sgt Moore sees Jason "walking straight at us."   He describes Jason's gait as

7   "almost a march.   He [i]s very direct, very specific, and determined in the direction he [i]s

8   going.  I [do]n't see any kind of sway or stagger as he walk[s] out of the residence.  He [takes] a

9   very marched direct route down the pathway from the front door of the residence directly

10  towards where we [are] standing." (*Ex. 29, Moore Walk-Thru, COS-PROST-001309; Ex.16,*

11  *Moore Deposition, 113:24 to 114:1.*)

12              **JASON'S FACIAL EXPRESSION & DEMEANOR**

13     250.   Lt. Bayne describes Jason as having as a "very determined look," a "very

14  aggressive look . . . like he is determined on assaulting somebody."   "He had a look on his face

15  like, 'I'm gonna kill you.'" (*Ex. 1, Bayne IA Interview, COS-PROST-011216; Ex. 4, Bayne*

16  *Walk-Thru, COS-PROST-001272 and 001275.*)

17     251.   Lt. Bayne believes that Jason intends to fight the officers. (*Ex. 4, Bayne Walk-*

18  *Thru, COS-PROST-001272.*)

19     252.   Lt. Bayne describes "the determined stare on his face, looking right down the

20  sidewalk at us and even through us".  (*Ex. 1, Bayne IA Interview, COS-PROST-011219.*)

21     253.   Lt Bayne observes "the first thing I notice is he's got [a] stare…I've seen before

22  with people...under the influence of mind altering drugs. (*Ex. 1, Bayne IA Interview, COS-*

11255923v4

*PROST-011215.*)

254. Mind-altering substances such as crack cocaine are associated with bizarre behavior and violence, and an individual may have an absent or distracted look, or stare, or "glazed" look, and, depending on the mind-altering substance in question, such individuals may be unresponsive to what is happening in the environment. (*Ex. 8, Beckson Report, COS-PROST-012953 ¶10c.*)

255. Drug abusing alcoholics often suffer from impairments of judgment when under the influence of powerful stimulants such as cocaine. This is especially true when they combine stimulant drugs and alcohol. When the human central nervous system is poisoned in such a manner, the subject's behavior often becomes erratic, violent, unpredictable, and dangerous. (*Ex. 60, Greenberg Report, COS-PROST-012800 ¶1.*)

256. Such persons under the influence of stimulant drugs and alcohol can suddenly and unpredictably assault persons with almost superhuman strength. Surviving patients often state that they felt invincible from the effects of the alcohol and stimulant drugs. (*Ex. 60, Greenberg Report, COS-PROST-012800 ¶1.*)

257. Persons under the influence of mind altering drugs such as crack cocaine often exhibit little or no response to irritant sprays and other non-lethal methods used in an attempt to control them. They lose their normal healthy protective fears of dangerous situations. (*Ex. 60, Greenberg Report, COS-PROST-012800 ¶1.*)

258. Based upon the information known to Lt. Bayne and his observations of Jason, it would have been reasonable for Lt. Bayne to suspect that Jason was under the influence of mind-altering substances. (*Ex. 8, Beckson Report, COS-PROST-012953 at ¶¶7-10.*)

11255923v4

259. Officer Reynolds describes Jason's expression as "it look[s] like he kn[ows] what he want[s] to do and he [i]s just walking towards it…As he [keeps] getting closer, I c[an] see that he ha[s] a very glazed look about his face and he [i]s - it's almost like he just [i]sn't there. He [i]s - it [i]s one of the - the scariest, live facial expressions I've seen since I've been on the job. …almost like he…ha[s] a mission, and he [does]n't care what [i]s going on." (*Ex. 40, Reynolds IA Interview, COS-PROST-011313.*)

260. Officer Reynolds feels "threatened from the moment he … walk[s] towards us. He [does]n't have to be 15 feet…I …genuinely think[], this is for real. . . . this is serious. Something's gonna happen. Either one of us is getting hurt by this guy or we're going to have to take action. And, simple as that, he just [keeps] moving…." (*Ex. 40, Reynolds IA Interview, COS-PROST-011321.*)

261. Officer Goodson sees that Jason "kind of ha[s] that…looking at you, but looking through you, coming at you type of look" (*Ex. 44, Goodson Walk-thru, COS-PROST-001365*). "That - he kind of ha[s] that 1000-yard stare, kind of looking through us and he just starts walking right at the mailbox, right at us." (*Ex. 56, Goodson IA Interview, COS-PROST-011126.*)

262. Officer Goodson observes: "So he comes walking out and…at that point as soon as I [see] him, it kind of click[s] like, Holy crap, this guy's on a mission. Cause the whole expression that he ha[s] in his face [i]s he [i]sn't listening to anyone, he [i]sn't…responding to any commands and this guy [i]s on a mission…he kind of ha[s] that 1000-yard stare, kind of looking through us and he just starts walking right at the mailbox, right at us." (*Ex. 56, Goodson IA Interview, COS-PROST-011126.*)

263. Sgt. Moore observes that Jason has a "piercing stare" and "thousand yard stare."

(*Ex. 26, Moore First Interview, COS-PROST-001293.*)

264.   Sgt. Moore observes that Jason is "kinda looking through us" (Moore Second Interview, COS-PROST-001301).   "He [i]s looking directly through us, just like we…almost [are]n't there, or he [i]sn't responding to the fact that we [are] pointing guns at him". (*Ex. 29, Moore Walk-Thru, COS-PROST-001309.*)

265.   Sgt. Moore, "What I [see] [i]s a very blank, kind of not heeding our commands look on his face." (*Ex.16, Moore Deposition, 77:21-22.*)

266.   Sgt Moore reports, "he ha[s] this look on his face like-[i]sn't even registering who we [are] or what we [are] doing.  And he [i]s just gonna keep doing what he need[s] to do and keep walking where he want[s] to go". (*Ex. 29, Moore Walk-Thru, COS-PROST-001313.*)

## JASON DOES NOT RESPOND TO REPEATED POLICE COMMANDS

267.   Officer Sanborn repeatedly gives loud verbal commands to Jason including "Scottsdale Police" "Stop" "Don't move" "Drop the weapons" "Police dog. He will bite you if you don't stop" "You need to obey all commands".   Prostrollo does not respond to the repeated commands being given.  (*Ex. 4, Bayne Walk-Thru, COS-PROST-001272; Ex. 29, Moore Walk-Thru, COS-PROST-001308; Ex. 36, Goodson Interview, COS-PROST-001352; Ex. 38, Sanborn Interview, COS-PROST-001317; Ex. 40, Reynolds IA Interview, COS-PROST-011313; see also Ex. 47, Goodson video clip-commands.*)

268.   Sgt. Moore observes that Jason does not respond to any of the commands and he is looking "straight though" the officers like they "[are]n't even there." (*Ex. 41, Moore IA Interview, COS-PROST-011170.*)

269.   Lt. Bayne sees Jason continue to walk down the walkway with the sticks in his

hands with Officer Sanborn yelling commands at him and "nothing's fazed him." (*Ex. 4, Bayne Walk-Thru, COS-PROST-001272.*)

270. Officer Sanborn, the canine officer, is relying upon the other officers' actions to defend him from the suspect's use of deadly force; he cannot simultaneously control the canine and operate a firearm. (*Ex. 3, Bayne Deposition, 57: 6-10, 58:12 – 59:1, 150:18-21, 151:14-153:7; Ex. 39, Sanborn Deposition, 100:1-5; 129:22-130-2; Ex. 56, Goodson IA Interview, COS-PROST-011133.*)

271. As Jason continues his deliberate march toward the officers and closes the distance, the other officers begin to shout at him to stop and to drop his weapons. (*Ex. 1, Bayne IA Interview, COS-PROST-011222; Ex. 4, Bayne Walk Thru, COS-PROST-001278-1279; Ex.16, Moore deposition, 127:6-7; Ex. 39, Sanborn deposition, 102:18-24; Ex. 40, Reynolds IA Interview, COS-PROST-011313; Ex. 41, Moore IA Interview, COS-PROST-011170 and 011172; Ex. 48, Sanborn IA Interview, COS-PROST-011282.*)

272. At this point, there is an extremely elevated and heightened sense of tension. (*Ex. 1, Bayne IA Interview, COS-PROST-011221-011222.*)

273. The officers' concerns for their safety dramatically increase with each step forward and each swing of the weapons, causing officers other than Officer Sanborn to also shout warnings. (*Ex. 43, Wallentine Report, COS-PROST-012828 at ¶ 2.*)

274. Lt. Bayne "out of desperation for him to comply, [I] drop[] my discipline and I start[] yelling at him as well, in hopes that he [will] comply and stop advancing towards us." (*Ex. 3, Bayne Deposition, 149:12-15.*)

275. "As he [keeps] going - getting closer, I know I [am], based on adrenaline, I even

11255923v4

blurt[] out a couple of times, 'stop. police'. And he just [keeps] moving forward." (*Ex. 40, Reynolds IA Interview, COS-PROST-011313; Ex. 51, Reynolds Interview, COS-PROST-001381.*)

276.    Jason does not comply; he keeps advancing towards the officers with his "hands still raised, items still in his hands coming straight towards us". (*Ex. 51, Reynolds Interview, COS-PROST-001381.*)

277.    Lt. Bayne "has been in a lot – a lot of these situations where … we've . . . been faced with potential deadly force and we've given commands and people have complied.  There [i]s never an indication in my mind that [Jason] ha[s] any intention of complying – at all."  (*Ex. 4, Bayne Walk-Thru, COS-PROST-001275.*)

278.    Jason continues to advance toward the officers, ignoring commands, and displaying what Lt. Bayne describes as an "aggressive posture." (*Ex. 1, Bayne IA Interview, COS-PROST-011220.*)

279.    The officers have very little cover available in the form of the mailbox structure. (*Ex. 43, Wallentine Report, COS-PROST-012827 at ¶ 10.*)

280.    It would be tactically unreasonable for the officers to move away from the tactical position that they have established.  Jason's determined gait and the "thousand yard" distant stare show the officers that he is focused on coming to them.  Moving back would merely move the location of an attack that Jason is determined to accomplish.  Moreover, movement would likely expose even more of the neighborhood residents to danger.   (*Ex. 43, Wallentine Report, COS-PROST-012827 at ¶ 10.*)

281.    Jason's not acknowledging the commands by any verbal or behavioral action

11255923v4

strengthens the officers' belief that Jason is under the influence of mind-altering drugs. (*Ex. 43, Wallentine Report, COS-PROST-012828 at ¶ 3.*)

## **JASON GETS TOO CLOSE**

282.   The Scottsdale Police Officers have been trained in tactical responses, in preserving distance and cover, in the concept of the reactionary gap and use of deadly force to stop assaults. (*Ex. 43, Wallentine Report, COS-PROST-012833 at ¶ 13.*)

283.   The distance at which someone is a threat with a knife or an impact weapon has been taught to officers, including Lt. Bayne, as the "21 foot rule."  This alleged "rule," attributed to Dennis Tueller (SWAT magazine, 1983), was never intended by Tueller to be a "rule" but as an indication that, based on what an officer is doing or will do, an assailant can close a distance and injure or kill an officer faster than an officer can react.  In essence Tueller was expressing a relationship between action / reaction and distance.  (*Ex. 19, Lewinski Report, COS-PROST-012677 at ¶ 10; Ex. 3, Bayne Deposition, 171:11 – 172:21.*)

284.   This concept is taught to officers as the "21 foot rule" but there is no known pre-service or in-service training program in law enforcement that teaches officers how to accurately judge the distance of 21 feet.  Instead officers are taught the concept that letting someone get "too close" with an edged or impact weapon is extremely dangerous and something an officer might not be able to defend against.  (*Ex. 19, Lewinski Report, COS-PROST-012677 at ¶ 10; Ex. 3, Bayne Deposition, 171:11 – 172:21.*)

285.   Lt. Bayne: "…the distance where he was when I finally took that shot I was in complete desperation mode, and my only option in my mind was to put my gun away and run the other way, and that wasn't an option. . . . I felt my officers were in imminent danger, I liken

it to I'm a scuba diver. And I've seen sharks on television, I've seen sharks in aquariums, and I can easily measure them and gauge their distance. I have been scuba diving before and seen great white sharks close to me. And all I can tell you is that they're too close. Too close where I can't measure the distance, but they've been dangerously close to me, in my mind, that I felt unsafe. That's the way that I would relate this right here." (*Ex. 3, Bayne Deposition, 175: 15 – 176:13.*)

286. The officers only have seconds to make their judgment of the threat presented by Jason. (*Ex. 19, Lewinski Report, COS-PROST-012675 at ¶ 5.*)

287. During this brief time span, the speed with which the impact weapons are being swung and the pattern of the swing, leads the officers, and particularly Lt. Bayne, to detect and recognize this action as a threatening, pre-assault pattern of movement performed by someone familiar with using impact weapons. (*Ex. 19, Lewinski Report, COS-PROST-012675 at ¶ 5.*)

## SHOTS FIRED

288. All officers behind the mailbox structure agree that Jason is approaching them in a threatening manner in disregard of police commands. (*Ex. 4, Bayne Walk-thru at COS-PROST-001272-1273; Ex.16, Moore deposition, 127:10-128:5; Ex. 39, Sanborn deposition, 55:5-56:7; Ex. 40, Reynolds IA Interview at COS-PROST-011313, 011321; Ex. 48, Sanborn IA Interview, 011282; Ex. 56, Goodson IA Interview, COS-PROST-011127-11128.*)

289. All officers behind the mailbox structure perceive this as a lethal force situation, and all except for K9 Officer Sanborn have their firearm or rifle drawn. (*Ex. 1, Bayne IA Interview at COS-PROST-011231; Ex. 4, Bayne Walk-Thru, COS-PROST-001275-1276; Ex. 40, Reynolds IA Interview, COS-PROST-011323; Ex. 41, Moore IA Interview, COS-PROST-*

11255923v4

*011178; Ex. 48, Sanborn IA Interview, COS-PROST-011295; Ex. 56, Goodson IA Interview, COS-PROST-011132.*)

290.   Lt. Bayne is positioned near the mailbox structure, facing toward Jason. (*Ex. 4, Bayne Walk-Thru, COS-PROST-001272; Ex. 30, Scene Photos, COS-PROST-002180, 002273.*)

291.   Lt. Bayne's sight picture is focused upon Jason's chest – his center mass. (*Ex. 1, Bayne IA Interview, COS-PROST-011225; Ex. 3, Bayne Deposition, 162:11-14; Ex. 4, Bayne Walk-Thru, COS-PROST-001276, 1282.*)

292.   Officers throughout the nation are trained that center mass is the generally preferable target zone when using deadly force.  (*Ex. 43, Wallentine Report, COS-PROST-012819.*)

293.   Lt. Bayne takes a split second to look down the sidewalk to assess the length of the sidewalk, and to see where Jason is going to get to before Lt. Bayne feels like Jason is directly on top of the officers, where it will be unsafe to allow Jason to come any closer.  (*Ex. 1, Bayne IA Interview, COS-PROST-011224.*)

294.   As Jason comes closer, Lt. Bayne flanks off to the left of the officers taking cover behind the mailbox structure. (*Ex. 1, Bayne IA Interview, COS-PROST-011224; Ex. 36, Goodson Interview, COS-PROST-001353; Labeled Scene Photo, attached hereto at Exhibit 69.*)

295.   Sgt. Moore has the safety off his rifle, his finger on the trigger, and is beginning to apply pressure to the trigger.  (*Ex.16, Moore Deposition, 90:17-20; Ex. 29, Moore Walk-Thru, COS-PROST-001312; Ex. 41, Moore IA Interview, COS-PROST-011173-011175.*)

296.   Officer Goodson observes that "the safety [is] off, my finger [i]s on the trigger [of my rifle], my sights [are] on his chest and I [am] gonna give the dog one split second, and if the

dog [i]sn't gonna do anything, then I [think to myself] that I'm gonna have to shoot this guy." (*Ex. 56, Goodson IA Interview, COS-PROST-011128-29; see also Ex. 36, Goodson Interview, COS-PROST-001353.*)

297.    When Jason enters the area at the west side of the circle drive, Officer Sanborn is able to perceive that Jason is not holding a knife or a gun in his hands, and based upon his training, he releases Raider.  (*Ex. 48, Sanborn IA Interview, COS-PROST-011282-11283; 011292-11293.*)

298.    Raider leaps at Jason and initially makes contact with his chest and then moves to bite his right bicep.  Jason makes no attempt to avoid Raider and "[takes] the bite." (*Ex. 39, Sanborn deposition, 163, 7-164:12; 178:3-17; 180:17-24; 193:5-17; see also Ex. 38, Sanborn Interview, COS-PROST-001317-1318; Ex. 46, Sanborn Walk-Thru, COS-PROST-001337.*)

299.    At approximately the same time that Raider is released, Lt. Bayne believes that Jason is dangerously close and has the ability to strike the other officers.  (*Ex. 4, Bayne Walk-Thru, COS-PROST-001277.*)

300.    Lt. Bayne fears that Jason is dangerously close such that even if the canine achieves a sufficient bite, the canine might not be able to stop Jason from assaulting the other officers.  (*Ex. 4, Bayne Walk-Thru, COS-PROST-001277.*)

301.    Police officers are trained that force options, including firing a gun, do not always result in the expected outcome.  "Bullets don't work, except when they do" is a maxim repeated in some training programs.  Suspects and officers are physically capable of receiving many gunshots or blows or stab thrusts and continuing to fight even if some or all of the injuries prove to be ultimately fatal.  Officers are trained on this fact and must consider it in making force

11255923v4

decisions.  (*Ex. 43, Wallentine Report, COS-PROST-012832 at ¶ 9.*)

302.    Lt. Bayne is concerned, based upon his training, that their bullets are not going to stop Jason because Jason is so close, and he knows that it will take perfect shot placement to immediately stop Jason.  (*Ex. 1, Bayne IA Interview, COS-PROST-011225; Ex. 3, Bayne Deposition, 174:3-11.*)

303.    Non-lethal gunshot wounds often fail to stop the attack of an individual under the influence of mind altering drugs such as crack cocaine, necessitating a critical hit to the brain, spinal cord, or heart in order to neutralize the attack. (*Ex. 60, Greenberg Report, COS-PROST-012800 ¶1.*)

304.    From his vantage point, Lt. Bayne sees that another step by Jason will cause Lt. Bayne to lose his shot as the suspect will be obscured by the mailbox structure.  "That [i]s my very last opportunity to be able to defend anybody.  If I . . . wait[] a split second longer, he [will be] out of sight for me, based on that pillar right there, and I [will be] completely defenseless." (*Ex. 1, Bayne IA Interview, COS-PROST-011235; Ex. 3, Bayne Deposition, 150:2-6; Ex. 4, Bayne Walk-Thru, COS-PROST-001276.*)

305.    Lt. Bayne: "I have …a very compelling duty as a supervisor to protect my officers.  And I [feel] that I absolutely ha[ve] to take that shot because I don't know why a shot [i]sn't coming from my right." (*Ex. 3, Bayne Deposition, 150:18-21.*)

306.    Lt. Bayne's response to Jason's actions is completely guided by his training on the perception of and reaction to a threat.  (*Ex. 1, Bayne IA Interview, COS-PROST-011252, 11254.*)

307.    "It [i]s clear to me that he [i]sn't going to comply with our commands and he ha[s] every intent to hit one of the officers.  And I believe that that [will] cause[] life threatening

11255923v4

injuries if he [is] successful." (*Ex. 4, Bayne Walk-Thru, COS-PROST-001283.*)

308. Lt. Bayne fires two rounds in rapid succession from his Scottsdale Police Department issued duty firearm. (*Ex. 1, Bayne IA Interview, COS-PROST-011225; Ex. 4, Bayne Walk-Thru, COS-PROST-001282.*)

309. One bullet hits Jason center mass while he is in mid-swing with the weapons. (*Ex. 1, Bayne IA Interview, COS-PROST-011226; Ex. 3, Bayne Deposition, 168:7-11.*)

310. The wound path travels through the right ventricle of the heart, nicks the aorta, and continues through the lower lobe of the left lung. (*Report of Autopsy, COS-PROST-002408 at ¶2, attached hereto as Exhibit 70.*)

311. Such a wound would cause instant incapacitation due to the hydrostatic shock of the expanding bullet, direct trauma to both the heart and the aorta, pulmonary injury, damage to the electrical conduction system of the heart, and severe hemorrhage – all of which would have contributed to an immediate catastrophic loss of blood pressure, loss of consciousness, and rapid death. This particular wound path causes Jason to immediately drop to the ground upon being shot. (*Ex. 60, Greenberg Report, COS-PROST-012800 at ¶ 4.*)

312. The other bullet hits canine Raider in the neck, wounding him. (*Ex. 4, Bayne Walk-Thru, COS-PROST-001276; Ex. 39, Sanborn deposition, 123:9-16; 158:15-21; Ex. 48, Sanborn IA Interview, COS-PROST-011288.*)

313. Jason immediately falls to the ground and is motionless. (*Ex. 1, Bayne IA Interview, COS-PROST-011226; Ex. 3, Bayne Deposition, 167:3-4; Ex. 38, Sanborn Interview, COS-PROST-001318.*)

314. Sgt. Moore and Officer Goodson initially believe that they had fired their

weapons.  (*Ex.16, Moore Deposition, 90:13, 17-20; Ex. 41, Moore IA Interview, COS-PROST-011185; Ex. 56, Goodson IA Interview, COS-PROST-011128.*)

315.    Lt. Bayne is focused on an accurate shot placement and is unaware of the response of other officers, including the actions of the canine.  Lt. Bayne observes that "because my vision was focused on the person aggressing us – the subject – I had no lateral vision in the darkness of the dog coming at him."  (*Ex. 19, Lewinski Report, COS-PROST-012679 at ¶ 4; Ex. 1, Bayne IA Interview, COS-PROST-011228.*)

316.    This focused attention and rapid independent decision-making is characteristic of officers in the middle of a conflict who are independently making judgments about the threat and focused on their individual response to the threat.  In the police world this is called "tunnel vision" but is actually a well-known and well-researched phenomenon that occurs in all humans.  (*Ex. 19, Lewinski Report, COS-PROST-012679 at ¶ 4.*)

317.    Lt. Bayne testified: "I knew that everybody was armed with at least a sidearm, and I knew that they had a dog, yes, that's true.  That doesn't allow me to override that feeling of desperation that I needed to take action, that in my 26 years of law enforcement carrying a sidearm, carrying a pistol on duty since I was 18 years old, involved in numerous, numerous, hundreds of situations, where there's conflict, I have worked all over the State of Arizona, I've been on a SWAT team, I've worked in gang neighborhoods in South Phoenix, and never ever once have I felt compelled to use deadly force like I did in that very moment.  I was desperate for Jason to stop advancing towards us and he didn't.  My perception was right then – right now sitting here in the comfort of this room looking at measurements and things like that, that's really nice in retrospect, and I certainly respect that, that's the investigation, those are the facts.

What I can testify to is my overwhelming feeling, based on what was known to me at the time, based on my observations of the cab driver who was so scared that in his explanation to me the way he demonstrated that somebody had held a knife to his throat and was going to slit his throat, okay? . . . Because that goes into my decision to shoot, to use deadly force, without a doubt. I saw that, and when I saw that, it was not the first time in my career that I've experienced that kind of explanation from a victim, but that told me that we were dealing with an individual who had the potential to use a great degree of violence. That was not known to the other individuals who are off to my right who you're talking about were well armed to protect themselves. I was the one who had that information firsthand." (*Ex. 3, Bayne Deposition, 151:14 – 153:7.*)

318. Lt. Bayne also explained: "[M]y perception, my belief was …from my – all my years of training [unintelligible] hit me or one of those officers in the head very easily with his level of violence that he has displayed all night, it was clear to me that he wasn't gonna comply with our commands and he had every intent to hit one of the officers. And I believe that that would've caused life threatening injuries if he would've been successful with that. That's – that's what I believe." (*Ex. 4, Bayne Walk-Thru, COS-PROST- 001283.*)

319. Lt. Bayne: "I found myself - what I thought was a predetermined point in the sidewalk where I looked at it and I mentally said to myself, if he gets to this point, he's gonna be right on top of us. It's gonna be dangerously close. We're - we can be assaulted by him if he - if he jumped out, if he swung - swung at us, there wouldn't be much that we would be able to do to stop him. And I felt  . . .  by the time I made the decision to shoot, that that point was actually even much closer than what I had imagined before he got to it. And I'll tell you why, because I'm

relying on, um, gunshots actually stopping him. I'm thinking that a dog deployment is coming somewhere and potentially stopping him. But nothing - nothing came at any point. A dog didn't come. And this happened really fast. And now he's so close that I'm concerned that me shooting him and, um, and I'll get to this in a minute, but I thought everybody had actually shot him. My concern was that our bullets weren't gonna stop him because he was so close. From what I know with shootings and training and things like that, you have to be very accurate, you have to be very skilled to hit somebody to immediately stop them. We all know about the 21 foot rule, and the studies that have been done with that with aggression and edged weapons and things like that. My assessment was that he was easily within that. He was easily within a distance where he could reach out and strike us where, even a half a step more and we would not have had the opportunity to respond to - to defend ourselves if the rounds were not absolutely appropriately placed to be able to immediately stop him." (*Ex. 1, Bayne IA Interview, COS-PROST-011224-011225.*)

320. Lt. Bayne: "I would do exactly the same thing again, because to me the only set of circumstances that would be worse than this is if I didn't do that, and I was sitting here dealing with you representing one of my officers who I didn't defend. And that was the way I felt that night." (*Ex. 3, Bayne Deposition, 176: 17-22.*)

## **AFTER SHOTS FIRED**

321. Per Scottsdale Police procedure, Jason is handcuffed. (*Ex. 1, Bayne IA Interview, COS-PROST-011227; Ex. 4, Bayne Walk-Thru, COS-PROST-001274; Ex. 40, Reynolds IA Interview, COS-PROST-011316.*)

322. Officer Sanborn does not immediately call-in the shoot after the shots are fired.

11255923v4

(*Ex. 38, Sanborn Interview, COS-PROST-001318-001319; Ex. 46, Sanborn Walk-Thru, COS-PROST-001334.*)

323. In that gap of time between the shots actually being fired and Officer Sanborn radioing-in to Dispatch that there had been an officer involved shooting, (*Ex. 2, Radio Traffic Transcript-House, COS-PROST-011396*, *"King 28. 998. Roll fire."*), Officer Sanborn observes and performs the following activities:

(a) ". . . the [suspect] immediately drops, hits the ground and he's got no movement." (*Ex. 38, Sanborn Interview, COS-PROST-001318*)

(b) "I look, I don't see Raider initially 'cause he came off the bite 'cause it's dark." (*Ex. 38, Sanborn Interview, COS-PROST-001318*)

(c) "But then I see he's in the driveway and he kind of made a circle." (*Ex. 38, Sanborn Interview, COS-PROST-001318*)

(d) "Registers to me, okay, this [suspect] just got shot." (*Ex. 38, Sanborn Interview, COS-PROST-001318*)

(e) "So I – I go to approach to – to secure [the suspect]. ….and to handcuff him and, uh, see – really identify what's in his hands." (*Ex. 38, Sanborn Interview, COS-PROST-001318*)

(f) ". . . as I do that I realize Raider's still around here and he's – he could be freaked out. Uh, I don't want him biting cops." (*Ex. 38, Sanborn Interview, COS-PROST-001318*)

(g) "So, when I see [the suspect is] not moving I refocus my attention to finding Raider." (*Ex. 38, Sanborn Interview, COS-PROST-001318*)

(h) "I recall [Raider] to me." (*Ex. 38, Sanborn Interview, COS-PROST-001318*)

11255923v4

(i) "[Raider] comes back. There's no limp. No anything. He comes back to me. He comes to my side." (*Ex. 38, Sanborn Interview, COS-PROST-001318*)

(j) "I'm able to grab [Raider] by his leash. Uh, reassure him that he's good. He's a good boy, he did a good job." (*Ex. 38, Sanborn Interview, COS-PROST-001318*)

(k) "Um, our team is now capable of – of handling our bad guy. They – I can see that they have enough personnel that they can move to this guy, do what they need to do and I remember them being focused on the house." (*Ex. 38, Sanborn Interview, COS-PROST-001318*)

(l) "That's when I started hearing splashing sounds." (*Ex. 38, Sanborn Interview, COS-PROST-001318*)

(m) "I couldn't figure out where that was coming from." (*Ex. 38, Sanborn Interview, COS-PROST-001318*)

(n) "And then I looked down and I started to see blood. And what I was seeing on the floor was blood and it was fresh and it was splashing." (*Ex. 38, Sanborn Interview, COS-PROST-001318*)

(o) "I kind of looked towards the bad guy, realized I was too far away to see that, to have [blood from the suspect] hitting here towards my feet and then it registers that, um, [the blood is] coming from Raider." (*Ex. 38, Sanborn Interview, COS-PROST-001318*)

(p) "So I realized [Raider] is bleeding and now it's starting to sound very heavy, loud splashing." (*Ex. 38, Sanborn Interview, COS-PROST-001318*)

(q) "I looked down, I can't see anything, uh, because it's just too dark, but I can tell there's a lot of liquid on his chest. And I know that it's blood." (*Ex. 38, Sanborn*

*Interview, COS-PROST-001318*)

(r) ". . .and then the splashing kind of helped secure that it was [Raider's] blood and not our bad guy's blood. . . .Um, but again, active, uh, bleeding, heavy amounts." (*Ex. 38, Sanborn Interview, COS-PROST-001319*)

(s) "So, when that registered I inform the contact team, Raider's shot. I'm going back to the car. I'm going to try and render [Raider] aid." (*Ex. 38, Sanborn Interview, COS-PROST-001319*)

(t) "I get someone to acknowledge and say okay. I don't know who it was." (*Ex. 38, Sanborn Interview, COS-PROST-001319*)

(u) "Um, before I left here I announced that, uh, 998, subject was down." (*Ex. 38, Sanborn Interview, COS-PROST-001330*)

(*See also Ex. 28, Carlisle Interview, COS-PROST-011444-011446*, detailing several of Carlisle's observations and activities occurring between shots fired and seeing Officer Sanborn starting to approach him with Raider).

324.    At 4:50:13 am, Officer Sanborn radios to Dispatch that there's been an officer involved shooting, or "998," and to send medical aid for the suspect. (*Ex. 2, Radio Traffic Transcript-House, COS-PROST-011396, "King 28. 998. Roll fire."*)

325.    Lt. Bayne then radios at 4:50:26 "I don't know if, uh, it's been advised but 998 got a subject down, uh, start fire." (*Ex. 2, Radio Traffic Transcript-House, COS-PROST-011396*)

## **SUBSEQUENT INVESTIGATION, TIMING & MEASUREMENTS**

326.    Pursuant to a search warrant served on the house, a large amount of cocaine,

11255923v4

63

methamphetamine, and other dangerous and illegal drugs and drug paraphernalia is found inside the house. (*Return of Search Warrant 2012-000886 and Scottsdale Crime Lab Report, COS-PROST-001716, 1701-1702 and 1706, attached hereto as Exhibit 71.*)

327.    Pursuant to a search warrant served on the house, two knives fitting the descriptions given by witnesses are recovered.  (*Search Warrant 2012-000884, COS-PROST-001545, attached hereto as Exhibit 72; Knife #1 Photograph, COS-PROST-002259-2263, attached hereto as Exhibit 73; Knife #2 Photograph, COS-PROST-002284-2286, attached hereto as Exhibit 74.)*

328.    At least one of those knives is identified as belonging to Jason, a Christmas gift from his former girlfriend Sarah Beattie.  (*Ex. 10, Beattie Deposition, 74:2-15; See Ex. 73, Knife #1 Photograph COS-PROST-002259-2263; Receipt and Evidence of knife purchase, COS-PROST-012066-12067 and 012084, attached hereto as Exhibit 75.*)

329.    The Maricopa County Attorney's Office Shooting Review Board investigated and reviewed the facts and circumstances surrounding this shooting and determined that Lt. Bayne did not commit any act that warrants criminal prosecution.  (*MCAO Letter to Chief Rodbell, COS-PROST-011077, attached hereto as Exhibit 76.*)

330.    The Internal Affairs Unit of the Scottsdale Police Department investigated and reviewed the facts and circumstances surrounding this shooting and determined that Lt. Bayne was in policy.  (*Ex. 20, IA Summary, COS-PROST-011491-011600.*)

331.    The distance from the front door of the house to Jason's body is approximately 37.6 feet.  (*Ex. 31, Scene Diagram and Measurements, COS-PROST-001623.*)

332.    Jason is shot at a distance of approximately 17 to 19 feet directly in front of the

officers taking cover behind the mailbox structure. (*Ex. 24, Kuzel Report at photo 07693PH_0009, COS-PROST-012738; Ex. 31, Scene Diagram and Measurements, COS-PROST-001623.*)

333.    This incident is very brief, intense, dynamic, visually and behaviorally complex and is perceived by all of the officers to be life threatening. (*Ex. 19, Lewinski Report, COS-PROST-012679.*)

334.    Approximately fourteen (14) minutes elapse from the time officers arrive on the scene until Jason exits the residence and begins to advance on the officers. (*Ex. 2, Radio Traffic Transcript-House, COS-PROST-011390-95.*)

335.    From the time Lt. Bayne arrives at the residence until Jason exits the residence, approximately 4 to 5 minutes elapse (*Ex. 1, Bayne IA Interview, COS-PROST-011206; Ex. 2, Radio Traffic Transcript-House, COS-PROST-011395; Ex.14, CAD – House, COS-PROST-001156-001157; Ex. 20, IA Summary, COS-PROST-011507-11508.*)

336.    From the announcement that Jason is exiting the residence (4:49:42) to the time it is announced on PD Radio by Officer Sanborn that an Officer Involved Shooting has occurred (4:50:13), 31 seconds elapse. (*Ex. 2, Radio Traffic Transcript-House, COS-PROST-011395-96.*)

337.    Within that 31 seconds, Jason exits the house, Jason approaches the officers, Jason is shot, Sanborn perceives and responds to the shooting, Sanborn advances toward Jason, Sanborn assesses Jason's condition, Sanborn locates and assesses Raider, and then Sanborn calls out the "998" on the PD Radio. (*Ex. 2, Radio Traffic Transcript-House, COS-PROST-011395-96; Ex. 38, Sanborn Interview, COS-PROST-001318-001319; Ex. 46, Sanborn Walk-Thru, COS-PROST-001334.*)

338.    Witnesses differ in their statements with regard to exactly how much time passes from Jason's exit to shots being fired:  Sanborn describes the time as 5 seconds from time Jason exits to Sanborn's decision to send the dog (*Ex. 38, Sanborn Interview, COS-PROST-001323-1324*); Sgt. Moore estimates 10-12 seconds (*Ex.16, Moore deposition, 115:24-116:5*); Lt. Bayne estimates 4 to 6 seconds (*Ex. 1, Bayne IA Interview, COS-PROST-011236*).

339.    The witnesses' stated perception of speed is indicative of a walking speed in the range of 3 to 9 feet per second, which covers the range of slow to brisk walking pace for an adult male of Jason's age, stature and physical ability.  In this respective range of walking speeds, Jason would have required roughly 4 to 13 seconds to travel from the front door to the area where he was shot.  (*Ex. 24, Kuzel Report, COS-PROST-012729 at ¶ 5.*)

340.    Scientifically examining the re-enactments demonstrated on videotape by the officers under oath in deposition, a conservative walking pace of Jason is 4.3 to 9.3 feet per second.  This means that, based on the re-enactments during deposition, Jason would have required roughly 4 to 9 seconds to travel from the front door to the area he was shot.  (*Ex. 58, Desmoulin Report, COS-PROST 012990; See also Bayne video clip-pace from Bayne Deposition at 139:19-140:19, attached hereto as Exhibit 77; Moore video clip-pace from Moore deposition at 29:5-6, attached hereto as Exhibit 78; Goodson video clip-pace from Goodson Deposition at 73:8-17, attached hereto as Exhibit 79; Sanborn video clip-pace from Sanborn Deposition at 78:2-79:3, attached hereto as Exhibit 80.*)

## REACTIONARY GAP

341.    Failing to stop Jason's assault at the point where Lt. Bayne fired would have perilously narrowed the "reactionary gap," *i.e.*, the minimum space necessary to permit the

11255923v4

officers to properly react to whatever threat and assault that a suspect can deliver. (*Ex. 43, Wallentine Report, COS-PROST-012831 at ¶ 8.*)

342. Jason is less than twenty feet away from the officers at the time he is shot. Research shows that someone can cover this distance in approximately two seconds. (*Ex. 19, Lewinski Report, COS-PROST-012677 at ¶ 9.*)

343. If one were to swing a two or three foot weapon at arm's length then they would only have to close a distance of about sixteen or seventeen feet and swing. This could be accomplished easily in a second and a half, and that includes a swing with the weapon or a slice with a knife. This means that if Jason is an average person, at the position or distance from the officers where he is shot, he can easily be perceived as an imminent if not immediate threat by the officers. (*Ex. 19, Lewinski Report, COS-PROST-012677 at ¶ 9.*)

344. In this incident, the officers perceive that they cannot influence Jason. This is especially true for Lt. Bayne, given his knowledge of Jason's previous behavior and Jason's current apparent defiance and perceived skill with the impact weapons he is holding in his hands. (*Ex. 19, Lewinski Report, COS-PROST-012677 at ¶ 10.*)

345. Not only could the blows from Jason potentially have been fatal, but Jason would have been in a position to disarm an officer and use the officer's weapon. (*Ex. 43, Wallentine Report, COS-PROST-012831 at ¶ 8.*)

346. Every encounter with an armed police officer involves at least one gun. Each year, tragically, a number of police officers are killed with their own guns when a suspect is able to overpower the officer and take the officer's gun. (*Ex. 43, Wallentine Report, COS-PROST-012832 at ¶ 10.*)

11255923v4

347.    Even though there are multiple officers present, it would be very easy for Jason to grab one of the officers' weapons if he were able to disable – even partially or temporarily – one of the officers by striking him with the weapons.  (*Ex. 43, Wallentine Report, COS-PROST-012832 at ¶ 10.*)

348.    A reasonable and well-trained officer would have recognized that deadly force was a reasonably necessary response to Jason's determined assault with potentially deadly weapons against the officers.   The decision to use deadly force was reasonable and was consistent with generally accepted police practices, policy and training.  (*Ex. 43, Wallentine Report, COS-PROST-012833 at ¶ 12.*)

349.    "I do not know what could have been done differently, given the exact same circumstances.  Um, I believe that the people who know me well, know that, had this individual come out…. Had – had this individual come out and requested assistance, I'd be the first person to put my arm around this guy and say, let's go get you help.  He did not do that.  He chose to come out fighting.  And it left me no options but to defend myself and the other officers." (*Ex. 1, Bayne IA Interview, COS-PROST-011255.*)

## THE SCIENCE OF PERCEPTION AND MEMORY

350.    Shooting situations are often fluid and dynamic and the memory of each person at the incident will be different based upon their attention and focus during the incident.  (*Ex. 19, Lewinski Report, COS-PROST-012678 at ¶ 1.*)

351.    An officer's attention and focus are driven by their professional and survival interests and will often be different than that of witnesses who are not directly involved in the incident and who do not see it from the involved officer's perspective. (*Ex. 19, Lewinski Report,*

11255923v4

352. The ability to perceive and process information is significantly impaired within the heat of a dynamic, violent conflict. (*Ex. 19, Lewinski Report, COS-PROST-012678 at ¶ 2.*)

353. Violent encounters of a life threatening nature, that are dynamic, complex and rapidly unfolding further challenge anyone's perceptual and attentional abilities. Even in a non-stressful encounter it is generally impossible to note every piece of information and action. In a life-threatening encounter, an officer can often just get glimpses of an incident but might not clearly see anything else except that on which they are intently focused. (*Ex. 19, Lewinski Report, COS-PROST-012678 at ¶ 2.*)

354. The speed of the encounter, the limited time exposure of any specific action, and the complexity of the behavior combine with the threatening nature of the incident to significantly impair the officers' ability to accurately observe and report on anything but that on which they are directly focused. (*Ex. 19, Lewinski Report, COS-PROST-012678 at ¶ 2.*)

355. Generally speaking, humans can gather only snippets of an incident or gather partial information of the incident and then interpret that information using the history and context of that specific incident and our experience and training to make judgments and form a memory about the activity occurring within the incident. This is one of the reasons why officers will occasionally report on something that might not have been readily apparent to them during the incident but which fit the pattern they made of observable behavior during the incident. (*Ex. 19, Lewinski Report, COS-PROST-012678 at ¶ 2.*)

356. The officers' behavior and memory in this incident are classic examples consistent with the behavior and memory studied in well-trained officers acting reasonably in similar

11255923v4

circumstance. (*Ex. 19, Lewinski Report, COS-PROST-012680.*)

## JASON – UNDER THE INFLUENCE OF ALCOHOL

357. Jason was also under the influence of alcohol, which is associated with disinhibition, impaired judgment, aggression and violence. (*Ex. 8, Beckson Report, COS-PROST-012917 ¶c; Ex. 9, Toxicology Report, COS-PROST-002415-2416.*)

358. Jason had a history of extreme binge drinking patterns. (*Ex. 60, Greenberg Report, COS-PROST-012799 ¶1.*)

359. Jason had a history of binge drinking up to a "fifth" (750 ml bottle) of Jack Daniels whisky in a day (*Ex. 7, Bryan Prostrollo Deposition, 34:19; Ex. 8, Beckson Report, COS-PROST-012938 ¶5a.*)

360. The accepted definition for binge drinking is five or more standard drinks per occasion. (*Ex. 60, Greenberg Report, COS-PROST-012799 ¶1.*)

361. Jason's records reveal that he had a history of frequently drinking a full 750 ml bottle of Jack Daniels Whiskey per evening throughout much of the year prior to his death. (*Ex. 60, Greenberg Report, COS-PROST-012799 ¶1.*)

362. "There were times when he said, 'Oh, I drank a handle of this on my own" [a "handle" refers to a 1.5 liter bottle of liquor] (*Ex. 10, Beattie Deposition, 42:2*).

363. Jason had a drinking problem and "didn't have the ability to really stop himself." Jason "was drinking until the bar closes or drink until [he couldn't] stand or drink until he's asked to leave," and it "was in excess" (*Ex. 10, Beattie Deposition, 39:9*).

364. Jason drank to the point of intoxication "multiple nights a week" (*Ex. 10, Beattie Deposition, 39:9*).

365.    Jason "could certainly out-drink most people," an indication of his very substantial tolerance to alcohol (*Ex. 10, Beattie Deposition, 42:7; Ex. 8, Beckson Report, COS-PROST-012939*).

366.    On December 12, 2011, just weeks prior to this incident, Jason had a measured Blood Alcohol Content ("BAC") of 0.343%.  When he was informed of that fact by the medical personnel evaluating him he responded, "I've been higher than that."  (*Scottsdale Healthcare Medical Records, CPRI Crisis Evaluation, COS-PROST-008905, attached hereto as Exhibit 81.*)

367.    At autopsy, microscopic pathology revealed "chronic hepatitis manifested by moderate to marked increase in portal chronic inflammatory infiltrate with invasion of periportal hepatocytes.  Mild steatosis" (*Ex. 8, Beckson Report, COS-PROST-012938 ¶4a; Ex. 70, Report of Autopsy, COS-PROST-002411.*)

368.    "Chronic" duration typically means a period of months to years.  (*Ex. 8, Beckson Report, COS-PROST-012938 ¶4(a)(i).*)

369.    Alcoholic hepatitis is the precursor to alcoholic cirrhosis of the liver, and is a common cause of premature death in heavy drinkers worldwide. Alcoholic hepatitis and cirrhosis of the liver are more common in extreme binge drinkers.  (*Ex. 60, Greenberg Report, COS-PROST-012799, ¶2.*)

370.    Use of cocaine and alcohol is not uncommon in binge pattern alcoholics. Stimulant drugs such as cocaine are taken by the binge drinker in order to keep them from passing out so they can continue to consume more alcohol and enjoy the effects they desire. Unfortunately, this also contributes to multiple high risk behaviors to include acts of violence and suicide.  (*Ex. 60, Greenberg Report, COS-PROST-012799 ¶4.*)

371.   Chronic hepatitis is consistent with chronic alcohol abuse having caused liver damage and inflammation.  This finding increases the likelihood that Jason has a relatively high chronic tolerance for alcohol, as compared to the tolerance of an average social drinker.  (*Ex. 8, Beckson Report, COS-PROST-012938 ¶4.*)

372.   Jason's alcohol abuse caused the development of tolerance so that he was able to handle relatively high BAC (compared to average social drinkers) without being obviously intoxicated. (*Ex. 8, Beckson Report, COS-PROST-012928 ¶2.*)

373.   It is likely that Jason had a high tolerance to alcohol at the time of his death. (*Ex. 8, Beckson Report, COS-PROST-012939 ¶iii.*)

RESPECTFULLY SUBMITTED this 16th day of August, 2013.

**SCOTTSDALE CITY ATTORNEY'S OFFICE**

/s/ Lori S. Davis
Lori S. Davis, Assistant City Attorney
3939 North Drinkwater Boulevard
Scottsdale, Arizona 85251
Attorneys for Defendants, City of Scottsdale
    and Lt. Ronald Bayne

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of August, 2013, I electronically transmitted the attached document to the Clerk's office using the CM/ECF Systems for filing and transmittal of a Notice of Electronic filing to CM/ECF registrants:

Joel B. Robbins
Anne E. Findling
Robbins & Curtin, PLLC
301 East Bethany Home Road
Suite B-100
Phoenix, AZ 85012
Attorneys for Plaintiff

/s/ Elaine Goetze
An Employee of the Scottsdale
City Attorney's Office

11255923v4