**EXHIBIT 20**

# INTERNAL AFFAIRS INVESTIGATION
## ASSISTANT CHIEF/CHIEF OF POLICE
## REVIEW LOG

INVESTIGATION NUMBER:     **IA2012-011**

EMPLOYEE:     **LIEUTENANT RON BAYNE**

INCIDENT:     **OFFICER INVOLVED SHOOTING**

FINDING:     IN POLICY

~~ACOP HELEN GANDARA:~~ _____ DATE REVIEWED: _____

ACOP JOHN COCCA: _____ DATE REVIEWED: 5-2-13

~~ACOP SEAN DUGGAN:~~ _____ DATE REVIEWED: _____

COP ALAN RODBELL: _____ DATE REVIEWED: 5-29-13

Chief's Final Recommendation:

_Concur w/ investigation & findings._

_____

_____

_____

_____
DO NOT WRITE BELOW THIS LINE

Supervisor notified

_____      5/29/13
Signature                              Date

COS-PROST-011491

# SUMMARY

IA# 2012-011

## INCIDENT SUMMARY

On January 28, 2012 at around 3:56am, taxi cab driver Travis Keehn picked up Jason Prostrollo at 10274 North 135th Place in Scottsdale, Arizona. Jason had been at the address drinking with the residents, Daniel Hall and Rachel Rogers (Daniel's girlfriend).

After getting into the cab, Jason produced a knife and held it to Travis' throat while making him drive around the area. A short time later, Jason had Travis drop him back off at 10274 North 135th Place. Fearful, Travis left the area and called the police from a gas station located at 8990 East Shea Blvd.

Meanwhile, Jason entered the 135th Place house and confronted the residents. Jason held Daniel at knifepoint and refused repeated requests by Daniel to put the knife down. Rachel was able to call Scottsdale Police Dispatch via 911 from the bedroom.

Scottsdale Police Officers responded to the address and contacted Rachel. They were aware that Jason was currently holding Daniel inside the house at knifepoint. At one point Daniel was able to get out of the house, however, Jason remained inside.

Officers set up around the house and established a contact team that consisted of a Canine handler and his canine, a Sergeant, and two additional officers. The contact team was in

place at the front of the house where the street/sidewalk meets the property line. The team was positioned behind/near a small structure that contained a mailbox.

Lieutenant Ron Bayne arrived and approached the front of the house. He was speaking on the phone with a Police Sergeant who was supervising the investigative effort of the incident involving Travis at 8990 East Shea Blvd. Shortly after arriving, Jason exited the house from the front door. The outside area was dark and Jason was backlit by the lights coming from inside the house.

Jason was armed with two poles that were later determined to be two halves of a pool cue. The Canine Officer, Anthony Sanborn, began yelling commands. Jason ignored commands as he approached the contact team. The poles were in an upward position near Jason's shoulders. Lieutenant Bayne described Jason as moving the poles in a martial arts type motion in front of him. As Jason got close to the team, multiple officers began yelling for Jason to stop. Officer Sanborn released his dog.

When Jason reached and area approximately between 17 and 19 feet directly in front of the team, Officer Sanborn's canine made it to Jason and lunged up toward his chest area. At about the same time, Lieutenant Bayne fired his Glock 22 handgun two times at Jason. Jason was fatally stuck by one bullet.

Jason was then handcuffed and medical help was summoned. The police canine had also been shot as it lunged up in front of Jason.

COS-PROST-011493

During the search of Daniel's residence after the shooting, investigators found illegal drugs. An additional report was authored regarding possession of narcotics, dangerous drugs, and drug paraphernalia.


## INCIDENT OVERVIEW

*This section provides an overview of the incident. This section includes summary information for the call for service to 12074 North 135th Place regarding a Subject with a Knife, the call for service to 8990 East Shea Blvd regarding an Armed Robbery, the response/arrival/timeline to the Subject with a Knife call, the response/arrival/timeline to the Armed Robbery call, Lieutenant Bayne's response/use of deadly force/timeline, and the post shooting actions/timeline. This incident overview was completed after reviewing the information contained in interviews, GPS data, Computer Aided Dispatch data, time-stamped radio broadcast transcripts, 911-call transcripts, Medical Examiner reports, and Incident Reports.*


### Call for Service – *12074 North 135th Place*

On January 28, 2012 at approximately 4:19am, Rachel Rogers called the Scottsdale Police Department via 911. Rachel was calling from 12074 North 135th Place and reported that a male subject named "Jason" was threatening her boyfriend, Daniel Hall, with a knife. Rachel's first words to the dispatcher were, "I need somebody over here right now."

COS-PROST-011494

Rachel stated that she was in the bedroom of the house and Daniel was in the kitchen area. Jason was refusing to put the knife down. Rachel confirmed that it was only her, Daniel, and Jason in the residence.

Rachel explained that they had met Jason at a bar named "Ernie's" and he had come back to the house with them. At one point, they called Jason a cab and he left (in the cab); however, a short time later Jason returned and was armed with a knife.

Rachel tried to then lock herself in the bathroom but was having trouble locking the door. Rachel was then able to leave the house through the front door and stated that she was "really scared." Rachel also told the dispatcher that the guy was "whacked out."

Rachel described Jason's physical appearance to the dispatcher as being 26 and that he looks "young." Rachel stated that he was a white male with brown hair, "maybe 5'7" – 5'8", 190lbs, and described him as a "small guy." Rachel stated that he was wearing a "gray hoodie," but then stated that he was wearing a black leather jacket and blue jeans.

The dispatcher attempted to have Rachel get Daniel in the bedroom with her and away from Jason; however, Rachel was not able to. Rachel stated that Daniel could not come to the bedroom because Jason was holding him in the kitchen area at knifepoint. Rachel stated that Daniel was trying to calm Jason down and asking him to put the knife down, but Jason was refusing.

COS-PROST-011495

Rachel told the dispatcher that she was unable to lock the bedroom door. The dispatcher asked Rachel if she could lock herself somewhere or get out the house. Rachel stated, "Oh, God, I'm just shaking." The dispatcher asked her again if she could get out of the house. Rachel indicated that she could not and then attempted to lock herself in the bathroom. Rachel reported that she thought "he" was on the other side of the door. Rachel was having trouble confirming if the door was locked.

Rachel told the dispatcher that they had been drinking, but denied any drug use. Rachel also told the dispatcher that Daniel was wearing a long-sleeved collared shirt and blue jeans.

Rachel reported that Daniel was trying to call her on her other line. The dispatcher got Daniel's number and told Rachel she would have someone call him. The dispatcher indicated that she wanted Rachel to stay on the line with her.

Rachel then reported that Dan told her that he [Jason] was shoving him. Rachel was then able to leave via the front door. She told the dispatcher, "Oh, God, please tell them to hurry. Okay, I'm outside the door." Rachel repeated, "Oh, God, please tell them to hurry," and also stated, "Dan's a pretty big guy. You know, like, that's just - and he could probably take this guy with one hand, you know? And so like, that's really not right that he's calling for me right now, you know?"

COS-PROST-011496

Rachel told the dispatcher that after Jason got into the cab, he returned 7 minutes later. Rachel stated that they left Ernie's around "12:00." The dispatcher asked Rachel if she ever saw a weapon on Jason and specifically asked about guns. Rachel indicated that she did not see him with any guns, and stated, "No, he brought his pool stick."

Rachel had originally given the dispatcher the address of 12074 North 136th Place, however, she later corrected the address as 12074 135th Place. Officers had arrived in the area of 136th Place at approximately 4:27am and then rerouted to the correct address.

When Rachel saw the police arrive she disconnected from the dispatcher. Records indicate that the time that the officers arrived and contacted Rachel was approximately 4:35am.

### Call for Service – *8990 East Shea Blvd.*

On January 28, 2012 at approximately 4:28 am, Discount Cab Operator, Travis Keehn, called the Scottsdale Police Department via 911 to report that he had been held up at knifepoint. Travis reported that this occurred approximately 10 minutes prior to him calling.

Travis reported that the subject had him drive around "in circles" while the subject held a knife up to his chin. Travis stated that he was frightened. Travis also told the dispatcher that he had something else that was "pretty long" and did not know if it was a "gun or a rifle or anything."

COS-PROST-011497

Travis stated that the subject did not take any money from him. Travis explained that the subject had him drop him off at the same location where he picked him up.

Travis described the suspect as a white male, "maybe" 6'2", skinny, wearing a black jacket, and what "looked like" tan pants. Travis stated that the item (aforementioned) was covered by his jacket.

Travis reported the pickup/drop off location as 12074 North 135th Place. Travis was calling from a gas station located at 8990 East Shea Blvd. Lieutenant Ron Bayne arrived and contacted Travis at approximately 4:30am.

## Initial Police Response and Arrival/Timeline - 10274 N. 135th Place

At approximately 4:20am dispatchers aired the call as a "Subject with a Knife." Officers arrived at the 135th Place address at approximately 4:35am and met with Rachel Rogers. Prior to the initial officers' arrival, the dispatcher had relayed information pertaining to the call via Emergency Channel 16 (times noted are approximate). In addition, officers requested information and began setting up their response/arrival. The following is a summary of the response and arrival to the call –officer's aired requests/actions are italicized:

1. The initial address given was 12074 North 136th Place. (4:20am)

2. Dispatch advised that a subject named "Jason" had been drinking and was now arguing with another male subject named "Dan." Jason was intoxicated. (4:20am)

COS-PROST-011498

3. Dispatch advised that the reporting parting was currently locked in her bedroom and can hear the boyfriend [Daniel] arguing with a subject. (4:20am/4:21am)

4. Dispatch advised that the boyfriend was saying "Put the knife down man." (4:20am/4:21am)

   a. *Sergeant KC Moore asked how many units were going and requested that the dispatcher determine if the reporting person, Rachel Rogers, could extricate through one of the windows or get out of the home. (4:21am)*

   b. *Sergeant KC Moore Directed three (3) units to respond to the front of the house and two (2) units to respond to the rear of the residence. (4:22am).*

5. Dispatch advised that Jason, the suspect, is a 26 year old male, brown hair, 5'7", and 190lbs (4:22am)

   a. *Sergeant KC Moore asked the dispatcher to find out if there were any other weapons besides the knife and if the suspect lived at the residence alone. (4:22am)*

6. Dispatch advised that they (Rachel and Daniel) had met Jason at a bar "tonight" and he was a guest. (4:22am/4:23am)

7. Dispatch advised that Jason's clothing description was a black leather jacket and blue jeans. (4:22am/4:23am)

   a. *Sergeant KC Moore asked if the suspect has access to a vehicle. (4:23am)*

8. Dispatch advised that Jason did not have access to a vehicle. (4:23am)

   a. *Officer Carlisle asked how many people total were in the residence. (4:24am)*

COS-PROST-011499

9.  Dispatch advised that there were a total of two males and one female: Jason was intoxicated and had a knife, Daniel the boyfriend [of the reporting party], and the reporting party who was currently separated from the males. (4:24am)

10. Dispatch advised that the reporting party could not get her boyfriend into the bedroom with her because Jason had him cornered in the kitchen. (4:24am)

    a.  *Sergeant Moore asked the dispatcher to find out if the suspect was on drugs or intoxicated by alcohol. (4:25am)*

    b.  *Lieutenant Bayne announced that he is on channel 16. (4:25am)*

11. Dispatch advised that the reporting person stated that the suspect was not using drugs as far as she knew. (4:25am/4:26am).

    a.  *Sergeant Moore asked if the dispatcher could find out what the argument was about and if he (Jason) knew the police were on the way.(4:26am)*

12. Dispatch advised that Jason did not know that the police were on the way and it was unknown what the confrontation was about; however, Jason just "flipped." (4:26am)

    a.  *Lieutenant Bayne asked how far away the police canine was to the call. (4:28am)*

    b.  *Officer Sanborn airs that he is at the 101 freeway and Via De Ventura (approximately 9.4 miles away from the scene). (4:28am)*

13. Dispatch advised that that an Armed Robbery had just occurred at 92nd Street and Shea. (4:29am)

14. Dispatch advised that the reporting party (Rachel) is leaving the home from the front door. (4:29am)

COS-PROST-011500

15. Dispatch updated the address to 12074 North 135th Place. (4:31am)

    a.  *Sergeant Moore advised that they would be changing locations.* (4:31am)

16. Dispatch advised that the Armed Robbery was related to this call and the subject had a knife to the victim's (cab driver) throat and also possibly had a rifle. (4:31am)

    a.  *Sergeant Moore asked for confirmation that the victim of the Armed Robbery (cab driver) said the suspect had a rifle.* (4:32am)

17. Dispatch confirmed that the cab driver had a knife to his throat and stated that the "suspect also had a rifle". (4:32am)

    a.  *Sergeant Moore asked to see if they could get more units to this call.* (4:32am)

18. Dispatch announced that the rifle will actually be a pool stick. (4:32am)

    a.  *Lieutenant Bayne asked Sergeant Moore if he could talk for a second and announces that he got rerouted to the other call (the Armed Robbery).* (4:34am)

    b.  *Sergeant Moore asked Lieutenant Bayne to standby since he was just arriving at the scene.* (4:34am)

    c.  *Sergeant Moore asked if the suspect was still on scene.* (4:34am/4:35am)

19. Dispatch advised that the reporting party stated that she did not know if the suspect was still in the house, but also stated that when she ran out of the door it sounded like there was a struggle. (4:35am)

COS-PROST-011501

20. At 4:35am, Sergeant KC Moore, Officer Cody Carlisle, and Officer Kevin Reynolds arrived on scene. Officer Carlisle contacted Rachel Rogers who had been standing in the driveway and airs that both subjects are still in the residence.

   a. *Officer Sanborn advised that he has arrived at the gate to the community.* *(4:37am)*

   b. *Officer Carlisle aired that Jason has brown hair, a brown leather jacket and blue jeans. (4:37am) He also aired that the "shorter subject" is going to be the one with the knife. (4:38am)*

21. At 4:40am, Sergeant Moore and Officer Reynolds work out rear coverage of the residence. Officer Adam Fernandez is assigned to that task.

   a. *Officer Fernandez aired that he is unable to place himself to the rear of the residence do to it backing up to a wash. He states that he will be in the "neighbor's backyard" and would watch the rear of the residence from that location. (4:41am)*

   b. *Sergeant Moore aired that he is going to have Rachel try to contact Daniel in an attempt to have him exit the house. (4:41am/4:42am)*

   c. *Officer Fernandez requested that dispatch let the neighbors to the north of the residence know that he is in their backyard. (4:42am) He also advises that he can see the entire backyard, but not into the house. (4:43am)*

   d. *Officer Carlisle advised over the air that there is one subject (Daniel) exiting the house with his hands up. (4:43am)*

COS-PROST-011502

e. *Lieutenant Bayne Arrived on scene. (4:44am-4:45am)- (detailed later in this report)*

f. *Sergeant Moore advised that the boyfriend (Daniel) is out of the residence and the subject still in the house is the suspect (Jason). (4:45am)*

g. *Sergeant Moore advised that they were getting confirmation that only the suspect remained in the residence. (4:46am)*

h. *Officer Carlisle aired that the subject was a military vet with "possible issues." (4:47am)*

i. *Officer Carlisle aired that the subject (Jason) was exiting "the building." (4:49:42am)*

22. At 4:50:13am Officer Sanborn announced that there was an officer involved shooting and requests the Fire Department. A few seconds later, Lieutenant Bayne advised that there was an officer involved shooting and also requests the Fire Department.

From the time the call was first dispatched to the time that the officer involved shooting was announced, approximately 30 minutes had elapsed. The following table illustrates the events and the time elapsed, progressively per radio transmissions:

| Event | Time Elapsed |
|---|---|
| Call to Subject with a Knife Dispatched | 0 Minutes |
| Officers Arrive at First Location Given by Reporting Person, Rachel Rogers | 7 Minutes |
| Dispatch Airs that an Armed Robbery Occurred at 92nd and Shea | 9 Minutes |
| Dispatch Airs that the Armed Robbery That Just Occurred is Related | 11 Minutes |
| Officers Arrive at Correct Location, 12074 N. 135th Place | 15 Minutes |
| Containment on the Residence is Achieved | 21 Minutes |
| Daniel Hall Exits the Residence | 23 Minutes |

COS-PROST-011503

| Jason Prostrollo Exits the Residence | 29 Minutes |
|---|---|
| Officer Involved Shooting Announced | 29 Minutes 31 Seconds |

## Initial Police Response and Arrival/Timeline - 8990 E. Shea Blvd.

At approximately 4:28am, dispatchers announced this call as an Armed Robbery that had just occurred. The first officer, Lieutenant Bayne, arrived at the scene of 8990 East Shea Blvd. at approximately 4:30am and met with the victim, cab driver Travis Keehn. Prior to the initial officers' arrival, the dispatcher had relayed information pertaining to the call via PD Channel 2 –restricted due to the emergency traffic on Channel 16 (times noted are approximate). In addition, officers requested information and began to set up their response/arrival. The following is a summary of the response and arrival to the call – officer's aired requests/actions are italicized:

1. The time delay was 10 minutes. (4:29am)

2. The reporting parting was a cab driver and the suspect had been in his cab. (4:29am)

   a. *Sergeant Chuck Cabrera asked if the reporting party was saying that the suspect was no longer there. (4:29am)*

3. The dispatcher confirmed that the suspect was no longer on scene at 8990 East Shea Blvd. (4:29am)

   a. *Sergeant Chuck Cabrera instructed dispatch to send two units. (4:30am)*

4. The suspect was described as a white male, 6'2", thin build, wearing a black jacket and tan khaki pants. (4:30am)

   a. *Lieutenant Bayne asked the dispatcher to remove him from the call on 135th Place since he was on the scene of the Armed Robbery call and with*

COS-PROST-011504

the cab driver. Lieutenant Bayne reported that the scene (8990 East Shea) is "code 4". (4:30am)

5. Per the cab driver, he dropped the suspect off at 12074 North 135th Place. The dispatcher also airs that it is related to the Subject with the Knife call being worked on Channel 16. (4:31am)

   a. *Lieutenant Bayne* reported that the Armed Robbery sounded like it was going to be related to the Subject with a Knife call and tells the dispatcher that the armed robbery does not need to be handled as emergency traffic anymore. *Lt Bayne* further requested that a unit respond to talk to the cab driver so that he or she could obtain information related to the other call (Subject with a Knife). (4:32am)

6. The dispatcher unrestricted the channel. (4:32am)

   a. *Lieutenant Bayne* indicated that a unit was pulling up so he was going to respond to the Subject with a Knife call. (4:33am)

   b. *Officer Anthony Wells* reported that the cab driver said the suspect was dropped back off at the "beat 14" address and was unsure, but possibly had a rifle. (4:36am/4:37am)

   c. *Officer Anthony Wells* reported that the suspect of the armed robbery was a white male, dark hair, about 6'1" to 6'2", with a thin build. (4:41am)

   d. *Officer Anthony Wells* reported that the cab driver stated that the person who called for the cab was named "Dan." (4:41am)

7. The dispatcher confirmed that "Dan" is one of the subjects involved in the "beat 14 call" –referring to the Subject with the Knife call. (4:42am)

COS-PROST-011505

    a. **Officer Anthony Wells** *requested that the dispatcher advise the units on the Subject with the Knife call that the cab driver wanted to prosecute for aggravated assault and that there was probable cause for arrest. (4:43am)*

    b. **Officer Anthony Wells** *requested a Crime Scene Specialist for the armed robbery call. (4:46am)*

8. The dispatcher announced that the Crime Scene Specialist is being diverted to the Subject with a Knife call. (4:55am)

    a. **Sergeant Chuck Cabrera** *directed* **Officer Anthony** *Wells to stay with the cab driver and keep him at the scene. (4:55am/4:56am)*

## Lieutenant Bayne's Response and Use of Lethal Force/Timeline

On January 28, 2012 at approximately 4:25am Lieutenant Ron Bayne announced that he was on Channel 16. He was en route to the Subject with a Knife call. He was responding from the District 4 building, 20363 North Pima Road in Scottsdale. From this location to the call (12074 North 135th Place) was approximately 13.6 miles. The following summarizes Lieutenant Bayne's response to the dispatched calls (Subject with a Knife and the Armed Robbery):

1. Per GPS data, Lieutenant Bayne began driving south on Pima Road toward the 101 Freeway at approximately 4:23am. Lieutenant Bayne entered the freeway and continued south.

COS-PROST-011506

2. At approximately 4:29am the call for the Armed Robbery was aired on the PD 2 Channel. Lieutenant Bayne appeared to just be exiting the 101 onto Shea eastbound at this time. Lieutenant Bayne arrived at the call of the Armed Robbery, 8990 East Shea Blvd. at approximately 4:30am and announced his arrival on the PD 2 Channel.

3. Lieutenant Bayne contacted the victim of the armed robbery and determined that the two calls were most likely related. Lieutenant Bayne waited for the arrival of the first patrol unit and then started back to the Subject with a Knife call at approximately 4:32am.

4. Lieutenant Bayne drove east on Shea Blvd. At approximately 4:34am, Lieutenant Bayne asked Sergeant Moore if he was able to talk over Channel 16. Sergeant Moore indicated that he was just arriving at the call and asked Lieutenant Bayne to standby.

5. Lieutenant Bayne continued east on Shea to 136th Street where he turned north into the area of the call. At approximately 4:45am Sergeant Moore announced over Channel 16 that the "boyfriend" (Daniel) was out and the suspect was still in the residence.

6. It is estimated from CAD records, GPS Data, Officer's statements, and radio traffic that Lt Bayne arrived at the Subject with a Knife Call between 4:44am and

COS-PROST-011507

4:45am, parked his vehicle east of the house on Paradise Drive, and walked toward the house westbound.

7. While Lieutenant Bayne walked west he passed the reporting party, Rachel Rogers and asked the officers standing with her who she was. The officers identified her as the reporting party. Lieutenant Bayne also walked passed Daniel Hall and ascertained that Daniel was the boyfriend. Lt Bayne then continued west where he could see Sergeant Moore and other officers, including the canine, attempting to find cover behind a mailbox structure in front of the residence. Lieutenant Bayne then spoke with Sergeant Moore regarding who was still in the residence and began making tactical decisions and giving direction *(detailed later in this report)*.

8. At approximately 4:46am, Lieutenant Bayne called Sergeant Chuck Cabrera who was currently on the scene of the Armed Robbery. Lieutenant Bayne received final confirmation that the two calls were related, that a violent felony occurred, and that the victim of the Armed Robbery wanted to press charges.

9. At approximately 4:49:42 am, it was announced on channel 16 that Jason Prostrollo exited the residence from the front door. Lieutenant Bayne hung up the telephone and drew his primary weapon, a Glock 22, in his right hand. Jason began to walk toward the officers. Jason had two halves of a pool cue, one half in each hand. Officer Anthony Sanborn, the canine officer, repeatedly yelled

COS-PROST-011508

commands for Jason to stop, drop what was in his hands. Jason continued toward the officers and had what Lieutenant Bayne described as a "very determined look" and a "very aggressive look."

10. Jason continued to advance toward the location of the officers, ignoring commands, and displaying what Lieutenant Bayne described as an "aggressive posture." Lieutenant Bayne was positioned near the mailbox structure toward the area south of it. Lieutenant Bayne was facing west toward Jason and moved to his left (south). When Lieutenant Bayne felt that Jason was dangerously close and had the ability to strike the officers, he shot twice in rapid succession. Jason then dropped to the ground.

11. The police canine had been released by Officer Sanborn prior to Lieutenant Bayne's shot and arrived at Jason's chest area at the same time the trigger was pulled. One round hit the canine in the area of his neck and the other hit Jason in his chest area.

*Investigators Note:  The distance from the front door of the house to the point where Jason was when deadly force was used is approximately 37.6 feet.   From the announcement that Jason was exiting the residence (4:49:42) to the time it was announced that an Officer Involved Shooting had occurred (4:50:13), 31 seconds elapsed.  It is unknown how many seconds elapsed from the time the actual shots were fired to the time Officer Sanborn announced the "998" (Officer*

COS-PROST-011509

*Involved Shooting); however, Officer Sanborn' moved toward the suspect to check his hands, approached and took custody of his canine, and noted possible injury prior to calling out that there had been an Officer Involved shooting. It appears that Rachel Rogers estimated that from the time Jason began walking toward the officers to the time she heard the shots was approximately 5 to 8 seconds.*

12. At approximately 4:50:13 am, Officer Sanborn advised over Channel 16 that there had been an officer involved shooting and requested the fire department. A few seconds later, Lieutenant Bayne advised over Channel 16 that there had been an officer involved shooting and also requested the fire department.

The following table illustrates the events and the time elapsed, progressively, regarding Lieutenant Bayne's response per radio transmissions:

| Event | Time Elapsed |
|---|---|
| Call to Subject with a Knife Dispatched, 12074 N. 135th Street | 0 Minutes |
| Lt. Bayne was En route | 3 Minutes |
| Call to Armed Robbery Dispatched, 8990 East Shea Blvd. | 9 Minutes |
| Lt. Bayne Arrives at Armed Robbery | 10 Minutes |
| Lt. Bayne is Back en route to the Subject with a Knife Call | 12 Minutes |
| Lt. Bayne Arrives at the Subject with a Knife Call | 24/25 Minutes |
| Lt. Bayne Contacts Sgt. Moore and Calls Sgt. Cabrera | 26 Minutes |
| Jason Prostrollo Exits the Residence | 29 Minutes |
| Officer Involved Shooting Announced | 29 Minutes 31 Seconds |

COS-PROST-011510

**Post Shooting Actions/Timeline**

After the shooting, officers responded by summoning medical assistance for Jason Prostrollo, clearing the house for additional victims and/or threats, and preserving the scene. The following summarizes the events in chronological order:

13. At 4:50:13 am, Officer Sanborn advised over Channel 16 that there had been an officer involved shooting and requested the Fire Department. A few seconds later, Lieutenant Bayne advised over Channel 16 that there had been an officer involved shooting and also requested the fire department.

1. At 4:50 am, just after the shots were fired, Sergeant KC Moore directed Officer Brian Reynolds to handcuff Jason and check for severity of injury. Sergeant KC Moore, Officer Thomas Goodson, and Officer Brian Reynolds entered the residence to ensure no one else was inside. Lieutenant Bayne and Officer Cody Carlisle stayed with Jason outside.

2. At 4:50 am, an unknown person announced over Channel 16 that all of the officers are safe.

3. At 04:51 am, Lieutenant Bayne began making requests for more supervisors and resources to manage the scene and identified himself as the one who had been involved in the shooting.

4. At 04:52 am, it appears that Officer Sanborn advised that the police canine has a gunshot wound and requested that the fire department respond.

5. At 04:54 am, the fire department requested information about the wounds on the police canine and Jason. One of the officers responded by reporting that the

COS-PROST-011511

canine had a gunshot wound to the neck with heavy bleeding and Jason had a wound to his "right chest area" and had "slow breathing."

6. At 4:56 am, it is announced that the residence was "clear" and they were staring a secondary search.

7. At 4:56am/4:57 am, Sergeant Sanborn asked what the estimated time of arrival for the fire department was. He was told that they were .5 miles away.

8. At 4:57am, Lieutenant Bayne advised that the house was clear and they will be walking the fire personnel up to Jason.

9. At 4:58 am, Lieutenant Bayne aired his intent to establish Incident Command System (ICS).

10. At 5:00 am, Lieutenant Bayne asked if Officer Sanborn was at the vet clinic. Officer Sanborn responded that he was still on scene. Lieutenant Bayne stated that he was going to have fire personnel come to him.

11. At 5:04am, Lieutenant Bayne began to organize ICS via the radio.

The following table illustrates the events and the time elapsed, progressively, regarding the post shooting actions:

| Event | Time Elapsed |
|---|---|
| Officer Involved Shooting | 0 Minutes |
| Medical Help Summoned | 0 Minutes 31 Seconds |
| House is found to be clear of further victims or threats | 6 Minutes |
| Medical arrives and is brought to suspect | 7 Minutes |
| Lt. Bayne airs intent to set up Incident Command | 8 Minutes |
| Lt. Bayne begins setting up Incident Command | 14 Minutes |

COS-PROST-011512

## INVESTIGATION

*This section outlines the significant investigative efforts undertaken pertaining to the internal review of this incident. This section includes the review of related incident reports, interview summaries of the officers who were directly involved in the lethal use of force, and a summary of the Major Incident Board findings*

On January 28, 2012, I received a request to respond to an officer involved shooting incident that had occurred at approximately 4:49 am. I was briefed that Lieutenant Ron Bayne had shot an armed and threatening subject at 12074 North 135th Place in Scottsdale, Arizona.

I drove to the Scottsdale Advocacy Center, 10225 East Via Linda, and met Internal Affairs Sergeant Mike Hanafin. Lieutenant Bayne arrived and I presented him with a Scottsdale Police Department Notice of Investigation (NOI). Lieutenant Bayne initialed the form where requested and signed the bottom of the second page. I signed the form next to his signature.

The NOI informed Lieutenant Bayne that he would be placed on procedural Non-Disciplinary Suspension. I also had him sign his Non-Disciplinary Suspension Notice. Both of these forms are located with this case file.

COS-PROST-011513

I requested that a phlebotomist respond to obtain a blood sample from Lieutenant Bayne, per policy. At 10:27 am, while at the Scottsdale Family Advocacy Center I collected a urine sample from Lieutenant Bayne. This sample was obtained in the men's bathroom located on the first floor of the advocacy center (central restrooms). I observed Lieutenant Bayne urinate into the specimen collection cup. The sample was 96 degrees as indicated on a temperature sticker located on the specimen cup. I poured the urine into the container that was submitted for testing.

At 10:36am, I observed a phlebotomist collect a blood sample from Lieutenant Bayne's left arm. Lieutenant Bayne was seated in an office in the Forensic Nurse Examiner's area. A Cottonelle Brand alcohol free wipe was used to clean the area where the phlebotomist collected his blood. Two grey top vials were used to contain the blood for analysis. The samples were sealed with evidence tape.

At 10:58 am, I provided Lieutenant Bayne with a temporary duty weapon to replace his while it was being processed. This replacement firearm bore the serial number PEK992. I also gave him 3 magazines labeled with the firearm serial number and a separate designation of 1, 2, or 3. I also provided him with duty ammunition for this firearm.

At 11:42 am, I arrived at the scene of the incident, 12074 North 135th Place. Upon my arrival, I contacted Case Detective High Lockerby with the Violent Crimes Unit and gathered preliminary information. Detective Lockerby had conducted a walk-through of the scene with Lieutenant Bayne around 9:06 am.

COS-PROST-011514

Detective Lockerby briefed me on the events regarding both the Subject with a Knife call and the Armed Robbery call. He identified the Officers who had been on the contact team during the time of the shooting as Lieutenant Bayne, Sergeant Moore, Officer Goodson, Officer Sanborn (with Raider), and Officer Reynolds. He told me that Officer Carlisle was with the reporting person (Rachel) and her boyfriend (Daniel) when the incident occurred.

On January 30, 2012, I contacted Lieutenant Bayne in order to set up the mandatory psychological visit with M & M Public Safety Psychology Services. I also contacted M & M and was able to set up the appointment for February 10, 2012. Commander Rosenberger later received a letter from M & M confirming that Lieutenant Bayne attended his appointment. A copy of this letter is included in the case file.

**Review of Related Scottsdale Police Reports**

I reviewed the following police reports related to this investigation and/or the involved parties: 12-02226, 12-02228, and 12-02242.

*Report number 12-02226* memorializes the criminal investigation surrounding Jason Prostrollo's actions at 12074 North 135th Place in Scottsdale, Arizona and the officer involved shooting.

COS-PROST-011515

**Report number 12-02228** memorializes the criminal investigation involving Jason Prostrollo holding a knife against cab driver Travis Keehn's throat. The report is titled Kidnap and includes a subtitle of Aggravated Assault.

**Report number 12-02242** memorializes the criminal investigation involving the search of 12074 North 135th Place in Scottsdale, Arizona regarding illegal drugs and/or narcotics. The report indicated that drugs and drug related items were located inside the residence.

**Investigative Interviews**

Between February 28, 2012 and April 4, 2012, I interviewed police employees that were directly involved in and/or witnessed the use of force. On March 5, 2013, I interviewed Canine Sergeant Chris Coffee. The following are summaries of those interviews.

**Lieutenant Ron Bayne** was interviewed at 3:42 pm on Tuesday, February 28, 2012 in the Internal Affairs Office. Also present was Internal Affairs Sergeant Mike Hanafin. The interview was audio recorded and later transcribed. A copy of the transcription is included in this case file. The following is a summary of the interview.

Lieutenant Bayne was shown the Notice of Investigation that he had signed on January 28, 2012. He confirmed that he remembered initialing and signing it. He also confirmed that he understood it.

COS-PROST-011516

We then went over Lieutenant Bayne's experience, specializations and training. Lieutenant Bayne has been a Scottsdale Police Officer for approximately 19 years. He was promoted to Sergeant in October of 2005 and promoted again to Lieutenant in November of 2009. Prior to that, Lieutenant Bayne was a Military Police Officer for 5.5 years in the United States Army. In the Army, Lieutenant Bayne stated that he served on the Special Reaction Team (equivalent to SWAT), the Sniper Team, and in the Investigations Section. Lt Bayne left the Army with the rank of Sergeant.

Lieutenant Bayne graduated from the Police Academy in 1993 and has held multiple assignments within the police department. These assignments included:

- Special Assignment Unit (SWAT Operator and fugitive apprehension)
- SWAT Negotiator
- Precision Rifle Operator (SWAT)
- Property Crimes Detective
- State Gang Taskforce Detective
- High Enforcement Arrest Team Detective
- Patrol Sergeant
- Sergeant of the High Enforcement Arrest Team
- Internal Affairs Sergeant
- Patrol Lieutenant
- *Since this interview Lieutenant Bayne was assigned to the Patrol Enforcement Section which supervises the Bike Unit, High Enforcement Arrest Team, Mounted Unit, Canine Unit, and School Resource Unit.*

COS-PROST-011517

We then talked about Lieutenant Bayne's specialized training and certifications. He outlined the more poignant training/certifications as follows:

- Arizona Police Officers Standards and Training (AZPOST) General Instructor Certified

- Fitness Instructor

- AZPOST Firearms Instructor

- Spanish Language Instructor (for law enforcement)

- AZPOST High Risk Vehicle Stops Instructor

Lieutenant Bayne's training transcript is included with this case.

Lieutenant Bayne stated that he is currently qualified to carry his primary duty weapon, a Glock 22 and his secondary Glock 27 (both handguns). He is also certified to carry Oleoresin Capsicum (OC) spray and a Taser. Lieutenant Bayne stated that he was carrying all of the aforementioned items when this incident occurred.

Lieutenant Bayne stated that he started his shift on Friday, January 27, 2012 at 7:00pm. He normally begins his shift at 8:00pm; however, he came in early due to coverage issues. Although Lieutenant Bayne is on a 4-day, 10-hours per day schedule, he had worked an extra shift during that week (for coverage) making Friday his 5th consecutive day of work. His weekend would begin on Saturday, January 28, 2012 after the end of his shift.

COS-PROST-011518

Lieutenant Bayne stated that he had slept for approximately 5 hours the night before, which is "normal" for him.

Lieutenant Bayne described that evening's shift as being busy up until about 2:30 am. When things slowed down he was able to get back to his District (District 4 – 20363 North Pima Road) at approximately 3:30 am. He had planned to stay in the office and do administrative work until being relieved by the incoming Watch Commander at around 5:30 am.

Lieutenant Bayne stated that around 4:35 am the call regarding a subject threatening with a knife was dispatched. Lieutenant Bayne said that he was the only Watch Commander on at that time (citywide). Lieutenant Bayne related his thought process and the information he was aware of at this time:

1. He was aware that the call was in the area of 136th Street and Shea Blvd. and that Sergeant KC Moore was responding.

2. The call continued to get more serious as time passed, and there always "seemed to be a new element" that came up.

3. A female was locked in a bedroom and then moved to the bathroom, "behind locked doors" where she was frantically reporting that her boyfriend or husband was on the other side being threatened by a guest that they had invited over.

4. The guest was threatening the boyfriend or husband with a knife. The female caller was saying she could hear the boyfriend or her husband telling the man,

COS-PROST-011519

"don't do this, put the knife down," and he was asking her to help him, but she was too scared to open the door to try and help him.

5. The caller had actually seen the individual threatening her boyfriend or husband with a knife and she was too scared to open or unlock the door.

6. Sergeant KC Moore was supervising the call and Lieutenant Bayne felt that he was making good decisions and giving good direction to his officers over the radio.

At that time, since things appeared to be escalating, Lieutenant Bayne left the station and began to head to the call. Lieutenant Bayne stated that he was aware that he had an extended drive to get to the call. Lieutenant Bayne reported that he put his primary radio in the Watch Commander vehicle on the emergency channel (channel 16) and advised dispatch that he was en route. Dispatch then sent him the information about the call via Computer Aided Dispatch.

Lieutenant Bayne stated that while en route to the call he was thinking about the call and specifically less than lethal options. He attempted to get a hold of Sergeant Moore on the radio to ensure that less than lethal options were in place, but was unable to. Lieutenant Bayne speculated that Sergeant Moore did not answer him due to him either being inundated managing the call or due to the noise from the high winds that were present that evening. Lieutenant Bayne stated that the wind gusts were causing an issue with communications. Lieutenant Bayne then stated that he checked on the location of the police canine.

COS-PROST-011520

*Investigators Note: Lieutenant Bayne attempted to contact Sergeant Moore on Channel 16 at 4:27am with no direct response. Lieutenant Bayne's next transmission approximately 13 seconds later is asking how far out the police canine was. At 4:33am Lieutenant Bayne called for Sergeant Moore and asked if he was able to talk for a second. Sergeant Moore had him standby since he and other officers were just arriving at the residence. Some of the communication was unintelligible throughout the audio recording of the call.*

Lieutenant Bayne stated that he drove down the 101 and as he exited onto Shea Blvd., he heard the Armed Robbery call dispatched at the Shell Station at 90th Street and Shea Blvd. Lieutenant Bayne stated that he was scanning the other city radio channels on the second radio in the Watch Commander's vehicle. Lieutenant Bayne stated that since he was right there, he called out that he was arriving and requested further details about the call. Lieutenant Bayne explained that he was told that a cab driver was reporting that he was kidnapped, held at knife point and forced to drive around. Lieutenant Bayne then saw the cab sitting in the parking lot and approached the victim after determining that it appeared that no one was currently in duress.

Lieutenant Bayne explained that the cab driver was "visibly trembling." Lieutenant Bayne asked him if he was "okay," and the cab driver told him that he was not sure. Lieutenant Bayne then asked him if he needed medical help and the cab driver declined. Lieutenant Bayne asked him what had happened. Lieutenant Bayne told me that the cab

COS-PROST-011521

driver stated, "This crazy guy got into a cab, he had a big knife and he gets behind me and he puts it up to my throat and he was gonna slit my throat and he forced me to drive around. And I thought he was gonna kill me and - and slash my throat. And he demanded money from me."

Lieutenant Bayne stated that the cab driver told him that the suspect forced him to drive back to the house where he picked him up. The suspect ran out of the cab and back into the house still armed with the knife. The cab driver told him that the house was located in a neighborhood north of Shea on 136th Street. Lieutenant Bayne told me that this is when he suspected that the two calls were related.

Lieutenant Bayne turned that scene over to Sergeant Chuck Cabrera and Officer Tony Wells who pulled in shortly after he arrived. Lieutenant Bayne stated that he informed them that it looked like the call was going to be related to the "District 3 hot traffic." Lieutenant Bayne then continued to the other call. Lieutenant Bayne indicated that due to the time of the morning, it reinforced his thought that the calls were related.

Lieutenant Bayne described how he got to the area of the call and contacted a guard at the gate on 136th Street. The guard explained that other police units had driven in and then left. Lieutenant Bayne then made a U-turn. I asked Lieutenant Bayne if he had heard that the caller (Rachel) had given the wrong address. Lieutenant Bayne stated that he did

COS-PROST-011522

not know and that he had missed a lot of the radio traffic when he responded to the other call.

Lieutenant Bayne stated that when he arrived he noted that it was "really dark" and the community had no lights. Lieutenant Bayne stated that there was no moonlight or ambient light. Lieutenant Bayne stated that it was also extremely windy.

Lieutenant Bayne then explained how he parked in back of the other police vehicles on the east-west street [Paradise Drive] with the thought that if the call turned into a barricade, he could walk back to his vehicle and start a command post out of the way of the incident.

Lieutenant Bayne told me that he exited his vehicle and began walking down the road, intermittently shining his flashlight in order to locate other officers and the proper house. Lieutenant Bayne stated that as he walked west, he heard voices west of him and found officers and a female seated on the curb [Rachel Rogers] crying. Lieutenant Bayne was told that she was the reporting person. Lieutenant Bayne told me that a couple yards west he saw officers with a male subject that was identified to him as the "boyfriend or husband." Lieutenant Bayne asked these officers where the suspect with the knife was. Lieutenant Bayne was told that he was still inside the house as far as they knew. Lieutenant Bayne asked if there were any others inside the house that needed rescue. Lieutenant Bayne stated that he was told that the officers thought the suspect was in the home by himself and that a perimeter had been established. Lieutenant Bayne then asked where Sergeant Moore was and he was directed to the west towards the residence.

COS-PROST-011523

*Investigators Note:* At this time Lieutenant Bayne used a piece of paper to draw a rough diagram of the area, where the cars were parked, and the location of the officers he encountered when he arrived. The diagram included a box that represented the residence, the mailbox structure in front of the residence, and the neighboring house to the north. The diagram is included with this case file.

Lieutenant Bayne stated that his encounter with the officers was brief and then he contacted Sergeant Moore. Lieutenant Bayne told me that he saw a group of three or four officers "making themselves as small as possible" huddled behind a mailbox structure for cover. Lieutenant Bayne estimated the distance from the mailbox structure to the house as approximately 30 yards. Lieutenant Bayne did not feel that the mailbox structure was adequate cover, but told me that there was nothing else in the immediate area and it was a distance from the house. Lieutenant Bayne stated that at that time he did not know who the officers were individually, but did see that the canine was one of them.

Lieutenant Bayne told me that he spoke with Sergeant Moore and confirmed that the reporting person and the other victim were outside of the house and the suspect was still inside alone. He then asked Sergeant Moore if he was aware of the call from 90th Street and Shea (Armed Robbery) and how it might be related to this call. Sergeant Moore indicated that he did not know that the two calls were related, so Lieutenant Bayne told him that he was "99 percent" sure that the two were related. Lieutenant Bayne explained that he then told Sergeant Moore that he was going to call Sergeant Cabrera in his presence so that they could confirm that the two calls were definitely related.

COS-PROST-011524

Lieutenant Bayne stated that just prior to calling Sergeant Cabrera; he asked Sergeant Moore if he had containment on the residence. Sergeant Moore answered that he did. Lieutenant Bayne explained how he told Sergeant Moore that they were going to "slow this down" and that if the suspect does not come out, they were going to standard barricade procedures. Lieutenant Bayne stated that he told Sergeant Moore that he would go back to his vehicle, set up a command post and call SWAT. Lieutenant Bayne stated that he remarked that it would be the fourth time in his tenure as a watch commander that he called SWAT.

Lieutenant Bayne stated that since the suspect was alone in the residence time was on their side. Lieutenant Bayne anticipated that this was going to be a barricade and they would "lock it down," and "step up our planning." Lieutenant Bayne stated that this was not the way it turned out due to the suspect's actions.

Lieutenant Bayne told me that the front door to the residence was standing open about ¾ of the way and there was light coming out of the residence. Other than that light is was "pitch black."

Lieutenant Bayne explained that he made the call to Sergeant Cabrera. He told me that he made that call at 4:46 am and it was a 2 minute and 21 second telephone call. Lieutenant Bayne stated that he was standing next to Sergeant Moore and he asked Sergeant Cabrera to confirm that the call he was on (Armed Robbery) was related to this one (Subject with a Knife). Lieutenant Bayne stated that Sergeant Cabrera responded by

COS-PROST-011525

saying, "Absolutely, 100 percent." Lieutenant Bayne stated that he then asked Sergeant Cabrera how he knew that and Sergeant Cabrera explained that they had just looked at his fare on the computer and it confirmed it was the same address where they (Lt Bayne and the other officers) were.

Lieutenant Bayne also confirmed that they had a valid felony, serious crime. Sergeant Cabrera indicated that the victim was extremely scared. Sergeant Cabrera explained to Lieutenant Bayne that the suspect of the Armed Robbery call had committed Kidnapping, Armed Robbery, and Carjacking. Lieutenant Bayne told me that Sergeant Cabrera also provided him with the following information during this telephone call:

1. The victim [Travis Keehn] had marks on his throat from a large straight blade knife that the suspect used by holding up against him from behind.

2. Travis reported that the suspect threatened to slit his throat.

3. Travis reported that the suspect told him to drive and at some point the suspect demanded that he be driven back to the address that Lieutenant Bayne was currently at (12074 North 135th Place).

4. Travis was willing to press charges.

Lieutenant Bayne stated that he asked Sergeant Cabrera to ensure that Travis Keehn's interview was being recorded to confirm that a serious offense was being reported in the event officers had to use deadly force against the suspect. Sergeant Cabrera replied that it was being recorded.

COS-PROST-011526

Lieutenant Bayne stated at that time Sergeant Moore told him that the suspect was coming out of the house. Lieutenant Bayne then related the following:

1. Lieutenant Bayne hung up the phone with his left hand and drew his primary firearm with his right hand.

2. Lieutenant Bayne was standing to the far left (south) of the other officers.

3. Lieutenant Bayne directed his attention to the front door and saw the suspect standing in the doorway. The suspect was backlit.

4. Lieutenant Bayne observed that the suspect has two sticks in his hands and is standing "in a martial arts type position."

5. Lieutenant Bayne saw that the suspect had the sticks back, resting on his shoulders.

6. Lieutenant Bayne described the suspect as having a kind of "stare" that he has seen before with people who are under the influence of "mind altering drugs." Lieutenant Bayne explained that the suspect had a "very determined look on his face. And he was going to fight us."

7. It was very clear to Lieutenant Bayne that the suspect had intention of walking at them and "aggressing" them before he even started moving.

8. The suspect had the sticks up in a fighting position and then raised his arms with the sticks in his hands and crossed them over his body in a martial arts type movement.

9. When asked further about the suspect's position, Lieutenant Bayne stated, "Like, a fighter position. Like a martial artist who's got their fists up in the ready

COS-PROST-011527

position. But instead of empty fists, he's got weapons. He's got two batons in his hands."

10. Lieutenant Bayne thought the sticks were "martial arts type fighter sticks" and described the sticks as 2.5 to 3 foot long with one of them being dark or black in color.

11. When asked further about the description of the sticks, Lieutenant Bayne stated that they were the thickness of the grip end of a baseball bat and then compared them to the black, composite straight batons that he had first been issued at the department, only longer.

12. When asked why he felt the movement was martial arts style, Lieutenant Bayne stated:

> "Um, I have taken basic martial arts training in the military, um, and the form of martial arts that I participate in but I never got to a point where I went up in levels or belts or anything like that - it was called Shorin Ryu. And the instructor of the Shorin Ryu used to also, uh, teach stick fighting, and, uh, with one stick and with two sticks. And it was the same type of movement. Uh, firmly believe that this individual had training in stick fighting. And, um, like, if you were to watch a, um, martial arts movie, um, like an - like an old Bruce Lee movie with, uh, nun chucks and see the way nun chucks are up - you know, starting up with - and there's a name for it. Like, I can't think of the name right now - the position - the - the starting fighting position - where the hands up are like this with the weapons resting and then moving to different assault positions from there. But it - it immediately struck me as a fighting position, hands are up, two batons in hand, coming out the door and then it crossed his body like - like - like, what you would envision from a nun chuck across the body type movement, but they weren't nun chucks, they were - they were sticks for, like, stick fighting."

13. Lieutenant Bayne felt that the martial arts movement coupled with the look on the suspect's face immediately registered to him that the suspect was coming out to

COS-PROST-011528

fight. Lieutenant Bayne stated that he had "no doubt in his mind," referring to the suspect's intention to fight.

14. Lieutenant Bayne was in "self defense officer mode" at that point.

15. Lieutenant Bayne yelled to Officer Sanborn that he had commands and Officer Sanborn began shouting out commands before the suspect took a step out of the door. Lieutenant Bayne did not remember exactly what Officer Sanborn's commands were, but described them as loud.

16. The suspect continued to move in spite of the commands that were given.

17. Lieutenant Bayne had a very high, elevated sense of tension at this point since the suspect is moving toward them at a fairly fast pace. During this time, the suspect moved the sticks across his body a couple of times, again like a martial arts type movement. Lieutenant Bayne described it further as like the suspect was "going into battle... somebody coming at you swinging nun chucks around without a chain, it just being regular sticks."

18. Lieutenant Bayne looked down the "sidewalk" real quick to see how far the suspect is going to get before he felt he would be too close.

19. Lieutenant Bayne described the sidewalk as extending from the front door of the residence to the pillar, and explained that the suspect was walking directly down the sidewalk a couple of steps to the south of the pillar.

20. The suspect continued down the sidewalk and was not obeying commands. At about halfway down the sidewalk, everyone started yelling commands, including Lieutenant Bayne. Lieutenant Bayne stated that they were all yelling, "stop," and trying to get the suspect to comply.

COS-PROST-011529

21. Lieutenant Bayne then described the use of force as follows:

> "Everybody starts yelling when he's about halfway and he's not obeying commands. He keeps walking. He's still in an aggressive manner. He's still, um, animated with his body motions, his facial expressions. He looks very determined. He's walking in a very determined manner. He's got a look on his face like he is determined on assaulting somebody. And, um, and at that time I sidestep to my left and just outside of the pillar a little - up a little bit. And when he gets to the point where he is so close, um, pretty much right up on the other side of the pillar here, I felt like he was right on top of us and gonna reach out and assault these officers, and I shot him."

22. When asked if the suspect had reached a predetermined point or if he let him go beyond that, Lieutenant Bayne replied:

> "I found myself - what I thought was a predetermined point in the sidewalk where I looked at it and I mentally said to myself, if he gets to this point, he's gonna be right on top of us. It's gonna be dangerously close. We're - we can be assaulted by him if he - if he jumped out, if he swung - swung at us, there wouldn't be much that we would be able to do to stop him. And I felt - in - in - in looking at this, I felt like by the time I made the decision to shoot, that that point was actually even much closer than what I had imagined before he got to it. And I'll tell you why, Because I'm relying on, um, gunshots actually stopping him. I'm thinking, that a dog deployment is coming somewhere and potentially stopping him. But nothing - nothing came at any point. A dog didn't come. And this happened really fast. And now he's so close that I'm concerned that me shooting him and, um, and I'll get to this in a minute, but I thought everybody had actually shot him. My concern was that our bullets weren't gonna stop him because he was so close. From what I know with shootings and training and things like that, you have to be very accurate, you have to be very skilled to hit somebody to immediately stop them. We all know about the 21 foot and, the studies that have been done with that with aggression and edge weapons and things like that. My assessment was that he was easily within that. He was easily within a distance where he could reach out and strike us where, even a half a step more and we would not have had the opportunity to respond to - to defend ourself if the rounds were not absolutely appropriately placed to be able to immediately stop him."

COS-PROST-011530

23. I asked Lieutenant Bayne what his sight picture was and he stated that it was his front site on his (Jason's) chest.

24. Lieutenant Bayne was cognizant that he fired two times in rapid succession. Lieutenant Bayne described what happened next by saying, "I remember that my front site looked very large, and, it was on his chest and they were a lot of things that were being processed. I felt like I was on the range in one of our range exercises. As far as marksmanship goes, as far as having the weapon pointed at the target that we practice shooting at - a silhouette style target - with the exception of it was moving, it was dark, it was windy and the consequences of missing him were gonna be very high. So when he got to that point where he was extremely close, I fired two rounds in rapid succession and he immediately dropped…"

25. Lieutenant Bayne and the other officers moved up and Lieutenant Bayne instructed one of the officers to handcuff him.

26. Lieutenant Bayne had thought that other officers also fired until he was told that they had not.

27. As other officers moved up to clear the house, it was announced that the police canine had been shot. Lieutenant Bayne stated that he never saw the dog, but understands why. I asked Lieutenant Bayne to explain why he understood not seeing the dog. Lieutenant Bayne stated that he was aware of narrowed focus of vision during these circumstances. Specifically Lieutenant Bayne stated:

> "The dog and my bullets came together at the same time. And because my vision was focused on the person aggressing us - the suspect - I had no lateral vision in the darkness of the dog coming at him."

COS-PROST-011531

28. I asked Lieutenant Bayne about his analysis regarding the police canine and if he felt it should have been deployed earlier. Lieutenant Bayne explained that he did not know what Officer Sanborn's perception was, nor is he trained on canine use so he could not answer that due to it being a complicated issue that would need further analysis.

29. Lieutenant Bayne spoke about the use of a Taser and stated:

> "If you're relying on a taser to stop an aggressive offender, determined to assault police officers with a blunt object or a bladed weapon, they're already within that kill zone where they can cause - from what we're trained - that - that 21 foot rule, which is a general principal rule – that they're dangerously close, where our - our rounds need to be perfectly placed to be able to stop them from - from assaulting us. Well, that's the same range of a taser deployment. So if we're relying on a taser deployment, then if - if you're aware of - of - of that principal of - of protecting yourself in a deadly force assault - well, that taser deployment is gonna be coming simultaneous with somebody's decision to use deadly force."

30. Lieutenant Bayne stated, "I have no doubt that the person was too close in - in - in my world, where he - if - if I wouldn't have shot when he did, another - even a half of step - he would have been on top of the officers and - and - and he could have assaulted and killed them with - with one blow of the sticks."

31. Lieutenant Bayne also stated that if the suspect would have taken another step forward, he (Lieutenant Bayne) would have been useless in the other officers' defense because the pillar would have been obstructing his line of fire.

32. I asked Lieutenant Bayne about the pace of the suspect. Lieutenant Bayne described it as moderate, purposeful, and determined.

33. In response to me asking him if he felt an intermediate weapon would have failed, Lieutenant Bayne stated, "All I can tell you is that the only way that you

COS-PROST-011532

could safely deploy an intermediate weapon under those circumstances is if the officer deploying it is behind a completely protected barricade so that if it does fail they - they're not going to be assaulted with that failure. Because the - there was - it's such a close distance that there's no time for a deadly force response after the failure because it's so close."

Lieutenant Bayne stated that he advised over the radio that he had been involved in a shooting and asked for the fire department to come up. The fire department had been staging per Lieutenant Bayne.

At 5:15 pm, we took a break. At 5:29 pm, we continued with the interview. I asked Lieutenant Bayne to tell me what, specifically, he knew about the suspect going into the call. Lieutenant Bayne related that he knew the following:

1. The suspect's reported behavior that evening was extremely irrational.

2. The suspect was at a residence threatening a man with a knife and had the man cornered in a room of the man's house with a knife.

3. The man the suspect had cornered (Daniel) was desperately trying to talk him into releasing the weapon. Lieutenant Bayne remarked, "that alone told me that [the suspect] had a heightened level of potential violence.

4. The two calls were related (the Armed Robbery and Subject with a Knife call).

5. The victim of the Armed Robbery call was traumatized (by the same suspect). Lieutenant Bayne stated that the suspect had "violent - irrational tendencies based on what I'm seeing from the cab driver."

COS-PROST-011533

6. The suspect was possibly a Marine. Lieutenant Bayne stated that the suspect being associated with the military made him feel that he was trained with stick fighting or something similar.

7. Lieutenant Bayne did not know where the knife was when the suspect came out.

8. Summarizing, Lieutenant Bayne stated:

> "So there's a lot, um, it was the behavior, the reported behavior at - at the residence, the reported behavior with the cab driver, me visually seeing the - the cab driver as a victim and - and how scared he was, Sergeant Cabrera validated for me my visual - my observations. The information of his erratic irrational threats of violence at the residence, and then him coming out aggressive. From a knife, to two sticks - all that together - this - this - this was a very escalated situation."

I then asked Lieutenant Bayne specifically what was going through his mind when the suspect came out regarding the potential injury to the officers and public. Lieutenant Bayne responded by saying:

> "Well, here's an individual based on all of the reported threatened violence, that he needed to be detained. He had already threatened at least two people this evening with the knife. And so we were the last line of stopping this individual from getting to another person - the third person. He needed to be stopped, he needed to be detained. So there was the - the threat that if we didn't stop him, he would eventually get to somebody else and continue with the same threat and violence of potentially even heightened and he would actually carry out the threat and - and - and cause great physical harm to somebody. The immediate threat came to myself and the officers next to me, when he presented himself in the doorway, holding two sticks in a threatening manner, failed to comply to police commands that were loudly given to him. And he aggressed us and he closed the distance on us. And he - I did not know where his knife was - if it was in the back of his waistband or in his pants secreted some place. Regardless, he had - his hands were occupied in closed fist-like fashions around two batons. And he was swinging 'em in a manner like he knew what he was doing, getting ready to assault the crap out of us. So he was an immediate, imminent, deadly force, threat to the other officers that

COS-PROST-011534

were responsible for stopping him and myself, being one of those officers."

I asked Lieutenant Bayne about other options available at the time. He explained that he had only been on scene for only a couple of minutes so there was not time to set up any other type of tactical plan. Lieutenant Bayne stated that the suspect did not allow them time; as the suspect came out presenting deadly force right after he (Lieutenant Bayne) arrived.

I asked Lieutenant Bayne about his past experience regarding encounters with violent individuals. Lieutenant Bayne related the following:

1. As a SWAT member, he was present and participated directly in the arrest of several high-risk, violent people. A vast majority surrendered without resistance, some did not, and a couple of them presented deadly force.

2. Lieutenant Bayne had never been in a situation where he had to respond personally to a deadly threat with deadly force.

3. He worked with the Gang Unit and contacted high risk gang members. He also was present (working) at an event in Laughlin, Nevada where outlaw motorcycle gangs were gathered.

4. A couple time in his career an incident escalated to where deadly force was presented and other officers around him appropriately responded with deadly force.

COS-PROST-011535

5. He has attended numerous tactical schools (around 20 tactical formal schools such as entry, sniper, and negotiator schools). During these schools they would role play scenarios where they were presented with deadly force situations.

6. Through his training and US Army experience, he has been able to participate in scenarios from different positions giving him different perspectives on how to try and resolve incidents without using deadly force.

7. Lieutenant Bayne organized a team to author better policies regarding how the department responds to officer involved shootings and put together a training lesson plan. The training was delivered to all sworn personnel at the rank of Lieutenant and below, as well as, some civilian staff.

I asked Lieutenant Bayne if he felt he was adequately trained to respond to the situation. He replied, "Completely." I then asked him if he felt he responded to his training and he stated that he did.

I asked Lieutenant Bayne who he called after the shooting that was above his rank. He told me that he called Commander Rosenberger at 4:54 am.

I asked Lieutenant Bayne if there were any policy violations that he was aware of. He thought through the event verbally, however, did not articulate any policy violations. Lieutenant Bayne stated that training worked, policy was followed, and their equipment worked.

COS-PROST-011536

I asked Lieutenant Bayne if there was anything else that he thought was important for

Sergeant Hanafin and I to know. Lieutenant Bayne stated:

> "Yes, and this is - this is one thing because it was mentioned to me
> obviously through media reports, through all of the public scrutiny that
> naturally came as a result of this – that the individual who had been shot
> was a combat veteran who had been suffering from post-traumatic stress
> disorder. And it's somehow been implied that number one, we should have
> known that. And number two, that with knowing that, we should have
> responded to this differently. Number one, I did not know that and I don't
> know or I don't believe that any of the other officers out there on scene did
> know it. Number two, and more importantly, that I want to strongly assert
> is that, had I did know that, I do not know what could have been done
> differently, given the exact same circumstances. I believe that the people
> who know me well, know that, had this individual come out had - had this
> individual come out and requested assistance, I'd be the first person to put
> my arm around this guy and say, let's go get you help. He did not do that.
> He chose to come out fighting. And it left me no options but to defend
> myself and the other officers.

Lieutenant Bayne got emotional at this point. Sergeant Hanafin was asked if he had any

further questions. He did not. The interview ended at 6:15 pm.


**Sergeant Charles Cabrera** was interviewed at 2:55 pm on March 13, 2012 in the Internal

Affairs Office. The interview was audio recorded and later transcribed. A copy of the

transcription is included in this case file. The following is a summary of the interview:

I first asked Sergeant Cabrera about his tenure and current assignment. He told me that

he has been a police officer for 9.5 years. He has been a Sergeant for approximately 2 of

those years. Sergeant Cabrera is the supervisor for the Relief 1 shift in District 4. The

Relief 1 squad in District 4 works from 3:30 pm to 1:30 am on Wednesdays and from

8:00 pm to 6:00 am on Thursday, Friday, and Saturdays.

COS-PROST-011537

Sergeant Cabrera stated that he began his shift at 8:00 pm on the night of this incident and was due to get off at 6:00 am. Sergeant Cabrera stated that he gets 6 to 7 hours of sleep per night on average.

On the night of this incident, Sergeant Cabrera stated he was driving around in District 4 when he heard the emergency traffic regarding the Subject with a Knife in District 3. Sergeant Cabrera explained he was aware that at that hour staffing was light, so he moved closer to District 3 so he could supervise both districts. Sergeant Cabrera stated that it was around 5 to 10 minutes into the Subject with a Knife call when the Armed Robbery call was dispatched.

Sergeant Cabrera knew he had to respond due to being the only supervisor left in Districts 3 and 4 since the District 3 supervisor (Sergeant) would be busy on the other emergency traffic. Sergeant Cabrera stated that he heard Lieutenant Bayne announce over the radio that he had arrived at the Armed Robbery call. Sergeant Cabrera also told me that he heard Lieutenant Bayne report that the Armed Robbery call was related to the Subject with a Knife call. Sergeant Cabrera arrived at the Armed Robbery Call with Officer Tony Wells. Sergeant Cabrera stated that as he drove up, he saw Lieutenant Bayne start to leave.

Sergeant Cabrera stated that Officer Wells contacted the cab driver (victim) and eventually came over to him and explained what the victim had reported. Sergeant Cabrera learned that the cab driver had dropped off the suspect at the same location as the Subject with a Knife call.

COS-PROST-011538

Sergeant Cabrera stated that he then got a phone call from Lieutenant Bayne. Lieutenant Bayne asks him for information pertaining to what occurred to the cab driver. Sergeant Cabrera explained that the suspect had held a knife to the cab drivers throat, made him drive around, and then drive the suspect back to the house. Sergeant Cabrera told Lieutenant Bayne that the cab driver then drove to the Superpumper and called 911. Sergeant Cabrera told me that Lieutenant Bayne asked him to make sure that Officer Wells conducted a good, detailed interview and that he records it in case the call escalated and lethal force needed to be used. Sergeant Cabrera indicated that he also told Lieutenant Bayne that the victim wanted to prosecute.

I asked Sergeant Cabrera how Lieutenant Bayne sounded. Sergeant Cabrera stated that he sounded very calm.

Sergeant Cabrera then explained that the investigation continued and they heard that there was an officer involved shooting at the other scene. Sergeant Cabrera realized that detectives would be responding so he ensured that Officer Wells stayed with the victim (Travis Keehn). Sergeant Cabrera stated that Lieutenant Bayne got on the air and requested that he come to the scene on 135th Pace.

I asked Sergeant Cabrera how much time he thought went by from the time he hung up with Lieutenant Bayne and the time he heard the shooting announced. Sergeant Cabrera told me that it was not more than a couple of minutes.

COS-PROST-011539

Sergeant Cabrera stated that when he arrived on the scene, Lieutenant Bayne began giving direction to him and Sergeant Moore pertaining to assignments. Sergeant Cabrera was assigned to handle the inner perimeter and Sergeant Moore was given command.

Sergeant Cabrera described how he handled the management of the scene from that point and told me that he secured around 1:00pm on the 28th.

***Officer Anthony Sanborn*** was interviewed at 2:30pm on March 15, 2012 in the Internal Affairs Office. Internal Affairs Sergeant Mike Hanafin was also present for the interview. The interview was audio recorded and later transcribed. A copy of the transcription is included in this case file. The following is a summary of the interview:

Officer Sanborn has been a Police Officer for 7 years and has been assigned to the Police Canine Unit for 2 years. He has always had the same canine, Raider. Officer Sanborn stated that he has received the following specialized training/certifications:

- 6-week Handler School at Adlerhorst in Riverside, California

- 1-week Agitation School

- Annual National Police Canine Association Conference (training)

- Annual Recertification

- Field Training Officer

- Narcotics Trained Officer

- Gang Liaison Officer

- General Instructor Certification

COS-PROST-011540

On January 27, 2012 Officer Sanborn began his shift at 8:30 pm. He was wearing the standard K9 uniform that includes police insignias. Officer Sanborn carries OC spray, Taser, baton, and his primary duty weapon. He does not carry a secondary handgun. In addition, Officer Sanborn carries an E-Collar, which is a radio transmitter that delivers a correction in the form of an electric shock to the dog via a collar the canine wears. Officer Sanborn told me that the E-Collar that Raider had been wearing was impounded due to it being hit with a bullet during the shooting.

Officer Sanborn stated that his last day of that week would have been Sunday and he had worked since Wednesday (January 25, 2012). Officer Sanborn told me that he usually gets 6 to 7 hours of sleep. Officer Sanborn described the weather on the night of the 27th as being cold and windy.

Officer Sanborn stated that he had been in the Canine Office prior to the call of the Subject with a Knife coming out. The Canine Office is near the District 2 station in downtown Scottsdale. Officer Sanborn stated that he drove north on the 101 freeway to respond to the call and was in the area of 90th Street and Via Linda when the second emergency call was aired regarding the Armed Robbery. Officer Sanborn stated that he had learned the following while responding to the 135th Place call:

1. A female had barricaded herself inside the bathroom of the home.

2. The female advised that her boyfriend was in the living room where a male subject was holding him at knifepoint.

COS-PROST-011541

3. An Armed Robbery occurred at 90th Street and Shea and the dispatcher announced that the two calls were related.

Officer Sanborn stated that he remembered being confused as to why the two calls were related since they were far apart; however, when he got to the 135th Place call he spoke with Sergeant Moore who advised him that it was possible that the subject that used a knife to rob the cab driver was the one inside the residence.

Officer Sanborn described his response the Subject with a Knife Call and his actions and observations during the incident:

1. Officer Sanborn parked his vehicle on the north side of the residential street facing the residence (Paradise Lane). He arrived after other units were already on scene.

2. Officer Sanborn exited his vehicle with Raider on lead and saw that the female (Rachel Rogers) was already outside speaking with officers on the south side of the street.

3. Sergeant KC Moore was in the area where the officers were speaking with Rachel.

4. Lieutenant Bayne had not arrived yet.

5. Officer Sanborn stated that he spoke briefly with Sergeant Moore who was attempting to figure out how the two calls were related. Officer Sanborn asked Sergeant Moore if they were treating the call like a hostage barricade. Sergeant Moore told him that it looked like it was going that way, but was not sure yet.

COS-PROST-011542

6.  Officer Sanborn saw a few officers (including Officer Thomas Goodson) setting up a contact team closer to the residence, so he went to them.

7.  Officer Sanborn stated that he decided that it would be best for him to go to the contact team as the canine less-than-lethal option if the suspect chose to exit.

8.  Officer Sanborn stated that an officer had gone over to the front driveway of the house to the north and Officer Goodson was "set up" on the mailbox directly in front of the residence. Officer Sanborn stated that Goodson had deployed his rifle (AR-15), which was pointed at the front door of the residence.

9.  Officer Sanborn stated that Officer Goodson was using the mailbox as cover and concealment.

10. Officer Sanborn stated that he first went up to the other officer in front of the driveway. Officer Sanborn did not remember the officer's name. Officer Sanborn stated that they were still trying to get a perimeter around the house set up and see if they could see inside the home.

11. Officer Sanborn then learned that phone contact had been made with the boyfriend who was still inside the residence. Officer Sanborn then announced that he would have commands.

12. Officer Sanborn stated that they could not be sure of the identity of the male who exited the house was (the boyfriend or the suspect).

13. Officer Sanborn then told me that a male subject exited the house and he gave him commands. Officer Sanborn stated that the male subject was cooperative and was holding a cellular phone. Officer Sanborn stated that he obeyed all commands, dropped the cell phone and walked back toward the officers. The

COS-PROST-011543

male subject (Daniel) was then interviewed and Officer Sanborn went over to the mailbox to join Officer Goodson.

14. Officer Sanborn stated that he walked back and forth between Goodson and the boyfriend in order to try and get more information. Officer Sanborn stated that the boyfriend (Daniel) was being deceptive and denied knowing about a knife. Officer Sanborn stated that due to the way he was avoiding questions regarding the knife, it appeared that he was being deceptive. Officer Sanborn stated that the boyfriend was trying to downplay the incident and stated that the suspect had a pool stick and was inside playing pool.

15. Officer Sanborn thought that the boyfriend was intoxicated due to him having slurred speech and being "slightly mumbled." Officer Sanborn thought this was the reason why he was acting that way.

16. Officer Sanborn returned to the mailbox to join Officer Goodson and other officers starting to form a contact team.

17. Officer Sanborn stated that he was focused on the front door, as it was slightly open and he was hoping the suspect would pass in front of it so he could see what he was doing.

18. Officer Sanborn described what happened next:

> "Um, we knew that this guy at some point had had a knife, and now - now information was coming in as KC Moore was joining the contact team. Um, I head heard Lieutenant Bayne's voice at that point - I know he had shown up, and he was talking to some people behind me, so I knew he was there. And they were starting to give us some information about how these two were related, so they were piecing that together. Basically he had - we knew that he had been at the house, caught a cab, left the area, threatened the cab driver at knifepoint to come back to the house, came back, and then had gone back inside and was armed with a knife inside, and that was

COS-PROST-011544

when our female had called to say that uh, her boyfriend was being threatened with a knife. So, clearly he still had it, the propensity to use it, um, that he was still inside with that knife, uh, armed in some way at least. But at that point I remember relaying or speaking to someone about, now it looks like we can slow things down. This guy has - has barricaded himself, and we were able to confirm between the two RP's, slash, victims, that there was no one else inside but him. So, we had containment now to the rear, we had our contact team in the front, um, so things were set up pretty good at that point for a guy who was inside basically and - and no one else - no other victims were inside, no hostages, no - no other victims, just him."

19. Officer Sanborn stated that they discussed a plan that if the suspect (Jason) came out with anything other than a gun or a knife, he would send the dog. Officer Sanborn told me that he explained that while the dog was "on the bite" they would move up and arrest him. Officer Sanborn told me that he looked around and ensured that "people" acknowledged him and then checked with Sergeant Moore who was standing behind him. Officer Sanborn stated that Sergeant Moore was okay with the plan. Officer Sanborn stated, "So everybody was clear that this guy comes out, he's showing anything other than a knife or a gun, uh, then he's gonna be bitten by the K-9 and that's when we'll move up and make contact."

20. I asked Officer Sanborn if Lieutenant Bayne was present at that point. Officer Sanborn told me that Lieutenant Bayne was in the area but thought he was on the phone. Officer Sanborn told me that Lieutenant Bayne was not a part of the planning processed and that he (Officer Sanborn) never shared his plan with him.

21. Officer Sanborn stated that he returned his focus to the front door and it was very quickly after that, the suspect walked across the front door from north to south (still inside the residence).

COS-PROST-011545

22. Officer Sanborn announced that he saw something in the suspect's hands, but could not identify what it was. Officer Sanborn described it as a long cylinder, tube shaped device.

23. Officer Sanborn stated that everyone focused on the door at that point and it was "quickly" right after that the suspect came from the south end of the doorway, opened the door and began to walk out. Officer Sanborn stated that he immediately engaged him in verbal commands.

24. I asked officer Sanborn if he thought the object in the suspect's hands could have been a pool cue when he saw him pass in front of the door. Officer Sanborn stated at that point it could have been a pool cue or could have been a rifle. Officer Sanborn stated that the lighting was low and it was very dark. The lights were on inside the home, but it was dark outside. Officer Sanborn stated that there was a light on one of the pillars that separated the walkway into the front porch area.

25. Officer Sanborn continued to describe how the suspect exited the house by saying:

> "Still has items in his hands. I'm yelling at him, that, police, stop, police, stop. You need to drop what's in your hands, turn around, face away from us. I was giving him all the commands that he needed to get. I was giving him K-9 commands uh, 'cause he wasn't obeying anything. He continued to walk and it was at a steady pace, at a brisk... All our K-9 commands basically consist of um, you know, Police, K-9. You need to stop now, uh, or you'll be - you'll be bit by the dog. So basically announcing who I am, what I need him to do, and what the consequences are if he doesn't do it. Uh, that being you'll be bit by the K-9. So those were very clearly made several times, that he needed to stop or he would be bit by the police K-9."

COS-PROST-011546

26. Officer Sanborn stated that the suspect had long cylinders in both hands and had them up on his shoulders. Officer Sanborn still could not positively identify what they were and stated that he did not know if he had a "rifle, pool cue, or whatever it may have been."

27. Officer Sanborn stated that the suspect never slowed his pace and was walking directly towards where they were (he and the officers). Officer Sanborn described the suspect's pace as a "brisk walk."

28. Officer Sanborn stated that the suspect continued coming toward them despite the canine commands and standard police "challenges" for him to "stop" and "you need to stop now."

29. Officer Sanborn stated that once the suspect passed the threshold of the front porch area, everybody got a "little nervy" and that is when everyone started yelling commands.

30. Officer Sanborn stated that he could see his dog was focused on the suspect and described the next events by saying:

> "Now that he's up in that light is when I'm first able to identify what's in his hands. I can see now that he's holding a stick, basically. He's holding a - I couldn't say it was a pool cue at that point, it wasn't clear enough but uh, not a rifle - clearly some sort of long stick - two long sticks. Um, and not only that but he's - he's taking them and he's - he's kind of - as he's walking he's basically cocking them and - and swinging them back and forth as he's - as he's walking. Basically that threatening manner of, you know, I'm swinging them and, you know, I'm coming for a fight is - is the way I took it, is that's - that's a threat. He's coming at us and he's warming these things up and - and swing them around to show us that, you know, he's coming at us to hit us with some sticks. Um, what I first identified at that point, holding a dog and being that K-9 option, was A, this fit into our plan, that he's not holding a gun and he's not holding a knife. Is he armed with a knife? Potentially, and in my mind most likely that knife is still somewhere on him, maybe in his waistband. Uh, but he

COS-PROST-011547

currently doesn't have it in his hands. Uh, so he's fitting into our plan as far as the K-9 deployment."

31. Officer Sanborn stated that the way the suspect presented himself was similar to a training exercise they do with the police canines call a "courage test" so he felt comfortable that Raider would be familiar with the scenario.

32. Officer Sanborn stated that at that point the suspect continued walking briskly and was closing "very quickly" and was coming directly at them. Officer Sanborn stated, "We needed to stop him. Officer Sanborn explained that he let raider go and gave him his "bite command," and Raider was "inbound" at a full sprint towards the suspect. The suspect was 5 or 10 yards in front of them per Officer Sanborn's estimation.

33. I asked Officer Sanborn if he communicated that he was releasing the dog to the people around him. He stated that most officers understand the bite command of "Foss" indicating that giving the bite command to the dog should make everyone aware that it was being released if they heard it.

34. Sergeant Hanafin asked Officer Sanborn what the distance was from them to the suspect. Officer Sanborn stated the suspect was "about five yards from where that mailbox was to where – to where our suspect was at that point."

35. Sergeant Hanafin confirmed that Officer Sanborn was estimating the distance from the officers to the suspect at 5 yards.

36. Sergeant Hanafin asked if in the two years Officer Sanborn had Raider, if the canine had ever run past the intended target or failed to engage.

COS-PROST-011548

37. Officer Sanborn stated that Raider had failed to engage the suspect he sent on his first "bite" with him (not in training). Officer Sanborn explained that the suspect was not showing agitation that the canines usually look for, so instead Raider ran to two open doors on a building beyond the suspect thinking it was a building search. Officer Sanborn estimated that it occurred about a year ago.

38. Officer Sanborn then continued to describe what happened next by saying:

> "He immediately hits this - our suspect. Jumps - I - I see him leap to go for upper torso area. My initial thought, and again, this was - in that moment I can recall everything slowing way down, and now I can see things very clearly, and so I'll - I'll speak on things in detail but again, it was very, very fast. But I remember watching him inbound. He's at a full sprint. He had a very short period to go, but he was - a very short distance but he was at a - a full sprint when he - when he got to where our suspect was, he leaped, went for upper torso area - they're usually trained to take the arm if the arm is available. I can recall as he's going in to hit the suspect, that um, his sus- his arms were up and apart, and I thought it was odd because Raider's mouth and his head was going directly towards like a pec or chest area on our suspect's right side. Um, so he hit that area - I remember thinking that was kind of odd that he had - he had gone for that area. I thought it'd be an inside arm bite, which isn't unusual, especially on a courage test 'cause we'll be swinging and sometimes the dog will take inside arm. Um, still a very good bite, but they typically would get that outside back of the arm. Um, so he initially hit him more towards like the pec and chest, shoulder area, but he ran up full speed and was engaging him. And as soon as he engaged him is when I heard two shots, and they were - they were almost simultaneous from when Raider hit him to the two shots, and um, the suspect dropped quick, very quick. No noise from Raider whatsoever. Um, he basically disappeared from the picture."

39. Officer Sanborn described how he got the leash back on Raider, announced on the air that there had been an officer involved shooting and then requested the fire department.

COS-PROST-011549

Officer Sanborn continued by describing how he found that Raider had been shot and he was eventually transported to the area of Scottsdale and Acoma to be treated.

Sergeant Hanafin then asked Officer Sanborn questions regarding the incident. First, Sergeant Hanafin asked him if he had a "mental line in the sand" referring to how close Jason would get before he released his dog. Officer Sanborn stated:

> "You know, it wasn't necessarily that I'd predetermined that if he crosses that rock, I'm going to send Raider. I was - I - I think I was more caught off guard on how fast he actually approached us. I think I was expecting more of a standoff there when he came out, and some - some - there'd be some communication, 'cause that's typically what we get when someone comes outside, is there's gonna be a little bit of communication. They won't come at that beeline for you, um, typically. So I think I was caught off guard when he first came out, at how fast he was approaching and - and closing on us. So he's closed distance very quick, and I tried to make sure I gave every command I could give, but there was zero response from him. I'll never forget the look on his face."

Sergeant Hanafin asked him how far Jason was away from them before he could tell that all he was armed with pool cues. Officer Sanborn said, "Ten yards, if I could guess, I think it's ten yards from that mailbox to where that porch starts, that, that pillar area where the walkway flows into the porch."

Sergeant Hanafin confirmed that Officer Sanborn's decision time was 10 yards from them to 5 yards from them and that Jason had walked the 5 yards at a brisk pace. Officer Sanborn responded affirmatively. Officer Sanborn stated that he covered the 5 yards in a very short period of time and estimated one or two seconds.

COS-PROST-011550

Officer Sanborn stated that his thought processes was, "What's in his hand? Is it a rifle? Is it a stick? Okay, it is a stick." Okay I'm giving more commands, he's still not listening. All right, that's it, that's – something has to be done he's not stopping, he's coming straight at us. All right, deploy Raider…"

I asked Officer Sanborn if he was in fear for his safety. He stated, "Oh, yeah, absolutely." I then asked him at what point. Officer Sanborn replied, "It was clear when he stepped out, he had one intention. He was swinging those - those - whatever the long items were in his hand. He was swinging them and his pace and his direction, directly at us where we were standing, it was clear he had one intention, and that was to come out that door, come straight at us and whack one of us with those sticks."

I asked Officer Sanborn about using a Taser. He told me the following:

> "You know, I personally didn't think about the Taser at any point. Looking back on it now if I'm second - if I'm - if I'm quarterbacking, Monday morning quarterbacking everyone else and what our different options could have been to subdue him, I don't think anyone - anyone was actually designated as the Taser option. The distance from where we were would have been probably the max distance for the accuracy of that Taser. The Taser is not, in my opinion, I've seen it deployed many times. It's effective, 50% to seven - may-maybe 50% to 60% of the time, which is not a good number for me when you're talking about that short distance. I don't like thinking that it may work or it may not work, it's a coin toss when we deploy this Taser. It was too short, he was moving too quick. He was - he was getting too close to us too fast, and if the Taser didn't work, one barb didn't stick, or just didn't deploy the way it should have, then it would have been - he would have been on us, and he would have been on us swinging a stick - a heavy, heavy stick, and trying to hit one of us, maybe me, the guy who's holding a leash, not a gun."

COS-PROST-011551

I asked Officer Sanborn if he felt it was a deadly force situation. He stated, "I do."

The interview ended at 3:18pm.

I subsequently asked Officer Sanborn to clarify which pillars he was talking about during his interview, as there were two tall support pillars on the east end of the front exterior foyer area and two short pillar-type structures east of that. Officer Sanborn identified the pillars as the ones furthest east (using a printed photo of the front of the house).

**Officer Thomas Goodson** was interviewed at 12:47 pm on March 15, 2012 in the Internal Affairs Office. Internal Affairs Sergeant Mike Hanafin was present during the interview. The interview was audio recorded and later transcribed. A copy of the transcription is included in this case file. The following is a summary of the interview:

Officer Goodson has been a Scottsdale Police Officer for approximately 7 years. During college he attended Officer's Candidate School with the Marine Corps, but did not spend time in the military.

Officer Goodson summarized his significant training/certifications as follows:

- Firearms Instructor (80 hour class)
- Rifle Operator
- AZPOST Defensive Tactics Instructor
- Assigned as Recruit Training Officer for a year at ALEA.

COS-PROST-011552

- Narcotics Trained Officer

- Investigative Services Officer

- Field Training Officer

- Officer in Charge School

- AZPOST General Instructor

On January 27/28, 2012 Officer Goodson stated he was working the Relief 1 Shift in District 3. The Relief 1 squad in District 3 works from 4:00 pm to 2:00 am on Wednesdays and from 8:30 pm to 6:30 am on Thursday, Friday, and Saturdays. Officer Goodson stated he usually gets between 6 and 7 hours of sleep.

Officer Goodson stated that the weather was clear and windy.

Officer Goodson stated that he was in full uniform and carries a baton and Taser. He also only carries his primary handgun and a rifle. Officer Goodson stated that it is his personally owned rifle, a Colt.

Officer Goodson stated that when the emergency call came out for the Subject with a Knife, he and Officer Adam Fernandez were at an area beat office on Indian Bend and Scottsdale Road working on paperwork. He stated that is was slow at the time. Officer Goodson and Officer Fernandez headed to the call by driving north on the 101 freeway.

COS-PROST-011553

Officer Goodson stated that he got a flat tire at about 110th Street and Shea Blvd., so he requested the assistance of a Police Aide. When the Police Aide arrived, Officer Goodson took the Police Aide's vehicle and continued to the call.

I asked Officer Goodson what he had learned regarding the call while he was en route. Officer Goodson told me the following:

1. There was a 911 call from the female at the house.

2. A male was armed with a knife.

3. The female was safe and was calling from a bedroom "or something."

4. The female's boyfriend was arguing with the guy who had the knife.

5. Another emergency call was dispatched in the area of 92nd Street and Shea regarding a cab driver that was held at knifepoint.

6. At first he did not know the calls were related; however, information was dispatched on the PD2 Channel that the calls were related. He thought it was Sergeant Cabrera and Lieutenant Bayne who relayed this information.

Officer Goodson stated that he pulled up behind Lt. Bayne as he arrived. Officer Goodson told me that he saw Sergeant Moore and Officer Cody Carlisle talking to the female reporting party (Rachel) when he arrived. Officer Goodson also heard that Officer Fernandez was making his way to the backyard, or trying to get into a position to see the back yard of the residence. Officer Goodson stated that he grabbed his rifle before exiting the vehicle.

COS-PROST-011554

Officer Goodson also stated that he saw Officer Sanborn getting Raider out of his vehicle and he and Officer Sanborn walked up to Sergeant Moore together. Officer Carlisle was trying to get Rachel to call her boyfriend and have him exit the residence. Rachel did and the boyfriend (Daniel) stated that he was coming out. Officer Goodson told me that he, Sergeant Moore, Officer Sanborn, and Raider went towards the end of the cul-de-sac to "receive" Daniel.

Officer Goodson explained that Lieutenant Bayne was still in his vehicle at this point.

Officer Goodson stated that when Daniel came out he was talking on his cellular phone and Officer Sanborn was giving commands to put the phone down. Daniel complied with all of Officer Sanborn's commands and they were able to walk Daniel back. Officer Kevin Reynolds walked up at that time and took custody of Daniel.

Officer Goodson stated that they handcuffed Daniel since they were not completely sure that he was not the suspect with the knife.

Officer Goodson then explained the events that led up to the shooting as follows:

1. Sergeant Moore walked up to the mailbox and was focused on the front door (deployed with his rife).

2. Officer Goodson relieved him at the mailbox and Sergeant Moore moved behind him.

COS-PROST-011555

3. Officer Sanborn walked up and stood directly off of his right shoulder behind him and Raider was sitting by his right leg.

4. Officer Reynolds came up behind Sergeant Moore and they began talking about what to do.

5. Officer Sanborn advised that he was going to be the one giving commands if the suspect came out and that he would send the dog if he saw "anything in his hands."

6. The description they had of the suspect was that he was a white male wearing a tank top and "Jeans."

7. Officer Goodson saw a male in a ribbed t-shirt walk from the north to the south. Officer Goodson could see this through the front door as it was open "about a foot or two."

8. Officer Goodson then saw the subject walk from the south to the north. Officer Goodson stated that the lights were on inside the house and there were no lights outside other than the lights over the garage. Officer Goodson stated they could see inside and that there was a pool table.

I asked Officer Goodson if he had gained any more information from Rachel or Daniel on whether the suspect was still armed, how he was acting, or anything pertaining to what had occurred inside. Officer Goodson stated that the boyfriend (Daniel) said that the suspect was a war veteran and was "freaking out" and "wigging out" or something similar. Officer Goodson stated that Sergeant Moore (a former Marine) kept asking what

COS-PROST-011556

service the suspect was in. Officer Goodson also stated that Daniel stated that the suspect

had Post Traumatic Stress Disorder (PTSD).

Officer Goodson continued describing the events leading up to the shooting:

9. The suspect walked out of the door and he (Goodson) was aware that Raider was

   right off of his "left heel" and kind of jumping.

10. Officer Sanborn "instantly" started giving verbal commands.

11. Sergeant Moore was behind him (Goodson) as he could feel him pushing on him.

12. Officer Goodson was not aware that Lieutenant Bayne was there.

13. Officer Goodson recognized that the suspect had two pool cues and was holding

    them up "across his back". Officer Goodson "knew instantly" that it was a pool

    stick but it was in "broken in half."

14. Officer Goodson then stated, "So he comes walking out and at - at that point as

    soon as I saw him, it kind of clicked like, holy crap, this guy's on a mission.

    'Cause the whole expression that he had in his face was he wasn't listening to

    anyone, he wasn't responding to any commands and this guy was on a mission.

    That - he kind of had that 1000-yard stare, kind of looking through us and he just

    starts walking right at the mailbox, right at us."

15. Officer Goodson described that the suspect was holding the pool cue halves up

    resting on his trapezoids.

16. Officer Goodson described the suspect's pace using the words "just a pretty good

    walk... determined ... a steady paced walk."

COS-PROST-011557

17. Officer Goodson stated that the suspect continued to walk toward the mailbox "right where we're at" and was not stopping. Officer Sanborn continued giving him commands.

18. Officer Goodson stated that Officer Sanborn said he was going to send the dog. I asked Officer Goodson how Officer Sanborn said that exactly. Officer Goodson then stated:

> "He - he yells to the - to the offender, he yells, I'm gonna send the dog - you will get bit, and then he says to us, in a lower voice, he says, I'm sending the dog. And then he gives his um, his FOS or FOOS or whatever they say to send the dog, they're kind of commands, so I knew that would - that meant that the dog was going. And I remember thinking in my head that - I was looking through my sights, right on the guy's chest, so I had already clicked my safety off. I'm thinking, I'm gonna need to shoot this guy - oh, wait. I'm gonna want - I want the dog to go - I want to see what the dog does, and if the - depending on what the dog does is what I'm gonna do. 'Cause I've been on calls before where Raider has actually ran past everyone, gone into the house, and other times where Raider just kind of doesn't engage, so I kind of thought - being familiar with the dog, I know how he works, and so I was gonna give him one chance as the guy was going to see what the dog was gonna do. And I had the safety off, my finger was on the trigger, my sights were on his chest and I was gonna give the dog one - one split second, and if the dog wasn't gonna do anything, then I remember thinking that I'm gonna have to shoot this guy. Then all of a sudden to the left Lieutenant Bayne comes out and shoots twice. I remember thinking, holy crap, where was the recoil on my gun? 'Cause I thought that I shot."

19. Officer Goodson directed Officer Reynolds to handcuff the suspect and he, Officer Reynolds and Sergeant Moore checked the house for any threats or victims.

COS-PROST-011558

20. I then asked Officer Goodson to describe the timing between the dog being released, the dog engaging the suspect, contact with the suspect, and the sound of shots. Officer Goodson stated:

> "The dog being released - I remember the dog going and he kind of did like a - like a - like a kind of a - he couldn't get any traction 'cause he was so anxious to go, so he kind of did like a flick twice, and then he hit my leg as he was going by. And it probably took him three or four steps to get to the suspect, 'cause the guy - the suspect was only about 15 yards max away from us. So the dog jumped, so he covered that ground very quickly and as he jumped up, that's when the two shots came out. And then I remember thinking, Man, where's the recoil on my gun? And then I was like, Oh, I must have shot too quick - I didn't give the dog time to - to engage or anything. This was really quick. The dog goes and covers that ground, and it's just as the dog's jumping the two shots come out."

21. Officer Goodson estimated that the suspect was 15 yards from them "max" when the canine was released and stated that it took the canine 3 to 4 steps to get to the suspect.

I asked if Officer Goodson was saying that he perceived the situation as a deadly force situation, depending on if the dog was able to make a difference in the occurrence. Officer Goodson stated that he "saw it all as a deadly force situation" but thought that the dog would have been able to help them by enabling them to take the pool cues "out of the situation" making it not a deadly force situation.

Officer Goodson stated, "If the dog - as soon as the dog was released, if the dog would - would have ran right past him and gone in the house, I would have shot him." I asked Officer Goodson why. He then said, "Because he was walking too - at a pace - it was

COS-PROST-011559

steady enough, his pool cues were up and this - the guy looked like he was on a mission, like he was gonna come and he was gonna start - just start swinging at one of us, and it would have caused um, serious physical injury. I mean those things, they have some weight to them and he wasn't gonna stop."

I asked Officer Goodson if he was concerned about his own safety, the other officer's safety, or both. Officer Goodson told me that he was concerned more for Officer Sanborn's Safety because he did not have a gun out, only the canine. Officer Goodson stated that the mailbox was between the suspect and himself so the suspect would have to have made a couple of movements to get to him. However, Officer Sanborn was in the direct line of the suspect.

I asked Officer Goodson about less than lethal besides the canine. Officer Goodson stated that it "wasn't an option." I asked him to tell me why. Officer Goodson stated that the wind was blowing so much that the probe probably would not have "even hit him," and OC spray would also not have been effective for the same reason. In addition, due to the pace the suspect was moving toward them, it would have had to have been "one heck of a shot to even get him with a Taser."

I asked Officer Goodson if there was anything notable in the house. He told me that there was alcohol "all over the place".

COS-PROST-011560

Sergeant Hanafin asked Officer Goodson about the Taser and the wind. Officer Goodson

stated:

> "Um, because he was walking - he - he - as soon as he exited the house, he
> was walking at a steady rate, and it had been steady the whole time. I
> know if I was - I wouldn't feel comfortable shooting a Taser at him
> because I know I wouldn't have been able to, um, I don't think I would
> have been able to hit him because he was - been walking so fast to where
> um, when I'd been comfortable to taking a shot I'd have been too close
> because you had the pool cues, and he would have been able to reach me. I
> think the only less lethal we had designated in our plan was the K9. We
> kind of had a plan set out that Tony would give commands and had less
> lethal; I had lethal and then Sergeant Moore was behind me and had lethal,
> and then Kevin Reynolds would have been hands on. "

I asked Officer Goodson if Lieutenant Bayne had been part of the planning process.

Officer Goodman stated that he did not know where Lieutenant Bayne was. Officer

Goodson stated that the first time he saw Lieutenant Bayne, he was in his vehicle and the

next time he saw him was after the shot.

Sergeant Hanafin again asked for more clarification about the Taser use in the wind.

Officer Goodson stated that he had been on a lot of calls and about "half of the time" that

a Taser is used it is "ineffective" due to the probes not sticking or they hit the clothing.

Officer Goodson stated that the Taser did not cross his mind because they had the dog.

Officer Goodson also said, "I didn't want to risk him getting close enough to Tase him

with him having the pool cues."

The interview ended at 1:31pm

COS-PROST-011561

**Sergeant K.C. Moore** was interviewed at 1:30pm on March 22, 2012 in the Internal Affairs Office. Internal Affairs Sergeant Mike Hanafin was also present. The interview was audio recorded and later transcribed. A copy of the transcription is included in this case file. The following is a summary of the interview:

Sergeant Moore has been a Scottsdale Police Officer for 13 years. He has been a Sergeant for a little over a year. Sergeant Moore was a Motorcycle Officer for around 9 years. Prior to working for Scottsdale, Sergeant Moore was a Federal Police Officer with the Department of Veterans Affairs (4 years). He was also a Military Police Officer for about 5 years and a Marine for 4 years.

Sergeant Moore identified his significant training/certifications:

- Horizontal Nystagmus Gaze Certified
- Drug Recognition Expert and Instructor
- Field Sobriety Test Instructor
- EVOC Instructor
- AZPOST General Instructor
- Rifle Operator

Sergeant Moore supervises the District 3 Relief 1 Squad and works Wednesdays from 4:00pm to 2:00am and Thursday, Friday, and Saturday from 8:30pm to 6:30am. Sergeant Moore stated that he usually gets between 7 and 9 hours of sleep per night.

COS-PROST-011562

Sergeant Moore Carries a Taser, OC spray, his primary handgun, and a Colt AR-15 Rifle. On the morning of January 28, 2012 he had his rifle and deployed with it during the Subject with a Knife call.

Sergeant Moore and Officer Cody Carlisle were eating at Whataburger at 90th Street and Mountain View (just north) when the emergency traffic was broadcast. Sergeant Moore stated that the information included that a female reporting person (Rachel) was either in the bedroom or bathroom hiding behind the door and her boyfriend (Daniel) was in the house with a subject (Jason) who had a knife and was threatening.

Sergeant Moore stated that he and Officer Carlisle responded to the original address that was given; however, the original address was wrong. Once they determined the correct address he, Officer Carlisle, and Officer Reynolds arrived together.

Sergeant Moore stated that while en route he asked dispatch to see if they could get the female (Rachel) out of the residence. Rachel was able to get out of the residence and meet them in the driveway. Sergeant Moore directed Officer Carlisle to contact her and bring her away from the residence.

Sergeant Moore asked if she could call her boyfriend (Daniel) and see if she could get him to get out of the residence.

I had Sergeant Moore show me on a map how they responded.

COS-PROST-011563

Sergeant Moore stated that they spoke to Rachel in order to get information as to what was going on in the residence. Sergeant Moore stated that he wanted to go from a "crisis entry type situation" where they had someone inside the residence with a hostage to just a barricade situation and slow the incident down.

Sergeant Moore stated that Officer Goodson and Officer Fernandez arrived. Officer Fernandez went to the back part of the house. Sergeant Moore explained that he, Officer Goodson, and Officer Reynolds moved up to the house and at some point Officer Sanborn arrived with Raider. Officer Sanborn advised that he would give commands if anyone exited the home.

Sergeant Moore stated that the boyfriend (Daniel) exited the home and Officer Reynolds started getting information from him. Daniel was not "giving very good information" due to, in Sergeant Moore's assessment, being impaired. Sergeant Moore stated that Daniel kept saying that the suspect (Jason) had PTSD, so he continued to try and get more information from him for negotiation purposes.

Sergeant Moore stated that he was moving back and forth from their cover position behind a mailbox and Officer Reynolds. Sergeant Moore stated that he does not remember when Lieutenant Bayne arrived, but does remember him arriving and letting him know.

COS-PROST-011564

Sergeant Moore stated that he was unaware of the other call regarding the Armed Robbery due to being on the emergency channel (16). He stated that Lieutenant Bayne attempted to get a hold of him several times on the radio, however they did not connect. Sergeant Moore did not find out about the Armed Robbery call until Lieutenant Bayne arrived.

Sergeant Moore then gave me details about the events that occurred leading up to the shooting:

1. It was established that Officer Sanborn would give commands.

2. They had set up a contact team consisting of Officer Sanborn, Officer Goodson, and Officer Reynolds –*I had Sergeant Moore Diagram the positions.*

3. Officer Goodson or Officer Carlisle announced that they saw movement in the front doorway moving back and forth.

4. Sergeant Moore saw the suspect who was wearing a white tank top and had two items in his hands.

5. Sergeant More saw that he moved the items in his hands up and then down.

6. Sergeant Moore perceived the item in his right hand to be "long piece of cylindrical metal" like a barrel of a gun. Sergeant Moore asked me if I ever saw the television show "Suns of Guns." He equated the item he saw to a barrel of a gun that is brand new (that he had seen before on that show).

7. Sergeant Moore stated that the plan was for Officer Sanborn to give commands and that they would initially use his dog if needed. Sergeant Moore stated that

COS-PROST-011565

they did not specifically go over the use of the dog, but it was his assumption that they were going to send the dog based on what the suspect did.

8. Sergeant Moore explained that they would not send the dog if he came out with weapons.

9. Sergeant Moore then described how the suspect came out form the front door and immediately started walking straight toward them. Sergeant Moore estimated that it was 20 to 25 to 30 feet from the doorway to where they were standing.

10. Sergeant Moore stated that the suspect's walk was not a fast walk but a "deliberate" walk toward them.

11. Sergeant Moore stated that Officer Sanborn was giving numerous commands and he also gave at least one or two commands saying "police stop."

12. Sergeant Moore stated that the suspect never responded to any of the commands and he (the suspect) was looking "straight though" them like they "weren't even there." Sergeant Moore stated that he suspect was just going to do what he wanted to do.

13. Sergeant Moore stated that the suspect had the sticks up like a "Mui Thai Fighter" in striking position and then he would place them down by his side and then back up again.

14. Sergeant Moore still perceived the sticks were metal and if he got close enough he could use them to strike the officers.

15. Sergeant Moore then said the following:

> "I actually was - as he was approaching, uh, I began to bear down on my - on the trigger of my rifle and at that point I heard two loud pops. I never saw Sanborn sending his dog, um, I heard two loud pops and I was

COS-PROST-011566

thinking, did I pull the trigger 'cause I didn't - I didn't remember feeling the gun fire, I didn't think I pulled hard enough to pull the - the - to send rounds out and then I realized I hadn't and then at that point the subject fell to the ground, wasn't moving and then I heard what sounded like the dog move off to the side…"

16. Officer Reynolds moved up while Sergeant Moore kept cover on the suspect and Officer Reynolds then handcuffed the suspect.

I asked Sergeant Moore what was going through his mind as he was bearing down on the trigger. He told me that his thought process was if the suspect moved any closer to the officers he was going to shoot him.

Sergeant Moore stated that the suspect did not take any more steps, but dropped. Sergeant Moore then saw Lieutenant Bayne move up and he said he shot him.

Sergeant Moore stated that he never saw the dog get released.

I asked Sergeant Moore that per his assessment of the threat that he made a decision that if the suspect had gotten any closer that deadly force would be justified? Sergeant Moore stated "Based on the fact that he was not responding to our commands and that he had weapons in his hands, absolutely, yes."

I asked Sergeant Moore if the suspect got closer, would he have been able to strike him. Sergeant Moore stated, "…his distance was closing on us and the fact that he had those batons in his hands and the way he was carrying them, um, knowing that he was

COS-PROST-011567

somebody who sounded like he had military experience, still not knowing what service he was in, um, that was a concern to me, yes."

I asked Sergeant Moore about his thoughts about using less than lethal. Sergeant Moore stated that as windy as it was OC was not an option. Sergeant Moore also stated that a Taser was not a viable option against him and mentioned the force continuum.

Sergeant Moore stated that he asked Reynolds to handcuff the suspect and check for severity of injury. Sergeant Moore stated that he was not moving and did "not remember seeing any breath from him at all." Sergeant Moore stated that he left Lieutenant Bayne and Officer Carlisle with the suspect and he, Officer Reynolds and Officer Goodson cleared the house to make sure no one else was inside. Sergeant Moore stated that drug paraphernalia was found when they cleared the home.

Sergeant Moore stated that when he returned outside EMS had arrived and determined that the suspect did not have a pulse and was deceased.

Sergeant Hanafin clarified that Sergeant Moore had reported that he was in the process of shooting the suspect (pulling the trigger) when the shooting occurred..

Sergeant Moore stated that he had the equipment, training and supervision to deal with the situation.

COS-PROST-011568

The interview ended at 2:05pm.

**Officer Kevin Reynolds** was interviewed at 3:25 pm on April 4, 2012 in the Internal Affairs Office. The interview was audio recorded and later transcribed. A copy of the transcription is included in this case file. The following is a summary of the interview:

Officer Reynolds has been a Scottsdale Police Officer for approximately 2 years and has additional certification in Horizontal Gaze Nystagmus and Radar operation.

On January 28, 2012 he was working Relief 1 in District 3. Officer Reynolds stated that he typically gets anywhere from 6 to 8 hours of sleep per night.

On January 28, 2012 Officer Reynolds was wearing a uniform and carried a baton, Taser, and his primary firearm. Officer Reynolds stated that he was at the District 3 Station when he first heard the call of the Subject with a Knife come out. Officer Reynolds stated that the call came out as a subject who had a knife inside of a residence and was threatening the reporting party and the reporting party's boyfriend.

Officer Reynolds stated that he, Sergeant Moore, and Officer Carlisle all drove to the call together from the District 3 Station. Officer Reynolds explained that the original address given did not exist, so the correct address was dispatched. Around that time, there was also a call regarding an Armed Robbery that had just occurred at 90th Street and Shea. Officer Reynolds stated that "they" believed the same person was involved in both calls.

COS-PROST-011569

Officer Reynolds explained that when he arrived, they contacted the reporting female (Rachel) and later, the homeowner came out (Daniel). Officer Reynolds related the information he had learned regarding how Rachel and Daniel ended up having the suspect (Jason) over to the house. Officer Reynolds stated:

> "So they invited him back to their house after they've had some drinks. They start playing some pool, drinking some more. The reporting party told me, and maybe it was - or, excuse me, the - the homeowner told me that he kept saying that he was, uh, the - the subject was a - or the suspect, rather, was ranting a- about being involved in the Vietnam War. And he gave me his age and said he was relatively young, around 25-30 years old. So I knew that couldn't match. So I didn't know if he was going through some type of withdrawal or some type of mental issue, but he said that he was extremely intoxicated, uh, knew he had been involved in the war and whether or not the reporting party was just confused as to which one, I don't know. But he kept mentioning the Vietnam War. So I relayed that information to Sergeant Moore. He mentioned - the reporting party continued to mention that he was the, I guess the - the suspect kept threatening them with a knife, though the reporting party said that he hadn't seen it yet. The female said she had seen it and that it was taken out and that they were threatened and that, uh, at some point in time, the two males had gotten physically engaged in anger, yelling, pushing, uh, until they calmed each other down and just kept playing pool. It was very, very bizarre."

Officer Reynolds stated that Officer Fernandez went to go cover the rear of the residence, Officer Carlisle was talking to the female (Rachel), and Officer Goodson, Officer Sanborn, and Sergeant Moore approached the driveway and formed a contact team.

Officer Reynolds stated that Officer Sanborn had asked him for information he (Officer Reynolds) had learned and also contacted the homeowner with further questions.

COS-PROST-011570

Officer Reynolds stated that at one point Officer Goodson yelled "He's coming out." Officer Reynolds stated that he "backed" with his firearm, knowing that if something happened he would go hands on (assigned to handcuffing).

I asked Officer Reynolds if he remembered where Lieutenant Bayne was at that time. Officer Reynolds stated that he did not. Officer Reynolds stated that after the shots were fired he thought that Sergeant Moore had fired them, but then saw Lieutenant Bayne. Officer Reynolds stated that he did know Lieutenant Bayne was there and had been talking to Sergeant Moore, but did not know his location.

Officer Reynolds stated that Officer Sanborn told him that he would be "hands on" and that he (Officer Sanborn) would be less than lethal since he had the canine.

Officer Reynolds then described the events leading up to the shooting:

1. When the suspect came out of the residence he had "what appeared to be" 2 long rods in his hand, "about the length of fingertip to forearm."

2. Officer Reynolds stated that the suspect came walking out almost forming a "W" with his body/arms.

3. Officer Reynolds stated that the rods were extended and one of them looked like a metal barrel of a rifle.

4. The other rod looked like wood.

COS-PROST-011571

5.  Officer Reynolds stated that the subject was walking, not running. Officer Reynolds described the suspects approach by saying:

> "He was just continuously walking forward. Um, as he continued walking, he failed to listen to commands. I know - I know Officer Sanborn said something to the effect of, Scottsdale Police. Stop. Drop what's ever in your hand or drop the items in your hand. We have a K9. The K9 will bite you. Things of that effect. As he kept going - getting closer, I know I was, based on adrenaline, I even blurted out a couple of times, stop. police. And he just kept moving forward. As he kept getting closer, I could see that he had a very glazed look about his face and he was - it's almost like he just wasn't there. He was - it was one of the - the scariest, live facial expressions I've seen since I've been on the job."

6.  Officer Reynolds stated that his speed walking toward them was "brisk."

7.  Officer Reynolds stated that the suspect had the sticks to his side at one point but they were mostly up by his head.

8.  Officer Reynolds stated that as the suspect got closer he saw the top of Raider's head start to move forward so he thought they were going deploy Raider.

9.  Officer Reynolds stated that when Raider lunched forward, he heard two pops.

10. Officer Reynolds was told to handcuff the suspect by Sergeant Moore so he did.

11. Officer Reynolds stated, "In my head, I realize that he's dead," referring to Jason. Officer Reynolds stated that as he handcuffed him, he heard his last breath and he was not moving. Officer Reynolds stated that he handcuffed Jason in front.

I asked Officer Reynolds what made him believe Jason was deceased at that point. Officer Reynolds stated that he was bleeding extensively from the chest area and had

COS-PROST-011572

what appeared to be "two gunshot wounds to his cheek area." Officer Reynolds stated that there was no movement upon contact and was "limp" when he handcuffed him.

Officer Reynolds stated that he then helped to clear the house. Inside there were "a lot of alcohol bottles." And there was also drug paraphernalia such as needles and syringes.

I asked Officer Reynolds how close the suspect was when he heard the gunfire. Officer Reynolds stated "fifteen feet." I asked Officer Reynolds at what point he felt threatened. He stated:

> "I would say I was - I felt threatened from the moment he was walking towards us. He didn't have to be 15 feet. When I - when I got behind Officer (Sanborn) and was next to the other officers and he was moving forward, I remember genuinely thinking, this is for real. It was - it was the first situation that I've been in as an officer where it was - not that all other circumstances aren't real. I don't mean to say that. But it was, this is serious. Something's gonna happen. Either one of us is getting hurt by this guy or we're going to have to take action. And, simple as that, he just kept moving, and then I saw the, uh, the K9 lunge. So I withheld from fire."

Officer Reynolds stated that he started yelling commands at "maybe 18 feet."

Officer Reynolds told me that he thought the suspect was in range to attack them (when deadly force was used).

I asked Officer Reynolds about less than lethal. He told me that due to the suspect coming out with what appeared to be metal rods, a baton would not have worked and the Taser was not appropriate due to wind and the suspect's movement. I asked Officer Reynolds if he recognized the situation as a lethal encounter. He replied, "yeah."

COS-PROST-011573

Officer Reynolds stated that if he were standing where Lieutenant Bayne was, he would not have heard or seen Officer Sanborn. Officer Reynolds also stated that since the suspect came out of the house as quickly as he did, it did not allow everybody to get in the position they wanted to or "make notification to everybody in an opportune manner." Officer Reynolds stated that he had the equipment necessary to deal with the situation and he had the adequate training.

The interview ended at 3:56pm

***Sergeant Chris Coffee*** was interviewed at 12:54pm on March 05, 2013 in the Internal Affairs Office. The interview was audio recorded and later transcribed. A copy of the transcription is included in this case file. The following is a summary of the interview:

Sergeant Coffee has been a Scottsdale Police Officer for approximately 14 years. 6 of those were as a Sergeant (supervisor) of the Canine Unit. Sergeant Coffee also spent approximately 1 year as a Narcotics Detective.

Sergeant Coffee attended the following training regarding his position in the Canine Unit:
- 6 Week Basic Handler School (Adlerhorst)
- 7 Week EOD School (Adlerhorst)
- Yearly Certification with Canine Association
- Canine Supervisor School (Law Dog)

COS-PROST-011574

In addition, Sergeant Coffee stated that he attends yearly canine survival seminars and conducts Canine Unit squad training on Wednesday nights.

Sergeant Coffee stated that Officer Sanborn has worked in the unit for 3 years and that Raider was his (Officer Sanborn's) first canine.

Sergeant Coffee told me the following pertaining to canine policies, experiences, and training:

1. Canine handlers consider a "three prong test" when making a decision to release a canine. These considerations are the severity of the crime, if the suspect is resisting or fleeing (level), and if the suspect is a threat.

2. If the suspect is armed with a gun, a canine should not be deployed since there is no tactical advantage to using a canine and the suspect is presenting with deadly force.

3. If the suspect is armed with a knife or Machete there is no tactical advantage to using or deploying a canine in most circumstances (not absolute).

4. Sergeant Coffee discussed the "21 foot drill" regarding how it would not be a "dog call".

5. Sergeant Coffee also discussed that if a canine becomes injured form an edged weapon, the canine can become confused and bite officers.

6. Sergeant Coffee stated that the deployment of a canine is a less than lethal tool that is not 100 percent reliable as some suspects can fight through the pain of the

COS-PROST-011575

bite (or miss the intended target). It was also mentioned that he has experienced this occur and it is discussed in training.

7. Sergeant Coffee talked me about the decision and thought process a handler goes through prior to releasing a dog. He told me that a handler needs to give instructions to the team, assign duties to fellow officers (handler assigned to give commands), determine who the person presenting themselves is (suspect, victim, unknown), what is in the persons hands, what is the threat, and give warnings to the suspect.

### Weather/Light

The weather and lighting conditions were mentioned multiple times during this investigation. Officers described the night as dark and windy. This affected communications and visibility. The weather report for January 28, 2012 between 4:00 am and 5:00 am showed that the temperature was 60.1 degrees Fahrenheit. The wind speeds registered at 3:53 am were 8.1 mph and at 4:53 am were 5.8 mph with gusts up to 17.3mph. Additionally, I found that Sergeant Cabrera had advised dispatch at 3:24 am on January 28, 2012 that due to high wind that was moving a door setting off an alarm, they would not be responding (they had already been dispatched to the same alarm twice that night).

The street where the officers parked and moved west toward where the house was on Paradise Lane. There are no lights on this street. The only ambient light was provided from the lights inside the residence and from an exterior front foyer/porch light. I reviewed the photos of the scene and it was difficult to determine the level of darkness

COS-PROST-011576

due to the different "aperture" settings and new light sources from vehicles, flashlights, etc.

According to the US Navy Astronomical Applications Department, the moon had set at 10:30p m on January 27, 2012 and did not rise until 10:11 am on January 28, 2012, making it moonless during the incident. Twilight from the sunrise began at 7:00 am on January 28, 2012 and sunrise was 7:27 am.

The weather and sun/moon research information is included in this case file.

**Weapons**

Reviewing the report for the incident on 135th Place, I noted that on January 28, 2012 investigators found a "Hunting knife w/ sheath" during a search pursuant to a warrant. The location found was listed as "Front door sidewalk."

I reviewed the scene photos and saw the large (bottom end) of the pool cue. It was resting on Jason's torso in the position where he ended up after the shooting. The cue was large and substantial. The bottom portion was a darker color. On April 10, 2013 I received an additional lab report that listed the top half of the pool cue was 29 inches in length and weighed approximately .257 pounds. The lab report stated that the bottom half of the pool cue was 29.5 inches in length and weighed approximately .896 pounds. Additionally, I viewed other photos of the pool cue halves and noted that the bottom part of the cue had a metal screw protruding out of the end of it. This screw appeared to be

COS-PROST-011577

approximately 1 inch in length (the photo was taken with a tape measure) and had a tapered end. The base of the screw was metallic and was also approximately an inch long. These photos are included in this file.

## **Major Incident Review Board**

On March 7, 2013 the Major Incident Review Board met to examine this critical incident as it relates to:

1. Policy

2. Adequacy of Training

3. Adequacy of Equipment

4. Any other factors that may have contributed to the incident

The board reviewed the incident and heard presentations from Sergeant Bernie Hill (Violent Crimes Unit) and me. Sergeant Hill was not in attendance during my presentation.

Commander Bruce Ciolli chaired the board and gave me the findings form at the board's conclusion. The form illustrated the findings: ***the use of force was in policy and there were no issues with training or equipment.***

***The Major Incident Review Board did not find any policy violations for this critical incident.***

COS-PROST-011578

**Maricopa County Attorney's Office Review**

On September 19, 2012 the Office of the Chief received a letter from Keith Manning, the Law Enforcement Liaison for the Maricopa County Attorney's Office. The letter stated that the Shooting Review board of the Maricopa County Attorney's Office had reviewed this incident and came to the opinion that *"Lieutenant Bayne did not commit any act that warrants criminal prosecution."* The letter is included with this case file.

COS-PROST-011579

## FINDINGS AND CONCLUSIONS

*This section reports the findings and conclusions resulting from this internal investigation and addresses administrative policies regarding officer involved shootings (deadly force).*

**Finding:** The Use of Force used against Jason Prostrollo by Lieutenant Ron Bayne on January 28, 2012 at 12074 North 136th Place in Scottsdale, AZ was ***In-Policy.***

The purpose of this internal investigation was to determine if were the actions of Lieutenant Ron Bayne were within the Scottsdale Police Department's policy (Field Order 1205) as it relates to the use of deadly force and if those actions were justified under the parameters of Arizona Revised Statute 13-410.C.1, Use of Deadly Force in Law Enforcement. Both the Scottsdale Police Department policy on deadly force and the Arizona Revised Statutes (ARS) 13-410 have the same requirements. This investigation also served to identify any other policy issues, training deficiencies, equipment problems, and/or supervision issues.

*ARS 13-410 states that an officer may use deadly force when:*

1. *The officer reasonably believes it is necessary to defend himself or another person from what the officer reasonably believes to be the use of, or imminent use of, deadly force; or*

COS-PROST-011580

2. To affect an arrest or prevent the escape from custody of a person whom the officer reasonably believes:

    a. Has committed, attempted to commit, is committing or is attempting to commit a felony involving the use or a threatened use of a deadly weapon.

    b. Is attempting to escape by use of a deadly weapon

    c. Through past or present conduct of the person, which is known by the officer, that the person is likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay.

**Scottsdale Police Department Policy, Field Order 1205 – Use of Force states, in-part:**
*Determining whether to use any level of force and the reasonableness of that action is based upon a number of factors. Those factors include, but are not limited to:*

1. The conduct of the individual being confronted.

    a. Jason's past and present conduct was dangerous and felonious. Jason demonstrated a disregard for human life by threatening Travis Keehn and Daniel Hall with a knife, pressing the blade of a knife against the throat of Travis Keehn, restricting the movement and controlling Daniel Hall at knife point, refusing to comply to commands given by police officers, and advancing on police officers while aggressively displaying two halves of a pool cue.

COS-PROST-011581

2. *Influence of alcohol or drugs.*

   a. It was reported that Jason had been drinking that evening. His behavior led officers to believe that he could be under the influence. This was confirmed by the Medical Examiner's Report of Toxicological Examination that revealed Jason's Blood alcohol level to be .34 (vitreous) and .43 (pleural blood). The same report showed that Jason also had the illegal drugs Cocaine and Methamphetamine in his system at the time of his death.

3. *Weapons involved in the incident or in proximity to the incident.*

   a. Jason had used a knife and was armed with two halves of a pool cue as he approached the officers to within a distance that was threatening the safety of the officers. The bottom half of the cue was dark in color and substantial. Both halves were 29" in length each. The officers did not know if he still had the knife on his person.

4. *Seriousness of the offense.*

   a. Jason's committed multiple violent and serious Felony offenses including Aggravated Assault and Kidnapping while armed with a weapon.

5. *Department approved training.*

   a. The officers' actions were in line with department training regarding the use of force and the force continuum.

6. *Experience of the officer.*

COS-PROST-011582

a. Lieutenant Ron Bayne is an experienced officer. He has experience with weapons, tactics, and use of force due to the assignments he has held, the advanced training he has received, and his tenure in the profession.

7. *Potential for injury to citizens, officer, and suspect.*

b. Jason had demonstrated a disregard for the health and safety of citizens and officers. He used or threatened the use of a deadly weapon against two civilians and threatened the use of a deadly weapon against officers. If he was not taken into custody without delay, the potential for injury to others was high.

8. *Amount of time to deal with the situation.*

c. From the time the officers arrived on scene to the time Jason exited the home and began advancing on the officers was only 14 minutes. During that time the officers were able to get initial updated information from the reporting person, Rachel Rogers, establish containment on the residence, form a contact team, and gather resources. From the time Lieutenant Bayne arrived on the scene to the time Jason exited the residence was approximately 4 to 5 minutes. From the time Jason exited the residence to the time lethal force was used he travelled approximately 37.6 feet. Rachel Rogers estimated that 5 to 8 seconds past prior to hearing the shots. Jason advanced on the officers while armed and failed to comply with commands within a very short period of time.

9. *The suspect has committed, attempted to commit, is committing or is attempting to commit a felony involving the use or a threatened use of a deadly weapon.*

COS-PROST-011583

    d. This investigation showed that probable cause existed for the arrest of

        Jason Prostrollo and Lieutenant Bayne was aware of such. Lieutenant

        Bayne reasonably believed that that Jason Prostrollo had committed,

        attempted to commit, and was currently committing a felony involving the

        use and threatened use of a deadly weapon.

10. *Through past or present conduct of the person, which is known by the officer, that the person is likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay.*

    e. Lieutenant Bayne reasonably believed that Jason Prostrollo's past and

        present conduct, which was known, made him likely to endanger human

        life or inflict serious bodily injury to another unless apprehended without

        delay.

Lieutenant Ron Bayne was operating within the scope of his law enforcement duties when he responded to 12074 North 135th Place. Jason Prostrollo was found to be armed with a pool cue that was separated into two parts. Lieutenant Bayne knew that Jason had exhibited violent and irrational behavior, used a knife to injure a taxi driver (unprovoked and for no apparent reason), and kidnapped and threatened Daniel Hall at knifepoint in Daniel's own home.

Shortly after arriving on scene, Lieutenant Bayne observed Jason exit the residence armed with two rods, one in each hand. Jason walked directly toward the officers positioned at the edge of the street in front of the house and ignored repeated commands

COS-PROST-011584

to stop. Lieutenant Bayne fired his service weapon twice when he believed Jason was at a distance to officers where he could have caused serious physical injury or death to them and/or himself.

Jason's demeanor, violent actions previous to the shooting, and refusal to obey commands while directly approaching officers with weapons, would be perceived by a reasonable police officer to indicate Jason was about to use deadly force.

This investigation determined that Lieutenant Bayne reasonably believed that it was necessary to defend himself or another person from what he reasonably believed to be the use of, or imminent use of, deadly force by Jason Prostrollo.

**<u>Police Canine – Less than Lethal Considerations/Analysis</u>**

Scottsdale Police Canine Orders, K9 6401, states that The Scottsdale Police Department (SPD) Canine Unit is intended to supplement patrol functions in specific areas where a canine can be used in place of, or in addition to, an officer. The order describes the use of the canine as follows:

*The Scottsdale Police Department (SPD) Canine Unit is intended to supplement patrol functions in specific areas where a canine can be used in place of, or in addition to, an officer.*

*Police canines are used:*

1. *To protect the handler, other officers, and citizens from injury or death.*

COS-PROST-011585

2. *To search for suspects in buildings and open areas.*

3. *To search for evidence or articles.*

4. *For narcotics detection.*

5. *For explosive detection.*

6. *For SWAT Team assists.*

7. *Public Safety demonstrations.*

*Canines assist in effecting the arrest of suspects. Before deploying a canine to apprehend a suspect, the handler must weigh the following circumstances:*

1. *The severity of the crime at issue.*

2. *Whether the suspect poses an immediate threat to the safety of law enforcement officers or others.*

3. *Whether the suspect is actively resisting arrest or attempting to avoid arrest by flight.*

The order further states:

*The canine handler is responsible for the dog and its actions. The handler is aware of the dog's abilities, training, and temperament, and ultimately decides whether to use the dog in a particular situation. The watch commander must approve any decision to overrule the handler... Any use of a Canine Team to apprehend a suspect is considered a use of force, and as such, must be an appropriate level for the situation. Canine handlers are responsible for determining whether a situation justifies canine use, and*

COS-PROST-011586

*the appropriate tactical measures to be taken. The watch commander must approve*

*any decision to overrule the canine handler.*

The plan to deploy police canine as part of the contact team was proper under the following contingencies:

1. In consideration of Jason exiting with a different weapon other than a knife, bladed weapon, or a firearm.

2. If Jason would have run from the scene.

3. As a tactic to gain compliance.

***Timing and Distance Analysis/Estimate:*** Officer Sanborn reported that he first was able to recognize that the cylindrical objects that Jason had in his hands were not a rifle when he entered the lighted area at the end of the porch where the "pillar area where the walkway flows into the porch." He estimated this distance as 10 yards from where they were standing (30 Feet). Per the scene diagram, Officer Sanborn was approximately 17 feet from where his canine, Raider, made contact with Jason. The canine had to cover approximately 17 feet to reach Jason as Jason was simultaneously moving east toward the officers, once Officer Sanborn made the cognitive decision to let go of the dog --both actions take additional time.

Although Jason exited with two ends of a pool cue, the dog's potential effectiveness was diminished each second as Jason advanced on the officers without pause. Jason was able

COS-PROST-011587

to advance to a position where he posed a deadly threat prior to the dog being able to make contact.

Lt. Bayne reacted when Jason got within a distance that he reasonably felt he posed a serious risk. Lt. Bayne never saw the canine approach likely due to perceptual narrowing (PPCT Training) and his focus on the threat.

***Pertaining to the use of another less than lethal weapon***, the use of an intermediate weapon is not a correct or trained response to someone yielding an instrument that can cause serious physical injury or death. If Jason entered the effective range of a Taser (7 to 15 feet) or OC spray (3 to 12 feet), he would already be within the distance to pose a threat of serious physical injury or death. Therefore the only viable less than lethal option was deployment of the police canine due to range. As stated previously, Jason advanced too rapidly for the canine to be effective prior to Jason coming close enough to become an immediate, deadly threat.

## Conclusions

Officer Sanborn released the dog with good intentions and was within policy by waiting to release the dog until after he could identify what Jason held in his hands. Other less than lethal weapons were not appropriate or in line with training.

Further, this investigation has determined that ***the actions of Lieutenant Ron Bayne were within department policy and State law.***

COS-PROST-011588

## Administrative Matters and Additional Findings

### *General Order 2131 Firearms Qualifications:*

> *Training: Sworn personnel must qualify annually with their duty weapon, their off-duty/secondary weapon, and their issued or personally owned rifle. All qualifications are conducted at the department-designated range.*

Per training records, Lieutenant Ron Bayne met the department training requirements when he successfully qualified with his primary weapon, a Glock Model 22, serial number PEK955 on April 5, 2011 at a department designated range scoring a 250/250.

> *Approved Primary Firearms: Officers carry the department issued Glock Model 22 .40 caliber Smith and Wesson semi-automatic pistol as the primary weapon after successfully completing the AZPOST approved qualification course.*

> *Approved Ammunition: Winchester Ranger Law Enforcement .40 caliber Smith and Wesson 180 grain SXT. Carry all handheld weapons fully loaded while on-duty. Carry semi-automatic pistols with one round in the chamber and the mandatory number of rounds in the magazines.*

Lieutenant Ron Bayne utilized his department issued Glock Model 22 pistol, serial number PEK955. After the event, Crime Scene Specialist Bree McKenna inspected Lieutenant Bayne's firearm and magazines and noted the following in her report:

COS-PROST-011589

- Magazine SPD PEK955-1 was loaded inside the handgun and contained thirteen (13) live rounds of Winchester .40 S&W ammunition.

- Magazines SPD PEK955-2 and SPD PEK955-3 were located in Lieutenant Bayne's duty belt and contained [each] fifteen (15) live rounds of Winchester .40 S&W ammunition.

- The handgun contained one (1) round in the chamber.

CSS Marie Wood B1440 reported that she collected and impounded two (2) Winchester .40 S&W expended casings from the incident scene.

Criminalist Steven Valdez function tested the Lieutenant Bayne's Firearm and reported that it "functioned as expected."

Based on Crime Scene Specialists Bree McKenna and Marie Wood's reports, as well as, Criminalist Steven Valdez' report, Lieutenant Bayne's firearm was loaded with authorized ammunition. The number of rounds counted is consistent with department policy: fully loaded magazines with one round in the chamber (15+15+15+1=46).

***General Order 2600: Alcohol / Drug Abuse Policies:***

*Employee conduct in conjunction with the consumption of alcoholic beverages must not bring or have the potential of bringing discredit to the department. Employees will not allow alcohol to affect their job performance. Any misconduct*

COS-PROST-011590

*associated with alcohol consumption will result in disciplinary action up to and including dismissal. It is the employee's responsibility to abstain from alcohol abuse.*

*Employees will not use narcotics, dangerous drugs, or other controlled substances except under the direction of, and as prescribed by, a licensed physician. In cases where prescription drugs or other medication (including over-the-counter medications) have the potential to affect an employee's job performance, the employee will notify his immediate supervisor prior to going on-duty. It is the employee's responsibility to be fit for duty and to remain free from drug abuse or misuse.*

### General Order 1420: Use of Force Investigations:

*Deadly Force Investigations: Internal Affairs investigative duties and responsibilities for use of force cases include obtaining a blood, urine, or hair sample or identifiers of other physical characteristics.*

On January 28, 2012 at 10:27 am, while at the Scottsdale Family Advocacy Center located at 10225 East Via Linda in Scottsdale, Arizona, I collected a urine sample from Lieutenant Bayne. The sample was 96 degrees as indicated on a temperature sticker located on the specimen cup. I observed Lieutenant Bayne urinate into the specimen collection cup. I poured the urine into the container that was submitted for testing.

COS-PROST-011591

At 10:36 am, I observed a phlebotomist collect a blood sample from Lieutenant Bayne's left arm. A Cottonelle Brand alcohol free wipe was used to clean the area where the phlebotomist collected his blood. Two grey top vials were used to contain the blood for analysis.

Lieutenant Ron Bayne's blood and urine were collected and analyzed. The test results reported a negative finding for both drugs and alcohol. Additionally, there was no information or any indication that would lead investigators to suspect that Lieutenant Bayne had been under the influence of alcohol or any drug prior to, during, or after the shooting.

This investigation determined that Lieutenant Ron Bayne did not violate the Alcohol / Drug Abuse Policy.

**General Order 1421: Officer Involved Shootings:**

> *Immediately Arrange for the Care of Injuries: Employees involved in any shooting incident, weapon discharge or other deadly force incident must immediately arrange for the care of injuries.*

Lieutenant Bayne and Officer Sanborn immediately requested the medical care after being involved in the shooting. These requests were made at 4:50 am on Channel 16 in the same transmission, Lieutenant Bayne advised that he had been involved in a "998" (Officer Involved Shooting).

COS-PROST-011592

<u>*Notify a Supervisor:*</u> *Employees involved in any shooting incident, weapon discharge or other deadly force incident must notify a supervisor.*

Lieutenant Bayne called his supervisor, Commander Mike Rosenberger at 4:54 am.

<u>*Meeting with Departmental Psychologist:*</u> *Anyone involved in a Class III shooting to meet with a psychologist before they return to duty.*

Lieutenant Bayne fulfilled this requirement. The letter from the psychologist documenting his meeting on February 10, 2012 is included with this investigation.

**Field Order 1205: Use of Force, Deadly Force:**

<u>*Warnings:*</u> *If a warning is feasible under the circumstances and does not increase the risk to the officer or other person, first identify yourself and give a warning to the person before using deadly force.*

Officer Sanborn, as well as, the other officers at the mailbox structure gave Jason Prostrollo multiple warnings which included identification that they were police.

**Supervision of the Event:**

COS-PROST-011593

This investigation revealed no inadequacies in Lieutenant Bayne's supervision before, during, or after this event. After the shooting event, Lieutenant Bayne continued to direct the response of the officers and set up the Incident Command System.

*Equipment:*

This investigation revealed no equipment issues or failures.

*General Training:*

This investigation revealed no training deficiencies or issues. Lieutenant Bayne's training transcripts are included in this case file.

Joe LeDuc
Sergeant, Internal Affairs Unit

COS-PROST-011594



COS-PROST011424



COS-PROST011425



B5313

SDS P4Q MW IDQ5L6 THEM#80447L7
18-14-15 IDQ MW P4Q SDS
18-0336-12

COS-PROST-011426

COS-PROST-011597



Scottsdale Police Department

# NOTICE OF INVESTIGATION
## Lt. Ronald Bayne #559
## IA2012-011

An administrative investigation into conduct on your part is being conducted by the Scottsdale Police Department. The allegations under investigation are as follows:

### 1. Officer Involved Shooting

**Specifically: On 01/28/12, you discharged your firearm in the performance of your duties as a police officer.**

Per General Orders, Chapter 26 and A.R.S. 38-1101, as an employee you have specific rights and responsibilities in this investigation.

Initial _____ A.   You are being compelled by a Scottsdale Police Department supervisor to truthfully answer questions relating to your duties/conduct, and you can be disciplined up to and including dismissal for refusal to answer these questions.

Initial _____ B.   Questions, tests, or examinations will be narrowly and specifically related to your performance of duties and fitness for office.

Initial _____ C.   Any compelled statements, tests, or examination results can be used against you in disciplinary/administrative/civil proceeding, but will not be used against you in any subsequent criminal action related to the scope of this investigation. However, false statements made by you can be used in other criminal actions, such as Obstruction of Justice or Perjury.

Initial _____ D.   Any sustained false, deceptive, or misleading statements you make can lead to additional discipline up to and including dismissal, as well as possible suspension or revocation of your AZPOST Peace Officer Certification (R13-4-109).

Initial _____ E.   You have the right to mechanically record this interview so long as doing so does not substantially delay the interview and is done openly. The Department reserves the right to transcribe any mechanical recording of this interview for the purpose of verifying the accuracy of the interview. You may have a copy of the tape or transcription after paying for transcription or reproduction costs.

Initial _____ F.   You are entitled to receive a copy of this NOI prior to the start of the interview and to retain it throughout the entire course of the interview.

COS-PROST-011598

Initial _PC_ G.   During the course of the investigation, you have the responsibility to bring to the attention of the investigating supervisor any witness information or mitigating or exculpatory evidence you believe is relevant to the investigation.

Initial _W_ H.   Per General Orders 26.35 and A.R.S. 38-1101, you are entitled to have an observer present during your interview, which must be a department employee.  Your observer or other person may also be your legal representative so long as you obtain prior approval from the office of the chief.

Initial _PC_ I.   You are being given a direct order not to discuss this investigation, your interview(s), written statement(s), or examination(s) with any other employee, or potential witnesses to this investigation other than the investigating supervisor(s), your observer and/or your legal representative.

Initial _PC_ J.   Pursuant to A.R.S. 38-1101, you shall be permitted reasonable breaks of limited duration during any interview for telephonic or in person consultation with others, including an attorney, who are immediately available.

**Employee Status:**

Initial _PC_ You will be placed on non-disciplinary suspension during this investigation.

| | | |
|---|---|---|
| _signature_ S22 | _R.T. Boyd_ | 01-28-2012 |
| Investigating Supervisor Signature | Employee Signature | Date |

COS-PROST-011599



**DATE:**     **January 28, 2012**

**TO:**       **RONDALD BAYNE, POLICE LIEUTENANT**

**FROM:**     **ALAN RODBELL, CHIEF OF POLICE**

**SUBJECT:**  **NON-DISCIPLINARY SUSPENSION**


Under the provisions of Section 14-73 of the Scottsdale Revised Code, you are hereby placed on non-disciplinary suspension with pay for a period of not more than thirty (30) working days, effective January 28, 2011, until the internal investigation relating to your on-duty officer involved shooting is completed.

During this non-disciplinary suspension you shall make yourself available for interviews or other appointments deemed necessary by the City. Regardless of your current assigned shift, you will be required to be available Monday through Friday, 0800–1600, for all aspects of the investigation.

Outside employment, in which you perform duties as a City of Scottsdale Police Officer, is not permitted at this time

You are further directed to have no discussions or contacts with other employees regarding this investigation and to specifically have no discussions or contacts with prospective witnesses or parties to this investigation other than supervisors or those conducting the investigation.


_____          _____
**Alan Rodbell, Chief of Police**               **HR Executive Director**



Acknowledgement: _Ronald C. Bayne_____ Date: _01-28-2012_____
                    Officer Name



Non-Disciplinary Suspension

**EXHIBIT 21**

**AWARDS & Commendations**

| Date | Award/Commendation/Recognition | Agency/Location | | Bates |
|------|-------------------------------|-----------------|---|-------|
| | Various commendations and superior performance awards | COS | | COS-PROST-008605-8627; 008629-8671; 008673-8677; 008684-8687; 008689-8692; 008695; 8698-8699; 008701-8711; 008715-8717 |
| | Multiple Military Evaluation Reports; Military Police Investigator | US Army | 4/91 – 12/92 | COS-PROST-008513 -008518 |
| | Multiple COS Evaluations | COS | | COS-PROST-008519-8577 |
| | Multiple Letters of Recommendation | | | COS-PROST-008501-8507- |
| March 2, 1988 | Certificate of Achievement for setting the highest standards in conduct and performance for self. | US Army Training Brigade | | COS-PROST-008578 |
| March 15, 1988 | Certificate of Appreciation – 3rd place in "Iron Mike" event during 259th Military Police Company Organization Day. | 259th Military Police Company | | COS-PROST-008580 |
| 1988 (4th Quarter) | 4th Quarter – Outstanding Dress & Appearance Award | US Army | | COS-PROST-008581 |

| Date | Award/Commendation/Recognition | Agency/Location | | Bates |
|---|---|---|---|---|
| June 18, 1990 | Certificate of Achievement for 283 score on May, 1990 Physical Fitness test | US Army – Shite Sands Missile Range, NM | | COS-PROST-008579 |
| July 2, 1990 | Army Achievement Medal (2nd Oak Leaf Cluster) for meritorious service | US Army | | COS-PROST-008585-8586 |
| July 3, 1990 | (Impact) Army Achievement Medal for solving six previously investigated yet unresolved cases. | US Army | | COS-PROST-008587 |
| July 20, 1990 | Memo of Appreciation – help w/ 1990 WSMR Organization Day | US Army | | COS-PROST-008494 COS-PROST-008588 |
| August 30, 1990 | Certificate of Achievement for a score of 91% on Skill Qualification Test. | US Army | | COS-PROST-008583 |
| October, 1990 | Good Conduct Medal | US Army | 10/15/87 – 10/14/90 | COS-PROST-008591 |
| February 13, 1991 | NCO Initiative Award | Non Commissioned Officers Association of the USA | | COS-PROST-008595 |
| May 14, 1991 | Commendation – LF Brigadier General, Ronald Hite, re: work with DARE program. | US Army | | COS-PROST-008589 |
| May 15, 1991 | Nomination for TECOM Professional Award | US Army | | COS-PROST-008590 COS-PROST-008592 -8593 |

| Date | Award/Commendation/Recognition | Agency/Location | | Bates |
|---|---|---|---|---|
| July 1, 1991 | Army Commendation Medal | US Army | | COS-PROST-008594 |
| August 2, 1991 | Certificate of Achievement for a score of 95% on Skill Qualification Test | US Army | | COS-PROST-008584 |
| January 31, 1992 | Memo of Congratulations – attended Air Assault Course | US Army (Hawaii) | | COS-PROST-008406 COS-PROST-008596-8597 |
| March 10, 1992 | Memo re: **AWARD** of Air Assault Badge | US Army | | COS-PROST-008407 |
| May 29, 1992 | Army Commendation Medal | US Army | 7/29/91 – 7/7/92 | COS-PROST-008599-8601 |
| December 9, 1992 | Army Achievement Medal | US Army | 8/25/92 – 12/9/92 | COS-PROST-008598 |
| July 30, 1993 | Certificate of Achievement for excellence in physical fitness | Phoenix Regional Police Academy | | COS-PROST-008604 |
| July 30, 1993 | Police Academy – tied for first place in firearms class (score 100%) (Superior Performance Award re: same) | Phoenix Regional Police Academy (Phoenix) | | COS-PROST-008603 COS-PROST-000488 |
| October 13, 1993 | Letter of commendation – domestic disturbance call re: property and money, and whether to press charges. | Citizen | | COS-PROST-000628-629 |

| Date | Award/Commendation/Recognition | Agency/Location | | Bates |
|---|---|---|---|---|
| October 24, 1993 | Released from Field Training | COS | | COS-PROST-000532 |
| January 13, 1994 | Letter of commendation – returned two adolescents to facility | Westbridge Treatment Centers | | COS-PROST-000627 |
| February 16, 1994 | Letter of commendation – assisted citizen when she had car problems, and waited with her until help arrived | Citizen | | COS-PROST-000626 |
| March 11, 1994 | Superior Performance Award (silent alarm at Silo, arrests made of Vietnamese gang members) | COS | | COS-PROST-000486 |
| March 14, 1994 | Letter of commendation – daughter's lunch left on top of car – Bayne found lunch and went out of his way to find out which school and take lunch to daughter. | Citizen | | COS-PROST-000625 |
| September 18, 1994 | End of Probation | COS | | COS-PROST-000490 |
| September 28, 1994 | Superior Performance Award (teamwork in 40 months of preparation in pursuit of CALEA accreditation) | COS | | COS-PROST-000484 |
| October 4, 1994 | Letter of commendation – responded to call in area, observed a suspect acting suspiciously.  Attempted to question & detain, but suspect assaulted you and fled – suspect was pursued and ultimately arrested, but you sustained several injuries in the process. | COS | | COS-PROST-000624 |
| November 19, 1994 | Note of thanks from citizen when wall of townhouse was drenched from upstairs unit, and Bayne responded. | Citizen | | COS-PROST-000622-623 |

| Date | Award/Commendation/Recognition | Agency/Location | | Bates |
|------|-------------------------------|-----------------|---|-------|
| November 29, 1994 | Note of thanks from citizen when tire burst on Indian School | Citizen | | COS-PROST-000621 |
| December 29,1 994 | Note of thanks from citizen re: someone breaking into his truck | Neal's Custom Fishing Rods | | COS-PROST-000620 |
| January 10, 1995 | Superior Performance award – Bayne observed suspicious vehicle that tried to elude him; suspect stopped and as Bayne approached vehicle, noticed a pistol magazine protruding from passenger waistline.  Passenger reached under seat as if going to get a gun. Bayne (and others) took custody of occupants without incident and recovered 2 handguns from under their seats and 5 lbs. of marijuana. | COS/Duggan | | COS-PROST-008622 COS-PROST-000482 |
| January 18, 1995 | Officer of the year nomination (Received Patrol Officer of the Year Award for 1995) (Superior Performance Award for same) | COS (Sgt. Duggan) | | COS-PROST-008628 COS-PROST-008645 COS-PROST-000472 |
| February 8, 1995 | Letter of Commendation – worked an understaffed shift on 1/20/95, that resulted in 13 arrests, 14 reports taken, and CFS ranged from a drive-by shooting to officer needing assistance | COS | | COS-PROST-000619 |
| March 27, 1995 | Note of Thanks from Ollie the Trolley re: driver taking trolley home to his apartment complex. | Atypical Transportation Co | | COS-PROST-000618 |
| July 5, 1995 | Superior Performance Award (on 5/4/95, end of shift.  Suspicious vehicle stop –passenger reached under his seat, fled, and other officers chased him; Bayne stayed w/ other suspects.  Suspect was later identified as being wanted by PPD for shooting his girlfriend in the head earlier that week, who was not expected to survive. | COS | | COS-PROST-000476 |

| Date | Award/Commendation/Recognition | Agency/Location | | Bates |
|---|---|---|---|---|
| July 18, 1995 | Team Award – Simply Better Service | COS | | COS-PROST-000617 |
| September 20, 1995 | Superior Performance Award (arrests of 11 auto theft suspect and recovery of 9 stolen vehicles – enabled other agencies to close numerous open auto theft cases) | COS | | COS-PROST-000474 |
| February 1, 1996 | Letter of Commendation (re: intruder in home w/ knife) | COS | | COS-PROST-000616 |
| June 23, 1996 | Superior Performance Award<br>Patrol Officer of the Year for 1996 | COS | | COS-PROST-000478 |
| July 9, 1996 | Letter of commendation (re: DR9615267 – proactive police work and the need for cooperation between SRIC and COS) | COS/Councilman Pettycrew | | COS-PROST-000615 |
| July 24, 1996 | Superior Performance Award (Aviation Committee – alternate observer in 1995 Helicopter Feasibility Study – helped other observers give special training classes to the patrol units that would be utilizing the air support unit) | COS | | COS-PROST-000470 |
| August 30, 1996 | Letter of Commendation (SWAT team dealt with transient who broke into Scottsdale Baptist Churst on 8/17/96) | Scottsdale Baptist Church | | COS-PROST-000613 |
| November 4, 1996 | Letter of Commendation (cat burglary on 10/10/96 re: stolen purse and subsequent arrests because of traffic stop) | COS | | COS-PROST-000614 |
| January 7, 1997 | Letter of commendation (capture of suspects who burglarized Five Star Ford dealership on 12-22-96, and arrests of other subjects involved in prior burglaries) | COS | | COS-PROST-000612 |

| Date | Award/Commendation/Recognition | Agency/Location | | Bates |
|---|---|---|---|---|
| May 8, 1997 | Letter of commendation (citizen's Police Academy XII and ride along) | Eileen McLane (Citizen) | | COS-PROST-000611 |
| May 15, 1997 | Letter of Commendation (May 2, 1997 GITEM and PPD conducted a special enforcement operation at Snoop Dog concert, held at same time as "Family Night at the Fair". Operation resulted in 34 arrests, narcotic seizures, confiscated 13 weapons and recovered 4 stolen vehicles | MCSO | | COS-PROST-000610 |
| August 18, 1997 | Letter of commendation re: passing of female connected with SPD family | COS | | COS-PROST-000609 |
| September 21, 1997 | Selected for Specialty Assignment with SAU, Special Investigations Section | COS | | COS-PROST-000530 |
| December 30, 1997 | Letter of Commendation (re: SW in which SPD recovered drug related items, which was a major source of criminal activity in the community) | COS (Sam Campana) | | COS-PROST-000608 |
| April 28, 1998 | Commendation from Chief Bartosh. Bayne in undercover capacity. Noticed a suspicious vehicle & followed it. Learned it was involved in chase night before – blocked car so it couldn't leave liquor store and, in a low key manner, stalled suspect until police could arrive and apprehend. | COS/Bartosh | | COS-PROST-008658 |
| August 31, 1998 | Note of Thanks from COS employee for appreciation to officers for participating in youth program, "Cactapalooza". Bayne discussed firearm safety and dressed up in SWAT gear and provided tactical display and offered hands on experience. | COS employee | | COS-PROST-000607 |
| May 10, 1999 | Superior Performance Award (fitness committee – testing for new hires, promotional tests, teen academy, bin-annual dept. testing. Also health & wellness charity runs, often on his own time – role model – made bi-annual fitness testing mandatory for SWAT) | COS | | COS-PROST-000464 |

10631871v2

| Date | Award/Commendation/Recognition | Agency/Location | | Bates |
|---|---|---|---|---|
| June 8, 1999 | Superior Performance Award (SAU – investigating a series of burglaries. Instead of giving up, investigation became a Title 3 wiretap. At the conclusion, 80 burglaries were cleared and $50K in property recovered, and 13 people arrested. COS never did Title 3 as lead agency. AG's office pleased with outcome. | COS | | COS-PROST-000459-460 |
| December 16, 1999 | Letter of commendation – Apprehend a bad guy for some outstanding warrants from Coconino County. | Rural Metro Fire Department | | COS-PROST-000605-606 |
| June 25, 2000 | Selected for Specialty Assignment for Property Crimes Unit | COS | | COS-PROST-000529 COS-PROST-000541 |
| July 5, 2000 | Superior Performance Award (Teen police academy – in addition to regular duties, assist in fitness instruction and competition, which required many extra hours of planning and teamwork) | COS | | COS-PROST-000455-446 |
| October 4, 2000 | Letter of Commendation (State v. Sherer – assist Washington State with investigation) | King County, WA | | COS-PROST-000604 |
| November 10, 2000 | Superior Performance Award (surpass primary duties through involvement as fitness instructor – administers fitness tests to employees and PD applicants, constructing personal exercise programs for employees – positive role model) | COS | | COS-PROST-000454 |
| December 24, 2000 | Selected for Specialty Assignment with GITEM Gang Task Force | COS | | COS-PROST-000528 |
| 2001 | Certificate of Appreciation for Volunteer Translator Services | COS (Jan Dolan, City Manager) | | COS-PROST-008496 |

| Date | Award/Commendation/Recognition | Agency/Location | | Bates |
|---|---|---|---|---|
| 2001 | Certificate of Appreciation - Operation Safe Streets 2001 | Phoenix PD (Organized Crime & Gang Enforcement) | | COS-PROST-008672 |
| 2002 | Certificate of Appreciation - GITEM Officer | NAILEM | | COS-PROST-008678 |
| March 14, 2002 | Superior Performance Award (2001 Chief's Awards of Excellence recipient of the Peer Support Team award) | COS | | COS-PROST-000447 |
| June 9, 2002 | Selected for Specialty Assignment with the HEAT Unit | COS | | COS-PROST-000526 |
| December 24, 2002 | Superior Performance Award (adjusted schedule and worked extra hours for 2 weeks to accommodate patrol coverage during Mobile Field Force Tactics training) | COS | | COS-PROST-000445 |
| February 3, 2003 | Letter of Commendation (On December 31, January 2-3, Mounted Unit Mobile Field Force and other officers assisted in security at the Tostitos Fiesta Bowl Block party, pep rally, and game) | City of Tempe | | COS-PROST-000602-603 |
| February 12, 2003 | Completed firearm instructor selection process - selected to attend firearm instructor school at Mesa Police Range | COS | | COS-PROST-000540 |
| February 18, 2003 | Winner, Chief's Award of Excellence | COS | | COS-PROST-008681 COS-PROST-000601 |
| April 25, 2003 | Letter of Commendation (Mail theft and check manufacturing operation in Phoenix) | US Postal Inspection Service | | COS-PROST-000599-600 |

| Date | Award/Commendation/Recognition | Agency/Location | | Bates |
|---|---|---|---|---|
| October 3, 2003 | Master Police Officer award | COS | | COS-PROST-000543-544 |
| March 17, 2004 | Letter of Commendation (attempted escape of 2 inmates at Lewis Prison) | DPS | | COS-PROST-000597-598 |
| August 2, 2004 | Commendation to Bayne & Fairfield from Cocca re: negotiations. subject on roof, ranting and swinging long metal chains. Engaged subject in conversation, he surrendered 1 of his two chains. After a brief struggle, tactical operators apprehended suspect. | COS/Cocca | | COS-PROST-008666-8667 |
| September 3, 2004 | Note of Thanks (Assist to Payson PD in re: R. Squillante) | Payson PD | | COS-PROST-000595-596 |
| September 8, 2004 | Note of Thanks (re: car crash into backyard wall – got homeowners out – officers were professional and treated homeowners with courtesy and respect) | Citizen | | COS-PROST-000594 |
| September 27, 2004 | Superior Performance Award (excellent work in special assignment to ride with and mentor another officer that was having some difficulties) | COS | | COS-PROST-000443-444 |
| January 20, 2005 | 2004 Chief's Award of Excellent Nomination (Team Award for Operation Clean House by Steve Gesell) | COS | | COS-PROST-000589-593 |
| May 10, 2005 | Letter of commendation (Spanish Immersion Program in Hermosillo, Sonora, Mexico April 13-22, 2005) | Partners in Training | | COS-PROST-000588 |
| October 2, 2005 | Promoted to rank of Sergeant | COS | | COS-PROST-000538 |

| Date | Award/Commendation/Recognition | Agency/Location | | Bates |
|---|---|---|---|---|
| November 11, 2005 | Certificate of Appreciation – Hispanic Heritage Celebracion | City of Scottsdale – Diversity & Dialogue Committee | | COS-PROST-008497 |
| March 24, 2006 | Superior Performance Award (Community outreach) | COS | | COS-PROST-000441-442 |
| April 7, 2006 | Certificate of Appreciation for contributions to Scottsdale neighborhoods in Action Coalition | Paiute Neighborhood Center (COS) | | COS-PROST-008498 |
| April 12, 2006 | Recognized by Paiute Neighborhood Center for collaborating as a team to form the Scottsdale Neighborhood in Action Coalition | COS | | COS-PROST-008693 |
| April 12, 2006 | Recognized by Paiute Neighborhood Center for collaborating as employee of the year award | COS | | COS-PROST-008694 |
| August 27, 2006 | Transferred from Patrol to HEAT Unit | COS | | COS-PROST-000524 |
| January 22, 2007 | 2006 Chief's Award of Excellence Nomination (Supervisor of the Year, by Kevin Orvis, Johnny Cervantes, HEAT Unit) | COS | | COS-PROST-000579-587 |
| March 10, 2007 | Letter of Commendation (related to 2/9/07 crime spree re: kidnapping of 2 women, ultimately released after being forced to withdraw money from bank) | COS | | COS-PROST-000576-577 |
| February 13, 2007 | Police Supervisor of the Year Award | COS/SPD | | COS-PROST-008696 COS-PROST-000578 |

| Date | Award/Commendation/Recognition | Agency/Location | | Bates |
|---|---|---|---|---|
| July 12, 2007 | Certificate of Appreciation for outstanding contributions to community partnerships for public safety. | Law Enforcement Coordinating Committee (AZ) | | COS-PROST-008500 |
| February, 2008 | Military Service Challenge Coin | COS/SPD | | COS-PROST-008700 |
| June 1, 2008 | Transfer to Internal Affairs | COS | | COS-PROST-000522 |
| January 22, 2009 | 2009 Chief's Award of Excellence Nomination (Special Contribution to Agency's Future by Legal Advisor Luis Santaella) | COS | | COS-PROST-000572-574 |
| June 17, 2009 | Note of thanks re: investigation from Joe LeDuc | COS | | COS-PROST-000575 |
| November 8, 2009 | Promotion to Lieutenant (ranked 1st out of 6) | COS | | COS-PROST-000512 COS-PROST-000521 COS-PROST-000536 |
| December 7, 2009 | New Faculty Certification, University of Phoenix | University of Phoenix | | COS-PROST-008471 |
| March 25, 2010 | Letter of Commendation re: Russo and Steele January event | Russo & Steele | | COS-PROST-000571 |
| May 24, 2010 | Note of Thanks – ride along with COS employee Linda Walton | COS | | COS-PROST-000570 |

| Date | Award/Commendation/Recognition | Agency/Location | | Bates |
|------|-------------------------------|-----------------|--|-------|
| December 10, 2010 | Letter of Commendation (DV stabbing – RP was suspect who reported he just stabbed his wife in the back and she and daughter were locked in the bathroom) | COS | | COS-PROST-000568-569 |
| February 4, 2011 | 2010 Award of Excellence Nomination (Police Supervisor of the Year nomination, by P.A. Henningsen) | COS | | COS-PROST-000565 COS-PROST-000567 |
| June 11, 2011 | Note of thanks from Assistant City Attorney Eric Anderson re: ride-along | COS | | COS-PROST-000564 |
| December 13, 2011 | Letter of appreciation from City of Chandler for assisting Chandler PD with sergeant promotional process | Chandler | | COS-PROST-000563 |
| July, 2013 | Promotion to Commander | COS | | |

**\*Commander Bayne has also received at least 9 Superior Performance Awards for fitness assessment/test for reaching the following goals (40% is passing):**

**92% (5/27/00);      88% (1/30/01);      87% (10/2/01);      70% (5/29/99)      90% (12/1/97)      80% (5/14/97)**
**85% (5/5/95);      85% (11/27/95)      85% (10/31/96)**

**EXHIBIT 22**

# LT. BAYNE'S TRAINING SUMMARY

| Date | Course/Certification | Agency/Location | Hours | Bates |
|------|---------------------|-----------------|-------|-------|
| March 18, 1987 | Enlisted in Army | US Army | | COS-PROST-008399 |
| March 27, 1987 | Delayed Entry Program for training as Military Police | US Army | | COS-PROST-008400 |
| December 11, 1987 | Completed Basic Training | US Army | | COS-PROST-008401 |
| March 2, 1988 | Completed Basic Military Police Course | US Army Military Police School | | COS-PROST-008402 |
| June 16, 1988 | Completion of Basic Special Reaction Team Training Course – White Sands Missile Range | Resource & Referral | 80 hours | COS-PROST-008421 |
| July 13, 1988 | Certificate of Completion – Defensive Tactics  (White Sands Missile Range in WSMR, NM) | Law Enforcement Division of the United States Karate Association | 24 hours | COS-PROST-008422 |
| July 26, 1988 | Completion of Advanced Special Reaction Team Training Course | Resource & Referral | 24 hours | COS-PROST-008423 |
| August 8, 1988 | Certificate of Completion - Advanced Special Reaction Team Training Course (White Sands Missile Range) | Resource & Referral | 24 hours | COS-PROST-008428 |

| Date | Course/Certification | Agency/Location | Hours | Bates |
|------|---------------------|-----------------|-------|-------|
| 1989 | 1st Quarter – Completion of 150 Road Blocks in support of missile firings and tests | US Army | | COS-PROST-008582 |
| January 17, 1989 | Defensive Tactics Course in Las Cruces | DPS, New Mexico | 24 hours | COS-PROST-008426 |
| January 20, 1989 | Realistic Assailant Control | Calibre Press, Inc. (Las Cruces) | | COS-PROST-008425 |
| April 13, 1989 | Advanced Radio Communications | New Mexico DPS Training & Recruiting Division | 24 hours | COS-PROST-008508 |
| July 1, 1989 | Promoted to Rank of Specialist | US Army | | COS-PROST-008403 |
| July 10, 1989 | Special Reaction Team Training (Alabama) | US Army – Military Police School | July 10-21, 1989 | COS-PROST-008427 |
| April 30, 1990 | Drug Abuse Resistance Education | North Central Texas Council of Governments (D.A.R.E.) | 80 hours | COS-PROST-008463 |
| June 14, 1990 | Officer Survival | DPS, New Mexico | 24 hours | COS-PROST-008429 |
| October 3, 1990 | Military Police Investigator (graduate), Military Police School | US Army | August 7, 1990 – Oct 3, 1990 | COS-PROST-008448 |

| Date | Course/Certification | Agency/Location | Hours | Bates |
|------|---------------------|-----------------|-------|-------|
| December 7, 1990 | Primary Leadership Development Course | US Army | 4 weeks | COS-PROST-008472 |
| December 7, 1990 | Graduate, Commander's List of the Primary Leadership Development Course, US Army | US Army | 11/7/90 – 12/7/90 | COS-PROST-008512 |
| March 11, 1991 | Hostage Negotiations | Law Enforcement Officers Training School (New Mexico) | 16 hours | COS-PROST-008430 |
| April 1, 1991 | Promoted to Rank of Sergeant | US Army | | COS-PROST-008404 |
| July, 1991 | Associate in Criminal Justice | New Mexico State University | | COS-PROST-008712 |
| January 31, 1992 | Certificate - Completed Air Assault School, 25th Infantry Division (Light). Awarded Air Assault Badge | US Army | | COS-PROST-008405 |
| January 21, 1992 – January 31, 1992 | Certificate of Training – Air Assault Course | US Army | 80 hours | COS-PROST-008408 |
| September 1, 1992 | Certificate of Completion – Sniper training | TICAT-The Training Institute For Combat Arms & Tactics (NM) | 80 hours | COS-PROST-008431 |
| December 11, 1992 | Training Certificate - Tracking & Sign Cutting | New Mexico Correctional Facility (Las Cruces) | 8 hours | COS-PROST-008432 |
| February 15, 1993 | Honorable Discharge (DD214) Certificate of Honorable Discharge | US Army | | COS-PROST-008398 COS-PROST-008409 |

| Date | Course/Certification | Agency/Location | Hours | Bates |
|------|---------------------|-----------------|-------|-------|
| March 22, 1993 | LF Lisa Rogers re: start date - Hired at City of Scottsdale | COS | | COS-PROST-008602 |
| July 30, 1993 | Certificate of Graduation for Study for Peace Officer as approved by Arizona Law Enforcement Officer Advisory Council  (Bayne was Recruit Speaker) | Phoenix Regional Police Academy | | COS-PROST-008410 COS-PROST-008413-8415 |
| April 10, 1995 | AZ Post Instructor School | Mesa PD | | COS-PROST-008464 |
| July 12, 1995 | Completed Advanced Gang Conference | National Law Enforcement Institute (NLEI) | 16 hours | COS-PROST-008416-8417 |
| July 17, 1995 | Basic Radar course | SPD | 32 hours | COS_PROST-008509 |
| March 29, 1996 | Completion of Criminal Youth Gang Training at the 3rd Annual Nevada Gang Conference | Las Vegas Metropolitan Police Department | 24 hours | COS-PROST-008418 |
| July 22, 1996 | Certificate of Completion - Field Training Officer | SPD | 40 hours | COS-PROST-008474 |
| August 15, 1996 | Training Certificate - Steyr AUG Rifle Course | Mesa Police Department | 2 days | COS-PROST-008433 |
| January 16, 1997 | Training Certificate - Basic SWAT School | Mesa Police Department | 80 hours | COS-PROST-008434 |
| February 4, 1997 | Street Survival 1997 - the Tactical Edge Seminar | Brown County Sheriff's Dept. (Green Bay, WI) | 16 hours | COS-PROST-008435 |

| Date | Course/Certification | Agency/Location | Hours | Bates |
|---|---|---|---|---|
| February 6, 1997 | Street Survival 1997 – the Win seminar | Brown County Sherriff's Dept. (Green Bay, WI) | 8 hours | COS-PROST-008436 |
| March 10, 1997 | Precision Rifle Course | International Training Consultants (Mesa, AZ) | 24 hours | COS-OPROST-008437 |
| June 10, 1997 | Completion of Advanced Gang Training | AZ DPS State Gang Task Force | 3 days | COS-PROST-008419 |
| November 17, 1997 | Precision Rifle 2 Course | Thunder Ranch, Inc. (Mountain Home, TX) | 50 hours | COS-PROST-008438 |
| February 20, 1998 | Basic Spanish | Dario Language Systems | | COS-PROST-008454 |
| March 30, 1998 | Urban Sniper Tactical Training | USMC Special Operations Training Group | 60 hours | COS-PROST-008439 |
| March 30,1998 | Advanced Sniper course | USMC Special Operations Training Group | 50 hours | COS-PROST-008440 |
| September 14, 1998 | AZ Post Physical Fitness Instructor | APOST | 40 hours | COS-PROST-008465 |
| October 27, 1998 | Spanish Immersion Leadership in the 21st Century | City of Phoenix | | COS-PROST-008475 |
| December 5, 1998 | Volunteer Tutor Workshop for ESL | Laubach Literacy Action | 15 hours | COS-PROST-008495 |

10631871v2

| Date | Course/Certification | Agency/Location | Hours | Bates |
|------|---------------------|-----------------|-------|-------|
| December 18, 1998 | Basic Spanish II and Intermediate Spanish for Law Enforcement | Scottsdale Community College | | COS-PROST-008455 |
| January 7, 1999 | Passed intermediate level Spanish interpretation test, reading, writing, and conversing | SPD | | COS-PROST-008456 |
| June 11, 1999 | Advanced Observer/Marksman Court | Countermeasures Tactical Institute (CTI) | 50 hours | COS-PROST-008441 |
| November 14, 1999 | Advanced Spanish Immersion Training | Partners in Training Consultants (Marana, AZ) | 60 hours | COS-PROST-008457 |
| March 30, 2000 | Basic Command Spanish Instructor Training Program | Central Arizona College, Command Spanish Center | | COS-PROST-008466 |
| April 23, 2000 | Homicide Investigations Conference  (RMIN 2000 conference) | Rocky Mountain Information Network | 24 hours | COS-PROST-008449 |
| June 8, 2000 | Certificate to teach Spanish at Pinal Community College through May 31, 2002 | Central Arizona College | | COS-PROST-008467 |
| June 8, 2000 | 3rd Annual Conference (School Resource Officers) | Arizona School Resource Officers Association | | COS-PROST-008450 |
| July 10, 2000 | Spanish Instructor Training Program | Partners in Training Consultants (Scottsdale, AZ) | 80 hours | COS-PROST-008469 |
| August 21, 2000 | Detective and New Criminal Investigator | Public Agency Training Council (Tucson, AZ) | 40 hours | COS-PROST-008451 |

10631871v2

| Date | Course/Certification | Agency/Location | Hours | Bates |
|------|---------------------|-----------------|-------|-------|
| November 1, 2000 | Immersion Spanish Training Associate | Partners in Training Consultants (Gilbert, AZ) | 16 hours | COS-PROST-008458 |
| March 9, 2001 | IPMBA Cyclist Course completion and Certification | SPD | 40 hours | COS-PROST-008510-8511 |
| April 30, 2001 | Bachelor of Science in Business Management | University of Phoenix | | COS-PROST-008713 |
| June 19, 2001 | Street Survival 2001 – the Tactical Edge | Las Vegas Metro Police Dept (NV) | 16 hours | COS-PROST-008443 |
| June 21, 2001 | Street Survival 2001 – the Win Seminar | Las Vegas Metro Police Dept (NV) | 8 hours | COS-PROST-008444 |
| November 19-December 3, 2001 | Area Chair Training (Local), Certificate of Completion | University of Phoenix | | COS-PROST-008718 |
| April 29, 2002 | Completion of Advanced Gang Training | AZ DPS State Gang Task Force | 3 days | COS-PROST-008420 |
| May 20, 2002 | Basic Crisis Negotiation School | FBI Training School | 40 hours | COS-PROST-008445 |

| Date | Course/Certification | Agency/Location | Hours | Bates |
|------|---------------------|-----------------|-------|-------|
| 2003 | (From evaluation)<br>Participated in as either student or instructor:<br><br>High Risk Traffic Stops Instructors School<br>Street Jump Training<br>SWAT Training (2x/mo.)<br>Firearms Instructors School<br>Mobile Field Force<br>Defensive Tactics<br>Critical Incident Management<br>Methamphetamine Investigation Management Workshop<br>K9 agitators course<br>Advanced  Negotiation School<br>Spanish for Law Enforcement<br>First Aid and CPR<br>Firearms qualification and squad range | COS | | COS-PROST-008534 |
| February 3, 2003 | Critical Incident Stress Management: Individual Crisis Intervention and Peer Support | UMBC | 13 hours | COS-PROST-008491 |
| February 5, 2003 | Critical Incident Stress Management: Basic | UMBC | 14 hours | COS-PROST-008492 |
| February 26, 2003 | 24 Hour Advanced Negotiation School | Phoenix PD, SAU | 3 days | COS-PROST-008446 |
| March 3, 2003 | AZ Post Firearms Instructor School | Mesa PD | March 3-14, 2003 | COS-PROST-008470 |

| Date | Course/Certification | Agency/Location | Hours | Bates |
|---|---|---|---|---|
| 2004 | (From evaluation)<br>Participate in as either student tor instructor:<br><br>Defensive Tactics<br>Modular Training<br>Party Patrol Training<br>Firearms qualification and squad range<br>AR-15 rifle re-certification<br>Firearms Instructor<br>Basic Spanish for Law Enforcement (Instructor)<br>Spanish Immersion training (Instructor)<br>EVOC 2<br>Hostage Negotiations and Crisis Intervention phase 2<br>Supervisors Development Course | | | COS-PROST-008544-8545 |
| May 7, 2004 | Master of Education, Counseling-Human Relations | NAU | | COS-PROST-08714 |
| December 1, 2004 | Anti-Terrorism Intelligence Awareness Training Program (Federal Law Enforcement Training Center, Homeland Security) | National Center for State & Local Law Enforcement Trng | | COS-PROST-008452 |
| February 7, 2005 | Principle-Based Leadership Skills | Dodson Training Resources, Inc. | 14 hours | COS-PROST-008476 |
| February 17, 2005 | Media Relations for Law Enforcement / "Master Public Information Officer" certification | Chris Ryan Seminars (PoliceMediaRelations.com) | 4 days | COS-PROST-008477 |
| March 18, 2005 | Advanced Spanish for Law Enforcement | Gateway Community College | | COS-PROST-008459 |

| Date | Course/Certification | Agency/Location | Hours | Bates |
|---|---|---|---|---|
| April 13, 2005 | Advanced Spanish Immersion | Partners in Training Consultants (Hermosillo, Mexico) | 70 hours | COS-PROST-008460 |
| October 2, 2005 November 3, 2005 | Promotion to Sergeant | COS | | COS-PROST-000423 COS-PROST-008688 |
| February 14, 2006 | Leadership through People Skills | Psychological Associates / Dimensional Training | 3 days | COS-PROST-008478 |
| July 17, 2006 | Legal & Liability Management for Tactical, SWAT, and Emergency Response Operations | Public Agency Training Council | 14 hours | COS-PROST-008447 |
| September 6, 2006 | Leadership Skills for Challenging Times, 20 hours (Public Agency Training Council, National Criminal Justice Certificate) | Public Agency Training Council (Scottsdale, AZ) | 20 hours | COS-PROST-008479 |
| June 4 2007 | P.I.S.A. XXIII Bi-Annual Conference | Policia Internacional Sonora-Arizona | 3 days | COS-PROST-008499 |
| December 1, 2007 | Member, International Critical Incident Stress Foundation | International Critical Incident Stress Foundation | | COS-PROST-008493 |
| February 11, 2008 | The Reid Technique of Interviewing and Interrogation | John E. Reid & Assoc. (Chicago, Illinois) | 3 days | COS-PROST-008453 |
| February 25, 2008 | Internal Affairs | Public Agency Training Council | 20 hours | COS-PROST-008480 |
| May 2, 2008 | Spanish Immersion Program in Cuernavaca, Morelos | Anders Languages | | COS-PROST-008461 |

| Date | Course/Certification | Agency/Location | Hours | Bates |
|------|----------------------|-----------------|-------|-------|
| July 22, 2008 | Investigation of Citizen Complaints and Officer Misconduct for First Line Supervisors | Public Agency Training Council | 16 hours | COS-PROST-008481 |
| October 28, 2008 | IAPro software training | CI Technologies | 24 hours | COS-PROST-008482 |
| Spring, 2009 | Scottsdale Management Development Series | City of Scottsdale | | COS-PROST-008483 |
| June 10, 2009 | Public Speech Immersion Program | Interlingua | | COS-PROST-008462 |
| August 3, 2009 | Police Internal Affairs training course | Institute of Police Technology & Mgt., (University of North Florida) | 40 hours | COS-PROST-008484 |
| March 22, 2010 | Leadership Initiatives for Command Staff Program | Museum of Tolerance, Los Angeles | 3 days | COS-PROST-008485 |
| May 5, 2010 | Intermediate ICS for Expanding Incidents | FEMA, US Dept of Homeland Security, Center for Domestic Preparedness | 18 hours | COS-PROST-008486 |
| May 6, 2010 | Emergency Management Institute's ICS-400, Advanced ICS Command and General Staff-Complex Incidents | FEMA, US Dept of Homeland Security, Center for Domestic Preparedness | 14 hours | COS-PROST-008487 |
| September 24, 2010 | Field Force Command and Planning | FEMA, US Dept of Homeland Security, Center for Domestic Preparedness | 24 hours | COS-PROST-008488 |

| Date | Course/Certification | Agency/Location | Hours | Bates |
|---|---|---|---|---|
| October 5, 2011 | IACP Leadership in Police Organizations training course | AZPOST | | COS-PROST-008489 |
| October 5, 2011 | 7 Habits for Law Enforcement | Franklin Covey | | COS-PROST-008490 |
| April 23, 2001 | 1st Annual Crisis Negotiations Conference | National Tactical Officers Association (NTOA) | 3 days | COS-PROST-008442 |

**EXHIBIT 23**

## REPRIMANDS

| Date | Reprimand | Agency/Location | Result | Bates |
|------|-----------|-----------------|--------|-------|
| April 4, 1997 | Arrest of suspect for violating liquor law –arrest was improper to support charge during judicial review; searches of private residences needed to be fully and accurately reported in police reports) | COS | Letter of Reprimand (LOR) | COS-PROST-000545-546 |
| June 5, 1997 | Failing to adequately report facts relative to the search of two apartments and for making an improper arrest on 6/23/96) | COS | Letter of Reprimand (LOR) | COS-PROST-000489 |

**EXHIBIT 24**



Exponent
23445 N. 19th Avenue
Phoenix, AZ 85027

telephone 623-582-6949
facsimile 623-581-8814
www.exponent.com

June 27, 2013

Lori Davis
City of Scottsdale
City Attorney's Office
3939 N. Drinkwater Blvd.
Scottsdale, AZ 85251

Re:     **Prostrollo v. City of Scottsdale**
        Exponent Project Number: 1304029.000

Dear Ms. Davis:

At your request, I have conducted an analysis of the January 28, 2012 fatal shooting
event involving Mr. Jason Prostrollo. The purpose of this letter is to report the
conclusions I have formed to date. The sections below describe the event and discuss
my observations and conclusions. As part of the analysis I have reviewed the materials
listed in Appendix A and conducted an inspection of the site.

In general, I anticipate offering opinions related to human factors, biomechanics, and
the process of event reconstruction using various aspects of these sciences. Specifically,
you requested that I review the materials in order to analyze Mr. Prostrollo's rate of
movement while traveling from the front door of the residence to the point where he
was shot as well as his body position and rate of travel when shot.

My qualifications to render opinions in these areas are described in the attached
curriculum vitae. Exponent currently bills my time at $275 per hour. This rate is the
same for all activities including analysis and testimony. A copy of my four year
testifying history is attached hereto.

The analyses and opinions provided herein are based on the review of the materials,
and the education, knowledge, and experience of this author. The conclusions are
provided to a reasonable degree of scientific and engineering certainty. The conclusions
may be modified or amended if additional information becomes available.

COS-PROST-012719

## Background

The subject analysis is related to the fatal shooting of Mr. Jason Prostrollo on January 28, 2012. The events that occurred prior to and during the fatal shooting event of Mr. Jason Prostrollo are detailed in the Investigation Report of Detective Hugh Lockerby, the recorded interviews of various Scottsdale Police Officers and witnesses, as well as in deposition testimony from relevant parties. The information in this section provides a brief summary of this information, intended to provide a general incident description to lay foundation for the analyses conducted, including information about the parties involved and details about the event. The summary provided herein is not intended to be a complete recitation of all facts, information and evidence considered in conducting the analysis or used to support the conclusions.

On the evening of January 27, 2012, Mr. Jason Prostrollo, age 25, was at Ernie's bar in Scottsdale, Arizona with his brother, Mr. Bryan Prostrollo, age 22. The two men had been consuming alcohol. At approximately midnight on January 28, Mr. Jason Prostrollo parted with his brother and left the bar with Mr. Daniel Hall and Ms. Rachel Rogers. Mr. Prostrollo went with Mr. Hall and Ms. Rogers to their residence at 12074 N. 135th Place in Scottsdale. At their residence, Mr. Prostrollo reportedly continued to consume alcohol. Between 03:00 and 04:00, Ms. Rogers went to bed. Shortly thereafter, Mr. Hall called a cab for Mr. Prostrollo. Mr. Prostrollo departed the residence in the cab. After a short time, reportedly approximately 10 to 15 minutes, Mr. Prostrollo returned to the house and engaged in an aggressive discussion with Mr. Hall. In response, Ms. Rogers called 911 and reported that Mr. Prostrollo had a knife. In what was later determined to be an associated call to the police, the taxi driver who picked up Mr. Prostrollo reported being held at knife point and told to take Mr. Prostrollo back to the Hall/Rogers residence.

The Scottsdale Police responded to the scene. The officers initially on-scene included Sergeant KC Moore, Officer Cody Carlisle, Officer Tony Sanborn, Officer Kevin Reynolds, Officer Thomas Goodson, and Officer Adam Fernandez. Ofc. Sanborn was a K-9 officer and was accompanied by his police dog, Raider. Sgt. Moore directed Ofc. Fernandez to cover the rear of the house. At some point in time, Lieutenant Ronald Bayne arrived on scene. When Ms. Rogers exited the house she was directed to Ofc. Carlisle. Ofc. Reynolds was assigned to Mr. Hall once he exited the residence.

The remaining officers positioned themselves near an approximately 5 ft x 2 ft x 2 ft pillar structure that enclosed the mailbox, which was at the east end of the driveway. Based on post incident measurements, the pillar structure was approximately 51 feet from the front door. A paved walkway led from the front door to a circle drive in front of the pillar structure. Figure 1 depicts a view of the pillar structure, circle drive and walkway. The position of the officers relative to the pillar is documented in the Lockerby report.



COS-PROST-012720



Figure 1. Depicting layout of the site.

According to the Radio Traffic record, at 04:43:48, Ofc. Carlisle announced that Mr. Hall was exiting the residence with his hands up. Sgt. Moore radioed at 04:45:29 that Mr. Hall was out of the house and Mr. Prostrollo was still in the house. Ofc. Carlisle announced at 04:49:42 that Mr. Prostrollo was exiting the house. The next communication was from Ofc. Sanborn at 04:50:13, when he radioed "King 28. 998. Roll fire." Lt. Bayne then radioed at 04:50:26 "I don't know if, uh, it's been advised but 998 got a subject down, uh, start fire."

The events that occurred during the 31 seconds that elapsed between Ofc. Carlisle announcing that Mr. Prostrollo was exiting the house and Ofc. Sanborn announcing the 998 were not recorded or memorialized with any quantifiable evidence (evidence that could be measured, directly analyzed or reviewed). The only available source(s) of evidence to the events that occurred during these 31 seconds are the statements provided post-event and memorialized in the interviews and deposition testimonies of those who witnessed the event. These were recorded in audio format and are detailed in the Lockerby report.

The evidence reflects that during these 31 seconds, Mr. Prostrollo exited the house, continued advancing toward the officers positioned near the pillar structure, and was shot by Lt. Bayne. As Mr. Prostrollo advanced toward the officers, Ofc. Sanborn released Raider, who advanced on Mr. Prostrollo. In this same time frame, Lt. Bayne fired two shots, with one contacting Mr. Prostrollo and the other contacting Raider. The bullet that impacted Raider went through his collar, which left an imprint on the right chest area of Mr. Prostrollo. As a result of being shot, Mr. Prostrollo fell to the ground, landing on his left side, as depicted in the at-scene investigation photographs. The medical examiner's report recorded the injuries sustained by Mr. Prostrollo, including those resulting from the bullet, those from contact with Raider, and those resulting from contacting the ground.

$Ex^{TM}$

COS-PROST-012721

Review of the interview statements provided by the officers who had a direct view of Mr. Prostrollo, and by Mr. Hall and Ms. Rogers, both of whom witnessed the event, indicate that Mr. Prostrollo continuously walked toward the officers after exiting the residence. Mr. Prostrollo's walking pace is described in the various reports, with a range of speeds, which include the following descriptors: a methodical slow pace (Lt. Bayne), a regular pace (Rogers), and a brisk pace (Ofc. Sanborn; Ofc. Goodson).

The officers described seeing Mr. Prostrollo holding a club, baton, stick, or rifle blank in each hand. These were later determined to be the two ends of a pool cue stick. The descriptions of the manner in which he was holding the two batons vary, and include descriptions of him swinging the batons martial arts style. When Mr. Prostrollo had entered the area at the west side of the circle drive, Ofc. Sanborn made the decision to release Raider. Ofc. Sanborn described that Raider leapt at Mr. Prostrollo, and initially made contact with his chest and then moved to bite his right bicep. Ofc. Sanborn described that Mr. Prostrollo made no attempt to avoid Raider and "took the bite." At approximately this same time, Ofc. Sanborn heard two shots.

The officers generally describe that Mr. Prostrollo fell after being shot. Ofc. Goodson, who had a direct line of sight on Mr. Prostrollo and was preparing to fire his rifle if Raider did not stop Mr. Prostrollo's advance, described that Lt. Bayne's first shot hit Mr. Prostrollo and caused his body to spin, while the second shot hit Raider. This was also the conclusion reached during the police investigation, as described in the deposition of Detective Lockerby.

## Analysis

### Site inspection

The site was inspected on June 14, 2013. During the inspection, measurements were obtained and photographs and video were recorded. The photographs and video are provided on a compact disc with this report.

### Assessment of available evidence

As described above, my assignment was to conduct an assessment of the evidence with regard to the determination of Mr. Prostrollo's rate of movement while traveling from the front door of the residence to his point of final rest.

The radio traffic evidence indicates that Mr. Prostrollo was reported to have exited the house at 04:49:42 and that Officer Sanborn radioed a 998 call at 04:50:13, an elapsed time of 31 seconds. The distance traveled by Mr. Prostrollo from the front door of the house to his point of final rest was measured to be 37.6 feet. The events that occurred during these 31 seconds can only be determined through analysis of the statements



COS-PROST-012722

made during interviews and depositions of the witnesses to the event and from the nature of Mr. Prostrollo's injuries detailed in the medical examiner's report.

Witness statements and testimony may be useful in event analyses to establish the overall setting/layout of the scene and actions of involved parties. However, witness memory is not akin to a video recording, capturing all information occurring within the field of view and remaining unchanged for all time, thus being re-watchable and analyzable in great detail. Similarly, witness testimony is not akin to physical evidence, such as tire marks or vehicle damage, which is measurable, and can be analyzed, compared and tested by using governing physical laws of nature.

As described in the relevant scientific literature, changes in memory may occur as time passes (even after very short periods of time), and these changes occur without recognition by the person, simply due to the semantics of the questions posed, the opportunity to interact with other witnesses, or simply due to the expectations of being able to describe what was observed. The results of research studies have led to the understanding that witness statements are often unintentionally affected by the limitations of human cognition.[1] A person is only capable of gathering details about that part of a scene, object or condition to which he/she was focusing. These findings are generally recognized by human factors professionals involved in the investigation and reconstruction of collision events.[2]

Numerous studies in the field of cognitive science have shown that humans can be greatly unaware of details in their environment, even when 'looking' at the source of information.[3] One explanation why a witness would believe they saw an entire event, while only actually seeing some portion of the event, is that the intensity of the human visual experience can lead to the misconception that we perceive the world in the same amount of detail that actually exists.

---

[1] Loftus, E.F. and Palmer, J.C. (1974) *Reconstruction of automobile destruction: an example of the integration between language and memory.* Journal of verbal learning and verbal behavior, 13, 585-589.

Loftus, E. F., Miller, D. G., & Burns, H. J. (1978). *Semantic integration of verbal information into visual memory.* Journal of Experimental Psychology: Human Learning and Memory, 4, 19-31.

Loftus, E.F. (1975) *Leading questions and the eyewitness report.* Cognitive Psychology, 7, 560-572.

Haber, R.N. and Haber, L. (2000) *Experiencing, remembering and reporting events.* Psychology, Public Policy and Law, Vol. 6, No. 4, 1057-1097.

[2] Robins, P. (2001) *Eyewitness reliability in motor vehicle accident reconstruction and litigation.* Lawyers and Judges Publishing Company, Tucson, AZ

[3] Levin, D. and Simons, D. (1997) Failure to detect changes to attended objects in motion pictures. Psychonomic Bulletin & Review, 4, 501-506.

Simons, D. (2000) Attentional capture and inattentional blindness. Trends in Cognitive Sciences, Vol. 4, No. 4, 147-155. Simons, D. and Chabris, C. (1999) Gorillas in our midst: sustained inattentional blindness for dynamic events. Perception, Vol. 28, 1059-1074.



COS-PROST-012723

Accordingly, as there are no quantifiable data that can relate Mr. Prostrollo's position or actions within the scene at any specific time in the 31 second period between his exiting the residence and his falling to his final rest position, the witness testimony must be applied to determine a most likely sequence of events. In accordance with the literature on witness testimony, a certain amount of variance is expected in the statements of witnesses. This may include estimates of rate of movement as well as details about specific movements. Such variance is found in the various statements and testimonies of the witnesses. However, the witness statements and testimonies do provided a set of boundary conditions, which, when taken in conjunction with the factual evidence in the medical examiner's report, can be assessed using published studies.

*Assessment of walking speed*

Given the available evidence, one method to calculate gait speed would be to divide the total distance traveled by the total elapsed time. However, this will provide only the minimum possible average gait speed, not a reasonably likely, let alone most probable, account of Mr. Prostrollo's movement. This is the method utilized by Jesse Wobrock, Ph.D., the Plaintiff's biomechanics expert. Such a value is essentially irrelevant if the value is not consistent with witness evidence.

The witnesses describe that Mr. Prostrollo walked at a continuous pace after leaving the residence, with descriptors ranging from slow methodical walking pace to a brisk pace. The available witness evidence does not indicate that Mr. Prostrollo was walking at a pace that indicated significant effects of alcohol intoxication. Mr. Prostrollo's history, as described by the statements of family members, indicates that Mr. Prostrollo was an experienced, regular, excessive consumer of alcohol. A literature review did not reveal any studies indicating that a person with a blood alcohol content (BAC) level similar to Mr. Prostrollo's, who regularly consumed excessive amounts of alcohol, would have been incapable of walking at a normal or brisk walking pace.

As described in the materials reviewed, following an officer involved shooting, there are a sequence of steps that occur before the 998 call occurs. This is generally described in the interviews and depositions of the officers involved in the subject event: that some amount of time elapsed between the shots being fired and Ofc. Sanborn making the 998 call. The exact amount of time cannot be determined from any records.

Estimates for comfortable and maximum gait speeds of an adult male in Mr. Prostrollo's age range would be 4 to 9 feet per second.[4] Walking speeds at the lower end of this range, 4 feet per second or slightly slower, would be consistent with a slow

---

[4] Bohannon, R (1997). Comfortable and maximum walking speed of adults aged 20-79 years: reference values and determinants. Age and Ageing 1997; 26: 15-19



COS-PROST-012724

methodical pace. Similarly, walking speeds at the upper end of this range, 9 feet per second, would describe a brisk walking pace. Since the exact walking speed of Mr. Prostrollo cannot be quantitatively determined from evidence collected at the scene, the qualitative witness testimony provides the best available estimates for his pace. For purposes of analysis, the range for his walking pace is assumed to be 3 to 9 feet per second, which accounts for a slower, methodical pace at the lower end of the range.

In this respective range of walking speeds, Mr. Prostrollo would have required roughly a maximum of 13 seconds to a minimum of 4 seconds to travel from the front door to the area where he was shot. This would have resulted in roughly 18 to 27 seconds remaining after Mr. Prostrollo was shot and the 998 call. Ofc. Sanborn described that he made the 998 call after the officers advanced to and observed Mr. Prostrollo, and after locating Raider and assessing the wounds to Raider. Hence, the remaining time is accounted for when considering that the officers would have, among other actions, a) perceived and responded to Lt. Bayne shooting; b) performed safety checks before moving forward; c) advanced toward Mr. Prostrollo; and d) assessed his condition.

In this regard, both the range of walking speeds and the remaining time is consistent with the interview statements, and specifically that of Ofc. Sanborn, who made the first 998 call. Further, the method of directly calculating an average walking speed based on total distance traveled and total time elapsed is shown to be an irrelevant value, as the witness statements and actions post-shooting are not accounted for by such a value.

*Assessment of injuries relative to walking speed*

The injuries sustained by Mr. Prostrollo are detailed in the medical examiner's report. An analysis of these injuries was conducted to assess whether the evidence provided additional detail relative to his walking speed and/or motions when shot. Plaintiff's biomechanics expert Wobrock opines that the injuries and rest position of Mr. Prostrollo indicates that his forward momentum was halted when he was shot by Lt. Bayne.

Unlike the analysis of walking speed up to the point of being shot, which could only be assessed based on witness evidence, the final rest position of Mr. Prostrollo and the medical examiner's findings do provide physical evidence that is useful in assessing Mr. Prostrollo's bodily positions and motions as he was shot, and post-shooting. The witness statements are also necessary to provide details; however, as described above, due to the limitations of cognitive information processing, all details may not be gathered, recorded, or recalled by all witnesses.

Based on witness evidence, Mr. Prostrollo was carrying, one in each hand, the ends of a pool cue that had been disconnected into two-pieces. After the incident, the tip end of the pool cue was found at the end of a sloped and depressed drainage feature in the



COS-PROST-012725

driveway next to the gravel mound where the mailbox pillar is located (Figure 2, right panel). The grip end of the pool cue was found under the right arm of Mr. Prostrollo (Figure 2, left panel).



Figure 2. Scene photographs depicting pool cue stick locations.

The location of the tip end of the pool cue suggests that Mr. Prostrollo released the stick while still upright, either during the interaction with Raider at his right chest and right upper extremity area and/or upon being shot in the right chest. The location of the grip end of the pool cue under Mr. Prostrollo's right arm would be consistent with him attempting to strike Raider by swinging the grip end towards the right side of his torso. Ofc. Sanborn described that the initial contact from Raider was to Mr. Prostrollo's chest. The bite/contact marks from Raider are consistent with this description. The description is also consistent with Mr. Prostrollo's right arm being raised when Raider made initial contact. As Mr. Prostrollo brought his right arm down, this provided Raider the opportunity to make contact with the right bicep. Due to the interaction with Raider, and Mr. Prostrollo's ultimate fall onto the left side of his body, the grip end of the pool cue had the opportunity to be trapped underneath his right arm in his rest position. The movement of Mr. Prostrollo's right arm when he was handcuffed by Ofc. Reynolds also may have affected the relative final position of the pool cue. In total, the position of the two ends of the pool cue at final rest is consistent with the descriptions provided by the officers during the interview statements and testimony. The positions of the ends of the pool cue are also consistent with the action demonstrated by Lt. Bayne during his deposition.

The scene photographs depict Mr. Prostrollo's left foot forward of his right foot, indicative of Mr. Prostrollo being in mid-stride when he fell to his left. The at-scene photographs also depict Mr. Prostrollo lying on the ground, with the lower portion of his body resting on the left side, and his upper torso rotated facing upward. Mr. Prostrollo's body was oriented such that his head was directed toward the north. The medical examiner's report indicates that he had a 3.5 x 3.0 cm circular red cutaneous abrasion to the posterior central aspect of the scalp. The location of the scalp abrasion



COS-PROST-012726

indicates that Mr. Prostrollo's head contacted the ground near the posterior midline, or squarely at the back of his head. The final rest position is consistent with a combination of the bodily rotation due to the bullet impact (as described by Ofc. Goodson) and continued/compensatory stepping following the bullet impact and/or contact with Raider.

The medical examiner's report described the gunshot wound path:

> "The wound path sequentially runs through the right fifth costochondral junction, anteriorly, pericardium, anteriorly, right ventricle of the heart, pericardium, posterolaterally, nicks the intima of the aorta, and continues through the lower lobe of the left lung, left eleventh rib, posteromedially, back musculature, and penetrates subcutaneous tissue over the central aspect of the back where the wound path ends. There is no exit wound."

The right ventricle is one of four chambers of heart. The right ventricle receives de-oxygenated blood from the right atrium and sends blood to the lungs to become oxygenated. From the lungs, the blood travels into the left atrium, to the left ventricle, and out to the body through the aorta. The heart is surrounded by a protective membrane called the pericardium.

The gunshot wound path perforated the anterior pericardium, right ventricle, posterolateral pericardium, and aorta. The perforation of the right ventricle would have affected the ability of blood to enter the lungs. Once the remainder of blood in the left chambers and lungs was emptied, continued action by the left ventricle would have produced negative left ventricular pressure.

The perforation of the right ventricle and aorta would have resulted in internal blood loss. The rate of blood loss is a function of Mr. Prostrollo's cardiac output at the time of the shooting. The toxicology report indicated that Prostrollo had a vitreous ethyl alcohol concentration of 0.34 g% and a pleural blood ethyl alcohol concentration of 0.42 g%. Cocaine on the level of 0.15 mg/L and additional cocaine metabolites were also detected. The alcohol and cocaine would likely have caused an increase in Mr. Prostrollo's heart rate and blood pressure, thereby increasing his cardiac output.[5] Mr. Prostrollo's cardiac output would have been further elevated by the physiological stress response to the potential conflict he was entering into with the police. Based on these factors, the increased cardiac output could have resulted in an increased blood loss within a few seconds.

---

[5] Foltini, R & Fischman, M. (1989) Ethanol and Cocaine Interactions in Humans: Cardiovascular Consequences Pharmacology. *Biochemistry & Behavior*, Vol. 31, pp. 877-883.



COS-PROST-012727

The nature of the gunshot wound and the cardiovascular effects of alcohol and cocaine on Mr. Prostrollo at the time of the gunshot were likely to produce a rapid drop in blood pressure, deprivation of oxygen to the brain and sudden loss of consciousness.[6] The fact that Mr. Prostrollo was standing at the time of the injury would have reduced the onset time for the loss of consciousness because greater pressure is needed to deliver blood to the brain in a standing posture; thus, a standing person will have a lower tolerance for a rapid drop in blood pressure. Such is the effect that some experience when standing up too quickly, which can sometimes lead to a transient loss of consciousness, also known as fainting or syncope. The mechanism that causes syncope is a sudden drop of blood flow to the brain or drop in blood pressure. Thus, Mr. Prostrollo's fall position can be accounted for by a loss of consciousness resulting from the wound, and is not necessarily reflective of a slow or halted walking pace.

The exact actions that occurred in the short time that elapsed between the bullet entering Mr. Prostrollo and the loss of consciousness resulting in the fall to the ground were not likely to be readily discernible to the officers in a manner that could be recalled with exact detail. The nature of the events that were transpiring (including observation of the interaction between Raider and Mr. Prostrollo, the firing of shots from Lt. Bayne, the perception of who fired shots, and the perception of the effects of the shots and interaction with Raider on Mr. Prostrollo's incapacitation) were all generally overlapping and provided a mixture of sensory information, so that memorialization and recall would reasonably be limited. Thus, the time required for Mr. Prostrollo to lose consciousness as a result of the gunshot wound was perceived by the officers as elapsing quickly, when in fact several seconds may have elapsed while these actions were occurring. The evidence does not preclude Mr. Prostrollo from taking a step during the seconds between the gunshot and his loss of consciousness; however, interaction with Raider as well as any defensive motions Mr. Prostrollo made against Raider using the grip end of the pool cue may have hindered Mr. Prostrollo's forward motion.

Ofc. Goodson described that Mr. Prostrollo was shot first, before Raider. This was also the conclusion reached by the investigation of Detective Lockerby. The evidence and information presented for review supports these assessments. While Dr. Wobrock opines that Raider was shot first, he does not provide support for his analysis of this conclusion, other than referencing the location of the blood spatter and pooling created by Raider shown in the photographs. Review of the photographs depicting the blood splatter and pooling of blood around Mr. Prostrollo at final rest, along with the blood on his shoes and pants does not support the assessment that Raider was shot first. To the contrary, the location of the blood, taken in conjunction with the actions described by the witnesses and Mr. Prostrollo's final rest position appears most consistent with Mr. Prostrollo being shot before Raider.

---

[6] Magnusson, A. & Schriver, J. (1988) Mechanisms of injury: Pathophysiology of blunt, blast, and penetrating injury of the chest. *Topics in Emergency Medicine*, July 1988.



COS-PROST-012728

The final rest position of Mr. Prostrollo and details of his injuries sustained do provide physical evidence that is useful in evaluating Mr. Prostrollo's position and motions as he was shot, and post-shooting; however, none of this evidence can be used to make any determination of Mr. Prostrollo's walking speed prior to Raider's advance on Mr. Prostrollo and prior to the gunshots being fired. The injuries and evidence do not contradict the interview statements and deposition testimony of the witnesses regarding the walking speed of Mr. Prostrollo. Further, this evidence does not provide evidence to a reasonable degree of certainty that Mr. Prostrollo's forward motion was halted when he was shot.

## Summary

1. The evidence available for assessing Mr. Prostrollo's actions and motion during the 31 second period is mostly limited to information provided in the interviews and deposition testimony of witnesses to the events. Witness evidence is susceptible to the limits of human cognitive processing, which is directly related to the witness's area of focus, expectancy and emotional state.

2. The witness evidence indicates that some amount of time elapsed between Lt. Bayne firing two shots and Officer Sanborn radioing the 998 call. The exact time is not quantifiable from any evidence. At best, the amount of time can be estimated from the actions completed after the shots were fired.

3. The total elapsed time of 31 seconds does not provide an accurate or reliable measure for assessing the time required for Mr. Prostrollo to walk from the front door to his location when shot. The total elapsed time does not account for all actions that occurred by all parties involved, and thus cannot be used to accurately calculate, to a reasonable degree of probability, an average walking speed for Mr. Prostrollo.

4. Since Mr. Prostrollo's walking speed cannot be accurately calculated to a reasonable degree of probability from quantifiable evidence, analysis of witness testimony provides the only available means for estimating the time between Mr. Prostrollo exiting the front door and when Lt. Bayne fired the shots.

5. The witness evidence is indicative of a walking speed in the range of 3 to 9 feet per second, which covers the range of slow to brisk walking pace for an adult male of Mr. Prostrollo's age, stature and physical ability. In this respective range of walking speeds, Mr. Prostrollo would have required roughly a maximum of 13 seconds to a minimum of 4 seconds to travel from the front door to the area where he was shot.



6. The roughly 18 to 27 seconds that remained of the 31 seconds that elapsed between Mr. Prostrollo exiting the door and the 998 call can be accounted for by the time required for the officers to perceive and respond to Lt. Bayne shooting, which would include performing safety checks, advancing toward Mr. Prostrollo, assessing his condition, and Ofc. Sanborn's location and assessment of Raider. An elapsed time within this range is consistent with the interview statements, and specifically that of Officer Sanborn, who made the first 998 call at 04:50:13.

7. The physical position of Mr. Prostrollo after being shot is consistent with his injuries and the witness evidence. His body position was most likely effected by the impact from the bullet, by contact with Raider, and/or that he may have advanced with one or more steps after being shot. The ability of the witnesses to capture and record this information with exact detail is neither possible nor reasonably expected.

8. The final rest position of Mr. Prostrollo cannot be used, to a reasonable degree of probability, to assess his travel speed when Lt. Bayne made the decision to fire or when Mr. Prostrollo was impacted by the bullet. The potential for a change in body position after being shot, a change in body position and travel speed due to contact by the dog, and the effect of the bullet wounds on Mr. Prostrollo's ability to maintain an upright stance all affect final rest position. As these factors cannot be directly quantified from the available evidence, one can neither assess his bodily position nor his rate of travel when shot solely based on his final rest position.

Sincerely,

Michael J. Kuzel, PE, CHFP
Principal Engineer



COS-PROST-012730

## Appendix A

1. Scottsdale Police Department Use of Force Guideline
2. Scottsdale Police Department Memo "Shots Fired"
3. REDACTED-OCRLockerbyCaseFileDR12-02226
4. Prostrollo Blackberry Files/Photographs_REDACTED
5. 911 Call Recording and Transcript
6. Time-Stamped Radio Traffic Recording and Transcript
7. Taxi 911 Call Recording and Transcript
8. Taxi Radio Traffic Recording and Transcript
9. Taxi Driver Kheen Photo Lineup
10. MCAO Review Letter
11. IA Summary
12. Weather Underground Information
13. MIRB Finding
14. SPD Use of Force Board Findings
15. SPD K9 Reports
16. SPD K9 Training Logs, Including Raider
17. Bayne Firearms Qualifications
18. Bayne Training Binder
19. Bayne Personnel File
20. Sanborn Personnel File
21. Crime Scene Specialist and Crime Lab Notes
22. SPD Polices
    a. General Orders – Critical Incident Stress Management (CISM)
    b. Basic Field Operations Search
    c. Basic Field Operations Canine
    d. Use of Force
    e. Internal Affairs
    f. ARSTitle13Bomb
    g. Appearance Attire Equipment
    h. Detention Security
    i. SWAT Operations Philosophy
    j. Emergency Operations Philosophy
    k. Emergency Operations Incident Cmd
    l. Traffic Management Enforcement Pursuit
    m. Police Crisis Intervention Services – Canine
    n. Canine
    o. Detention Use of Force
    p. Mentally Ill Training Standard
    q. Use of Force Review Board
    r. General Sworn and Civilian Personnel Training
    s. Canine Training
23. Prior Officer Involved Shooting Reports



COS-PROST-012731

24. Prostrollo Employment, Medical, School Records
25. Prostrollo prior DRs
26. Prostrollo USMC and VA records
27. Taser ReCertifications
28. Training
    a. Contact-Crisis Outline
    b. Contact-Crisis PP
    c. Crisis Intervention PP Modular III
    d. Mentally Ill Briefing Lesson Plan
29. Use of Force Review Board Reports: Taser, Canine and Shootings 2005-2009
30. Taser Summaries 2009-2010
31. Combined Taser Use of Force Reports
32. News Recording
33. Mento Article 01/27/2013
34. Article-Pool Cue Shooting
35. Richardson Article re PIOs
36. Notice of Claim
37. Complaint
38. Answer to Complaint
39. COS Notice of Non-Parties at Fault
40. COS First Supplemental Disclosure Statement
41. Plaintiffs' First Supplemental Disclosure Statement
42. Scheduling Order
43. Order Extending Discovery Deadlines
44. Autopsy Photographs
45. SPD Scene Photographs
46. SPD Firearm Photographs
47. SPD Officers Involved Photographs
48. SPD Bayne/Scene Photographs
49. SPD Site/Lighting Photographs
50. SPD Dog Clinic Photographs
51. SPD Taxi Cab/Driver Photographs
52. Photographs & Lab Report re: pool cue
53. Recorded Interviews:
    a. Bayne
    b. Daniel Hall
    c. Fernandez
    d. Goodson Interview and Walkthrough
    e. Moore Interview 1 & 2 and Walkthrough
    f. Angel
    g. Rachel Rogers 1 & 2
    h. Reynolds Walkthrough
    i. Sanborn Interview and Walkthrough
    j. Warren and Bryan Prostrollo



COS-PROST-012732

        k. Carlisle
        l. Taxi Driver Kheen Interview 1 & 2

54. IA Interviews and Transcripts
        a. Bayne
        b. Cabrera
        c. Coffee
        d. Goodson
        e. Moore
        f. Reynolds
        g. Sanborn

55. Deposition - Bayne, Ronald 04.24.13
56. Deposition – Beattie, Sarah 06.18.13
57. Deposition – Caldwell, Daniel 06.18.13
58. Deposition - Fernandez, Adam 05.17.13
59. Deposition - Goodson, Thomas 04.23.13
60. Deposition - Lockerby, Hugh 04.15.13
61. Deposition – Moore, Kenneth 04.22.13
62. Deposition – Prostrollo, Warren 06.21.13
63. Deposition - Sanborn, Anthony 04.24.13
64. Deposition Demonstration Recordings
65. Burwell Report
66. Cacciatore Report
67. Clark Report
68. LoVecchio Report
69. Stephen Clark Report
70. Wobrock Report
71. Autopsy Report and Photographs
72. Scottsdale Fire Department Patient Care Report
73. Scottsdale Fire Department EMS Form
74. NMS Labs Prostrollo Toxicology Report



COS-PROST-012733



07693PH_0001



07693PH_0002

COS-PROST-012734



07693PH_0003



07693PH_0004

COS-PROST-012735



07693PH_0005



07693PH_0006

COS-PROST-012736



07693PH_0007



07693PH_0008

COS-PROST-012737



07693PH_0009



07693PH_0010

COS-PROST-012738



07693PH_0011



07693PH_0012

COS-PROST-012739



07693PH_0013



07693PH_0014

COS-PROST-012740



07693PH_0015



07693PH_0016

COS-PROST-012741



07693PH_0017



07693PH_0018

COS-PROST-012742



07693PH_0019



07693PH_0020

COS-PROST-012743



07693PH_0021



07693PH_0022

COS-PROST-012744



07693PH_0023



07693PH_0024

COS-PROST-012745



Exponent
23433 N. 19th Avenue
Phoenix, AZ 85027

telephone 623-582-6949
facsimile 623-581-8814
www.exponent.com

## Michael J. Kuzel, P.E., CHFP
**Principal Engineer**

### Professional Profile

Mr. Michael J. Kuzel is a Principal Engineer at Exponent's Test and Engineering Center in Phoenix, Arizona. Mr. Kuzel's unique skill-set includes biomechanics, industrial and mechanical engineering, and applied psychology. During his professional career, his work experience has included biomechanical analysis of injury mechanisms, investigation and reconstruction of accidents, medical device research, product and process evaluations, and transportation safety analyses. He has experience designing experiments and performing statistical analyses, conducting task analyses, using physical testing and simulation models to conduct evaluations, using questionnaires and surveys, participating in team-based safety analyses, and involving human participants in research protocols. Mr. Kuzel is both a Certified Human Factors Professional and a registered Professional Engineer. His combination of engineering and scientific disciplines allows him to offer integrated consulting services that addresses aspects of human factors, accident investigations and analyses, and safety.

Mr. Kuzel has applied the principles of human factors and engineering toward the analysis of events occurring in a wide variety of transportation modes (including pedestrians, bicycles, passenger vehicles, heavy trucks, mass transit, and motorcycles), in industrial and construction environments (including airports, warehouse facilities, and active roadway and commercial work sites), and in public environments (including hotels, malls, parks, sidewalks, stadiums and theaters). Within these environments and scenarios, he has addressed issues related to human physical performance and behavior, attention and information processing, perception-reaction time, interaction of the environment/product/task, visibility and lighting, audible and visual warnings, witness memory, and distractions.

Mr. Kuzel has developed a particular expertise in evaluating slip/trip-fall events during over-ground walking, on stairs and vehicle ingress/egress. He has evaluated the various aspects of the human-environment-task interaction that are typically associated with these events and the application of relevant codes, standards and recommended practices.

### Academic Credentials and Professional Honors

M.S., Applied Psychology, Arizona State University, 2012
M.S.E., Industrial Engineering, Arizona State University, 2000
B.S.E., Bioengineering, Arizona State University, 1993

### Academic Appointments

Faculty Associate, College of Technology and Innovation, Arizona State University, 2012–2013

12/12

COS-PROST-012746

**Licenses and Certifications**

Registered Professional Engineer, Arizona, #45695
Certificant, Board of Certification in Professional Ergonomics, CHFP #1136
English XL Variable Incidence Tribometer, CXLT (pedestrian surface friction measurement)

**Specialized Training**

*Senior Living Facilities*, Arizona Building Code Officials, 2012 Fall Institute (10/12)
*The Role of Warnings and Instructions*, University of Wisconsin-Madison, Department of
     Engineering Professional Development (11/08)
*Trainer Course in Occupational Safety & Health Standards for Construction Industry*, OSHA
     Training Institute, Rocky Mountain Education Center, Lakewood, CO (03/08)
*Crash Data Retrieval Specialist Certification Course*, Collision Safety Institute, Inc. (07/04)
*Accident and Incident Investigation*, OSHA Training Institute, University of California, San
     Diego, (05/04)
*Trainer Course in Occupational Safety & Health Standards for General Industry*, OSHA
     Training Institute, University of California, San Diego, (02/02)
*Basics of Outdoor Lighting*, Illumination Engineering Society of North America, (09/02)
*Accident Reconstruction I*, Institute of Police & Technology Management, (06/99)

**Publications**

Kwasniak A, Kuzel M. French lessons: A review of an effective road safety program. ITE
Journal, August 2009.

Heller M, Kuzel M, Kwasniak A, Cuadrado J. Individuals' abilities and behaviors and current
technologies in intersection crosswalks. ITE Journal, December 2008.

Larson R, Fowler GF, Kuzel M, Stubbs A, Brown J, Donelson AC. Single-vehicle rollovers
involving an initial off-roadway excursion followed by a return to roadway: A NASS study and
Vehicle Response Measurement. SAE 2008-01-0159, SAE 2008 World Congress, Society of
Automotive Engineers, Warrendale, PA, April 2008.

Krauss D, Kuzel M, Arndt S, Delahunt P. Validation of digital image representations of low-
illumination scenes. SAE 2006-01-1288, SAE 2006 World Congress, Society of Automotive
Engineers, Warrendale, PA, April 2006.

Kuzel M, Richard D, Werner S. The effect of stiffness coefficients on output variables in
EDSMAC4 Simulations. SAE 2006-01-1396, SAE 2006 World Congress, Society of
Automotive Engineers, Warrendale, PA, April 2006.

COS-PROST-012747

**Conference Proceedings and Published Abstracts**

Kwasniak A, Cuadrado J, Kuzel M, Sinocruz J. Evaluating public awareness of trip hazards on outdoor walkways. Proceedings, 56th Annual Meeting of the Human Factors and Ergonomics Society, Boston, MA, Session ED1, October 2012.

Kuzel M. Motorists overtaking bicyclists: Analysis of driver behavior in a simulated driving environment. Oral presentation, 1st International Conference on Human Factors Aspects of Transportation, as part of the 4th International Applied Human Factors and Ergonomics Conference, San Francisco, CA, Session 53, July, 2012

George J, Heller M, Kuzel M. Effect of shoe type on descending a curb. Proceedings, 18th World Conference on Ergonomics, International Ergonomics Association, Recife, Brazil, Session S-STF 01, February 2012.

Heller MF, Kuzel MJ. Footwear characteristics and potential implications on worker safety. Proceedings, American Society of Safety Engineers 2011 Safety Conference, Chicago, IL, Session 636, 2011.

Kuzel M. Motorist impact on bicycles and pedestrians. Oral presentation, ITE/IMSA Spring Conference, Phoenix, AZ, Session 3C, March 2011.

Heller MF, George J, Kuzel MJ, Kwasniak AM. Effect of ascending and descending a curb on normal gait: A review of the literature. Proceedings, International Conference on Slips, Trips, and Falls 2011, Buxton, United Kingdom, 2011.

George J, Heller MF, Fritton KE, Kuzel MJ. Effect of shoe type on level-ground walking in women. Proceedings, International Conference on Slips, Trips, and Falls 2011, Buxton, United Kingdom, 2011.

Kuzel M. Analysis of bicycle overtaking accidents. Oral presentation, 36th International Forum on Traffic Records & Highway Safety Information Systems, Association of Transportation Safety Information Professionals, New Orleans, LA, July 2010.

Cuadrado J, Kuzel M, Crosby C, Ward N. A survey of driver side view mirror blindzone settings. Oral presentation, XXIIIrd Annual International Occupational Ergonomics and Safety Conference, Tempe, AZ, 2010.

Heller M, Kuzel M. Fashion footwear and the risk of falling in young women. Proceedings, 2010 International Conference on Fall Prevention and Protection, Morgantown, WV, 2010.

Kuzel M. Cell Phone Use - Distraction When Driving. Oral presentation, ITE/IMSA Spring Conference, Phoenix, AZ, Session 2B, March 2010.

COS-PROST-012748

Kuzel MJ, Heller MF, Sala JB, Ciccarelli L, Gray R. An analysis of real-world accidents involving distracted pedestrians. Proceedings, XXth Annual International Occupational Ergonomics and Safety Conference, Chicago, IL, 2008.

Kuzel M, Heller M, Gray R, DiJorio S, Straughn S. Perception and cognition during walking while concurrently using a cellular phone. Proceedings, International Conference on Contemporary Ergonomics, Nottingham, UK, April 1–3, 2008.

Heller M, DiJorio S, Kuzel M, Carhart M, Ciccarelli L. Effect of shoe type on kinematics of stair negotiation in women. Proceedings, International Conference on Contemporary Ergonomics, Nottingham, UK, April 1–3, 2008.

Kuzel M, Krauss D, Moralde M, Kubose T. Comparison of subjective ratings of slipperiness to the measured slip resistance of real-world walking surfaces. Proceedings, International Conference on Slips, Trips and Falls 2007—From Research to Practice, Hopkinton, MA, IEA Press, August 23–24, 2007.

Krauss D, Kuzel M, Cassidy P, Goodman J. A review of technologies for studying visual perception under low-illumination conditions. Proceedings, 50th Annual Meeting of the Human Factors and Ergonomics Society, Santa Monica, CA, 2006.

Cargill R, Scher I, Vijayakumar V, Richards D, Kuzel M. Examining bumper cars as a surrogate for low-speed rear-end and frontal collisions. Oral presentation, Occupational and Impact Injury Biomechanics, 5th World Congress of Biomechanics, Munich, Germany, July 2006.

Kuzel M. Office lighting and worker productivity: An interrupted time series quasi-experiment. Thesis submitted in completion of Master's Degree in Industrial Engineering, Arizona State University, Tempe, Arizona, August 2000.

**Professional Affiliations**

- Human Factors and Ergonomics Society (member, peer reviewer)
- Institute of Ergonomics and Human Factors (associate member)
- International Society of Occupational Ergonomics and Safety (member)
- Society of Automotive Engineers (member; peer reviewer)
- American Society of Safety Engineers (member)
- ASTM International Pedestrian/Walkway Safety and Footwear Committee (member)

**Patents**

Patent D361,110: Golf Club Grip: August 8, 1995.

COS-PROST-012749

# Michael J. Kuzel, P.E. Testimony List

| Date Given | Case Name | Court Case Number (if known) | Case Type |
|---|---|---|---|
| | | **TRIALS** | |
| 17-Nov-09 | Clark v. Hipsher | Arizona Superior Court, Maricopa No. CV2004-093381 | Plaintiff |
| 14-Jan-10 | Mermet v. Westin La Paloma | Arizona Superior Court, Pima No. CV2007-5508 | Defense |
| 16-Mar-10 | Cameron v. VW | Wisconsin Circuit Court, Milwaukee County No. 08 CV 005649 | Defense |
| 19-May-10 | Vasquez-Sonarres v. CORE Construction | Arizona Superior Court, Maricopa No. CV2008-090796 | Defense |
| 26-May-10 | Lane v. Tuscon Boulder, Inc. | Arizona Superior Court, Pima No. CV2009-3389 | Defense |
| 27-May-10 | Larson v. City of Mesa | Arizona Superior Court, Maricopa No. CV2008-001010 | |
| 11-Jun-10 | Jepsen v. Blockbuster, Inc. | Oregon Circuit Court, Multnomah County No. 0508-08825 | Defense |
| 28-Jun-10 | Contreras v. Southwest Hazard Control, Inc. | Arizona Superior Court, Pima No. C20091641 | Defense |
| 22-Nov-10 | Larson v. City of Mesa | Arizona Superior Court, Maricopa No. CV2008-001010 | |
| 19-May-11 | Warbington v. City of Mesa | Arizona Superior Court, Maricopa No. CV2009-003835 | |
| 28-Nov-11 | Gomez v. City of Anaheim | California Superior Court, County of Orange No. 30-2009-00321431 | |
| 14-Feb-12 | Buhl v. United States Postal Service | United States District Court, District of Arizona No. CIV-09-02358-PHX-ROS | |
| 23-Mar-12 | Williams v. American Multi-Cinema, Inc. | Arizona Superior Court, Maricopa No. CV2009-052760 | |
| 18-Jun-12 | McReynolds v. Maricopa County | Arizona Superior Court, Maricopa No. CV2009-021697 | |
| 12-Sep-12 | Martin v. Berty | Arizona Superior Court, Maricopa No. CV2009-036697 | |
| 23-Jan-13 | Felipe v Theme Tech | Arizona Superior Court, Maricopa No. CV2009-014028 | Defense |
| 05-Mar-13 | Slavin v Town of Gilbert | Arizona Superior Court, Maricopa No. CV2010-000719 | |
| | | **DEPOSITIONS** | |
| 23-Feb-09 | Loya v City of Tempe | Arizona Superior Court, Maricopa No. CV2007-010922 | Defense |
| 05-Mar-09 | De La Torre et al. v. Dougherty and Tri Cal Distributing | California Superior Court, County of Sonoma No. 341092 | Defense |
| 13-Apr-09 | Wallace v. Crane Tec | California Superior Court, County of Fresno No. 06 CECG 03686MBS | |
| 04-May-09 | Hohman and McGuffy Guy v Anderson Co. TN | Anderson County Circuit Court, TN No. A6LA0588 | Defense |
| 07-May-09 | Cavan v Pencor | California Superior Court, County of San Francisco No. CGC-38-47377 | Defense |
| 20-May-09 | Clark v. Hipsher | Arizona Superior Court, Maricopa No. CV2004-093381 | Defense |
| 13-Aug-09 | Payton v. Hendrickson Trucking | Arizona Superior Court, Pinal No. CV2008-01297 | Defense |
| 14-Sep-09 | Mermet v. Westin La Paloma | Arizona Superior Court, Pima No. CV2007-5508 | Defense |
| 16-Sep-09 | Klawson v. Camel Motors | Arizona Superior Court, Pima No. CV2008-4199 | Defense |
| 29-Sep-09 | McColley v. Courtney | Arizona Superior Court, Maricopa No. CV2007-022922 | Defense |
| 02-Oct-09 | Rubenstein v. Sedona Arts Center | Arizona Superior Court, Yavapai No. CV2007-0089 | Defense |
| 13-Nov-09 | Leone v. Maricopa County | Arizona Superior Court, Maricopa No. CV2006-011308 | Defense |
| 04-Dec-09 | Ferguson v. Southwest Ambulance and Rural Metro | Arizona Superior Court, Maricopa No. CV2008-028528 | Defense |
| 11-Dec-09 | Hawkins v. Scientific Explorer | United States District Court, District of Missouri No. 09-00050-CV-W-FJG | |
| 21-Jan-10 | Levis v. Heckman | Arizona Superior Court, Maricopa No. CV2008-027577 | |
| 28-Jan-10 | Zander v. Bachman | California Superior Court, County of Santa Clara No. 108 CV 128884 | |
| 23-Feb-10 | Marshall v. MassPort | Massachusetts Superior Court, Suffolk No. 2005-4704A | |
| 02-Mar-10 | Cameron v. VW | Wisconsin Circuit Court, Milwaukee County No. 08 CV 005649 | |
| 20-Apr-10 | Lindsey v. Patel et al | United States District Court, District of Arizona No. CV-09-00-PHX-FJM | |
| 29-Apr-10 | Hunter v. SJ Louis Construction | Arizona Superior Court, Maricopa No. CV2009-004518 | |

COS-PROST-012750

# Michael J. Kuzel, P.E. Testimony List

| Date Given | Case Name | Court Case Number (If known) | Case Type |
|---|---|---|---|
| 05-May-10 | Hills v. Masalski et al | Arkansas Circuit Court, Benton No. CV-2008-1598-2 | Defense |
| 03-Jun-10 | Martinez v. Otto Trucking | Arizona Superior Court, Mohave No. CV2009-00463 | Plaintiff |
| 27-Aug-10 | Wenzel v. Thomas and King, Inc. | United States District Court, District of Arizona No. CV-09-1979-PHX-DGC | |
| 27-Sep-10 | Hammer v. SunState Equipment Company | Arizona Superior Court, Maricopa No. CV2009-031463 | |
| 25-Oct-10 | Rodriguez v. Safeway Inc | California Superior Court, County of Alameda. No. HG08428327 | |
| 24-Nov-10 | Buhl v. United States Postal Service | United States District Court, District of Arizona. No. CIV-09-00358-PHX-ROS | |
| 17-Jan-11 | Schulte v. Fastenal Company | Wisconsin Circuit Court, Barron County No. 06-CV-546 | |
| 25-Mar-11 | Cortez v. United Rentals Highway Technology | Nevada District Court, Clark County No. A538147 | |
| 11-Apr-11 | Adesso v. Mad Dog Express | California Superior Court, County of Alameda No. RG06250265 | |
| 16-May-11 | Waite v. The Wright House | Arizona Superior Court, Maricopa No. CV2010-016780 | |
| 18-May-11 | Legan v. Veolia Transportation | Arizona Superior Court, Maricopa No. CV2009-005504 | |
| 23-May-11 | Felipe v. Theme Tech Corporation | Arizona Superior Court, Maricopa No. CV2009-014028 | |
| 25-Jun-11 | Lori v. City of Chandler | Arizona Superior Court, Maricopa No. CV2009-006612 | |
| 09-Aug-11 | Borden v. CB Richard Ellis, Inc. | Arizona Superior Court, Maricopa No. CV2010-002350 | |
| 19-Aug-11 | Randall v. Jumping Party Mesa | Arizona Superior Court, Maricopa No. CV2009-093958 | |
| 12-Sep-11 | Kerrigan v. Town of Gilbert | Arizona Superior Court, Maricopa No. CV2010-000265 | |
| 29-Sep-11 | Olas v. Bed Bath & Beyond | Arizona Superior Court, Maricopa No. CV2010-014578 | |
| 19-Oct-11 | Skoglund v. Neste Development | Arizona Superior Court, Maricopa No. CV2009-009049 | |
| 26-Oct-11 | Gomez v. City of Anaheim | California Superior Court, County of Orange. No. 30-2009-00321431 | |
| 04-Nov-11 | Buchholdt v. City of Chandler | Arizona Superior Court, Maricopa No. CV2010-095012 | |
| 06-Dec-11 | McReynolds v. Maricopa County | Arizona Superior Court, Maricopa No. CV2009-021697 | |
| 12-Dec-11 | Lenssen v. City of Seattle | Washington Superior Court, County of King No. 10-2-18980-7SEA | |
| 16-Dec-11 | Lopez v. Operadora De Transporte | United States District Court, Division of Texas EP-11-CV-102-DB | |
| 19-Dec-11 | Gilman v. Scottsdale Unified School District | Arizona Superior Court, Maricopa No. CV2010-055237 | |
| 18-Jan-12 | Summers v. Summers, et al | Arizona Superior Court, Maricopa No. CV2009-090580 | |
| 26-Mar-12 | Young v. Community Garden Apartments | Nevada District Court, Washoe County No. CV11-03081 | |
| 16-Apr-12 | Schulz v. City of Mesa | Arizona Superior Court, Maricopa No. CV2011-033593 | |
| 14-May-12 | Ramirez, et al. v. Eaton, et al. | California Superior Court, County of Los Angeles No. BC428328 | |
| 11-Jul-12 | Holmes v. Alliance Healthcare, et al. | California Superior Court, County of Los Angeles No. KC061304 | |
| 17-Sep-12 | Glucksman v. Gainey Hotels, et al. | Arizona Superior Court, County of Maricopa No. CV2011-070185 | |
| 01-Feb-13 | Neer v. City of Tucson | Arizona Superior Court, County of Pima No. CV2011-7864 | |
| 17-May-13 | Whiting v Hogan | United States District Court, Division of Arizona 3:12-CV-8039-PCT-GMS | |
| 24-May-13 | Krekoukias v MGM Grand Resorts | Nevada District Court, Clark County A-11-640376-C | |

COS-PROST-012751

# Michael J. Kuzel, P.E. Testimony List

| Date Given | Case Name | Court Case Number  (if known) | Case Type |
|---|---|---|---|

## ARBITRATIONS/HEARINGS

| Date Given | Case Name | Court Case Number |
|---|---|---|
| 29-Mar-10 | Aira v. Cochise County | Arizona Superior Court, Pima No. C2007-5692 |
| 03-Aug-11 | Kleinfeld v. City of Chandler | Arizona Superior Court, Maricopa Co  CV2010-029242 |
| 20-Aug-12 | Young v. Community Garden Apartments | Nevada Distric Court, Washoe County, No. CV11-00681 |
| 24-Sep-12 | Rios v. Quechan Paradise Casino | Arizona Superior Court, Maricopa Co. 2009094766 |

Current Testimony List
(2009 - Present)

M. Kuzel

6/4/2013

COS-PROST-012752

**EXHIBIT 25**

**SCOTTSDALE CITY ATTORNEY'S OFFICE**
3939 North Drinkwater Boulevard
Scottsdale, Arizona 85251
(480) 312-2405 (T)
(480) 312-2548 (F)
Lori S. Davis (SBN: 027875)
legal@scottsdaleaz.gov
**Attorneys for City Defendants**

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| Warren Prostrollo, an individual, on behalf of himself and the statutory beneficiaries of Jason Prostrollo and as the personal representative of the Estate of Jason Prostrollo, | Case No.: CV 12-01815-PHX-SRB |
| Plaintiff, | **DECLARATION OF K. C. MOORE, JR.** |
| vs. | |
| City of Scottsdale, a municipality organized under the laws of the State of Arizona; Ronald Bayne, in his individual and official capacities as a lieutenant with the City of Scottsdale Police Department; JOHN DOES I-X; and BLACK ENTITIES I-V, | |
| Defendants. | |

K. C. Moore, Jr., being under penalty of perjury, does hereby certify and state as follows:

1.     I am a Sergeant with the City of Scottsdale Police Department (SPD), and have been so employed for  2.5  years. I have been employed by the SPD for a total of   14   years.

2.    I gave the following statements regarding the incident which is the subject of this lawsuit:

a.    First Interview at Bates numbers COS-PROST-001286-001293;

b.    Second Interview at Bates numbers COS-PROST-001294-001303;

c.    Walk thru Interview at Bates numbers COS-PROST-001304-001313; and,

d.    IA Interview on March 22, 2012, Bates numbers COS-PROST-011150-011186.

3.    The statements given were true and accurate to the best of my knowledge at the time they were given.

4.    I hereby incorporate by reference all aforementioned statements as if they were given under oath.

I certify, under penalty of perjury, that the foregoing statements are true and correct to the best of my knowledge.

_____
K. C. Moore, Jr.

**EXHIBIT 26**

| Agency: SPD | **Case Summary Report** | Case Number: 12-02226 |
|---|---|---|
| | **AGG ASSAULT-OFFICER -- WEAPON OR SERIOUS INJURY** | |

| Reported 01/28/2012 04:19 | Found 01/28/2012 04:19 | Occurred 01/28/2012 04:19 |
|---|---|---|
| Location 12074 N 135th Pl, Scottsdale, AZ | | Original Officer (707) LOCKERBY, H |

| **Supplement Information** | Supplement Page: 1 |
|---|---|
| Date Added: 02/02/2012 17:59:24 | Added By: (844) HEINZELMAN, J |

## Supplement Notes

FIRST INTERVIEW WITH SGT. KC MOORE
Q=Det. Heinzelman
A=Sgt. KC Moore

Q:All right. KC, we're gonna, uh, we're start your interview. What, uh, and I got your badge number 720?

A:Correct.

Q:Okay. And here's what - I think here's what's probably easiest thing to do is just to start off - what time did you start work last night?

A:Uh, shift started at 8:30.

Q:Okay. And you're, uh, your patrol capacity is...

A:I'm a supervisor for district three. I'm the district three, relief one squad, uh, supervisor.

Q:Okay, okay. So your shift is - you start at 8:30 and you work then 'til when?

A:6:30 in the morning.

Q:Schedule is until 6:30? Okay.

A:At least on Thursday, and Friday and Saturday.

Q:Right. Okay. Um, walk me through the day. Just - you said - we talked earlier. You said you - kind of a slow day?

A:I - there was - there wasn't much going on. I'd done a couple, uh, responded back to a couple officers on traffic stops, um, but nothing significant. The night pretty much was a pretty quiet, slow night. Uh, there was a couple intoxicated people that we contacted on the side of the road, but that was about it.

Q:Okay. And then at, um, like, at about 4 o'clock what's your - what is your staffing now? D squad had gone home already?

A:D squad goes home at 2:30.

Q:Okay.

A:Um, I believe there was one D squad officer on still, finish up with a DUI. Um, I had five last night, plus a - a trainee with one - with, uh, Officer (Semora).

---

COS-PROST-001286

**Agency: SPD**

# Case Summary Report

**Case Number: 12-02226**

## AGG ASSAULT-OFFICER -- WEAPON OR SERIOUS INJURY

**Reported** 01/28/2012 04:19          **Found** 01/28/2012 04:19          **Occurred** 01/28/2012 04:19

**Location** 12074 N 135th Pl, Scottsdale, AZ          **Original Officer** (707) LOCKERBY, H

---

## Supplement Information

**Supplement Page:** 2

**Date Added:** 02/02/2012 17:59:24          **Added By:** (844) HEINZELMAN, J

---

Q:Okay.

A:And then a rider with, uh, Officer (Adams) - or (Adam) - (Adam), uh, (Fernandez).

Q:Okay. And, um, kinda start off with what was the - what was the first thing that kicked out? Was it a - was it a hot tone to - to this address or what happened?

A:It was interesting. Myself and Officer (Carlisle) - (Cody Carlisle) had stopped Whataburger to get some food about 4:00, 4:15 in the morning and just ordered. And, uh, the hot tone came out of, uh, with a - a female saying that she was barricaded in - well, hiding in the bedroom. Believe it was the bedroom or bathroom. Not sure which one it was. Uh, that her boyfriend and a - another male subject -- was kinda convoluted what was coming out -- had gotten into it and there was a knife involved.

Q:Okay.

A:So we - again, that was hot traffic, it was, uh, emergency traffic. And myself and Officer (Carlisle) was the first in that direction. We were - we were the closest. I was following him, uh, westbound - or eastbound on Shea. Um, initial address they gave us was in Desert Mountain area, 136th Street. That was an incorrect address given by the female, uh, RP.

Q:Okay.

A:And we arrived on - in that area where we thought the how was going to be based on both what the computer said and the address that we were given. And then right after we got there, Officer, uh, (Reynolds) arrived as well.

Q:Okay.

A:We determined that that was not a good location, asked for confirmation on it, at which time the female updated the location to the, uh, one that was on 135th.

Q:Okay. How far away were you then when you first got sent? Like, where did you get sent? You got sent to...

A:We were sent from - from the Whataburger on 90th Street and, uh, Shea, and just actually Mountain View. And then we were going to 136th Street, just north of Via Linda. So a good - a good distance. It took us a while to get there.

Q:Right. But then from there you said, okay, we're here. And then - and then the caller updated the address?

A:It, uh, from 136th to 135th. Essentially the same, uh, 100 block north, but essentially a street over.

Q:Okay.

A:Different gated community.

Q:Okay.

---

COS-PROST-001287

| Agency: SPD | Case Summary Report | Case Number: 12-02226 |
|---|---|---|

### AGG ASSAULT-OFFICER -- WEAPON OR SERIOUS INJURY

| Reported 01/28/2012 04:19 | Found 01/28/2012 04:19 | Occurred 01/28/2012 04:19 |
|---|---|---|
| Location 12074 N 135th Pl, Scottsdale, AZ | | Original Officer (707) LOCKERBY, H |

| | Supplement Information | Supplement Page: 3 |
|---|---|---|
| Date Added: 02/02/2012 17:59:24 | | Added By: (844) HEINZELMAN, J |

A:So...

Q:Um, so you got there. Who - was there anybody else on scene or you said - were you guys the first?

A:Uh, initially on scene were - were myself and Officer (Carlisle).

Q:Okay.

A:Um, and then, uh, officer, uh, can`t think right now. Officer (Reynolds) showed up after that and then followed us over to the new location. Uh, a number of officers showed up, as well as Officer (Fernandez) and Officer (Goodson). And then, uh, Lieutenant Bayne showed up at some point. Actually I`m not sure when he showed up `cause we were already, at that point, looking at the house and determine which house it was.

Q:Okay. Um, was anything going on outside? Any neighbors out? Any...

A:At that time they were no neighbors out, but while we were en route, uh, I was able to determine - and I asked if the female who was barricaded or hiding in one of the rooms - if she could extricate herself from the house to kinda reduce the amount of possible victims that be involved.

Q:Sure.

A:Um, she stated that she was coming out of the house and she was gonna stand - stand in the, uh, driveway and wave us down when we got there. She was outside when we showed up. We did find her. We contacted her, pulled her aside. Officer (Carlisle) - (Carlisle) started talking to her, uh, asked her if she had a cell phone. She said she did have a cell phone and that - that, uh, I believe that the boyfriend - her boyfriend and the suspect were arguing inside at that point. They knew him from meeting him at Ernie`s at some time at the future or the past. Seem - I don`t know when they initially met and had all come back there to play pool.

Q:Okay.

A:Um, while this was also going on, Lieutenant Bayne was trying to get a hold of me. I later found out it was because of another incident that was involving the suspect and a cab driver. I didn`t really have much information until after the fact about what occurred, uh, after the fact. But until I talked to Lieutenant Bayne about what happened about the - the knife and the knife being put to the cab driver`s throat...

Q:Okay.

A:...that kinda caused the situation to be a little more, uh, pressing because I was concerned that this guy was gonna go stab the - the boyfriend that was in the house, uh, at that time. Uh, I asked the female if, uh, the RP if she had their - her cell phone - if she`d call her boyfriend, get him to come out. She stated she could. And we set up kind of a pseudo contact - contact team at that time, had Officer (Fernandez) go to the back of the house. He wasn`t able to actually be on the backside of the house because there`s a wash area there that you couldn`t really get into. But he was able to go to a side yard and have a kinda - a view of the back of the - of the residence.

COS-PROST-001288

| Agency: SPD | **Case Summary Report** | Case Number: 12-02226 |
|---|---|---|

**AGG ASSAULT-OFFICER -- WEAPON OR SERIOUS INJURY**

| Reported  01/28/2012 04:19 | Found  01/28/2012 04:19 | Occurred  01/28/2012 04:19 |
|---|---|---|
| Location   12074 N 135th Pl, Scottsdale, AZ | | Original Officer  (707) LOCKERBY, H |

| **Supplement Information** | Supplement Page:   4 |
|---|---|
| Date Added: 02/02/2012 17:59:24 | Added By: (844) HEINZELMAN, J |

Q:Okay

A:Uh, myself, Officer (Goodson), uh, Officer (Sanborn) showed up as a canine officer with his dog. Uh, and, uh, Lieutenant Bayne began to move up towards the house. I had a rifle, uh, Officer (Goodson) had his rifle, Lieutenant Bayne has, uh, his, uh, issued sidearm and then, uh, Officer (Sanborn) had his dog with him. And Officer (Reynolds) was actually initially speaking and helping assist with, uh, when we got the husband to come - not the husbandthe boyfriend to come out, got him aside, got some information from him. He was saying there was no knife. Said the guy was being very animated and outta control inside the house. Uh, within - I took a position on the west side or east side of where the, uh - uh, mailbox was as cover.

Q:Okay.

A:Uh, the block mailbox and had a position on the, um, the front door of the residence, which was open at that time, after the boyfriend came out.

Q:Okay.

A:And then, uh, I`m not sure which side, um, Lieutenant Bayne was on, but Officer (Goodson) moved up and said, hey, I`ll take your position on the mailbox so I could - so I could move to another position of cover, get - started giving - not commands, but taking control of the situation as a supervisor. Um, while that was occurring, uh, the - the suspect started enter - exiting from the door of the residence and both of his hands - he had - looked like a pool cue - actually, the one in his - in one of his hand actually looked like an, uh, I dunno if you`ve ever seen a blank in a rifle.

Q:Mm-hm.

A:It looked like a silver blank in a rifle and it end up being the back end of the pool cue. So it`s a pretty good size around. He`s got it in both of his hands and he just starts walking towards us. Officer (Sanborn) was kneeling next to the north side of the, uh, the mailbox and was giving commands to the guy to tell him to stop, to stop. Um, the guy wasn`t listening to him. He had a very piercing stare. Almost like - I don`t know if I wanna call a death stare, but he wasn`t paying attention to what we were saying. He wasn`t, uh, wasn`t like he was coherently figuring what - what we wanted him to do.

Q:Mm-hm.

A:So he kept walking toward us. Uh, at some point during those commands, uh, Officer (Sanborn) started to send his dog, at which time I also heard the two loud pops, which I later determined was, uh, sergeant Lieutenant Bayne fire his sidearm.

Q:Okay.

A:Uh, when he struck - I initially didn`t even see any - any wound to the - the suspect. When he fell, uh, initially, a little later when I saw the red from the blood on his chest and he hit the ground, uh, we proceeded to set up another contact team as Lieutenant Bayne and, uh, I believe it was Officer (Carlisle) stayed with the suspect. Uh, before that, um, officer - who was it? Um, Officer (Reynolds) went up and handcuffed the suspect into the front.

COS-PROST-001289

| Agency: SPD | **Case Summary Report** | Case Number: 12-02226 |
|---|---|---|

**AGG ASSAULT-OFFICER -- WEAPON OR SERIOUS INJURY**

| Reported 01/28/2012 04:19 | Found 01/28/2012 04:19 | Occurred 01/28/2012 04:19 |
|---|---|---|
| Location 12074 N 135th Pl, Scottsdale, AZ | | Original Officer (707) LOCKERBY, H |

**Supplement Information**    Supplement Page: 5

Date Added: 02/02/2012 17:59:24    Added By: (844) HEINZELMAN, J

Q:Okay.

A:He was - the suspect wasn`t moving. Uh, initially he kinda went up and kinda flinched and hit the ground. Um, myself, Officer (Goodson) and Officer (Reynolds) didn`t - completed a - a search of the residence, made sure there was nobody else inside.

Q:Okay.

A:And did the backyard as well. Did a secondary just to make sure there was nobody else and then moved back out. And then I contacted Lieutenant Bayne and talked to him about what had happened and see if he was all right and - and got him moved aside. So...

Q:Okay. Um, and we`ll go back and forth a little bit just to - just to clarify just, uh, a couple of things here. So when you got to the scene then, did you, um, you`re acting as supervisor pretty much at this...

A:I was.

Q:...at this particular, um, hot tone?

A:I was.

Q:Um, and where were you - where did you first meet this - this female? Was it, like...

A:She was...

Q:...right in the front yard or all the way out in the street?

A:She was walking out the front of the street towards us. Um, Officer (Carlisle) contacted her, brought her back to where our vehicles were parked, um, on the south side of the street, probably - I would say 75 to 80 feet from the front - well, maybe more like 100 feet from the front door of the residence.

Q:Okay. And, um, did she leave the front door open or was that closed at the time? Or do you remember?

A:I believe it was closed. I don`t think it was open until the, uh, the boyfriend came out. That`s - I`m not - honestly I`m not sure. I wanna say it was closed though before he came out - the boyfriend came out.

Q:Okay. And - and you said (Carlisle) was the one that was interviewing her. And then was he relaying information or were you close enough where you were hearing the whole thing?

A:He was - well, I had gone back and forth a couple times. Initially I was up there and didn`t have my - my rifle. Again, when the - when it was determined this guy was, uh, at some point we were told, either by her or, um, I wanna say it was from her that this guy was - the suspect was an, uh, prior military, um, and had had some issues with being in the gulf - I don`t wanna say gulf war syndrome, but he had been in the gulf war and was having issues with that.

COS-PROST-001290

| Agency: SPD | Case Summary Report | Case Number: 12-02226 |
|---|---|---|

## AGG ASSAULT-OFFICER -- WEAPON OR SERIOUS INJURY

| Reported  01/28/2012 04:19 | Found  01/28/2012 04:19 | Occurred  01/28/2012 04:19 |
|---|---|---|
| Location  12074 N 135th Pl, Scottsdale, AZ | | Original Officer  (707) LOCKERBY, H |

| Supplement Information | Supplement Page:  6 |
|---|---|
| Date Added: 02/02/2012 17:59:24 | Added By: (844) HEINZELMAN, J |

Q:Okay.

A:Um, the way he was acting, plus the fact that he had had - possibly had a knife. At one of those points, uh, Lieutenant Bayne advised me of the - the cab driver situation, where this individual had taken a knife and actually held it to the cab driver`s throat as he drove around for a period of time. Um, so that kinda bumped up the situation and the concerns of what was going on with the, uh, the boyfriend inside the house. Had the girlfriend not be able to get a hold of him and pull him out, I would have looked at possibly doing crisis entry because of the situation and the - the information we were getting from both the lieutenant, and the cab driver and from what we heard from the girlfriend as well.

Q:Okay. So were there - so there, uh, the stuff about the cab driver - was Lieutenant Bayne on the scene at that time or...

A:He was.

Q:...was he just telling you over the radio?

A:He was at that time.

Q:Okay.

A:He tried to get me over the radio earlier, um, but there was a number of things going on at that time - trying to find locations and setting things up that I couldn`t really go back between channels and try to figure out what was going on.

Q:Sure. Okay. And - and so the - so let me see if I got this straight. The girl says, "My boyfriend`s in there with this other guy. We met him at, um, Ernie`s and we`re - we came back to shoot pool and he has - they`re arguing. He has - this guy`s got a knife." Is that - came from her or was that just the initially dispatch...

A:That was the initial that he had a knife.

Q:Right. Okay.

A:And the words got from the, uh, boyfriend, when we got him outta the residence that he didn`t have a knife.

Q:Right.

A:So, um, it kinda went back and forth. So we were actually unsure if he did or did not have a knife at that point.

Q:Okay.

A:Um, you have two people saying he did, and one person saying he didn`t.

Q:Okay. And, um, did the boyfriend make any statements once he came out about what was going on in the house?

A:We - he came out and he was moved over to the side and was speaking with - initially with Officer (Reynolds) and we didn`t - I

COS-PROST-001291

| Agency: SPD | **Case Summary Report** | Case Number: 12-02226 |
|---|---|---|
| | **AGG ASSAULT-OFFICER -- WEAPON OR SERIOUS INJURY** | |

Reported  01/28/2012 04:19                Found   01/28/2012 04:19                Occurred  01/28/2012 04:19

Location   12074 N 135th Pl, Scottsdale, AZ                Original Officer  (707) LOCKERBY, H

| **Supplement Information** | Supplement Page:  7 |
|---|---|
| Date Added: 02/02/2012 17:59:24 | Added By: (844) HEINZELMAN, J |

didn't really have any contact with him at all, so I - he didn't say anything to me.

Q: Okay.

A: Uh, I did ask a couple times what the guy's name was inside and I - I never really got a good answer from him. I don't know if he was intoxicated or what was going on. But...

Q: Okay.

A: ...I never got good information on the guy's name.

Q: Okay.

A: Other than - I asked him, is he in the military? What service was he in? He wasn't, uh, the boyfriend wasn't really understanding that 'cause I finally had to say, was he in the army, was he in the marines, was he in the navy? He said he was a marine. So...

Q: Marine? Okay. And then, um, at that point you said all of a sudden the guy's just coming out with this - with what looks like, or what had - later finds out, two halves of this pool - pool cue? Is that what...

A: Correct? He started walking outta the residence, um, directly towards us - directly, uh, eastbound. Um, there were numerous commands. We were maybe 25 feet, if that far away from him. And he starts - he continues to walk towards us. Um, Officer (Sanborn) gave him many commands telling him to stop, guy never did. He went - he said, I'm sending the dog. And then at that point that's when the shooting took place.

Q: Okay. So yeah. That's what I was gonna say. So he announces - look, I'm deploying the dog or - he said to him?

A: It was almost at the same time that he said that, that Lieutenant Bayne fired. And the guy - I would say the guy was probably within maybe 15 feet of us at that point.

Q: Okay. And, um, were you still at the mailbox - at that - that concrete post when - when this all happened?

A: I was. I was - I had moved to the north side of the con- concrete most. I was no longer directly behind it as cover, and I think Officer (Goodson) had moved up beside me.

Q: Okay.

A: And I wanna say - I'm - I'm thinking that Lieutenant Bayne was to his immediate, uh, left, uh, that position as well.

Q: Okay.

A: So if you have the, uh, mailbox here, (Goodson) - Lieutenant - or Sergeant (Goodson) right - (Goodson)'s right behind it, I'm to the right of it. And Lieutenant Bayne's to the left of it I think. I'm pretty sure.

COS-PROST-001292

**Agency: SPD**

# Case Summary Report

**Case Number: 12-02226**

## AGG ASSAULT-OFFICER -- WEAPON OR SERIOUS INJURY

Reported 01/28/2012 04:19  Found 01/28/2012 04:19  Occurred 01/28/2012 04:19

Location 12074 N 135th Pl, Scottsdale, AZ  Original Officer (707) LOCKERBY, H

### Supplement Information

Supplement Page: 8

Date Added: 02/02/2012 17:59:24  Added By: (844) HEINZELMAN, J

Q:Okay. And then where was (Sanborn) with the - with the...

A:He was actually to - he was, like, in front of me and more next to the, uh, the mailbox. So I was - to his right.

Q:Okay.

A:So it`s me, (Sanborn), (Goodson) and then Lieutenant Bayne.

Q:All right. And is that your whole team? Were there any other officers there?

A:Uh, officer - I never saw Officer (Reynolds) came up - come up to me. He did say after the fact that he was right next to me. Um, I was more focused on the suspect so I don`t know if he - where he actually was.

Q:Sure. Okay. And the two people that came outta the house - where with they at the time?

A:Uh, the girlfriend had been moved over to, uh, the other side of the - one of the patrol vehicles on, uh, 150 feet away from the front door of the house, um, on the south side of the road. And again, Officer (Reynolds) had taken the boyfriend and moved him over to, uh, the north of where the residence was, I think he was still on the sidewalk.

Q:Okay. Um, did this guy say that he`s coming outta the house?

A:He didn`t...

Q:What...

A:He didn`t say a word. He was, like, a - kind of a thousand yard stare. Um...

Q:Do we need something?

Man:Hey, how`s it going? I had a quick question.

A:You want me to come out there...

The transcription has been reviewed with the audio recording submitted and it is an accurate transcription.
Signed_____

COS-PROST-001293