**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Warren Prostrollo, on behalf of himself and the statutory beneficiaries of Jason Prostrollo and as the personal representative of Jason Prostrollo, | No. CV-12-1815-PHX-SMM |
| Plaintiff, | **MEMORANDUM OF DECISION AND ORDER** |
| vs. | |
| City of Scottsdale, et al., | |
| Defendants. | |

Pending before the Court is Defendants' motion for summary judgment on Count 2 (Qualified Immunity) of the Complaint, which is fully briefed.  (Docs. 74, 75, 87, 90, 93, 96, 101-02.)  Also pending is Defendants' motion for summary judgment on the remaining claims in the Complaint, which is also fully briefed. (Docs. 95, 103-04, 107-08.)  After reviewing and considering the briefs, the Court will grant Defendants' motion for summary judgment on qualified immunity grounds and will grant Defendants' motion for summary judgment on Plaintiff's remaining claims.

## FACTUAL BACKGROUND

Plaintiff Warren Prostrollo is the father of Jason Prostrollo ("Jason") and brings this action against Defendants (City of Scottsdale and Lieutenant Ronald Bayne ("Lt. Bayne") alleging that Lt. Bayne of the Scottsdale Police Department ("SPD") used excessive deadly force in violation of the Fourth Amendment when Jason was shot and killed on December 28, 2012.  In order to evaluate Plaintiff's allegations, at issue for the Court is the information

known to Lt. Bayne at the time that he chose to use deadly force against Jason.  Using the relevant facts cited and acknowledged by Plaintiff, the Court will first present the undisputed facts known to Lt. Bayne.  Then, using both  Plaintiff's and Defendants' statement of facts, the Court will summarize what relevant material facts are disputed, and construe those material facts in the light most favorable to the Plaintiff, unless such a construction is clearly or blatantly contradicted by the record. See Scott v. Harris, 550 U.S. 372, 380 (2007).

*Undisputed Facts*

In the early morning hours of Saturday, January 28, 2012, Lt. Bayne was SPD's watch commander, the highest ranking on-duty officer. (Doc. 88-1 at 56-57.)  Lt. Bayne was listening to  radio traffic concerning the city. (Id.)  At 4:20 a.m., a 911 operator received a call from Rachel Rogers. (Id. at 120-35.)  Rachel Rogers informed the 911 operator that she needed help because her boyfriend, Dan, was being held at knifepoint inside their home. (Id., see also id. at 169.)  She advised the dispatcher that she and her boyfriend met the houseguest, Jason, at a bar and took him home with them.  (Doc. 88-1 at 122.)  The dispatcher broadcasts and continues to broadcast the alerts received from Rogers. (Id. at 120-35.) Rogers further states that she locked herself inside a bedroom, then a bathroom, and has overheard Dan tell Jason to calm down and put the knife down; she is too afraid to open the door in order to try and help Dan.  (Id. at 57, 123.)

Lt. Bayne hears the radio traffic indicating that a houseguest is making threats with a knife. (Id.)  Lt. Bayne monitors the radio traffic, confirming that the officer assigned to supervise the incident, Sergeant ("Sgt.") K.C. Moore, was "making good decisions." (Id. at 58.)  Nonetheless, due to the nature of the incident, Lt. Bayne responded to the location. (Id.) Lt. Bayne requests confirmation that a canine unit is heading to the scene. (Id. at 59, 125.) Canine Officer Anthony Sanborn radioed that he was headed to the scene. (Id. at 125, 178-79.)

On his way to the scene,  Lt. Bayne overhears radio traffic involving a taxi cab driver reporting an armed robbery. (Id. at 58-61.)  Because he is in the vicinity, Lt. Bayne detours to the gas station to meet with the taxi driver.  (Id.)  Lt. Bayne spends several minutes

speaking with the taxi driver. (Id.) He learns that the taxi driver recently picked up a fare at 136th Street and Shea–the same general location as the houseguest incident–and that the fare, after making the cabbie drive around for approximately 10 minutes, returned to the same home from which he was picked up. (Id.)  The taxi driver tells Lt. Bayne the fare held a knife to his throat demanding money and threatened to slit his throat. (Id.)  The taxi driver later communicated the same story to SPD, that the fare held a knife to his throat, threatened to slit his throat if he didn't go wherever he wanted, made him drive around for 10-15 minutes, and tried to rob him of his money. (Doc. 75-1 at 460-62.)  Through his interview with the cab driver, Lt. Bayne understood there might be a relationship between the two incidents. (Doc. 88-1 at 59-61.) Lt. Bayne continued to the houseguest scene. (Id. at 62-64.)

Rachel Rogers came out of the house unharmed at approximately 4:30 a.m. (Id. at 126.) At 4:31 a.m., the dispatcher advises that the suspect who held a knife to the cab driver will be related to the houseguest threatening the owner of the home, Dan, with a knife. (Id. at 127.) Dispatch then communicated that Jason has a pool cue with him. (Id. at 128.) The first police officers arrive at the scene at 4:35 a.m. (Id. at 129.) Sgt. Moore is supervising the scene. (Id. at 129-30.)  Rogers is escorted away and interviewed by Officer Cody Carlisle in his police vehicle. Id.; see also Doc. 74 at 7-8.) She immediately tells Officer Carlisle that the guest inside is very intoxicated, and that he is a military veteran who is suffering from Post-Traumatic Stress Disorder ("PTSD"). (Id. at 117-18.) Carlisle radios that Jason is shorter than Dan and has the knife. (Id. at 130.) Later, Carlisle also radios that Jason is a military vet with possible issues. (Id. at 134; see also Doc. 112 at 5-6 (Lt. Bayne remembers hearing on the radio or from someone at the scene that Jason might be a marine with combat training).)

Canine Officer Sanborn radioed that he had arrived at the scene with his police dog, Raider. (Doc. 88-1 at 130, 178-79.)  Officer Sanborn recalled seeing Officers Thomas Goodson, Kevin Reynolds, Fernandez, and Carlisle at the scene when he arrived. (Id. at 178-79.)

Shortly thereafter, the male owner of the home, Daniel Hall, also exits unharmed. (Id.

at 133.) He, too, is met by officers. (Id.)  Hall confirms that only one person remains in the house, Jason. (Id.)  At this time, Officer Fernandez is covering the rear of the house. (Id. at 131-32.) Officer Carlisle stayed with the female resident Rachel. (Id. at 117-18.) Sgt. Moore, Officer Goodson, and Officer Sanborn (along with Raider) congregate behind the mailbox in front of the home.

Lt. Bayne arrives at the scene at about this time, 4:45 a.m. (Id. at 64-65.) He parks behind the other police vehicles and walks towards the staging area. (Id.) He confirms that the two civilians he sees (Rachel and Dan) are the residents of the house, and that only one individual remains inside, the suspect with the knife.  (Id. at 65.) He then meets with Sgt. Moore and confirms that Sgt. Moore has a "contact team" in place and that the exits have been contained.  (Id. at 275.) Sgt. Moore points to the other officers near the mailbox and that an officer has eyes on the backyard. (Id. at 69-70, 275.) Lt. Bayne discusses with Sgt. Moore that the crisis situation of rescuing hostages no longer exists, that it is only a barricade situation now,  protecting the public from the armed individual Jason; there was no need to rush in.  (Doc. 112 at 7.)   Lt. Bayne suggests slowing the situation down and calling out a SWAT team to secure Jason from the home.  (Doc. 88-1 at 71.)

Lt. Bayne next advises Sgt. Moore that he is sure that the armed robbery of the cab driver and Jason, the suspect with the knife, are related crimes.  (Doc. 88-1 at 70.)  To confirm, while talking with Sgt. Moore Lt. Bayne calls Sgt. Charles Cabrera, who is at the service station with the taxi cab driver. (Id. at 70-72.)  Sgt. Cabrera confirmed that the fare address on the taxi driver's computer is the same address where the officers are now located. (Id. at 72.) The crimes against the cab driver include kidnapping, armed robbery, carjacking, all serious felonies.  (Id.)  Lt. Bayne told Sgt. Cabrera to make sure that his interview with the cab driver was recorded, which he indicated was recorded.  (Id.)

While Lt. Bayne is on the telephone with Sgt. Cabrera, Lt. Bayne is not part of any discussions with the contact team regarding the tactical plan should Jason come out of the home.  (Id. at 273.) Lt. Bayne testified that he did not hear Officer Sanborn state that if Jason comes out of the house without a gun or a knife and does not comply with police orders that

- 4 -

he was going to put the dog on him.  (Id. at 274.)  While Lt. Bayne is on the telephone with

Sgt. Cabrera, Sgt. Moore announces that Jason was coming out.  (Id. at 72; 134.)  The time

is 4:49 a.m.  (Id. at 134.)  Lt. Bayne hung up his phone, and drew his sidearm.  (Id.)  He also

determined that he would be the "lethal option," although he did not communicate this to the

contact team.  (Id. at 13.)

The parties dispute how fast Jason advanced on the officers, his type of walk, and

what he was doing with the pool cues as he walked.  But, it is undisputed that Jason came out

of the house with sticks in both hands, sticks that turned out to be the two halves of a pool

cue.  It is undisputed that pool sticks can be used as a dangerous instrument or deadly

weapon.  (Doc. 75-9 at 53.)  Lt. Bayne described Jason as he emerged from the house:

> I see . . . the suspect standing in the doorway with the light . . . background
> behind him. And he has two sticks in his hands. And he is standing in a martial
> arts type position. He's got the sticks back, like, resting on his shoulders and
> the first thing I notice is he's got stare that . . . I've seen before with people
> who are on . . . under the influence of mind altering drugs . . . but it was a stare
> where he was looking right through us and . . . he had a very determined look
> on his face and, like . . . he was going to fight us.  And it was very clear in my
> mind that he had intentions of walking at us down that walkway and
> aggressing us before he even started moving

(Id. at 74-75.)  The other officers also commented on Jason's determined stare.  (Doc. 75 at

46-49.)  Officer Reynolds stated: "He was - it was one of the - the scariest, live facial

expressions I've seen since I've been on the job. . . . almost like he…had a mission, and he

didn't care what was going on."  (Doc. 75-6 at 131.)  It is further undisputed that Officer

Sanborn yelled numerous warnings to Jason to stop and drop his weapons but that Jason

continued his straight-ahead advance on the officers. It is undisputed that when Jason came

out of the front door it remained partially open, which shed some of the light from the house

on Jason as he walked down the sidewalk toward the officers.  Otherwise it is undisputed that

it was extremely dark outside, with no moonlight, no streetlights, or outside houselights

shedding light on the scene.

Officer Sanborn warned Jason that he was going to release the dog if he didn't stop

and drop his weapons.  (Id. at 55-56.)  As Jason continued his advance on the officers, Lt.

Bayne stated that he was in self defense officer mode, fearing for his life. (Id. at 79-83, ("I

felt like he was right on top of us.") Officer Sanborn further shouted, "I'm going to release the dog who will bite you" or words to that effect.  (Id., 190.)  As Jason continues his advance, all the officers, not just Officer Sanborn, are yelling at Jason to stop and drop his weapons.  (Id. at 81.)  When Jason was approximately 20 feet away from Officer Sanborn, Officer Sanborn released Raider. He also issued the "bite" command to Raider: "Fass!" (Id., 190-91.)  Raider charged at Jason, and jumped up onto Jason. He bit Jason's chest and then his arm.  (Id.)  At the same time, without knowing the K-9 had been released (there is a high level of commotion at this point due to all the officers yelling at Jason to drop his weapons), Lt. Bayne fired his weapon and killed Jason and also struck the K-9. (Id. at 83-88, ("I had no lateral vision in the darkness of the dog coming at him.") (id. at 87).)[1]

*Disputed Facts*

As stated, the parties dispute the following facts: Jason's speed and his type of walk as he advanced on the officers, and what he was doing with the pool cues as he walked. From the officers, there is variation about how fast Jason advanced on the officers. (Doc. 75 at 45-46.)  None of the officers described Jason's walk as staggering or swaying.  Officer Sanborn testified that Jason was swinging the pool cues and that he stepped into each swing of the pool cues as he was walking, very aggressive, like he was taking warm-up swings. (Doc. 75-6 at 84.) Among the officers, there is also variation about what Jason was doing with the pool cues as he walked, some describing Jason swinging the weapons martial arts style, some that he was holding the weapons over his head, and some that he held them in a striking position.  (Doc. 75 at 34.)

According to Rachel Rogers, who observed the event from Officer Carlisle's police vehicle across the street from the home where Jason exited, she had varying remarks about the speed Jason advanced on the officers and the type of walk Jason displayed.  During her initial interview with police, she stated that she did not have her glasses on and was a bit

_____

[1]A subsequent autopsy and toxicology testing performed on Jason Prostrollo revealed that he had a blood alcohol content in excess of 0.40, as well as certain amounts of cocaine and methamphetamine in his system.  (Doc. 75-1 at 307.)

1   fuzzy. (Doc. 102-2 at 20-26.) She stated that Jason was swaying when he walked, but that

2   it wasn't slow motion, rather it was a regular pace. (Id.) She estimated Jason's emergence

3   from the house until he was shot at 5-8 seconds. (Id. at 28.) In her subsequent September

4   2013 affidavit, she stated that Jason's walk "could best be described as a combination of a

5   sway and a stagger. It appeared to me that he was trying to maintain his balance." (Doc. 88-1

6   at 118.) Regarding what Jason was doing with the pool cues as he walked, Rogers did not

7   remember Jason having anything in his hands. (Doc. 102-2 at 24.) In her subsequent

8   affidavit, she stated that she did not see Jason engage in any movements that would be

9   described as ninja-like or martial arts moves. (Doc. 88-1 at 118.)

10          The Court construes the disputed facts and reasonable inferences in the light most

11   favorable to Plaintiff, the non-moving party. Here, Rogers' statements are somewhat

12   inconsistent. At the time of the event, she states that Jason's speed was a regular pace yet

13   18 months later she states that he was swaying and staggering as he advanced on the officers.

14   Given that she didn't have her glasses and acknowledging that her clarity was fuzzy, the

15   alleged staggering is clearly contradicted by the overall record. See Scott, 550 U.S. at 380

16   (stating that the court on summary judgment should not adopt a disputed fact that is clearly

17   contradicted by the record). Rogers' statement that she did not remember Jason having

18   anything in his hands is also clearly contradicted by the record; the record establishes that

19   Jason had two halves of a pool cue in both hands when he emerged out of the house.

20   Whether Jason was or was not performing practice ninja or martial arts moves with the cues

21   as he advanced on the officers is not necessarily a material fact and need not be resolved.

**STANDARD OF REVIEW**

23          *Qualified Immunity*

24          A defendant in a § 1983 action is entitled to qualified immunity from damages for

25   civil liability if his or her conduct does not violate clearly established statutory or

26   constitutional rights of which a reasonable person would have known. See Harlow v.

27   Fitzgerald, 457 U.S. 800, 818 (1982). "The protection of qualified immunity applies

28   regardless of whether the government official's error is a mistake of law, a mistake of fact,

1    or a mistake based on mixed questions of law and fact." Pearson v. Callahan, 555 U.S. 223,

2    231 (2009) (further citation omitted).   Qualified immunity "gives government officials

3    breathing room to make reasonable but mistaken judgments about open legal questions," and

4    applies to "all but the plainly incompetent or those who knowingly violate the law." Ashcroft

5    v. al-Kidd, 131 S. Ct. 2074, 2085 (2011). Qualified immunity is "an immunity from suit

6    rather than a mere defense to liability," and therefore "it is effectively lost if a case is

7    erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

8          In deciding the issue of qualified immunity, a court asks whether the facts and

9    reasonable inferences, when taken in the light most favorable to the non-moving party,

10   demonstrate that the officer's conduct violated a constitutional right and "whether the right

11   was clearly established" at the time of the alleged violation. See Saucier v. Katz, 533 U.S.

12   194, 201 (2001), abrogated in part by Pearson, 555 U.S. at 236 (holding that the Saucier

13   review procedure is not an inflexible requirement in that judges should exercise their sound

14   discretion in deciding which of the two prongs of the qualified immunity analysis should be

15   addressed first). For a right to be clearly established for the purposes of qualified immunity,

16   "[t]he contours of the right must be sufficiently clear that a reasonable official would

17   understand that what he is doing violates that right." Wilson v. Layne, 526 U.S. 603, 615

18   (1999). The "clearly established" inquiry "must be undertaken in the light of the specific

19   context of the case, not as a broad general proposition." Brosseau v. Haugen, 543 U.S. 194,

20   198 (2004) (*per curiam*) (quoting Saucier, 533 U.S. at 201).

21         As with any motion for summary judgment, a moving defendant bears the burden of

22   proof on the issue of qualified immunity. See Butler v. San Diego Dist. Attorney's Office,

23   370 F.3d 956, 963 (9th Cir. 2004).

24         *Fourth Amendment–Excessive Force*

25         In resolving a claim of excessive force under the Constitution, courts review the facts

26   and reasonable inferences in the light most favorable to the party asserting the injury in order

27   to determine whether the relevant facts alleged show that the officer's conduct violated the

28   Fourth Amendment. See Scott v. Harris, 550 U.S. 372, 375, 380-81 (2007).  At the summary

1  judgment stage, whether or not an officer's actions were objectively reasonable under the

2  Fourth Amendment is a pure question of law, not a question of fact reserved for the jury. <u>Id.</u>

3  at 381 n.8.

4    A claim of excessive deadly force used in seizing a person is properly analyzed under

5  the Fourth Amendment's objective reasonableness standard. <u>See</u> <u>Scott v. Henrich</u>, 39 F.3d

6  912, 914 (9th Cir. 1994). An officer's use of deadly force is reasonable only if "the officer

7  has probable cause to believe that the suspect poses a significant threat of death or serious

8  physical injury to the officer or others." <u>Tennessee v. Garner</u>, 471 U.S. 1, 3 (1985). The

9  Court must determine whether the officer's use of force was reasonable under the totality of

10 the circumstances. <u>See</u> <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989). In deadly force cases,

11 the totality of the circumstances includes whether the officers were confronted with a serious

12 crime and whether the suspect is actively resisting arrest or attempting to evade arrest by

13 flight. <u>Id.</u>; <u>see also</u> <u>Gonzalez v. City of Anaheim</u>, 747 F.3d 789, 806 (9th Cir. 2014) (en

14 banc) (Trott, J. dissenting). This Court reviews all the circumstantial evidence that, if

15 believed, would tend to discredit the police officer's story, and considers whether such

16 evidence could convince a rational factfinder that the officer acted unreasonably. <u>See</u>

17 <u>Henrich</u>, 39 F.3d at 915.

18   "The 'reasonableness' of a particular use of force must be judged from the perspective

19 of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Graham</u>,

20 490 U.S. at 396 (further citation omitted). "The calculus of reasonableness must embody

21 allowance for the fact that police officers are often forced to make split-second

22 judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

23 amount of force that is necessary in a particular situation." <u>Id.</u> at 396-97.

24            **DISCUSSION**

25 <u>I. Defendants' Motion for Summary Judgment–Qualified Immunity</u>

26    *Qualified Immunity*

27   In <u>Pearson</u>, 555 U.S. 223, 236 (2009), the Supreme Court held that judges have

28 discretion in deciding which of the two prongs of qualified immunity analysis should be

addressed first, whether a state actor has violated the plaintiff's constitutional right, and if so, whether such right was clearly established at the time of the violation.  In the exercise of such discretion and in light of the specific factual context of this case, the Court will first consider the "clearly established" prong.  Under this prong, the Court considers relevant case law in order to determine whether the right allegedly violated, excessive force under the Fourth Amendment, it would have been clear to a "reasonable officer that his conduct was unlawful in the situation he confronted." Brosseau, 543 U.S. at 198-99.  Thus, whether Lt. Bayne's alleged excessive force against Jason was clearly established at the time of the alleged misconduct. See Pearson, 555 U.S. at 232. "The linchpin of qualified immunity is the reasonableness of the official's conduct" Rosenbaum v. Washoe Cnty., 663 F.3d 1071, 1075 (9th Cir. 2011); therefore, an official is immune from suit if he reasonably, but mistakenly, believes his conduct was lawful. Pearson, 555 U.S. at 231; Saucier, 533 U.S. at 202.

In his motion for summary judgment on qualified immunity, Lt. Bayne argues that there is no precedent, either now or as of January 2012, that clearly establishes that he should not have used deadly force against Jason in the factual circumstances he faced. (Doc. 74 at 12-13.) Lt. Bayne states that immediately prior to the deadly confrontation, Jason had within the last hour committed several violent felonies with a deadly weapon. (Id.) According to Lt. Bayne, in the final encounter with police, Jason advanced on the officers with deadly weapons visible, refusing to comply with officers' warnings to stop and drop his weapons, continuing his advance to the point where he is immediately threatening the safety of the officers.  (Id.)  Lt. Bayne further argues that under these circumstances there was no requirement that non-lethal force be exercised when deadly force is justified. (Doc. 101 at 1.)  To the extent Plaintiff argues that he made a mistake of fact as to whether or when Officer Sanborn would release the canine, Lt. Bayne argues that there was no such mistake of fact, but even if there was, it would be protected by qualified immunity. (Doc. 74 at 13.)

In support, Lt. Bayne cites a number of factually similar cases in which the courts found that the officer's use of deadly force was objectively reasonable. (Id. at 13-14 (citing

e.g., Blanford v. Sacramento Cty., 406 F.3d 1110, 1118 (9th Cir. 2005) (finding officers' use of deadly force to be objectively reasonable where suspect was wearing a ski mask, acting erratically, carrying a sword, not obeying police orders to stop and drop the sword, and "manifested a continuing intent to evade their authority by walking away); McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1246 (11th Cir. 2003) (affirming officer's use of deadly force against an aggravated battery suspect who continued to approach an officer with an ornate wooden walking stick and refused repeated commands to drop the stick); Forrett v. Richardson, 112 F.3d 416, 419-21 (9th Cir. 1997) (affirming officer's use of deadly force did not violate Fourth Amendment excessive force after suspect had committed several violent felonies involving a gun, including aggravated robbery and attempted murder against three victims and escaped before police arrived; in the subsequent chase and capture police used deadly force to subdue the suspect), overruled on other grounds, Chroma Lighting v. GTE Products Corp., 127 F.3d 1136 (9th Cir. 1997); Garcia v. United States, 826 F.2d 806, 812 (9th Cir. 1987) (holding under Arizona law that border control agent was justified in using deadly force to protect himself where suspect attacked him with a rock and stick); and James v. City of Chester, 852 F. Supp. 1288, 1294 (D.S.C. 1994) (affirming deadly force by an officer against an intoxicated person suspected of domestic violence while holding a baseball bat as there was probable cause to believe the suspect posed a significant risk of serious bodily injury to the officer; the court found that the officer was reasonable in using deadly force when the suspect approached the officer with the bat and ignored commands to stop).

In response, Plaintiff argues that Lt. Bayne was not entitled to use deadly force against Jason and therefore is not entitled to qualified immunity because the situation only called for non-lethal force which was being utilized by K-9 Officer Sanborn. (Doc. 87 at 15-16.) In support, Plaintiff cites Deorle v. Rutherford, 272 F.3d 1272 (9th Cir. 2001) and Herrera v. Las Vegas Metro. Police Dep't, 298 F. Supp.2d 1043 (D. Nev. 2004) and contends that Blanford and McCormick must be distinguished. (Doc. 87 at 15-16.)

According to Plaintiff, Deorle is factually similar and established that Lt. Bayne had

an obligation to use non-lethal force upon Jason, not deadly force.  Plaintiff argues:

> The Ninth Circuit issued its decision in <u>Deorle</u> in 2001, nearly eleven years prior to Lt. Bayne's shooting, clearly indicating that even nonlethal force may be unreasonable where an irrational individual is doing little more than walking in the direction of an officer, particularly where other officers had already established a plan to contain the individual. That is precisely the scenario here, and a reasonable officer would have known that it was beyond unreasonable to use deadly force when numerous other officers had already established and were executing a plan to contain Jason with nonlethal force.

(Doc. 87 at 15.)

Next, Plaintiff relies on <u>Herrera v. Las Vegas Metro. Police Dep't</u>, 298 F. Supp.2d 1043 (D. Nev. 2004), where police were summoned regarding an emotionally troubled suspect, who held onto a knife during the police encounter.  (<u>Id.</u>)  The police first tried non-lethal force–pepper spray and a beanbag round–before resorting to lethal force.  The <u>Herrera</u> court found that even though there was no dispute that the suspect was armed with a knife throughout the police encounter, the mere fact that a suspect possesses a weapon did not justify deadly force. <u>Id.</u> at 1050 (quotation omitted).  Continuing, the court found the suspect may have been armed and had refused commands to drop his knife but, under the totality of the circumstances, the jury could find that the decision to shoot and kill this mentally troubled young suspect was unreasonable under the circumstances.  <u>Id.</u> at 1051-52.

Regarding Lt. Bayne's authorities, Plaintiff contends that <u>McCormick</u> must be distinguished because the Eleventh Circuit granted qualified immunity to the officer's use of deadly force only after the officer, who had confronted the suspect with the stick alone, had attempted pepper spray at least twice.  Subsequently, the situation escalated.  When the suspect advanced on the officer with his stick, the officer backing up tripped over a curb and the suspect lunged at the officer with his stick prompting the officer to resort to deadly force.  (<u>Id.</u> at 16.)

According to Plaintiff, <u>Blanford</u> must be distinguished on the basis that in <u>Blanford</u> the suspect had a 2½ foot civil war calvary sword and when officers ordered him to put it down, the suspect raised his sword and growled. (<u>Id.</u>)  Here, according to Plaintiff, Jason had nothing but a pool cue, was not brandishing it and, in any event, the officers had a "good"

1   means of neutralizing Jason by the police canine which had been deployed when Lt. Bayne

2   decided to use deadly force.  (Id.)

3          The Court, in analyzing whether Lt. Bayne is entitled to qualified immunity, evaluates

4   the pertinent legal landscape as of December 2012.  At issue is Jason's right not to have

5   unconstitutional excessive force exercised against him under the relevant factual

6   circumstances.  In evaluating the legal landscape, the Supreme Court has made clear that the

7   "clearly established" inquiry is "undertaken in the light of the specific context of the case,

8   not as a broad general proposition."  Brosseau, 543 U.S. at 198; see also Boyd v. Benton

9   Cnty., 374 F.3d 773, 783 (9th Cir. 2004) ("we cannot extract from [these cases] a rule so

10  strong as to put the defendants in this case on clear notice that their actions would amount

11  to excessive force").  Thus, the legal landscape must be such that the contours of Jason's

12  right against excessive force is sufficiently clear so that it may be said that Lt. Bayne would

13  understand what he is doing violates that right.  See Wilson, 526 U.S. at 615.  In undertaking

14  this analysis, the Court will set forth the relevant factual basis, evaluate the controlling

15  authorities presented by the parties, and also consider any other pertinent controlling

16  authorities.

17         In order to establish the relevant factual context of this case, the Court considers the

18  relevant facts and reasonable inferences taken in the light most favorable to Plaintiff, the

19  non-moving party, unless such a construction is blatantly and clearly contradicted by the

20  record. See Scott, 550 U.S. at 380; see also Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014)

21  (per curiam) (stating that a judge's function at summary judgment is not to weigh the

22  evidence and determine the truth of the matter but to determine whether there is a genuine

23  issue for trial) (further quotation and citation omitted).  Regarding the clearly established

24  prong of qualified immunity, the Tolan Court further cautioned that "courts must take care

25  not to define a case's context in a manner that imports genuinely disputed factual

26  propositions."  134 S. Ct. at 1866 (further citation omitted).  The Court has already set forth

27  a more extensive recitation of the relevant facts and here summarizes the relevant undisputed

28  facts known by Lt. Bayne at the time that he exercised deadly force against Jason.

At the time of the shooting, Lt. Bayne knew that Jason was an ex-Marine with combat training, with "issues" due to his service, that Jason had been drinking alcohol that night, that his behavior was irrational (had flipped), that within the last hour had committed several violent felonies with a deadly weapon, his knife. Jason had kidnapped a taxi driver at knifepoint, had him drive wherever he directed, threatened to slit his throat, and then had the cabbie take him back to the home where he was picked up from, and that once there, he tried to rob the taxi driver before fleeing toward the house. Once inside the house, he threatened the owner, Dan, by knifepoint and the owner's girlfriend, Rachel, after seeing Jason "flipped out" with a knife, locked herself first in the bedroom and then the bathroom. She would not come out of the bathroom to help Dan, and called the police for help at 4:20 a.m. Rachel was able to escape from the house and advised Officer Carlisle about what she knows about Jason. Dan is also able to escape from the house. After interviewing the taxi driver, Lt. Bayne arrives at the scene at approximately 4:45 a.m. Lt. Bayne meets with Sgt. Moore, who is in charge of the scene. Lt. Bayne advises Sgt. Moore that since the other parties are now out of the house, he suggested slowing the situation down and calling out a SWAT team to secure Jason from the home. A staging area had been established in front of the house behind a 4-foot rock-enclosed mailbox. The staging area included three officers with their weapons behind the mailbox and a K-9 officer. While standing next to Sgt. Moore, by telephone Lt. Bayne confirms that their present location is the same address that the taxi driver picked up and returned Jason. At 4:49 a.m., before Lt. Bayne could complete the phone call, Jason unexpectedly emerges from the home at the front door and starts marching toward the officers. Lt. Bayne confirmed with K-9 Officer Sanborn that he had commands. In the final encounter with police, Jason advanced on the officers with deadly weapons visible, the two halves of a pool cue, refusing to comply with Officer Sanborn's warnings to stop and drop his weapons, continuing his advance to the point where he is immediately threatening the safety of the officers. Lt. Bayne stated that he was in self defense mode at this point, fearing for his life. At this point, all the officers are yelling at Jason to stop and drop his weapons, but Jason did not heed their warnings and continued his advance. With

1   Jason approximately 20 feet from Officer Sanborn, Sanborn released the K-9 who attacks

2   Jason.  At the same time, due to all the commotion and the darkness, without knowing that

3   the K-9 had been released, Lt. Bayne fired his weapon and killed Jason, and also struck the

4   K-9.

5           *Lt. Bayne's Qualified Immunity Authorities*

6           The Court first considers Lt. Bayne's argument that <u>Blanford</u> is factually similar and

7   is controlling Ninth Circuit authority for an officer's use of deadly force where the suspect

8   was wearing a ski mask, acting erratically, carrying a 2½ foot civil war calvary sword, not

9   obeying police orders to stop and drop the sword, and manifested a continuing intent to evade

10  their authority by walking away.  Plaintiff distinguishes <u>Blanford</u> on the basis that the suspect

11  in <u>Blanford</u> raised his sword at police and growled, whereas Jason had nothing but pool cues

12  and the officers had an effective non-lethal option with the K-9.

13          The Court finds that while pool cues may not be inherently as dangerous as the sword

14  in <u>Blanford</u> they are still lethal weapons when swung in an attack mode.  The <u>Blanford</u> facts

15  are similar in that the suspect had a dangerous weapon and refused to comply with the

16  officers commands to drop the weapon.  In <u>Blanford</u>, the officers initiated deadly force when

17  the suspect, moving away from the officers, entered a neighborhood and was trying to get

18  into a house.  The officers, fearing for the public's safety, used deadly force.  Here, Jason

19  refused to stop his advance upon the officers with his weapons and the officers used deadly

20  force when their safety was immediately threatened.  Furthermore, in this case, Jason had just

21  committed dangerous violent felonies with his knife, further alerting the officers to the

22  dangerousness of Jason's advance upon them. The Court finds that <u>Blanford</u> supports Lt.

23  Bayne's position that under these factual circumstances, deadly force was justified.  The

24  Court does not find that Lt. Bayne's lack of awareness of the K-9 being released adversely

25  impacts the qualified immunity comparison between <u>Blanford</u> and this case.  In <u>Blanford</u> and

26  in this case, the officers used deadly force.  In <u>Blanford</u>, it was to protect public safety; here,

27  it was to protect the officers closest to Jason, which was a distance of approximately 17-20

28  feet.  Thus, on the basis of <u>Blanford</u>, Lt. Bayne would not understand that exercising deadly

1    force against Jason would be violating Jason's clearly established right against excessive

2    force under the Fourth Amendment.  See Wilson, 526 U.S. at 615.

3         Next, the Court considers Lt. Bayne's argument that an Eleventh Circuit case,

4    McCormick, is factually similar and is persuasive authority for an officer's use of deadly

5    force.  In McCormick, the court affirmed an officer's use of deadly force against an

6    aggravated battery suspect who continued to approach an officer with an ornate wooden

7    walking stick and refused repeated commands to drop the stick.  Plaintiff contends that

8    McCormick must be distinguished because the Eleventh Circuit granted qualified immunity

9    to the officer's use of deadly force only after the officer, who had confronted the suspect with

10   the stick alone, had attempted pepper spray at least twice, before the situation escalated and

11   the man lunged at the officer with his stick after the officer tripped over a curb.

12        The Court agrees with Lt. Bayne that this case is factually similar and persuasive

13   authority.  The Court finds as the court did in McCormick that a stick can be used as a lethal

14   weapon justifying the use of deadly force.  Even though the suspect in McCormick was in

15   the act of lunging at the officer, the relevant similarities are controlling in that the suspects

16   in both McCormick and in this case refused the warnings to stop and drop their weapons and

17   continued to advance on the officers, justifying the use of deadly force to stop the assault.

18        The Court does not agree that McCormick must be distinguished by the divergent fact

19   that in the officer's initial contact with the suspect and his attempt to arrest the suspect, the

20   officer did use pepper spray against the suspect when he resisted arrest.  In contrast, the only

21   contact Lt. Bayne had with Jason was when Jason advanced on him and the other officers.

22   Here, as in McCormick, when the suspects advanced on the officers with their weapons, a

23   stick in McCormick and the pool cues in this case, it justified the use of deadly force because

24   the suspect posed a significant threat of death or serious physical injury to the officer or

25   others.

26        Thus, on the basis of the facts in McCormick, Lt. Bayne would not have understood

27   that exercising deadly force against Jason would be violating Jason's clearly established right

28   against excessive force under the Fourth Amendment.  See Wilson, 526 U.S. at 615.

1  The Court also finds that <u>Garcia</u> and <u>James</u> both support Lt. Bayne's argument that
2  he is entitled to qualified immunity.  In both cases, the officers justifiably used deadly force
3  when they were attacked by a stick and rock in <u>Garcia</u> and a baseball bat in <u>James</u>.  <u>See</u>
4  <u>Garcia</u>, 826 F.2d at 812; <u>James</u>, 852 F. Supp. at 1294.

5  *Plaintiff's Qualified Immunity Authorities*

6  The Court next considers Plaintiff's qualified immunity authorities.  (Doc. 87 at 15-
7  16.)  The Court finds without merit Plaintiff's argument that <u>Deorle</u> is factually similar.
8  Based on <u>Deorle</u>, Plaintiff contends that Lt. Bayne had an obligation to use non-lethal force
9  upon Jason, not deadly force.  The summary of the facts in <u>Deorle</u> shows the dissimilarity
10 between it and this case:

11  Police Officer Greg Rutherford fired a "less lethal" lead-filled "beanbag
    round" into the face of Richard Leo Deorle, an emotionally disturbed resident
12  of Butte County, California, who was walking at a "steady gait" in his
    direction. He did so although Deorle was unarmed, had not attacked or even
13  touched anyone, had generally obeyed the instructions given him by various
    police officers, and had not committed any serious offense. Rutherford did not
14  warn Deorle that he would be shot if he physically crossed an undisclosed line
    or order him to halt. Rutherford simply fired at Deorle when he arrived at a
15  spot Rutherford had predetermined.

16  <u>Deorle</u>, 272 F.3d at 1275.  In just about all of the major areas under review for factual
17  similarity, the <u>Deorle</u> facts are dissimilar: Deorle obeyed instructions, Deorle had committed
18  no serious offense, the suspect was unarmed, and the officer gave no warnings given before
19  using non-lethal force.

20  Thus, based on the factual dissimilarities of <u>Deorle</u>, Lt. Bayne would not have
21  believed that he was under an obligation to exercise non-lethal force against Jason given Lt.
22  Bayne's factual situation that Jason immediately posed a significant threat of death or serious
23  physical injury to himself and the other officers.  <u>See</u> <u>Wilson</u>, 526 U.S. at 615.

24  Finally, Plaintiff cites <u>Herrera</u> in support.  (Doc. 87 at 15-16.)  In <u>Herrera</u>, the basic
25  facts are that the police were summoned regarding an emotionally troubled suspect who held
26  onto a knife during the police encounter.  298 F. Supp.2d at 1047-48.  The police first tried
27  non-lethal force–pepper spray and beanbag rounds–before resorting to lethal force.  <u>Id.</u> The
28  officers contended and the plaintiffs disputed that the suspect advanced on the officers with

the knife.  Id.  The Nevada District Court found that though the suspect may have been armed and had refused commands to drop the knife, under the totality of the circumstances, the jury could find that the decision to shoot and kill this mentally-troubled suspect was unreasonable and in violation of the Fourth Amendment.  Id. at 1051-52.  Based on the factual disputes, the court stated that qualified immunity will depend upon the jury's resolution of the disputed facts.  Id.

Certainly, Herrera is not controlling authority.  The facts at issue were left unresolved, and thus, the legal issues–excessive force under the Fourth Amendment and qualified immunity–were also unresolved.  Although the suspect did have a knife, and non-lethal force was attempted first, the facts in Herrera do not establish that the suspect was threatening the officers or that he was involved in any previous violent felonies.

In contrast to Herrera, the only contact Lt. Bayne had with Jason was when Jason was advancing on him and the other officers with deadly weapons, there was no initial contact or an opportunity to utilize non-lethal force; Jason refused to stop and kept advancing on the officers with his weapons.  Thus, based on the factual dissimilarity of Herrera, Lt. Bayne would not have believed that he was under an obligation to use non-lethal force against Jason given Lt. Bayne's factual situation that Jason immediately posed a significant threat of death or serious physical injury to himself and the other officers.  See Wilson, 526 U.S. at 615.

*Plaintiff's Fourth Amendment Authorities*

The Court has reviewed all of Plaintiff's Fourth Amendment authorities in order to determine whether under these authorities it would have been clear to Lt. Bayne that he exercised excessive force in violation of the Fourth Amendment in the situation he confronted. See Brosseau, 543 U.S. at 198-99.  Specifically, the Court reviewed Plaintiff's cited Supreme Court authority, Graham v. Connor, 490 U.S. 386 (1989) and Scott v. Harris, 550 U.S. 372 (2007); cited Ninth Circuit authority, Glenn v. Washington Cnty., 673 F.3d 864 (9th Cir. 2011); Bryan v. MacPherson, 630 F.3d 805 (9th Cir. 2010); Espinosa v. City and Cnty. of San Francisco, 598 F.3d 528 (9th Cir. 2010); Smith v. City of Hemet, 394 F.3d 689 (9th Cir. 2005) (en banc); Drummond v. City of Anaheim, 343 F.3d 1052 (9th Cir. 2003);

Meredith v. Erath, 342 F.3d 1057 (9th Cir. 2003); Robinson v. Solano Cnty., 278 F.3d 1007 (9th Cir. 2002), and Hulstedt v. City of Scottsdale, 884 F. Supp.2d 972 (D. Ariz. 2012).  The Court also considered Plaintiff's citation of supplemental authority.  (Doc. 110.)

The Court finds that under none of these authorities Lt. Bayne would have believed that he was under an obligation to exercise non-lethal force against Jason given Lt. Bayne's factual situation that Jason immediately posed a significant threat of death or serious physical injury to himself and the other officers.

The Court has also considered the following Ninth Circuit summary of circuit authority on the use of deadly force addressed *en banc* in Smith v. City of Hemet, 394 F.3d at 704, as follows:

> In Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the Supreme Court held that a police officer may not use deadly force "unless it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Id. at 3, 105 S.Ct. 1694. Thus, where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force. See, e.g., Billington v. Smith, 292 F.3d 1177, 1185 (9th Cir. 2002) (holding that deadly force was justified where a suspect violently resisted arrest, physically attacked the officer, and grabbed the officer's gun); Reynolds v. County of San Diego, 84 F.3d 1162, 1168 (9th Cir. 1996) (holding that deadly force was reasonable where a suspect, who had been behaving erratically, swung a knife at an officer); Scott v. Henrich, 39 F.3d 912, 914–15 (9th Cir. 1994) (suggesting that the use of deadly force is objectively reasonable where a suspect points a gun at officers); Garcia v. United States, 826 F.2d 806, 812 (9th Cir. 1987) (holding that deadly force was reasonable where the plaintiff attacked a border patrol agent with a rock and stick).

Id. Under these precedents, following Tennessee v. Garner, and the Ninth Circuit authorities, Lt. Bayne would not understand that exercising deadly force against Jason would be violating Jason's clearly established right against excessive force under the Fourth Amendment.

Thus, under the "clearly established" prong of qualified immunity analysis, the controlling case law would not have put Lt. Bayne on notice that his use of deadly force against Jason under these factual circumstances would have violated Jason's clearly established right against excessive force.  Rather, clearly established law informed Lt. Bayne that his use of deadly force against Jason was not in violation of the Fourth Amendment and thus constitutionally permitted.

1  <u>II.  Defendants' Motion for Summary Judgment on Remaining Claims</u>

2      *A.  Plaintiff's Fourteenth Amendment Due Process Claims*

3      Plaintiff alleges that Lt. Bayne violated his procedural and substantive due process

4  rights under the Fourteenth Amendment to the United States Constitution.  (Doc. 1 at 21.)

5      In order to prevail on any section 1983 claim, including that of due process, Plaintiff

6  must first prove a violation of the underlying constitutional right. <u>See</u> <u>Daniels v. Williams</u>,

7  474 U.S. 327, 329 (1986).  The requirements of procedural due process apply only to

8  government deprivation of interests encompassed by the Fourteenth Amendment's protection

9  of liberty and property. <u>See</u> <u>Bd. of Regents v. Roth</u>, 408 U.S. 564, 569 (1972). A procedural

10 due process claim has two elements: "(1) a deprivation of a constitutionally protected liberty

11 or property interest, and (2) a denial of adequate procedural protections."  <u>Brewster v. Bd.</u>

12 <u>of Educ. of Lynwood Unified</u>, 149 F.3d 971, 982 (9th Cir. 1998).

13     Under these facts, procedural due process is obviously not applicable to any claimed

14 deprivation of Jason's liberty interest because, when officers are confronted with an

15 immediate situation requiring split-second decisions, there is no time to provide notice and

16 an opportunity to be heard beyond the notice given by police commands and the suspect's

17 opportunity to obey those commands. Thus, the Court finds that there was no violation of

18 procedural due process.

19     Plaintiff also asserts an independent substantive due process claim of disruption of

20 familial association based upon Lt. Bayne's shooting death of Plaintiff's son, Jason. (Doc.

21 1 at 21.)

22     Regarding substantive due process, the Ninth Circuit has recognized that "parents

23 have a Fourteenth Amendment liberty interest in the companionship and society of their

24 children" and that "[o]fficial conduct that 'shocks the conscience' in depriving parents of that

25 interest is cognizable as a violation of due process" under section 1983. <u>Wilkinson v. Torres</u>,

26 610 F.3d 546, 554 (9th Cir. 2010) (quoting <u>Porter v. Osborn</u>, 546 F.3d 1131, 1137 (9th Cir.

27 2008). "[W]here a law enforcement officer makes a snap judgment because of an escalating

28 situation, his conduct may only be found to shock the conscience if he acts with a *purpose*

1  *to harm* unrelated to legitimate law enforcement objectives." Wilkinson, 610 F.3d at 554

2  (emphasis added) (further citation omitted). "For example, a purpose to harm might be found

3  where an officer uses force to bully a suspect or 'get even.'" Id.

4        The underlying facts of this case called for fast action by the officers.  When Jason

5  unexpectedly emerged from the house, he is displaying deadly weapons, and immediately

6  starts advancing on the officers.  In a matter of seconds, Jason advanced on the officers and

7  became an immediate threat of bodily harm to them.  Such a deadly threat required Lt.

8  Bayne's decision to use deadly force to stop Jason's from exercising deadly harm against the

9  officers with his weapons.  Based on these facts, there is no evidence that Lt. Bayne was

10 acting with "a purpose to cause harm unrelated to legitimate" law enforcement objectives.

11 See Wilkinson, 610 F.3d at 554.  Therefore, there was no substantive due process violation.

12        *B. Plaintiff's Monell Claim*

13        Next, Plaintiff alleges a 42 U.S.C. § 1983 claim against Defendant City of Scottsdale

14 alleging that the City is subject to liability for its own unconstitutional policies and practices

15 and its failure to properly train or supervise its officers alleging that such a failure to train or

16 supervise by the City deprived the Plaintiff of their constitutional rights.

17        A local governmental unit may not be held responsible for the acts of its employees

18 under a *respondeat superior* theory of liability. See Bd. of County Comm'rs v. Brown, 520

19 U.S. 397, 403 (1997). Therefore, Plaintiff must go beyond the *respondeat superior* theory

20 of liability and demonstrate that the alleged constitutional deprivation was the product of a

21 policy or custom of the local governmental unit, because municipal liability must rest on the

22 actions of the municipality, and not the actions of the employees of the municipality. See

23 Brown, 520 U.S. at 403. A policy promulgated, adopted, or ratified by a local governmental

24 entity's legislative body satisfies Monell's policy requirement. See Thompson v. City of Los

25 Angeles, 885 F.2d 1439, 1443 (9th Cir. 1989), overruled on other grounds, Bull v. City &

26 County of San Francisco, 595 F.3d 964 (9th Cir. 2010) (en banc).  To demonstrate a failure

27 to train depends on three elements: (1) the training program must be inadequate in relation

28 to the tasks the particular officers must perform; (2) the city officials must have been

1    deliberately indifferent to the rights of persons with whom the local officials come into

2    contact; and (3) the inadequacy of the training must be shown to have actually caused the

3    constitutional deprivation at issue.  See Merritt v. Cnty. of Los Angeles, 875 F.2d 765, 770

4    (9th Cir. 1989) (further quotation and citation omitted). "To satisfy the statute, a

5    municipality's failure to train its employees in a relevant respect must amount to 'deliberate

6    indifference to the rights of persons with whom the [untrained employees] come into

7    contact.' [] Only then 'can such a shortcoming be properly thought of as a city 'policy or

8    custom' that is actionable under § 1983.'" Connick v. Thompson, 131 S. Ct. 1350, 1359

9    (2011) (quoting Canton, 489 U.S. at 388)). "A municipality's culpability for a deprivation

10   of rights is at its most tenuous where a claim turns on a failure to train." Connick v.

11   Thompson, 131 S. Ct. 1350, 1359 (2011).  The indifference of city officials may be shown

12   where, "in light of the duties assigned to specific . . . employees[,] the need for more or

13   different training is so obvious, and the inadequacy so likely to result in the violation of

14   constitutional rights, that the policymakers of the city can reasonably be said to have been

15   deliberately indifferent to the need." Canton, 489 U.S. at 390. "Liability for improper custom

16   may not be predicated on isolated or sporadic incidents; it must be founded upon practices

17   of sufficient duration, frequency and consistency that the conduct has become a traditional

18   method of carrying out policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996).

19         A municipality cannot be liable under § 1983 where no injury or constitutional

20   violation has occurred.  See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).  Here,

21   the Court finds that Jason was not deprived of any constitutional right, specifically his right

22   not to suffer excessive force under the Fourth Amendment; therefore all claims against the

23   City must fail as a matter of law.  See Miller v. Clark County, 340 F.3d 959, 968 n.14 (9th

24   Cir. 2003) ("Because [plaintiff's] Fourth Amendment rights were not violated, we need not

25   and do not decide whether defendant [county] could be liable for any constitutional violation

26   under Monell.").  Under Tennessee v. Garner and relevant Ninth Circuit authorities, the

27   Court has repeatedly discussed that Lt. Bayne was justified in using deadly force against

28   Jason as Jason's advance upon the officers with his deadly weapons immediately posed a

1  significant threat of death or serious physical injury to Lt. Bayne and the other officers.

2  Jason was resisting arrest and had committed serious violent felonies just minutes before

3  advancing on the officers with his deadly weapons.

4        *C. State Law Claims*

5        Defendants claim that they are entitled to summary judgment on Plaintiff's state law

6  claims (which include negligence, assault and battery, and Arizona constitutional violations)

7  on the ground that Lieutenant Bayne acted reasonably and justifiably in using deadly force

8  against Jason, citing  A.R.S. §§ 13-409[2] and 13-410[3]; see Marquez v. City of Phoenix, 693

9  F.3d 1167, 1176 (9th Cir. 2012).  (Doc. 95 at 12.)

10       The Court agrees.  Plaintiff's state law claims must fail as the Court has already found

11  that Lt. Bayne acted reasonably and justifiably in using deadly force against Jason not in

12  violation of the Fourth Amendment's prohibition against excessive force.  See Marquez, 693

13  _____

14       [2]Under A.R.S. § 13-409, a peace officer is justified in using physical force in making
   an arrest or detention when:

15       [a] reasonable person would believe that such force is immediately necessary
         to effect the arrest or detention or prevent the escape…such person makes

16       known the purpose of the arrest or detention or believes that it is otherwise
         known or cannot reasonably be made known to the person to be arrested or

17       detained…[and a] reasonable person would believe the arrest or detention to
         be lawful.

18
19  A.R.S. § 13-409.

20       [3]Under A.R.S. § 13-410, [t]he use of deadly force by a peace officer against another
   is justified pursuant to § 13-409 only when the peace officer reasonably believes that it is

21  necessary:

22       1. To defend himself or a third person from what the peace officer reasonably
         believes to be the use or imminent use of deadly physical force.

23       2. To effect an arrest or prevent the escape from custody of a person whom the
         peace officer reasonably believes:

24       (a) Has committed, attempted to commit, is committing or is attempting to

25       commit a felony involving the use or a threatened use of a deadly weapon.
         (b) Is attempting to escape by use of a deadly weapon.

26       (c) Through past or present conduct of the person which is known by the
         peace officer that the person is likely to endanger human life or inflict serious

27       bodily injury to another unless apprehended without delay.

28  A.R.S. § 13-410.

1  F.3d at 1176 (stating that because we conclude that the officers acted reasonably in using

2  force, this claim cannot succeed under Arizona law).

3  **CONCLUSION**

4  On the basis of the foregoing,

5  **IT IS HEREBY ORDERED** granting Defendants' motion for summary judgment

6  on Count 2, Qualified Immunity.  (Doc. 74.)

7  **IT IS FURTHER ORDERED** granting Defendants' Motion for Summary Judgment

8  on Remaining Claims.  (Doc. 95.)  The Clerk shall enter judgment in favor of Defendants and

9  dismiss this action.

10  DATED this 30th day of September, 2014.

11

12

13  Stephen M. McNamee
   Senior United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28